IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GTECH CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SCIENTIFIC GAMES INTERNATIONAL, INC., SCIENTIFIC GAMES HOLDINGS CORPORATION, SCIENTIFIC GAMES FINANCE CORPORATION, and SCIENTIFIC GAMES CORPORATION,<br><br>Defendants. | Civil Action No. 04-138-JJF |

**PLAINTIFF GTECH CORPORATION'S NOTICE OF DEPOSITION OF DEFENDANTS SCIENTIFIC GAMES INTERNATIONAL, INC., SCIENTIFIC GAMES HOLDINGS CORPORATION, SCIENTIFIC GAMES FINANCE CORPORATION AND SCIENTIFIC GAMES CORPORATION PURSUANT TO FED. R. CIV. P. 30(b)(6)**

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiff, GTECH Corporation ("GTECH"), through its attorneys, will take the deposition upon oral examination of Defendants, Scientific Games International, Inc., Scientific Games Holdings Corporation, Scientific Games Finance Corporation, and Scientific Games Corporation (collectively "Scientific Games") commencing at 9:00 a.m. on April 8, 2005, and continuing from day to day thereafter until completed, at the law offices of KENYON & KENYON, One Broadway, New York, New York, 10004, or at any other time and place as may be mutually agreed to by counsel for the parties. Scientific Games shall designate one or more of its officers, directors, managing agents, or other persons who consent to testify on its behalf, and shall set forth for each person the matters on which they are to testify. The topics for examination listed are in the attached Schedule A.

The deposition will be taken before a notary public or other officer duly authorized to administer oaths and take testimony, and will be recorded by stenographic means, and/or audiotape(s) and/or videotape.

You are invited to attend.

Dated: March 29, 2005

By _____
Josy W. Ingersoll (#1088)
Karen E. Keller (#4489)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: 302-571-6600
Facsimile: 302-571-1253

OF COUNSEL:

Thomas J. Meloro
Larissa A. Soccoli
Andrew L. Reibman
KENYON & KENYON
One Broadway
New York, New York 10004
Telephone: (212) 425-7200
Facsimile: (212) 425-5288

## SCHEDULE A

The instructions and definitions set forth in *Plaintiff GTECH Corporation's First Set of Requests for the Production of Documents and Things* are incorporated by reference herein and shall apply to this Notice of Deposition.

1. Conception, research, design, engineering, development, testing, manufacture, and/or operation of TVMs made, used, sold, or offered for sale by Scientific Games.

2. Conception, research, design, engineering, development, testing, manufacture, and/or operation of Scientific Games' PlayCentral Kiosk.

3. Conception, design, development, operation, manufacture, and/or testing of the ticket dispensing apparatus or "burster" used in Scientific Games' PlayCentral Kiosk.

4. Conception, design, development, testing, and operation of the customer interface for the Scientific Games' PlayCentral Kiosk, including the design, development, testing, and operation of any touch screen user interface screens.

5. Conception, design, source code, development, testing, and operation of any programs, code, software, or firmware which are part of or run on Scientific Games' PlayCentral Kiosk.

6. Conception, design, coding, documentation, development, testing, and operation of any programs, code, software, or firmware which are part of or run on Scientific Games' PlayCentral Kiosk and which are used to control or operate the ticket dispensing apparatus or "burster."

7. Conception, design, coding, documentation, development, testing, and operation of any programs, code, software which are part of or run on Scientific Games' PlayCentral Kiosk and which are used to control or operate the touch screen user interface.

8. Conception, design, coding, documentation, development, testing, and operation of any procedures, programs, code, or software which are used to load or download graphical information, graphics files, and/or graphical display information on or to Scientific Games' PlayCentral Kiosk.

9. The format, creation, layout, and/or design of graphical information, graphics files, and/or graphical display information for use on the Scientific Games' PlayCentral Kiosk, and any procedures and processes used to create such information or files.

10. Trials, pilots, and/or tests of PlayCentral Kiosk by any state lottery, foreign lottery, or other Scientific Games customer, including field test results, maintenance, or defect correction issues.

11. Trial, pilot, test deployment, and/or field testing of the PlayCentral Kiosk by, with, or for the Pennsylvania Lottery Corporation, including field test results, maintenance, or defect correction issues.

12. Trial, pilot, test deployment, and/or field testing of the PlayCentral Kiosk by, with, or for the Georgia Lottery Corporation, including field test results, maintenance, or defect correction issues.

13. Trial, pilot, test deployment, and/or field testing of the PlayCentral Kiosk by, with, or for the Colorado Lottery, including field test results, maintenance, or defect correction issues.

14. Trial, pilot, test deployment, and/or field testing of the PlayCentral Kiosk by, with, or for the Tennessee Education Lottery, including field test results, maintenance, or defect correction issues.

15. Bids, Proposals, Responses to Request for Proposals, and/or other offers by Scientific Games to any state or foreign lottery which included, featured, or offered TVMs.

16. Communications between Scientific Games and any state lottery, foreign lottery, or other Scientific Games' customer concerning TVMs.

17. Communications between Scientific Games and any state lottery, foreign lottery, or other Scientific Games' customer concerning PlayCentral Kiosk.

18. Bids, Proposals, Responses to Request for Proposals, and/or other offers by Scientific Games to any state or foreign lottery which included, featured, or offered Scientific Games' PlayCentral Kiosk.

19. Negotiations, contracts and/or agreements between Scientific Games and any state lottery, foreign lottery, or other Scientific Games customer for the purchase, sale, lease, delivery, use, or deployment of TVMs.

20. Negotiations, contracts and/or agreements between Scientific Games and any state lottery, foreign lottery, or other Scientific Games customer for the purchase, sale, lease, delivery, use, or deployment of Scientific Games' PlayCentral Kiosk.

21. Negotiations, contracts and/or agreements between Scientific Games and any state lottery, foreign lottery, or other Scientific Games customer, where the contracts or other agreements permit or include as an option the sale, lease, purchase, use, or deployment of Scientific Games' PlayCentral Kiosk.

22. Negotiations, contracts and/or agreements between Scientific Games and the Colorado Lottery that concern TVMs.

23. Negotiations, contracts and/or agreements between Scientific Games and the Colorado Lottery that concern Scientific Games' PlayCentral Kiosk.

24. Negotiations, contracts and/or agreements between Scientific Games and the Georgia Lottery Corporation that concern TVMs.

25. Negotiations, contracts and/or agreements between Scientific Games and the Georgia Lottery Corporation that concern Scientific Games' PlayCentral Kiosk.

26. Negotiations, contracts and/or agreements between Scientific Games and Pennsylvania Lottery Corporation that concern TVMs.

27. Negotiations, contracts and/or agreements between Scientific Games and Pennsylvania Lottery Corporation that concern Scientific Games' PlayCentral Kiosk.

28. Negotiations, contracts and/or agreements between Scientific Games and Tennessee Education Lottery Corporation that concern TVMs.

29. Negotiations, contracts and/or agreements between Scientific Games and Tennessee Education Lottery Corporation that concern Scientific Games' PlayCentral Kiosk.

30. Delivery to, deployment by, or use of PlayCentral Kiosk by any state lottery, foreign lottery, or other Scientific Games customer, including dates and numbers of machines actually deployed and/or delivered, and dates and numbers of machines planned, committed, and/or contracted for delivery.

31. Scientific Games' revenue, costs, expenses, and profits or losses (gross and net), including forecasted and actual revenue, costs, expenses, and profits and losses generated by Scientific Games' PlayCentral Kiosk; and how such revenue, costs, expenses, and profits or losses are accounted for and reported, including but not limited to Scientific Games' sales, accounting, and financial systems.

32. Scientific Games' revenue, costs, expenses, and profits or losses (gross and net), including forecasted and actual revenue, costs, expenses, and profits and losses generated by Scientific Games' TVMs; and how such revenue, costs, expenses, and profits or losses are accounted for and reported, including but not limited to Scientific Games' sales, accounting, and financial systems.

33. Marketing, promotion, advertising, and offering for sale of TVMs by Scientific Games.

34. Marketing, promotion, advertising, and offering for sale of Scientific Games' PlayCentral Kiosk.

35. The market(s) for instant ticket vending or dispensing machines, the market(s) for products covered by the Patents-in-Suit, and the market(s) for Scientific Games' PlayCentral Kiosk, and any market research, studies, or analyses, competitive analysis, sales forecasts, strategic or business plans concerning those markets.

36. Competitors and/or competition in the market place for TVMs sold or offered for sale by Scientific Games, including but not limited to: (a) the identity of each actual and forecasted competitor in the market place; (b) and the market share of each competitor, (c) the market share of Scientific Games in relation to each of its competitors; (d) documents concerning competition between Scientific Games and GTECH or any third party in the market place for TVMs; and (e) any studies, analyses or evaluations made by or on behalf of Scientific Games regarding its market share of the TVM market.

37. Competitors and/or competition in the market place for the PlayCentral Kiosk sold or offered for sale by Scientific Games, including but not limited to: (a) the identity of each actual and forecasted competitor in the market place; (b) and the market share of each competitor, (c) the market share of Scientific Games in relation to each of its competitors; (d) documents concerning competition between Scientific Games and GTECH or any third party in the market place for PlayCentral Kiosk; and (e) any studies, analyses or evaluations made by or on behalf of Scientific Games regarding its market share in the market for PlayCentral Kiosk.

38. Any products which Scientific Games believes or alleges are acceptable, non-infringing substitutes or alternatives to the inventions claimed in the patents-in-suit, including: (a) all reasons why such products would be acceptable to the customers who use Scientific Games' TVMs and/or PlayCentral Kiosks; (b) all reasons why such products would be available to Scientific Games; (c) all reasons why such products would not be infringing the patents-in-suit; (d) all attempts by

Scientific Games to implement such a system; and (e) any successes and failures in implementing such a system.

39. Scientific Games' pricing, costs, expenses, revenues, and profits attributable to the sale, lease, deployment, delivery, or operation of TVMs, and the basis and method for determining such pricing, costs, expenses, revenues, and profits

40. Scientific Games' pricing, costs, expenses, revenues, and profits attributable to the sale, lease, deployment, delivery, or operation, or maintenance of Scientific Games' PlayCentral Kiosk, the basis and method for determining such pricing, costs, expenses, revenues, and profits.

41. Any comparisons between any of Scientific Games' TVMs and GTECH's or Interlott's TVMs.

42. The values of Scientific Games' TVMs and/or PlayCentral Kiosk to Scientific Games, investors in Scientific Games, or any other third party, including: (any opinions and/or analyses ascribing overall value or worth to Scientific Games' TVMs and/or PlayCentral Kiosks; (b) the methods used in such valuations, studies and analyses; (c) the benefits provided to Scientific Games because of the operation and use of such TVMS and/or PlayCentral Kiosk; (d) the increase in customer value attributable from the operation and use of such TVMs and/or PlayCentral Kiosks; (e) any impact on Scientific Games' business as a result of the operation and use of such TVMs and/or PlayCentral Kiosks; and (f) any impact on any competitor's business, including GTECH, as a result of the operation and use of such TVMS and PlayCentral Kiosks.

43. The reasons for launching each version of Scientific Games' PlayCentral Kiosk, including any business plans, revenue forecasts, projections, reports, proposals, studies, market research, or business models performed by or on behalf of Scientific Games or any third party.

44. The licenses or agreements entered into by Scientific Games, including (a) the terms of such licenses or agreements; (b) the purposes for entering into such licenses or agreements; (c) Scientific Games' licensing policies, whether formal or informal, relating to such licenses or agreements; and (d) all documents relating to licenses pursuant to which Scientific Games pays or received royalties.

45. The licenses or agreements entered into by Scientific Games concerning TVMs, including (a) the terms of such licenses or agreements; (b) the purposes for entering into such licenses or agreements; (c) Scientific Games' licensing policies, whether formal or informal, relating to such licenses or agreements; and (d) all documents relating to licenses pursuant to which Scientific Games pays or received royalties.

46. The licenses or agreements entered into by Scientific Games concerning PlayCentral Kiosk including (a) the terms of such licenses or agreements; (b) the purposes for entering into such licenses or agreements; (c) Scientific Games' licensing policies, whether formal or informal, relating to such licenses or agreements; and (d) all documents relating to licenses pursuant to which Scientific Games pays or received royalties.

47. Agreements to indemnify, hold harmless or defend against infringement of the patents-in-suit, and the terms of such agreements.

48. Scientific Games' first knowledge or awareness of: (i) the application that resulted in the '337 patent; (ii) the '337 patent; (iii) the application that resulted in the '624 patent; and/or (iv) the '624 patent, and the circumstances concerning such awareness, including the identification of the name and address of the individual(s) who first became aware, the date such individual(s) first became aware, any actions taken following such awareness and the identification (including by production number) of all documents referring or relating to any of the foregoing.

49. All communications made to or by Scientific Games that refer or relate to Scientific Games' awareness of: (i) the application that resulted in the '337 patent; (ii) the '337 patent; (iii) the application that resulted in the '624 patent; and/or (iv) the '624 patent.

50. All opinions and draft opinions of counsel, both written and oral, communicated to Scientific Games relating to the infringement or non-infringement, validity or invalidity, or enforceability or unenforceability of any claim of the patents-in-suit, including the identification of all authors and recipients thereof, the identification of all individuals who provided information in connection with the preparation of such opinions, and any reliance or lack of reliance thereof by Scientific Games on such opinions.

51. All communications made to or by Scientific Games concerning any opinions or draft opinions of counsel, both written and oral, communicated to Scientific Games that refer or relate to the infringement or non-infringement, validity or invalidity, or enforceability or unenforceability of any claim of the patents-in-suit,

including but not limited to communications made prior to the dates such opinions and draft opinions were made in connection with the preparation of such opinions and draft opinions, communications made with such opinions and draft opinions, and communications made subsequent to the dates such opinions and draft opinions were provided to Scientific Games.

52. All work and other activities engaged in by Scientific games in response to Scientific Games' awareness of: (i) the application that resulted in the '337 patent; (ii) the '337 patent; (iii) the application that resulted in the '624 patent; and/or (iv) the '624 patent, including but not limited to any attempt by Scientific Games to determine whether any of Scientific Games' products or services infringed any claim of the patents-in-suit.

53. Any attempt by Scientific Games to design around either of the Patents-in-Suit.

54. Any comparisons of Scientific Games' PlayCentral Kiosk with TVMs made, sold, or offered for sale by GTECH and/or Interlott.

55. Communication to or from Scientific Games personnel regarding this lawsuit and/or the Patents-in-Suit, including any communications from or to customers by Scientific Games personnel involved in sales, marketing, public relations, or government relations.

56. Communications between Scientific Games and On-Point Technologies concerning TVMs.

57. Communications between Scientific Games and Interlott concerning TVMs.

58. The conception, design, development, manufacture, operation, sale, offer for sale, and use of the "Player Activated Terminal" identified in Scientific

Games' Response to GTECH's Interrogatory No. 7, which Scientific Games alleges was "offered for sale and sold more than one year before the application for the '624 patent was filed," and any other substantially similar terminal.

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> Wilmington, DE  19801

I further certify that on March 29, 2005, I caused a copy of the foregoing document to be served by hand-delivery on the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> Wilmington, DE  19801

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
kkeller@ycst.com

*Attorneys for GTECH Corporation*