# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

GTECH CORPORATION,

Plaintiffs,

v.

SCIENTIFIC GAMES INTERNATIONAL, INC., SCIENTIFIC GAMES HOLDINGS CORPORATION, SCIENTIFIC GAMES FINANCE CORPORATION, and SCIENTIFIC GAMES CORPORATION,

Defendants.

Civil Action No. 04-138-JJF

**PLAINTIFF GTECH CORPORATION'S SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES (NO. 1)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff, GTECH Corporation ("GTECH"), hereby serves the following supplemental objections and responses to Interrogatory No. 1 of Defendants, Scientific Games International, Inc., Scientific Games Holdings Corporation, Scientific Games Finance Corporation, and Scientific Games Corporation (collectively, "Defendants").

## GENERAL OBJECTIONS

GTECH incorporates by reference the General Objections set forth in its *Response to Defendants' First Set of Interrogatories* dated August 18, 2004.

## SUPPLEMENTAL RESPONSES

**Interrogatory No. 1**

With respect to your allegation that Scientific Games is infringing the Patents-In-Suit "under 35 U.S.C. 271(a), (b) and/or (c) by making, using, offering for sale, selling and/or importing into the Untied States products … and/or by contributing to or inducing such infringement by others," identify each claim of the Patents-in-Suit that you contend is infringed and for each asserted claim, identify each allegedly infringing product and describe in detail the basis for your allegation of infringement (including whether literal or under the doctrine of equivalents), state each fact supporting that allegation, identify each person with knowledge relating to that fact and each document relating to that fact, and provide claim charts setting forth how each limitation of each asserted claim of the Patents-in-Suit is met by each allegedly infringing product.

**Supplemental Response No. 1**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, GTECH specifically objects to the term "each asserted claim" as being vague since discovery has not yet been completed and all the claims to be asserted in this Action cannot yet be known. GTECH further objects because details of claims of infringement are more appropriately addressed in expert discovery, for which the Court has set a schedule. In addition, GTECH specifically objects to this interrogatory because it is a compound interrogatory which asks discrete questions that should have been asked, and should be counted, as separate interrogatories.

Subject to the General Objections and the foregoing specific objections, GTECH contends that Defendants' PlayCentral Kiosk directly infringes claim 18 of U.S. Patent No. 5,222,624 (the "'624 Patent"), and claims 20, 21, 22, 24, and 28 of U.S. Patent No. 4,982,337 (the "'337 Patent"), literally and/or under the doctrine of equivalents.

With respect to the '624 patent, GTECH believes that infringement can be determined from a visual inspection of machines as they are presently installed, as well as from publicly available Scientific Games machine specifications and marketing material, e.g., "Scientific Games International PlayCentral™ Lottery Ticket Kiosk" ("R1"), Scientific Games International's "Proposal to Tennessee Lottery" ("R2"), Scientific Games International's 2004 Advertisement from LAFLEURS ("R3") and the September 2003 issue of *SGI Today* ("R4"), as well as additional documents and testimony including but not limited to those cited below.

| '624 LANGUAGE | INFRINGING ELEMENT | EVIDENTIARY SUPPORT |
|---|---|---|
| 18. A lottery ticket vending machine comprising, in combination, | The Play Central Kiosk is a lottery ticket vending machine. | |
| a housing, | The PlayCentral Kiosk includes a cabinet. This cabinet is a housing. | *See, e.g.*, R1;<br><br>Behm Ex. 20, SGI108355-410, at, e.g., 108375 (GA Functional Spec);<br><br>Behm Ex. 15, SGI23092-109, at, e.g., 23094 (4/16/03 submission to CO lottery);<br><br>CO Functional Spec Version 1.4, SGI036474-610, at, e.g., 36498;<br><br>Behm Ex. 12, SGI-E107970-11 (CAD drawing of cabinet) and related testimony from 5/27/05 deposition at, e.g., 118-127;<br><br>Behm Ex. 18, GTECH39791 (photograph of the PlayCentral). |

| | | |
|---|---|---|
| display means for displaying an array of lottery ticket representations viewable from outside of said housing by a customer, said array representing tickets in said machine available for purchase, | This element is not subject to interpretation under 35 U.S.C. §112, ¶6, because the claim recites sufficient structure, i.e. a video display with a video screen, to perform the recited function.<br><br>The PlayCentral includes a video touch screen. One of the screens displayed on the video touch screen is a "game selection screen" (or "selection screen"). The selection screen includes rows of graphic images representing instant lottery tickets available for purchase from the PlayCentral. These graphic images are variously referred to as, e.g., "icons", "logos", "attract mode graphics", "games", "tickets" and "ticket images" in Scientific Games' own documents. These graphic images are viewable from outside of the housing by a customer. These graphic images are created from the computer art files which are used to print the instant tickets dispensed by the PlayCentral, and incorporate text and graphic elements from the instant tickets.<br><br>Even if this element were interpreted under 35 U.S.C. §112, ¶6, the PlayCentral selection screen is the same as or equivalent to the video display disclosed in the '624 patent. | *See, e.g.,* R2 & R4;<br><br>Behm Ex. 17, SGI081151-84, at, e.g., 81173 (PlayCentral spec.) and related testimony from 5/27/05 deposition at, e.g., 141-3;<br><br>Behm Ex. 19, GTECH39790 (photo of PlayCentral screen) and related testimony from 5/27/05 deposition at, e.g., 146-8;<br><br>Behm Ex. 15, SGI23092-109, at, e.g., 23096-9 (4/16/03 submission to CO lottery) and related testimony from 5/27/05 deposition at, e.g., 134-6;<br><br>Behm Ex. 20, SGI108355-410 (GA Functional Spec.);<br><br>Behm Ex. 13, SGI085114-32 (AEGIS Multi-States Release 1.0) and related testimony from 5/27/05 deposition at, e.g., 128-9;<br><br>SGI067586-67595, 67576-67585, 65666-65675, E-108489-00-001 -- 0011, and the related 30b(6) testimony of James Farrell;<br><br>GA STVM proposal, SGI029720-35, at, e.g., 29724 (selection screen);<br><br>PA 6/9/03 ITVM proposal, SGI04415-77 at, e.g., 4465;<br><br>TN functional spec., 44395-44516 at, e.g., SGI044445, 44447. |

| | | |
|---|---|---|
| | | SGI-E108490-0001 -- 0108, and SGI-E-1008494-0001 -- 0096, SGI-E-108495-0001 -- 0100. and SGI-E-1088493 -- 0001 - 0100 and related 30b(6) testimony of James Farrell;<br><br>CO Functional Spec Version 1.4, SGI036474-610 at, e.g., 19390, 19396. |
| acceptor means for receiving and accepting a means of monetary exchange, and | The PlayCentral includes a bill acceptor for receiving and accepting cash payments by a customer. | *See, e.g.*, R2;<br><br>Behm Ex. 12, SGI-E107970-11 (CAD drawing of cabinet) and Behm testimony from 5/27/05 deposition at, e.g., 120. |

| | | |
|---|---|---|
| means for dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer, | The dispensing means disclosed in the '624 patent includes a receptacle and an opening in the housing. The tickets are dispensed through the opening into the receptacle. The number of tickets which are dispensed may be indicated by use of a keypad, up to the amount of credit a player has in the machine.<br><br>The PlayCentral Kiosk includes a dispensing chute and receptacle for dispensing tickets to customers.<br><br>The PlayCentral also includes a "ticket purchase screen" which is displayed on the touch screen after one of the ticket representations on the "game selection screen" is pressed. The "ticket purchase screen" allows a customer to select a quantity of tickets to purchase, up to a number of tickets corresponding to the amount of money the customer has input into the machine.<br><br>The PlayCentral Kiosk then dispenses the appropriate number of purchased tickets by dropping them through the dispensing chute into the receptacle.<br><br>The PlayCentral dispensing chute and receptacle are the same as or equivalent to the opening and receptacle disclosed in the '624 patent. | *See, e.g.*, R1 & R2;<br><br>Behm testimony from 5/27/05 deposition at, e.g., 138-139;<br><br>Behm Ex. 12, SGI-E107970-11 (CAD drawing of cabinet);<br><br>CO Functional Spec Version 1.4, SGI036474-610;<br><br>Behm Ex. 17, SGI081151-84, at 81173 and Behm testimony from 5/27/05 deposition at, e.g., 142-3;<br><br>TN PlayCentral proposal, SGI025641-25671 at, e.g., 25647<br><br>TN functional spec., 44395-44516 at, e.g., 44446;<br><br>Johnson testimony from 5/10/05 deposition at, e.g., 31-34, 51;<br><br>Johnson Ex. 9, SGI086210 (PA Game Purchase Screen). |

| | | |
|---|---|---|
| in which said display means comprises video display means for displaying a plurality of arrays of ticket images on a video screen. | This element is not subject to interpretation under 35 U.S.C. §112, ¶6, because the claim recites sufficient structure, i.e. a video display with a video screen, to perform the recited function.<br><br>The PlayCentral includes a video touch screen. The graphic images displayed on the "game selection screen" are ticket images which are displayed on the screen in multiple rows. The ticket images are created, transferred to the PlayCentral, and stored on the PlayCentral as so-called ".bmp" files, which are a common type of image file format.<br><br>Even if this element were interpreted under 35 U.S.C. §112, ¶6, the PlayCentral game selection screen is the same as or equivalent to the video display disclosed in the '624 patent. | *See, e.g.,* R2 & R3;<br><br>*See also* above display means element. |

With respect to the '337 Patent, GTECH states that these claims are grounded on information and belief that literature for the Defendants' machines, such as the PlayCentral Kiosk, is marked with the U.S. Patent No. 5,950,898. The PlayCentral Kiosk is believed to operate as disclosed in U.S. Patents No. 5,950,898, 6,669,071, and 6,609,644 (collectively "R5"). In addition, GTECH states that these claims are also grounded on the references cited above for the '624 Patent as well as additional documents and testimony including but not limited to those cited below.

| '337 LANGUAGE | INFRINGING ELEMENT | EVIDENTIARY SUPPORT |
|---|---|---|
| 20. A ticket dispensing machine for dispensing tickets directly to the purchaser thereof, said dispenser comprising the combination of | The PlayCentral is a ticket dispensing machine which dispenses instant lottery tickets directly to a ticket purchaser. | |
| housing means for storing a strip of tickets to be dispensed, | This element is not subject to interpretation under 35 U.S.C. §112, ¶6, because the claim recites sufficient structure, i.e. a "housing", to perform the recited function.<br><br>In the '337 patent, the means disclosed in the specification for storing a strip of tickets includes a housing. *See, e.g.*, col. 7, lines 5-6 ("Unit 14 includes a housing ... ."); Fig. 3. The tickets are located in the housing.<br><br>The PlayCentral includes a cabinet. The PlayCentral cabinet is a housing which stores strips of instant tickets to be dispensed.<br><br>Even if this element were interpreted under 35 U.S.C. §112, ¶6, the PlayCentral cabinet is the same as or equivalent to the housing disclosed in the '337 patent. | *See, e.g.*, R1;<br><br>Behm Ex. 20, SGI108355-410 (GA Functional Spec.);<br><br>Behm Ex. 15, SGI23092-109 (4/16/03 submission to CO lottery);<br><br>CO Functional Spec Version 1.4, SGI036474-610;<br><br>Behm Ex. 12, SGI-E107970-11 (CAD drawing of cabinet);<br><br>Behm Ex. 18, GTECH39791 (photograph of the PlayCentral);<br><br>TN PlayCentral proposal, SGI025641-25671. |
| said housing means having an outlet opening accessible to the purchaser of tickets from said machine, | The PlayCentral cabinet includes an outlet opening from which tickets can be removed by a purchaser. | *See, e.g.*, R2;<br><br>Behm Ex. 12, SGI-E107970-11 (CAD drawing of cabinet);<br><br>Behm testimony from 5/27/05 deposition at, e.g., 122;<br><br>Illinois proposal, 1/28/04, |

| | | |
|---|---|---|
| | | SGI011763- 11835. |
| means operable for ordering a plurality of tickets in a single batch, | In the '337 patent, the means disclosed for ordering a plurality of tickets in a single batch includes a keypad.<br><br>The PlayCentral includes a "Ticket Purchase Screen" which enables a customer to order multiple tickets of the same type in a single batch. A person of ordinary skill in the art would have understood the touch screen used in the PlayCentral for ordering a plurality of tickets in a single batch to be equivalent to the keypad shown in the '337 patent. | *See, e.g.*, R4;<br><br>Behm Ex. 17, SGI081151-84, at, e.g., 81173 and Behm testimony from 5/27/05 deposition at, e.g., 142-3;<br><br>TN PlayCentral proposal, SGI025641-25671 at, e.g., 25647<br><br>TN functional spec., 44395-44516 at, e.g., 44446;<br><br>Johnson testimony from 5/10/05 deposition at, e.g., 31-34, 51;<br><br>Johnson Ex. 9, SGI086210 (PA Game Purchase Screen). |
| means for separating each of said tickets from said strip, dispensing means for dispensing tickets through said outlet opening, and | In the '337 patent, the means disclosed for separating each of said tickets from said strip includes a burster wheel. The ticket strip is held, and a drive mechanism creates relative motion between the ticket strip and the burster wheel.<br><br>The PlayCentral includes a burster mechanism for separating individual tickets from the strips of tickets stored within the cabinet. The burster mechanism includes a dull, v-shaped separator member. In the PlayCentral, the ticket strip is held, and a drive mechanism creates relative motion between the ticket strip and burster.<br><br>A person of ordinary skill in | *See, e.g.*, R2 & R5;<br><br>Behm testimony from 5/27/05 deposition at, e.g., 107, 121;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 11, SGI084606-14 (burster hardware & firmware interface spec.);<br><br>TN PlayCentral proposal, SGI025641-25671 at, e.g., 25653;<br><br>Behm Ex. 9, SGI108488 (sample burster) and related testimony from 5/27/05 deposition;<br><br>Defendants' Ex. 19 and |

| | | |
|---|---|---|
| | the art would have understood the burster mechanism in the PlayCentral to be equivalent to the burster disclosed in the '337 patent. In both mechanisms, the separator member bursts the strip in one locale at the perforation and then sequentially bursts along the perforation as the relative motion continues through the bursting operation.<br>The PlayCentral dispenses tickets through an outlet accessible to a customer. | related Behm testimony from 5/27/05 deposition at, e.g., 104-108. |
| control means for causing each ticket in said batch to be separated and dispensed separately from the other tickets in said batch regardless of the number of tickets in said batch. | The means disclosed in the '337 patent for performing the recited function includes a processor.<br><br>The PlayCentral includes a processor which controls its operation. In response to a request to purchase a batch of tickets received from the PlayCentral purchase screen, the processor issues a series of instructions to the burster mechanism to separate each ticket in the batch. Each ticket, after being separated, is dispensed via an outlet accessible to the customer.<br>The PlayCentral control means is a processor, which is the same or equivalent structure to that disclosed in the '337 patent for performing the recited function. | *See, e.g.,* R2 & R5;<br><br>CO Functional Spec Version 1.4, SGI036474-610 at, e.g., SGI036505-6;<br><br>Johnson testimony from 5/10/05 deposition at, e.g., 64;<br><br>Behm Ex. 20, SGI108355-410, at, e.g., 108375 (GA Functional Spec) at, e.g., 108382-3;<br><br>TN functional spec., 44395-44516 at, e.g., 44421-2. |

| | | |
|---|---|---|
| 21. A machine as in claim 20 in which said tickets are instant-winner lottery tickets. | The PlayCentral dispenses instant-winner lottery tickets. | *See, e.g.,* R1 & R2; |

| | | |
|---|---|---|
| 22. Apparatus for dispensing tickets from a strip of tickets delineated from one another by lines along which the material of said strip is weakened, said apparatus comprising, in combination, | The PlayCentral dispenses instant lottery tickets delineated from each other by perforations. | |
| means for moving said strip towards a dispensing position, | The means disclosed in the '337 patent for moving the strip of tickets towards a dispensing position includes a motor which rotates a roller in a set of rollers, with the ticket strip between the rollers, such that movement of the motor causes movement of the rollers and ticket strip.<br><br>The PlayCentral includes a motor which rotates a roller in a set of rollers, with the ticket strip between the rollers, such that movement of the motor causes movement of the rollers and ticket strip. To burst a ticket, the motor causes movement of the rollers which advances the ticket strip towards a dispensing position.<br><br>The PlayCentral means for performing the recited function is the same or equivalent to the means disclosed in the '337 patent for performing this function. | *See, e.g.*, Behm testimony from 5/27/05 deposition at, e.g., 109;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 9, SGI108488 (sample burster) and related testimony from 5/27/05 deposition. |
| a separation member, | The PlayCentral's burster mechanism includes a dull, V-shaped separation member. | *See, e.g.*, Defendants' Ex. 19 and related Behm testimony from 5/27/05 deposition at, e.g., 104-108.<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and |

| | | |
|---|---|---|
| | | related testimony from 5/27/05 deposition;<br><br>Behm Ex. 9, SGI108488 (sample burster) and related testimony from 5/27/05 deposition. |
| means for holding said strip adjacent one line along which said strip is to be separated, and causing said strip to bend along said one line at said dispensing position to facilitate tearing of said strip by engagement with said separator member along said one line while said strip is bend, | The means disclosed in the '337 patent for holding the strip includes a set of rollers. As the tickets are held, a motor causes relative motion between the ticket strip and the separation member, causing the strip to bend along the line to facilitate tearing of the strip.<br><br>The PlayCentral's burster mechanism has a movable "gate" and a roller that hold the ticket strip adjacent one line along which the strip is to be separated. As the tickets are held, a motor causes relative motion between the ticket strip and the separation member, causing the strip to bend along the line to facilitate the tearing of the strip of tickets by engagement with the separation member while the strip is bent.<br><br>The means in the PlayCentral for performing the recited function is the same as or equivalent to the means disclosed in the '337 patent. | *See, e.g.*, CO Functional Spec Version 1.4, SGI036474-610 at, e.g., SGI036513.<br><br>Bartolone testimony from 4/27/05 deposition at, e.g., 45;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 9, SGI108488 (sample burster) and related testimony from 5/27/05 deposition. |

| | | |
|---|---|---|
| and including drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line. | The drive means disclosed in the '337 patent includes a motor, which creates relative motion between the ticket strip and a separation member.<br><br>The PlayCentral's burster mechanism includes a motor. The motor pulls the ticket against separator. This creates relative motion between the strip and the separator member. The separator member, as it enters the perforation moves transverse to the strip. Also, the points of contact between the separator member and the perforation radiate in transverse direction, starting in the center of the strip, and moving in a transverse direction towards the edge of the strip. The separator member contacts the strip and causes it to deflect and bend along the perforation, causing the bursting apart of the ticket strip at the line of perforation.<br><br>This is the same as or equivalent to the structure disclosed in the '337 patent. | *See, e.g.*, R5;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 11, SGI084606-14 (burster hardware & firmware interface spec.);<br><br>Bartolone testimony from 4/27/05 deposition at, e.g., 45;<br><br>Behm testimony from 5/27/05 deposition at, e.g., 108. |

| | | |
|---|---|---|
| 24. Apparatus for dispensing tickets from a strip of tickets delineated from one another by lines along which the material of said strip is weakened, said apparatus comprising, in combination, | The PlayCentral dispenses instant lottery tickets delineated by perforations. | |
| means for moving said strip towards a dispensing position, | See same element of claim 22 above. | *See, e.g.*, same element of claim 22 above. |

| | | |
|---|---|---|
| means for holding said strip adjacent one line along which said strip is to be separated, and bending said strip along said line to facilitate tearing of said strip along said one line, | See similar element of claim 22 above. | *See, e.g.*, similar element of claim 22 above;<br><br>Bartolone testimony from 4/27/05 deposition at, e.g., 45;<br><br>Behm Ex. 9, SGI108488 (sample burster) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 11, SGI086406-414 (burster hardware & firmware spec.) at, e.g., SGI084610. |
| including separation means having a separator member and drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line, | The "separation means" element is not subject to interpretation under 35 U.S.C. §112, ¶6, because the claim recites sufficient structure, i.e. a "separator member" and a "drive means", to perform the recited function.<br><br>The PlayCentral burster mechanism includes a dull, v-shaped separator member.<br><br>As to the drive means for creating motion, see the similar element of claim 22 above.<br><br>In the PlayCentral burster mechanism, relative motion between the ticket strip and the separator member in a direction transverse to the ticket strip is created by the drive means, deflecting the strip so that it bends along the perforation and bursts the stickets apart along the | *See, e.g.*, defendants' Ex. 19 and related Behm testimony from 5/27/05 deposition at, e.g., 104-108;<br><br>Behm Ex. 9, SGI108488 (sample burster) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 11, SGI086406-414 (burster hardware & firmware spec.) at, e.g., SGI084610;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition. |

| | | |
|---|---|---|
| | perforation line.<br><br>Even if this element were subject to interpretation under 35 U.S.C. §112, ¶6, the Play Central burster mechanism is the same as or equivalent to the burster disclosed in the '337 patent. | |
| and including means for causing said separator member to break through said strip in one locale and then traverse the strip along said line. | The burster wheel disclosed in the '337 patent breaks through the ticket strip at one locale, and from the perspective of the ticket strip, the burster wheel traverses the strip.<br><br>The relative motion between the separator member and the ticket strip in the PlayCentral is such that the separator member breaks through the ticket strip at one locale, and, from the perspective of the ticket strip, the separator member traverses the strip.<br><br>This is the same as or equivalent to the relative motion between the burster wheel and ticket strip in the '337 patent. | *See, e.g.*, Defendants' Ex. 19 and related Behm testimony from 5/27/05 deposition at, e.g., 107-8.<br><br>Behm Ex. 9, SGI108488 (sample burster) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 11, SGI086406-414 (burster hardware & firmware spec.) at, e.g., SGI084610;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition. |

| | | |
|---|---|---|
| 28. A dispenser for dispensing tickets from a strip of tickets printed in a strip with the individual tickets being delineated from one another by lines of weakness, | The PlayCentral dispenses instant lottery tickets from a strip of fan-folded tickets delineated from each other by perforated lines. | |
| moving means for moving said strip by a pre-determined distance to a position in which one of said lines is near a separation location at which adjacent tickets are separated from one another,<br>said moving means comprising drive means for moving said strip by a pre-determined distance, and | The means disclosed in the '337 patent for moving the strip of tickets towards a dispensing position includes a motor which rotates a roller in a set of rollers, with the ticket strip between the rollers, such that movement of the motor causes movement of the rollers which results in movement of the ticket strip. To burst a ticket, the motor causes movement of the rollers, advancing the ticket strip towards a dispensing position.<br><br>The PlayCentral includes a motor which rotates a roller in a set of rollers, with the ticket strip between the rollers, such that movement of the motor causes movement of the rollers which results in the movement of the ticket strip.<br><br>The PlayCentral means for performing the recited function is the same or equivalent to the means disclosed in the '337 patent for performing this function. | *See, e.g.*, R1 & R5;<br><br>Behm Ex. 11, SGI086406-414 (burster hardware & firmware spec.) at, e.g., SGI084610;<br><br>SGI033854 (Burster Firmware Operation email);<br><br>Behm Ex. 9, SGI108488 (sample burster) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition. |
| position detecting means for detecting the distance actually moved by said strip and producing an output signal to control said drive means to drive said strip until said output signal indicates that said strip | The mechanism disclosed in the '337 patent for performing the recited function includes a sensor which detects that the strip actually has moved by a predetermined distance. | *See, e.g.*, R1, R2, & R5;<br><br>Behm Ex. 11, SGI086406-414 (burster hardware & firmware spec.) at, e.g., SGI084611;<br><br>Behm Ex. 9, SGI108488 |

| | | |
|---|---|---|
| actually has moved by said pre-determined distance to dispense one of said tickets, and to control means for severing a ticket from said strip. | The PlayCentral burster mechanism includes two sensors, a load sensor and a leading edge sensor, which are used in conjunction with the burster controller, to detect actual ticket positions and distances actually moved by the ticket strip, and to control the separation of tickets for dispensing.<br><br>At the load and initialization stage, the load and leading edge sensors are used in conjunction to measure the actual distance a ticket moves to advance it past the sensors, which is used to determine the actual length of an instant ticket.<br><br>Prior to dispensing, the leading edge sensor is used to detect the actual position of the ticket strip so that the ticket strip can be positioned at a known position. The ticket is then advanced a predetermined distance forward under the control of the burster controller.<br><br>The motor is then reversed, pulling the ticket strip against the separator member to separate the tickets. The motor is moved by a predetermined distance in the reverse direction. The leading edge sensor is monitored to insure that the ticket strip's leading edge has actually moved backwards by the correct distance and that the separator member has actually separated the leading ticket in the strip. Thus, an output signal indicates that the strip actually | (sample burster) and related testimony from 5/27/05 deposition;<br><br>Behm Ex. 8, SGI-E107907-4 (burster CAD drawing) and related testimony from 5/27/05 deposition. |

| | | |
|---|---|---|
| | has moved by the predetermined distance.<br><br>The means in the PlayCentral is the same as or equivalent to the means disclosed in the '337 patent. | |

Dated: June 10, 2005

As to objections:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Josy W. Ingersoll (#1088)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: 302-571-6600
Facsimile: 302-571-1253

KENYON & KENYON
Thomas J. Meloro
Larissa A. Soccoli
Andrew L. Reibman
One Broadway
New York, New York 10004
Telephone: (212) 425-7200
Facsimile: (212) 425-5288

# EXHIBIT I

GEORGIA-PACIFIC CORPORATION, Plaintiff, v. UNITED STATESGYPSUM COMPANY and L & W SUPPLY CORPORATION, Defendants.
Civil Action No. 94-489-RRM

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1996 U.S. Dist. LEXIS 22616

December 27, 1996, Decided

DISPOSITION: [*1] Defendants' motions for judgment as a matter of law (D.I. 268 and 294) denied. Defendants' motion in the alternative for a new trial granted in part and defendants entitled.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff patent holder brought an action against defendant corporation, alleging that the corporation willfully infringed on four patents. A jury returned a verdict, finding against the corporation. The corporation brought a motion for an order granting judgment as a matter of law or, in the alternative, for a new trial.

OVERVIEW: The patent holder contended that the corporation willfully infringed on the patents by manufacturing and selling a gypsum sheathing. The corporation contended, and the court agreed that there was insufficient evidence from which the jury could have concluded that the gypsum sheathing contained fire resistant additives so as to infringe that element of the first two claims of the patent holder. The court found that there was sufficient evidence to support the jury's conclusions on the patent holder's other claims. The court rejected the corporation's contention that all of the asserted claims were obvious. The court held that a review of the record confirmed there was substantial evidence to support the jury's conclusion that the corporation failed to show by clear and convincing evidence that the claims were invalid due to obviousness. The court held that the corporation had the burden of proving that the claims of a patent were obvious by clear and convincing evidence, but that the ultimate determination was a question of law. The court held that the evidence did not suggest that the system claims would not have been obvious to one of ordinary skill in the art.

OUTCOME: The court denied the corporation's motions for judgment as a matter of law. The court granted in part the corporation's motion for a new trial.

LexisNexis(R) Headnotes

COUNSEL: Jack B. Blumenfeld, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for plaintiff.

Albert E. Fey, Esquire, W. Edward Bailey, Esquire, Steven C. Cherny, Esquire, Stacy L. Kelly, Esquire, Fish & Neave, New York, New York, for plaintiff.

Joseph F. Posillico, Esquire, Synnestvedt & Lechner, Philadelphia, Pennsylvania, for plaintiff.

Robert A. Currie, Esquire, Georgia-Pacific Corporation, Atlanta, Georgia, for plaintiff.

Richard K. Herrmann, Esquire, Stradley, Ronon, Stevens & Young, LLP, Wilmington, Delaware, for defendants.

James M. Amend, P.C., David K. Callahan, Esquire, Paul R. Garcia, Esquire, Christian C. Taylor, Esquire, Kirkland & Ellis, John M. Lorenzen, Esquire, USG Corporation, Chicago, Illinois, for defendants.

JUDGES: Roderick R. McKelvie, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Roderick R. McKelvie

OPINION: MEMORANDUM OPINION

Dated: December 27, 1996

McKELVIE, District Judge

This is a patent case. Plaintiff Georgia-Pacific Corporation owns U.S. Patent Nos. [*2] *4,647,496* (the " *'496* patent"), *4,810,569* (the " *'569* patent"), *5,319,900* (the " *'900* patent"), and *5,371,989* (the " *'989* patent"). The patents relate to the manufacture and use of fibrous mat-faced gypsum board.

Georgia-Pacific alleges defendants United States Gypsum Company and L&W Supply (collectively hereinafter referred to as "U.S. Gypsum") are willfully infringing the *'496*, *'569*, *'900* and *'989* patents by manufacturing and selling a gypsum sheathing called Weatherock. U.S. Gypsum has denied infringement and counter claimed for a judgment that these patents are invalid and unenforceable.

The case was tried to a jury beginning on January 29, 1996. On February 9, 1996, the jury returned with a verdict finding U.S. Gypsum infringed claims of the *'569* and *'900* patents and had infringed, induced others to infringe and had contributed to the infringement of claims of the *'496* and *'989* patents. A copy of the verdict is attached. The jury found U.S. Gypsum had failed to show there was no infringement of these claims under the reverse doctrine of equivalents. The jury also found U.S. Gypsum had failed to show by clear and convincing evidence that the asserted claims of the four patents are[*3] invalid due to obviousness or for lack of enablement, or that the claims of the *'989* patent are invalid due to obviousness-type double patenting.

U.S. Gypsum has moved for an order granting it judgment as a matter of law, or, in the alternative, for a new trial. The parties have completed briefing on the motions and the court heard oral argument on May 6, 1996. This is the court's decision on these motions.

I. FACTUAL AND PROCEDURAL BACKGROUND

A. The Fields of the Invention and the Plaintiff's Patents

1. The Field of Invention: Gypsum Board and Exterior Insulating Systems

Gypsum is a mineral. Plaster of Paris is a fine powder of ground gypsum. When water is added to Plaster of Paris, it makes a slurry. Gypsum board is a panel with a core of hardened gypsum slurry sandwiched between paper cover sheets. Gypsum sheathing is a gypsum board designed for exterior use. Its gypsum core contains additives which improve its water resistance.

Builders have used gypsum sheathing in construction as a part of an exterior insulation system in which the builder will place the insulation on the outside rather than on the inside of the building. In an exterior insulation system, [*4]the gypsum sheathing is attached as a support surface to the frame of the outside wall. The insulation is then attached to the sheathing. A mesh-like material is affixed to the insulation and an exterior finish, such as stucco or aluminum or wood siding, is attached to the mesh.

Traditionally, gypsum sheathing included a core of gypsum sandwiched between layers of water-repellant paper cover sheets. The sheathing was mechanically attached to the frame of the building with, for example, nails or screws. The insulation was then glued to the sheathing.

A number of problems were identified with this paper-covered sheathing. As the paper tended to absorb water, it needed to be covered when stored at a job site and when it was being installed. Otherwise, the water might penetrate the paper and be absorbed into the core, which substantially reduced the strength of the sheathing. If the paper became wet after the sheathing was installed, the bond between the paper and the core might deteriorate, which could lead to cracking of the exterior finish.

Paper is also limited in its adhesive strength. As the insulation was typically glued to the paper on the sheathing, this tended to undermine[*5] the adhesive strengths of the various components of the system. While a builder might seek to overcome that problem by screwing or nailing insulation to the sheathing and the frame, that would both increase the installation costs and the risk that the fastener would provide a path for water to penetrate the insulation, the paper and the gypsum core.

2. February 27, 1984: Georgia-Pacific's Patent Application

On February 27, 1984, Georgia-Pacific, as assignee of Charles W. Lehnert and Brian Randall, filed an application with the United States Patent and Trademark Office for a patent on an invention relating to an improved gypsum board or sheathing. The application described a method of manufacturing a board on a conventional wallboard machine in which a gypsum slurry of a particular viscosity and including fire and water resistant additives was fed onto a moving sheet of glass fiber mat. The slurry penetrated substantially through some portions of the underlying mat to form a thin film on portions of the outer surface of that mat. At that viscosity, the slurry did not penetrate through portions of the overlying mat.

The application reported that the fibrous mat-faced sheathing[*6] was an improvement over the paper-faced sheathing in that it had improved rigidity, strength and water resistance, and can be installed with water-based adhesives or secured by nailing. It set out 20 claims, including claims to an exterior insulating system comprising a fibrous mat- faced gypsum support system, a board with a gypsum core sandwiched between two sheets of porous glass mat, a process for manufacturing

the board, the board with water- resistant additives, and the board with an outer surface substantially fee of gypsum.

By an action dated June 5, 1985, an examiner with the Patent and Trademark Office rejected all 20 of the claims as being unpatentable over U.S. Patent No. *4,504,533* to Altenhofer et al., which disclosed a gypsum construction panel comprising a gypsum core having fibrous mat facings.

In a reply dated December 6, 1985, John T. Synnestvedt, counsel for Georgia- Pacific, sought to distinguish Altenhofer as directed to improving adhesive bonding of a composite web on the side of a gypsum sheet and as nothing in Altenhofer suggested: 1) a method for installing a panel in an exterior insulating system; 2) a glass mat-faced gypsum board in which one face of the [*7]board has set gypsum and the other is substantially free of gypsum; 3) a method for regulating gypsum slurry viscosity; 4) a fibrous mat-faced gypsum board having water resistant additives; and 5) a shaft wall assembly.

Following a March 1986 telephone conference with the Examiner, Alexis Barron of Synnestvedt & Lechner, filed an amendment adding a claim 21 directed to an exterior finishing system, declarations of the inventors describing the dramatic weatherability of the board and identifying and distinguishing certain prior art, including Canadian Patent No. 993,779 to Morrone, U.S. Patent Nos. *4,378,405* and *4,477,300* to Pilgrim, U.S. Patent No. *3,993,822* to Knauf, and U.S. Patent No. *3,944,698* to Dierks.

By an action dated April 18, 1986, the Examiner reported that he had found three distinct inventions described in the patent and required the applicant pursuant to *35 U.S.C. § 121* to restrict the application to one of the three. Barron initially objected to the Examiner's decision. Thereafter, he confirmed Georgia-Pacific had elected to proceed with the product claims. In August, Barron filed a supplemental amendment that, among other things, amended the [*8]board claims to claim an exterior insulating system that incorporated a glass mat-faced gypsum board. He added 26 claims, reviewed certain other prior art and renewed Georgia-Pacific's position that none of the prior art discloses the use of a glass mat-faced gypsum support surface as a structural support member in an exterior system.

By a notice dated September 5, 1986, the Examiner allowed the pending claims.

3. March 1987: The Systems Patent (the *'496* patent) Issues and Georgia-Pacific Files a Divisional Application on the Board Claims

Georgia-Pacific's patent on the systems claims issued on March 3, 1987 as No. *4,647,496*, titled Use of Fibrous Mat-Faced Gypsum Board in Exterior Finishing Systems for Buildings. Georgia-Pacific contends U.S. Gypsum has infringed five claims of the *'496* patent: claims 1, 2, 5, 6 and 11. Claims 1 and 11 are independent claims. They read:

1. An exterior insulation system for a building comprising a glass mat-faced gypsum support surface, insulating material having an inner surface and an outer surface, the inner surface of which is adhered to said support surface by an adhesive material, the insulating material being substantially free[*9] of channels penetrating therethrough and between said inner and outer surfaces, and an exterior finishing material overlying the outer surface of said insulating material.

11. An exterior finishing system for a building comprising an underlying structural support element which is covered with an overlying finishing material, said support element including gypsum board comprising a set gypsum core sandwiched between two sheets of porous glass fiber mat, the gypsum core including one or more additives which are effective in improving the water-resistant properties of the board in an amount at least sufficient to impart to the board improved water-resistant properties.

On March 2, 1987, Georgia-Pacific filed a request for a divisional application for the board claims. By a decision dated June 19, 1987, the Examiner rejected the board claims as unpatentable over Altenhofer, both Pilgrim patents, and Morrone. The Examiner noted Altenhofer disclosed a gypsum board with a gypsum core layered with a glass fiber web, Pilgrim disclosed a gypsum board between two facing sheets of nonwoven glass fiber, and Morrone disclosed a process for making a gypsum board wherein a slurry is applied[*10] to a glass mat.

Barron responded by a paper dated December 22, 1987. He argued that Altenhofer is distinguishable as it claimed an outer surface that is a composite sheet of non-woven and woven fiberglass, it did not claim a board in which portions of one of the glass mats are coated with gypsum and it did not disclose the process for making the boards as described in Georgia-Pacific's application. He distinguished Pilgrim as claiming a board in which the glass mats are covered by a thin layer of core gypsum. He distinguished Morrone as also calling for a total coating of the glass fiber mat facing by the core gypsum. He noted that an advantage of the applicant's claimed

invention is that it avoided a bleed through of gypsum during the manufacturing operation, avoided a build-up of slurry on the equipment, and thus allowed a manufacturer to change from paper board to fiber glass board without having to shut down and clean up the manufacturing line. He also noted that the gypsum-free surface of the applicant's board was stronger than the board where the gypsum had bled through, and it offered a convenient surface to print product data.

On March 8, 1988, Barron supplemented his earlier[*11] reply to the Examiner by adding nine claims directed to a board and a process for making a board in which both surfaces of the glass mat are substantially free of set gypsum. In this paper, he acknowledged that the prior art disclosed a gypsum product of the type in which a set gypsum core is sandwiched between two glass mats, and argued that this art did not disclose a gypsum board in which the outer surface of each of the glass mats is substantially free of set gypsum. In that paper, he also distinguished Knauf, in that the board described in Knauf has an underlying glass mat that is not substantially free of set gypsum, and that in Knauf's process for manufacturing the board, a barrier material was placed below the mat to prevent the slurry from penetrating through the mat. He wrote:

In summary, it can be said that the prior art does not disclose that a glass mat-faced gypsum board can be produced by means of controlling the viscosity of a gypsum slurry in a manner such that the slurry penetrates but part-way into a porous glass mat, thereby affixing firmly one surface of the mat to the set gypsum core while the other surface remains gypsum-free.

In a second supplementary[*12] reply dated March 22, 1988, Barron added ten more claims directed to the nature and thickness of the mats and the slurry in various embodiments of the invention.

4. March 1987: The Board Patent (the *'569* patent) Issues

By an office action dated May 9, 1988, the Examiner allowed the pending claims subject to certain modifications. Patent No. *4,810,569*, titled Fibrous Mat-Faced Gypsum Board was issued on March 7, 1989. Georgia-Pacific contends U.S. Gypsum has infringed claim 1 of that patent. It reads:

1. Gypsum board comprising a set gypsum core sandwiched between two sets of porous glass mat, each of which has an inner and outer surface, said mat comprising randomly distributed glass fibers bonded by an adhesive material, the inner surface of each of said mats adhered to said gypsum core by a portion of the set gypsum comprising said core, the outer surface of one of said mats having portions thereof coated with set gypsum comprising portions of the set gypsum of said core, and the outer surface of the other of said mats being substantially free of set gypsum.

In February 1992, Peter Cronk of Synnestvedt and Lechner filed a continued application based on Georgia-Pacific's[*13] original February 27, 1984 application. This application set out 26 claims directed to a gypsum board for use in an exterior finishing system. The application included claims to a board with water-resistant additives and a method of manufacturing that board.

By an action dated April 27, 1993, the Examiner rejected all of the claims. One reason cited by the Examiner for rejecting certain claims directed to the method of forming the board is that they were anticipated by German Utility Model No. 7,806,114, which had been assigned to Rigips Baustoffwerke GmbH & Co. The Examiner rejected other claims directed to the board as obvious over Morrone in view of Novak, as the German patent disclosed a gypsum board comprising a core of set gypsum sandwiched between two sheets of porous glass fibers mats, with an outer surface permeated by the gypsum and Novak disclosed a board formed of a gypsum core between sheets of fiber with the outer surfaces uncalendered. The Examiner concluded it would have been obvious to one of ordinary skill in the art to leave the outer surface of the board of the German patent unpermeated by gypsum. The examiner also concluded it would have been obvious to one of [*14]ordinary skill in the art to comprise the core of the German patent of a fire-resistant additive to protect the structure to which the board is applied.

By a paper dated October 27, 1993, Cronk responded to the rejection with comments, canceled a claim, and amended certain other claims. Cronk argued that while Rigips disclosed a gypsum board including a set gypsum core bound by a pair of composite glass mat layers, it could be distinguished for a number of reasons, including that the composite layers were more expensive and complicated than the mats claimed in Georgia-Pacific's application, in that the mats included an inner fabric, a middle layer of chopped glass mat and an outer layer of glass mat with an increased density. He also argued that those of ordinary skill in the art would not have deciphered the applicants' viscosity control solution from the disclosure in the Rigips reference. Cronk argued that Morrone did not disclose the use of its board in exterior insulation or finishing systems and did not show a mat substantially free of gypsum on the exterior surface.

By an office action dated February 14, 1994, the Examiner again rejected all of the claims under *35 U.S.C. § 112,*[*15] for failure of the specification to point out particularly how the mats are adhered to the gypsum core, for failure to show how the gypsum flow is controlled, and as to certain claims as indefinite. The Examiner noted that the claims would be allowable if rewritten or amended to overcome the rejections.

No prior art of record shows a gypsum board comprising a set gypsum core sandwiched between mats comprising randomly distributed glass fibers, with the set gypsum being adhered to the mats by a portion of the set gypsum and having an outer surface of the mats free of set gypsum.

Joseph Posillico of Synnestvedt & Lechner responded by a paper dated May 16, 1996, in which he reviewed where the specification described how the mats adhere to the core, and set out the viscosity flow-control parameter.

5. December, 1994: The Second Board Patent (the *'989* patent) Issues

On June 2, 1994, the Examiner confirmed the claims would be allowed. Patent No. *5,371,989*, titled Use of Fibrous Mat-Faced Gypsum Board, issued December 13, 1994. Georgia-Pacific contends U.S. Gypsum has infringed claims 1, 6, 8, 9, 10, 12, 15 and 17 of that patent. The independent claims 1, 9 and 17 read as [*16]follows:

1. A gypsum board comprising a set gypsum-containing core sandwiched between two sheets of porous glass mat, each of said mats consisting of randomly distributed glass fibers bonded by an adhesive material, said mats adhered to said set gypsum core by a portion of said set gypsum, at least a first of said mats having an outer surface which is substantially free of set gypsum.

9. An exterior insulation system for a building, comprising a support surface, insulating material having an inner surface and an outer surface, the inner surface of which is adhered to the support surface by an adhesive material, and an exterior finishing material overlying the outer surface of the insulating material, said support surface comprising a gypsum board according to claim 1.

17. A gypsum board comprising a set gypsum core having at least one porous, non-woven glass mat thereon, said mat consisting of randomly distributed glass fibers bonded by an adhesive material, said mat adhered to said gypsum core by mechanical interlocking means formed from a portion of said randomly distributed glass fibers bonded to said set gypsum, whereby an outer surface of said mat is substantially[*17] free of set gypsum.

On May 6, 1993, Peter Cronk of Synnestvedt and Lechner filed a continued application based on Georgia-Pacific's original February 27, 1984 application. This application set out 16 claims directed to a gypsum board for use in an exterior finishing and roof deck system. The application included claims to a finishing system with a fibrous mat-faced gypsum board with a core having one or more additives which improve the board's water and fire resistance. The application describes adding mineral fibers to the gypsum core to improve the ability of the set gypsum composition to maintain its integrity when subjected to the heat of fire, and describes mineral fibers, such as glass fibers, asbestos fibers and calcium sulfate whisker fibers, as examples of the materials.

In August 1993, the Examiner reported that the application contained claims directed to patentably distinct species, including exterior, interior and roof deck systems, and called on the applicant to elect a single disclosed species for prosecution on the merits. Cronk elected to pursue claims 1 and 4 through 7, which were directed to an exterior finishing system; and claims 12 through 16, which were[*18] directed to a board with fire and water resistant additives. Consequently, Cronk withdrew claims 2, 3 and 8 through 11. The examiner then rejected the claims for obviousness-type double patenting over claims of the *'496* and U.S. Patent No. *5,220,762* issued to Lehnert et al. and assigned to Georgia-Pacific, titled Fibrous Mat-Faced Gypsum Board in Exterior and Interior Finishing Systems for Buildings.

By an amendment filed on October 10, 1993, Cronk canceled claims 1, 4 through 6, 7 and 11. In addition, Cronk requested that the Examiner reconsider the rejection of claims 12-16 in light of a disclaimer filed with the amendment by which Georgia-Pacific disclaimed the terminal part of any patent granted on the application which would extend beyond the expiration date of the *'762* patent.

By a notice dated November 11, 1993, the Examiner allowed claims 12-16 of the application. Patent No. *5,319,900*, titled Finishing and Roof Deck Systems Containing Fibrous Mat-Faced Gypsum Boards, was issued on June 14, 1994. Georgia-Pacific contends U.S. Gypsum has infringed claims 1 and 2 of that patent. They read as follows:

1. Gypsum board comprising a set gypsum core faced with a fibrous mat,[*19] the gypsum core including one or more additives which are effective in simultaneously improving the water resistance and fire resistance properties of the board in an amount at least sufficient to

impart to the board improved water resistance and fire resistance properties.

2. The gypsum board of claim 1, wherein said fibrous mat contains glass fibers.

B. Pre-Trial and Trial Proceedings

1. Pretrial Proceedings

Georgia-Pacific filed this action against United States Gypsum Company and L & W Supply Corporation on September 24, 1994, alleging they have willfully infringed claims of the *'496*, *'569* and *'900* patents and that they have actively induced and contributed to infringement by others. U.S. Gypsum responded on November 18, 1994, by denying infringement, and asserting a number of affirmative defenses, including a defense that the patents are invalid for a failure to meet the conditions in *35 U.S.C. § 102,* that the inventions claimed are not new, for a failure to meet the conditions of *35 U.S.C. § 103,* that the subject matter of the patent would not have been obvious at the time of the invention to a person having ordinary[*20] skill in the art to which it pertains, and for a failure to comply with the conditions of *35 U.S.C. §§ 111* and 112, that the claims of the patent particularly point out and distinctly claim the subject matter which the patentee regards as his invention or the preferred embodiment thereof. U.S. Gypsum also counterclaimed for a judgment that the three patents are invalid and unenforceable for the reasons identified in its answer.

Following a conference on December 9, 1994, the court entered a Scheduling Order providing that all discovery be initiated so that it would be completed on or before July 1, 1995 and scheduling the case for a ten-day jury trial beginning on September 25, 1995.

In January 1995, Georgia-Pacific moved for an order compelling U.S. Gypsum to provide more responsive answers to interrogatories Georgia-Pacific had served on November 4, 1995, seeking, among other things, the factual basis for U.S. Gypsum's contentions that the patents in suit were invalid or unenforceable. During a January 6, 1995 conference on the motion, the court reviewed with counsel the opinions in *Scovill Mfg. Co. v. Sunbeam Corp., 61 F.R.D. 598 (D. Del. 1973)*[*21] and *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 844 F. Supp. 987 (D. Del. 1994)* and the court's view that contention interrogatories can be an important tool to be used early on in discovery. In granting Georgia-Pacific's motion, the court noted:

To the extent that you don't fairly disclose those matters in response to the contention interrogatories, then I will prevent you at trial from arguing or offering proof on those claims, or those arguments. . . . There will come a time at trial where each of you may stand up and say, Judge, we asked them back in November on this issue and they didn't produce the information. We haven't had a fair chance to take discovery on it and we ask you to preclude them from offering proof. And, consistent with these matters, I will preclude a party from offering facts or argument on points where they haven't fairly disclosed those matters in response to a contention interrogatory that seeks that information. . . . The party who is seeking the information should be comfortable. If you can show me the other side has been unreasonable, I will prevent them from ambushing you later on.

On January 10, 1995, the court entered[*22] an order implementing a stipulation filed by the parties by which Georgia-Pacific amended its complaint to add claims alleging defendants infringed the claims of the *'989* patent. In answering the amended complaint, U.S. Gypsum no longer contended plaintiff's patents were invalid for failure to comply with the requirements in *35 U.S.C. § 111.* Otherwise, it answered the amended complaint by again denying infringement, asserting the same affirmative defenses and counterclaiming for a judgment that all of the patents are invalid and unenforceable. U.S. Gypsum joined as a new affirmative defense and claim for relief allegations that Georgia-Pacific had sought to mislead the Patent and Trademark Office about the nature of the *'405* patent issued to Pilgrim as to whether Pilgrim disclosed the inclusion of a water-resistant additive in the core of the board.

As the parties continued to report their disagreement on the adequacy and timing of responses to contention interrogatories, the court wrote to counsel on March 16, 1995 and reminded counsel of the court's view on the subject by sending counsel a transcript of a recent proceeding in another case where the court told[*23] counsel:

If you show me you're fairly responding with the information you've got when you've got it and you update and give the other side notice before the pretrial conference and before the trial, that's fine. But if it looks like you're holding back on something and the other side hasn't had a fair chance to respond in preparation for trial, I'll just preclude you from putting those facts or evidence in at trial. . . . And part of the reason I'm all over everybody in the early stages of the case is because there will come a time at the pretrial conference where I'll start cutting some heads and arms off. I've done it a couple of times and people have been a little upset, but part of my theory is we've talked about it for two months

and if you haven't fairly disclosed it, it's too late at the pretrial conference to say "By the way, Judge."

The court reviewed these issues with counsel again during a conference on March 23, 1995, during which the court discussed setting firm dates in March and April by which the parties would respond to contention interrogatories. Thereafter, any party seeking to supplement a response as to a contention or the basis for a contention would[*24] have to show why that party could not have provided that response sooner.

The court reviewed these issues with counsel again during an April 6, 1995 conference. During that conference the court set May 1, 1995 as a date by which U.S. Gypsum's position on the bases for its defenses would be fixed.

Following the April 6, 1995 conference, the court entered an Amended Scheduling Order extending the date for the completion of discovery to October 13, 1995 and rescheduling the trial to January 1996.

On September 6, 1995, Georgia-Pacific moved for an order precluding U.S. Gypsum from relying on certain prior art or asserting certain defenses, reporting that on September 1, U.S. Gypsum had served a Fourth Amended Reply to Georgia-Pacific's contention interrogatories and in those answers identified 57 prior art references not previously asserted, and new bases for defenses based on invalidity, including the Morrone '779 patent, a Pearson '371 patent, and a contention U.S. Gypsum invented a board similar to Weatherock in the late 1970's. During a conference on September 13, 1995, the court granted Georgia-Pacific's request for relief, subject to a further showing by U.S. Gypsum as to why[*25] it had failed to provide the information in these answers earlier. With regard to newly disclosed facts or art, the court invited U.S. Gypsum to show it had only recently learned of these facts or the art. With regard to new contentions based on previously disclosed facts, the court invited U.S. Gypsum to show that Georgia-Pacific would not be unfairly prejudiced by having to respond to them at the trial.

U.S. Gypsum followed up on that invitation with further argument on why it should not be precluded from obtaining relief based on matters, facts or contentions identified for the first time in its Fourth Amended Reply. After reviewing the matter and having found U.S. Gypsum failed to show why it could not have set out the factual and legal bases for these contentions earlier, the court entered an order precluding U.S. Gypsum from relying at trial on the new matter disclosed in the September 1st Fourth Amended Reply.

2. The Trial

The case was tried to a jury beginning on Monday, January 29, 1996. At the trial, Georgia-Pacific offered evidence on Brian Randall and William Lehnert's work in the early 1980's that led to the development of the inventions that are the subject of[*26] the patents, including a glass-mat-surfaced gypsum board and Georgia-Pacific's introduction and marketing of products based on their invention, including a glass-mat faced gypsum board called Dens Glass and later a board called Dens Glass Gold, by which Georgia-Pacific added a gold-colored acrylic coat on the outer surface of the Dens Glass. Georgia-Pacific manufactures its Dens Glass Gold on a traditional gypsum board manufacturing line, by pouring a gyspum slurry onto that mat. It increases the viscosity of the slurry to prevent it from flowing or bleeding through the mat. It then places a mat on top of the slurry. As some slurry may seep through the bottom mat, portions of the outer surface of the bottom mat may be covered by gypsum. However, the outer surface of the top mat is gyspum-free.

Georgia-Pacific offered evidence showing that Georgia-Pacific was losing sales on Dens Glass products with customers buying U.S. Gypsum's competing product, Weatherock, which U.S. Gypsum began selling in the 1990s. U.S. Gypsum manufactures its Weatherock board by placing a fiber glass-mat on release paper, pouring a densified gypsum slurry on the mat, forcing the slurry into and through the[*27] mat, adding a foamed gypsum slurry as a core, and placing a fiber glass-mat on top of the core slurry. It then removes the paper, to have a board with 95% of the bottom surface (where the paper had been) covered with gypsum, and with the outer surface of the top mat substantially free of gypsum. U.S. Gypsum admits it adds a water resistant additive to its slurry, but denies it adds a fire resistant additive.

Brian Randall testified he had taken a sample of Weatherock and soaked it in water. As the core gypsum dissolved, he found glass fiber filaments in the core, which he concluded U.S. Gypsum had added to make the board more fire-resistant.

Georgia-Pacific called Robert Bruce to offer opinions as an expert witness on the subject of gypsum manufacturing. He testified to his opinions that Weatherock infringed claims of the patents in issue, such as, for example, claims 1 of the *'569* and claim 1 of the *'989* patent. They read:

Claim 1 of the *'569* patent.

1. Gypsum board comprising a set gypsum core sandwiched between two sets of porous glass mat, each of which has an inner and outer surface, said mat comprising randomly distributed glass fibers bonded by an adhesive material, [*28]the inner surface of each of said mats adhered to said gypsum core by a portion of the set gypsum comprising said core, the outer surface of one of said mats having portions thereof coated with set gypsum comprising portions of the set gypsum of said core, and the outer surface of the other of said mats being substantially free of set gypsum.

Claim 1 of the *'989* patent.

1. A gypsum board comprising a set gypsum-containing core sandwiched between two sheets of porous glass mat, each of said mats consisting of randomly distributed glass fibers bonded by an adhesive material, said mats adhered to said set gypsum core by a portion of said set gypsum, at least a first of said mats having an outer surface which is substantially free of set gypsum.

Bruce based his opinions in part on his conclusions that: 1) the gypsum coating on the bottom of the Weatherock board covered only portions of the board; 2) the core of the Weatherock board was sandwiched between two glass mats; and 3) the facing of a gypsum board is a surface reinforcing material and, therefore, the Weatherock board with fiber glass-mat covered with gypsum is a glass-mat faced board.

U.S. Gypsum called a number[*29] of witnesses to testify, including Dr. Richard A. . Dr. Kuntze. Dr. Kuntze offered opinions as an expert witness in the field of gypsum board design, manufacture and use. He testified that the words glass-mat faced as used in the exterior insulation and finishing systems (EIFS) industry mean glass-mat on the face, or outer surface of the board (and nothing on top of the glass). Consequently, as Weatherock had gypsum on one outer surface of the board, that side was not glass-mat faced.

Dr. Kuntze reviewed prior art in the field, including the Morrone Canadian Patent No. 993779, U.S. Patent *3,993,822* to Knauf, German utility model number 7806114 to Rigips Baustoffwerke, and the Pilgrim Patent, U.S. patent *4,378,405*. He offered his opinion that the prior art described the same kind of invention that is contained in the board claims of the patent. Rigips describes a board with gypsum free surfaces. Morrone and Pilgrim described a board using randomly-oriented fiberglass mat. Pilgrim described adding fiberglass to increase fire resistance of the core of the board.

In instructing the jury, the court construed the disputed terms of the claims as follows. The word "portions" should be read[*30] with its ordinary meaning, "a part of a whole." The word "sandwiched" should be read with its ordinary meaning, "between two things and not through and outside one of those two things." To those skilled in the art, the words "glass mat-faced" mean "glass mat surface reinforcing material."

In closing arguments, counsel for Georgia-Pacific conceded that with the court's claim construction Georgia-Pacific would not be able to establish the bottom surface of Weatherock was only covered with portions of gypsum, thus conceding a failure to prove infringement of claim 1 of the *'569* patent and claim 6 of the *'496* patent.

Counsel argued Georgia-Pacific had establish Weatherock infringed the balance of the asserted claims, as Weatherock was a "glass mat-faced" gypsum board, in that it had a glass mat surface reinforcing material. Counsel argued Weatherock met the "sandwiched" limitation, in that the gypsum core was sandwiched between the two mats, and what was through and outside the bottom mat was not the core gypsum, but the densified layer of gypsum. Counsel also argued Georgia-Pacific had established Weatherock had sufficient fibers in the core to create a fire-resistant additive.

In[*31] responding to U.S. Gypsum's evidence as to obviousness, counsel argued that Rigips taught away from the invention, in that the text of the patent suggested the invention solved a problem that would otherwise arise from using fiberglass, that Morrone and Pilgrim had gypsum on the outside of both mats, and that Knauf was made from a composite mat, a woven fabric.

Counsel reviewed other evidence relating to secondary considerations as to obviousness and other evidence relating to Georgia-Pacific's claim for $650,000 as damages for lost profits.

In his closing argument, counsel for U.S. Gypsum argued Georgia-Pacific had failed to prove infringement and failed to rebut U.S. Gypsum's evidence on obviousness.

The jury's verdict is attached. It shows the jury found Georgia-Pacific had met its burden of showing U.S. Gypsum infringed the assert claims of the patents, that Georgia-Pacific had failed to meet its burden of proof to show no infringement under the reverse doctrine of equivalents, or invalidity due to obviousness, double-type patenting, a lack of enablement. The jury found Georgia-Pacific had proved damages of $325,000.

U.S. Gypsum has moved for judgment as a matter of law or[*32] in the alternative for a new trial. Its briefing includes three arguments. First, it argues the court improperly precluded it from presenting certain defenses. Second, it contends there was insufficient evidence to support the jury's infringement findings. Third, it contends the claims in issue are invalid as a matter of law.

II. DISCUSSION

In deciding whether to grant judgment as a matter of law on a particular issue after a jury has returned a verdict, the court must determine whether substantial evidence exists in the record to support the jury's verdict when the correct legal standard is applied. *Markman v. Westview Instruments, Inc., 52 F.3d 967, 975 (Fed. Cir. 1995),* aff'd, *517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996).* Substantial evidence is the quantum of evidence that reasonable jurors would accept as adequate to support the finding under review. *The Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893* (Fed. Cir.), cert. denied, *469 U.S. 857, 83 L. Ed. 2d 120, 105 S. Ct. 187 (1984).* The court must consider all evidence and draw all reasonable inferences from the evidence in the[*33] light most favorable to the nonmovant. Id. In addition, the court may not determine the credibility of the witnesses, and it may not "substitute its choice for that of the jury as between conflicting elements of the evidence." Id.

In deciding whether to grant a new trial, the court may consider, among other things, whether the verdict is against the weight of the evidence, *Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1017 (3d Cir. 1995),* whether the verdict turned on erroneously admitted evidence, *Blanche Road Corporation v. Bensalem Township, 57 F.3d 253* (3d Cir.), cert. denied, *516 U.S. 915, 116 S. Ct. 303, 133 L. Ed. 2d 208 (1995),* or whether the court improperly instructed the jury. *Cooper Distributing Co. v. Amana Refrigeration, 63 F.3d 262 (3d Cir. 1995);* see generally *Lind v. Schenley Industries, Inc., 278 F.2d 79, 90* (3d Cir.), cert. denied, *364 U.S. 835, 5 L. Ed. 2d 60, 81 S. Ct. 58 (1960).* In determining whether a verdict is against the weight of the evidence, the court should not substitute its view of the facts for that of the jurors. *Wagner, 49 F.3d at 1017.*[*34] Nevertheless, the court may grant a new trial even when judgment as a matter of law is inappropriate. Id. Ultimately, the grant of a new trial is within the sound discretion of the district court. Id.

1. Did the court improperly preclude U.S. Gypsum from presenting certain defenses?

U.S. Gypsum contends the court improperly precluded it from seeking relief based on claims that the board and additive claims are anticipated by a single prior art reference, that the asserted claims fail to distinctly point out and claim what Lehnert and Randall regard as their invention, and that Georgia-Pacific failed to name the proper inventors in the patents in suit. It is not clear why U.S. Gypsum is calling on this court to revisit this issue. Early on in the case, the court put counsel on notice of its view that discovery relating to contentions and the basis for contentions is an effective tool that can assist the court and counsel in formulating and simplifying issues consistent with *Federal Rule of Civil Procedure 16.* Early on in the case, the court set deadlines for counsel to respond to these discovery questions and warned counsel of the consequences that would follow from a[*35] failure to respond, or to identify why counsel could not respond at that time. Georgia-Pacific heard that message and used that tool. When Georgia-Pacific concluded U.S. Gypsum had not heard that message, it asked the court for assistance well before the close of discovery. As noted above, the court's decision to preclude U.S. Gypsum from making certain arguments and offering certain evidence came after a number of conferences, and after U.S. Gypsum had numerous opportunities to respond to Georgia-Pacific's discovery requests or to show why it should be relieved from having to respond. This court sees no reason to revisit the issue.

2. Is there sufficient evidence in the record to support the jury's verdicts as to infringement?

U.S. Gypsum argues that Georgia-Pacific's evidence as to infringement was deficient in two respects. First, U.S. Gypsum argues there was insufficient evidence from which the jury could conclude Weatherock contained fire resistant additives so as to infringe that element of claims 1 and 2 of the *'900* patent, and claim 8 of the *'989* patent. The court agrees. Even if we accept Georgia-Pacific's evidence that it found some glass fibers in Weatherock's gypsum[*36] core--which was disputed by U.S. Gypsum--that testimony is not sufficient to show there were enough fibers to give the boards a fire resistant property. For example, in prosecuting the *'900* patent, Georgia-Pacific reported that the amount of glass fibers to be included in the core to provide the fire resistant properties should be at least 0.03% of the weight of the slurry. Georgia-Pacific has not offered evidence to show that the fibers they contend they found in Weatherock are sufficient to meet this minimum weight. As the verdict as to these claims is against the weight of the evidence, the court will enter an order granting U.S. Gypsum's motion for a new trial as to Georgia-Pacific's claims it is infringing these claims.

Second, U.S. Gypsum contends there is insufficient evidence to support a finding of infringement as to claims 6 and 11 of the *'496* patent, and claims 1, 6, 8, 9, 10, 12, and 15 of the *'989* patent, as they claim a gypsum board or a system with a gypsum board with the core gypsum "sandwiched" between two mats. U.S. Gypsum contends that as Weatherock has gypsum penetrating through and on the outside of one of the mats, its core is not "sandwiched" between the mats [*37]and thus it does not infringe.

Georgia-Pacific had initially argued Weatherock met this "sandwiched" limitation by having the gypsum slurry between the two mats and that U.S. Gypsum had simply added a feature by also forcing the gypsum through one mat and onto its outer surface. After the court construed sandwich to read "between two things and not through and outside of one of those two things," Georgia-Pacific offered a new argument: Weatherock still met this limitation as its core slurry was sandwiched between the two mats, what penetrated through the mat and to the outside on the Weatherock was not the core gypsum slurry, but the densified layer of gypsum U.S. Gypsum added and pressed through the mat before it added the gypsum slurry. Needless to say, this new argument, this new view of the facts (and perhaps new construction of the claims) caused some stir in the courtroom, as it came during the rebuttal portion of plaintiff's closing argument.

A review of the prosecution history of the patents as set out above shows Lehnert and Randall started out claiming they had developed a method of manufacturing a gypsum board with fiber glass mats on a conventional wallboard machine. [*38] They accomplished this by controlling the viscosity of the slurry as it was fed onto a moving sheet of glass fiber mat. With a porous mat, they reported the slurry would penetrate the mat to form a thin film on portions of the outer surface of the mat. The words they used in claiming their invention, included a "gypsum slurry," which was to be poured between "two glass mats." In that context, they described the slurry as sandwiched between the mats and the term "sandwich" can be read with its ordinary meaning, that is to place between two things (but not on the outside of either). Lehnert and Randall further described the mats in their claims as "porous," and noted that for certain claims at least one of them would allow the core gypsum to penetrate through the porous mat. In that context, by claiming "a board comprising a set gypsum core sandwiched between two sheets of porous glass mat...the outer surface of one of said mats having portions thereof coated with set gypsum," they added words to further describe the sandwich as having a core of slurry that penetrated through a porous mat and formed a thin film on portions of the outer surface. For other claims, they claimed a sandwich[*39] where at least one mat had an outer surface that was substantially free of gypsum (implying that the other need not). In others, they claimed a sandwich were both surfaces were substantially free of gypsum. And in others, they claimed a board of core gypsum sandwiched between two mats, without claiming any unique or particular surface on the outside of the mats.

As counsel maneuvered through the Patent and Trademark office and around and past the prior art, they refined and rewrote the claims frequently to limit the extent to which they claimed the core gypsum would penetrate through the glass mats.

By construing the word sandwiched, the court did not constrain Georgia-Pacific from arguing (or the jury from finding) that a claim may describe a board with a gypsum core sandwiched between two porous glass mats and (where the additional matter is claimed) through the porous mat and on the outer surface of one mat. See for example, claim 1 of the *'569* patent, which reads:

1. Gypsum board comprising a set gypsum core sandwiched between two sets of porous glass mat, each of which has an inner and outer surface, said mat comprising randomly distributed glass fibers bonded by an[*40] adhesive material, the inner surface of each of said mats adhered to said gypsum core by a portion of the set gypsum comprising said core, the outer surface of one of said mats having portions thereof coated with set gypsum comprising portions of the set gypsum of said core, and the outer surface of the other of said mats being substantially free of set gypsum.

The issue raised by the jury's finding of infringement, is whether the claims asserted by Georgia-Pacific cover Weatherock, a board with slurry that is through and on the outside of one of the mats. Claim 6 of the *'496* patent does, but as noted above, U.S. Gypsum does not infringe that claim as the claim includes the limitation that the gypsum on the outside cover only a portion of the mat. Georgia-Pacific now concedes more than portions of one side of Weatherock are covered with gypsum.

Claim 11 of the *'496* patent does not cover a board with slurry that is through and on the outside of the mat, as it claims in part a board with a gypsum core sandwiched between two mats, but does not claim a board where the core penetrates through and onto the outside of the mat. It appears, therefore, there was no substantial evidence[*41] to support the jury's verdict U.S. Gypsum infringes this claim.

Claim 1, 6, 9, 10, 12, 15 and 17 of the *'989* patent do claim a board or a system with a board where the outer

surface of one mat is substantially free of gypsum (and by implication the other is not). As Weatherock has the other elements of these claims, it infringes each of these claims of the patent.

In summary, the court will affirm the jury's verdict as to infringement of claims 1, 2 and 5 of the *'496* patent and of claims 1, 6, 9, 10, 12, 15 and 17 of the *'989* patent. The court will grant defendants' motion for a new trial on Georgia-Pacific's claim U.S. Gypsum infringes and induces others to infringe claim 11 of the *'496* patent, claim 8 of the *'989* patent, and its motion for a new trial on claims 1 and 2 of the *'900* patent.

3. Is there sufficient evidence to support the jury's verdict that U.S. Gypsum failed to show by clear and convincing evidence that the claims in issue are invalid due to obviousness?

U.S. Gypsum contends it is entitled to a judgment as a matter of law that all of the asserted claims are obvious. An inventor cannot obtain a patent" if the differences between the subject matter sought to[*42] be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which" the invention pertains. *35 U.S.C. § 103.* Facts to consider when determining whether the claims of a patent were obvious include: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the subject matter claimed and the prior art; and 4) other objective indicia of nonobviousness. See *Graham v. John Deere Co. 383 U.S. 1, 17-18, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966).* U.S. Gypsum has the burden of proving these facts by clear and convincing evidence. *Greenwood v. Hattori Seiko Co., 900 F.2d 238, 241 (Fed. Cir. 1990).* The ultimate determination of obviousness, however, is a question of law. *Graham, 383 U.S. at 17; Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1547 (Fed. Cir. 1983).*

As to the systems claims, U.S. Gypsum contends it established at trial that system claims are old, that a glass mat faced board was known in the prior art, that the EIFS industry[*43] recognized that exterior insulation systems could be put up over virtually any sound substrate and that fiberglass reinforced gypsum board was a sound substrate. It also argues that it has shown that paper-reinforced gypsum boards had been used as a substrate and that it would have been obvious to replace a paper-reinforced board with a fiberglass-reinforced board (because paper had been identified as the weak link in the systems using paper-faced gypsum sheathing). It also points to evidence offered at the trial showing that years before Georgia-Pacific applied for the patents, U.S. Gypsum researches had considered fiberglass-reinforced gypsum boards as being desirable for use in exterior insulation systems.

U.S. Gypsum argues the board claims would have been obvious in light of the prior art, including Morrone and Rigips. It contends it showed Morrone contained each of the following elements: (1) gypsum board sandwiched between two sheets of porous glass mat; (2) each mat having an inner and outer surface; (3) the mats comprising randomly distributed glass fibers bonded by an adhesive material; (4) the inner surface of each mat being adhered to the core by a portion of the core[*44] gypsum; and (5) one of the mats having a surface free of gypsum, and the other having portions which are coated with gypsum. It contends Rigips discloses a fiberglass mater-reinforced board with the outer surfaces of both glass-mats gypsum free.

Georgia-Pacific has responded by arguing there is substantial evidence the jury could have looked to in rejecting U.S. Gypsum's arguments. As to the system claims, Georgia-Pacific relies on the testimony of Hopkins, Randall and Lehnert and their identification of the unique problems in developing a board for the EIFS industry, including problems relating to developing a board that would be exposed to the weather. Georgia-Pacific notes that each of the references cited by U.S. Gypsum discloses interior boards. None discloses or suggests an exterior system. It also relies on Hopkins' testimony that while the EIFS industry had been looking for a better substrate for years, it was not until Randall and Lehnert conducted their experiments and developed their fiberglass mat that the need was met.

Georgia-Pacific is correct that this evidence does suggest the system claims would not have been obvious to one of ordinary skill in the art. It is sufficient[*45] to support the jury's finding U.S. Gypsum failed to meet its burden of coming forward with clear and convincing evidence that the system claims were invalid due to obviousness.

As to the board claims, Georgia-Pacific responds that it offered evidence at the trial (evidence the jury was entitled to rely on) to show that Morrone does not have a gypsum free surface. That evidence included U.S. Gypsum's pre-trial admissions that Morrone did not have a gypsum-free surface. While Dr. Kuntze testified at trial that he believed it did, he appears to have conceded on cross examination that the drawings in Morrone and the text to the drawings appear to refer to gypsum on the outside of both sheets. Georgia-Pacific argues it is the gypsum free surface that makes its board claims patentable over the prior art, as it is the gypsum free surface that allows a manufacturer to make the fiber

glass-mat faced boards on a conventional gypsum board line. Georgia-Pacific argues the jury was entitled to credit its evidence on this point.

During the oral argument following the post trial briefing counsel for U.S. Gypsum identified the following language from claim 1 of the Morrone patent as showing the[*46] patent disclosed both a gypsum-free surface and a surface coated with gypsum.

...thin glass fiber sheet adhered to at least one major side of the core, a portion of the fibers comprising said sheet being exposed on the exterior surface...a substantial number of interstices between adjacent fiber at the exterior surface of the sheet.

It appears this sentence speaks to whether the fibers are exposed, rather than to what portion of the fibers on the outer surface may otherwise be covered by gypsum. In any event, reading this sentence does not clearly show Morrone claimed a gypsum free surface. Perhaps the best evidence that it does not show that, comes from U.S.Gypsum's pre-trial admissions that it did not read Morrone as disclosing a gypsum free surface.

Georgia-Pacific also argues the jury was entitled to credit its evidence and arguments as to Rigips, including that it taught away from manufacturing a board with simple, clear, resin-bonded glass fiber maters (as used by Morrone and Georgia-Pacific).

Georgia-Pacific also relies on substantial evidence as to secondary considerations relevant to obviousness. It cites testimony by Hopkins, Kuntz and others that Georgia-Pacific's[*47] Dens Glass products met a long felt need in the industry, its proof as to the commercial success of its Dens Glass products, including evidence that they had gained a substantial share of the market, their sales were growing at relatively high rates (38%, 28% and 50% per year) and that they were generating substantial profits for Georgia-Pacific (1994 Georgia-Pacific made over $10 million worth of incremental profits on its Dens Glass products).

A review of the record confirms there is substantial evidence to support the jury's conclusion U.S. Gypsum failed to show by clear and convincing evidence that the claims in issue are invalid due to obviousness.

U.S. Gypsum has included other arguments in its post trial briefing. Certain of them are more in the nature of reargument of pretrial and trial decisions. To the extent they are not addressed in this opinion, they are denied for the reasons previously identified by the court. As to other arguments not addressed in this opinion, the court has reviewed them and finds them to be without merit.

VERDICT

I. INFRINGEMENT

A. The *'496* Patent

1. Do you find that Georgia-Pacific has shown by a preponderance of the evidence[*48] that defendants United States Gypsum Company and L & W Supply Corporation (collectively, "USG") have infringed any of the following claims of the *'496* patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG.)

Claim 1 YES X NO

Claim 2 YES X NO

Claim 5 YES X NO

Claim 6 YES NO X

Claim 11 YES X NO

2. Do you find that Georgia-Pacific has shown by a preponderance of the evidence that USG has induced infringement of any of the following claims of the *'496* patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG.)

Claim 1 YES X NO

Claim 2 YES X NO

Claim 5 YES X NO

Claim 6 YES NO X

Claim 11 YES X NO

3. Do you find that Georgia-Pacific has shown by a preponderance of the evidence that USG has contributed to the infringement of any[*49] of the following claims of the *'496* patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG.)

Claim 1 YES X NO

Claim 2 YES X NO

Claim 5 YES X NO

Claim 6 YES NO X

Claim 11 YES X NO

B. The *'569* Patent

1. Do you find that plaintiff Georgia-Pacific Corporation ("Georgia-Pacific") has shown by a preponderance of the evidence that USG has infringed claim 1 of the *'569* patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG).

YES NO X

C. The *'900* Patent

1. Do you find that Georgia-Pacific has shown by a preponderance of the evidence that USG has infringed any of the following claims of the *'900* patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG.)

Claim 1 YES X NO

Claim 2 YES X NO

D. The *'989* Patent

1. Do you find that[*50] Georgia-Pacific has shown by a preponderance of the evidence that USG has infringed any of the following claims of the *'989* patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG).

Claim 1 YES X NO

Claim 6 YES X NO

Claim 8 YES X NO

Claim 9 YES X NO

Claim 10 YES X NO

Claim 12 YES X NO

Claim 15 YES X NO

Claim 17 YES X NO

2. Do you find that Georgia-Pacific has shown by a preponderance of the evidence that USG has induced infringement of any of the following claims of the *'989* patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG).

Claim 9 YES X NO

Claim 10 YES X NO

Claim 12 YES X NO

Claim 15 YES X NO

3. Do you find that Georgia-Pacific has shown by[*51] a preponderance of the evidence that USG has contributed to the infringement of any of the following claims of the *'989* patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG).

Claim 9 YES X NO

Claim 10 YES X NO

Claim 12 YES X NO

Claim 15 YES X NO

II. REVERSE DOCTRINE OF EQUIVALENTS

Do you find that USG has shown by a preponderance of the evidence that there is no infringement of any of the following claims of the patents in suit under the reverse doctrine of equivalents? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

The *'496* Patent

Claim 1 YES NO X

Claim 2 YES NO X

Claim 5 YES NO X

Claim 6 YES NO X

Claim 11 YES NO X

The *'569* Patent

Claim 1 YES NO X

The *'900* Patent[*52]

Claim 1 YES NO X

Claim 2 YES NO X

The *'989* Patent

Claim 1 YES NO X

Claim 6 YES NO X

Claim 8 YES NO X

Claim 9 YES NO X

Claim 10 YES NO X

Claim 12 YES NO X

Claim 15 YES NO X

Claim 17 YES NO X

III. VALIDITY

1. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the *'496* patent are invalid due to obviousness? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

Claim 2 YES NO X

Claim 5 YES NO X

Claim 6 YES NO X

Claim 11 YES NO X

2. Do you find that USG has shown by clear and convincing evidence that the following claim[*53] of the *'569* patent is invalid due to obviousness? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

3. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the *'900* patent are invalid due to obviousness? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

Claim 2 YES NO X

4. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the *'989* patent are invalid due to obviousness? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

Claim 6 YES NO X

Claim 8 YES NO X

Claim 9 YES NO X

Claim 10 YES NO X

Claim 12 YES NO X

Claim 15 YES NO X[*54]

Claim 17 YES NO X

5. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the *'989* patent are invalid due to obviousness-type double patenting? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

Claim 6 YES NO X

Claim 8 YES NO X

Claim 9 YES NO X

Claim 10 YES NO X

Claim 12 YES NO X

Claim 15 YES NO X

Claim 17 YES NO X

6. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the *'496* patent are invalid for lack of enablement? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

Claim 2 YES NO X

Claim 5 YES NO X

Claim 6 YES[*55] NO X

Claim 11 YES NO X

7. Do you find that USG has shown by clear and convincing evidence that the following claim of the *'569* patent is invalid for lack of enablement? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

8. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the *'900* patent are invalid for lack of enablement? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

Claim 2 YES NO X

9. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the *'989* patent are invalid for lack of enablement? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1 YES NO X

Claim 6 YES NO X

Claim 8 YES NO X

Claim 9 YES [*56] NO X

Claim 10 YES NO X

Claim 12 YES NO X

Claim 15 YES NO X

Claim 17 YES NO X

III. DAMAGES

1. If you found at least one claim infringed and not invalid, what amount of damages do you find Georgia-Pacific has proved by a preponderance of the evidence?

Amount $325,000,00

You each must sign this verdict form:

/s/ Marian JoAnn Boyd

/s/ Kathaline D. Mauro

/s/ Arthur J. Waite

/s/ [Signature]

/s/ [Signature]

/s/ William R. Hudghton

/s/ [Signature]

/s/ Linda L. Brady

/s/ [Signature]

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS MOTION FOR JUDGMENT AS A MATTER OF LAW

For the reasons set out in the court's December 27, 1996 Memorandum Opinion,

IT IS HEREBY ORDERED as follows:

1) Defendants' motions for judgment as a matter of law (D.I. 268 and 294) are denied.

2) Defendants' motion in the alternative for a new trial is granted in part and defendants are entitled to a new trial on plaintiff's claims defendants infringe claims 1 and 2 of the *'900* patent and plaintiffs claims defendants infringe and induced others to[*57] infringe claim 8 of the *'989* patent and claim 11 of the *'496* patent.

Roderick R. McKelvie

UNITED STATES DISTRICT JUDGE

December 27, 1996

# EXHIBIT J

TRACINDA CORPORATION, a Nevada Corporation, Plaintiff, v.DAIMLERCHRYSLER AG, a Federal Republic of Germany corporation; DAIMLER-BENZ AG,a Federal Republic of Germany corporation; JUERGEN SCHREMPP, a citizen of theFederal Republic of Germany; and MANFRED GENTZ, a citizen of the FederalRepublic of Germany, Defendants.
Civil Action No. 00-993-JJF CONSOLIDATED

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 6741

April 20, 2005, Decided

PRIOR HISTORY: *Tracinda Corp. v. DaimlerChrysler AG, 2005 U.S. Dist. LEXIS 5830 (D. Del., Apr. 7, 2005)*


CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff corporation filed a motion, pursuant to *Fed. R. Civ. P. 16(f)*, *37(b)(2)*, (c)(1), for attorneys' fees and costs as a result of the failure of defendants, German corporations and associated individuals, to comply with discovery and scheduling orders.

OVERVIEW: Defendants produced 61 pages of handwritten notes taken by one of the principal participants in the negotiation of a merger 11 months after the court's discovery deadline on the eve of the last day of trial. The court held that, although a special master found that defendants did not act intentionally or in bad faith in withholding the relevant documents from production, sanctions were nevertheless warranted under *Fed. R. Civ. P. 16(f)*. The notes were highly relevant. In addition to its impact on judicial resources, including the court's schedule and the management of the trial, plaintiff was prejudiced to some extent by the delay in production. Defendants' explanations for the late production did not amount to substantial justification for the disregard of the scheduling order. Regardless of the reason for the failure to produce the documents, the fault lay with defendants. Half of its attorney fees and its actual expenses was a reasonable amount to compensate plaintiff for the late production. The categories of tasks objected to by defendants were properly considered in the award since those tasks needed additional attention due to the late production.

OUTCOME: The court granted plaintiff's request for costs and awarded it costs in the amount of $556,061.


LexisNexis(R) Headnotes

COUNSEL: [*1] For Tracinda Corporation, Plaintiff: A. Glichrist Sparks, III, Esquire, Alan J. Stone, Esquire, and Natalie J. Watson, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware. Of Counsel: Terry N. Christensen, Esquire, Mark G. Krum, Esquire and Eric P. Early, Esquire of CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO, LLP, Los Angeles, California. William G. McGuinness, Esquire and Julie E. Kamps, Esquire of FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York.

For DaimlerChryler AG, Daimler-Benz AG, Jurgen Schrempp and Manfred Gentz, Defendants: Thomas J. Allingham II, Esquire, and Robert S. Saunders, Esquire, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware. Of Counsel: Jonathan J. Lerner, Esquire, Lea Haber Kuck, Esquire and Joseph N. Sacca, Esquire of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York.

JUDGES: Farnan, District Judge.

OPINIONBY: JOSEPH J. FARNAN, JR

OPINION: MEMORANDUM OPINION

April 20, 2005
Wilmington, Delaware

Farnan, District Judge.

Presently before the Court is a Motion For Sanctions (D.I. 956) filed by Tracinda Corporation ("Tracinda") as a result of Defendants' late production of 61 pages[*2] of documents (the "Valade Notes"), consisting largely of handwritten notes taken by Gary Valade, the Chief Financial Officer of Chrysler and one of the principal

participants in the negotiation of the Merger between Daimler-Benz AG and Chrysler Corporation. The Court has already ruled on Tracinda's requests for trial remedies, denying and mooting those requests in oral rulings codified in a written Order entered on March 31, 2005. The Court also granted Tracinda's request for costs in the March 31, 2005 and will enter an Order awarding Tracinda $556,061, an amount representing 50% of the fees incurred by Tracinda plus the actual expenses incurred in connection with Defendants' late production of the Valade Notes.

I. Background

The trial in this action was recessed on December 16, 2003, after the Court reviewed the Valade Notes and heard applications and argument from the parties concerning the late production of the Notes. The Court concluded that it could not rule on the applications until a hearing was held regarding the factual circumstances of the production problem, and therefore, the Court referred the parties to the Special Master for a hearing.

The Special Master[*3] held a hearing on December 22, 2003, and issued a report on January 12, 2004 detailing his findings. Tracinda filed objections to the report on January 21, 2004.

Shortly thereafter, Tracinda filed the instant Motion For Sanctions requesting the following relief: (1) that Valade be barred from testifying about the subject matter of his notes except in response to questions about the notes by Tracinda and the Court; (2) that Jurgen Schrempp and Thomas Stallkamp be recalled to testify at trial; and (3) that Defendants, jointly and severally, be ordered to pay Tracinda all of its fees and costs incurred from December 16, 2003, through and until the conclusion of trial.

At the teleconference on January 30, 2004, the Court denied Tracinda's request to preclude Valade from testifying except in response to Tracinda and the Court's questions, stating that the Court would "permit [Valade] to testify about all matters" and "consider any objections to that testimony on a showing of undue prejudice post-trial." Tr. 1/30/04 at 4-5. As for Tracinda's request to recall Schrempp and Stallkamp, Defendants agreed to Tracinda's request to have those witnesses recalled. Accordingly, the first two forms[*4] of relief sought by Tracinda have been denied and mooted, respectively, and the Court has entered an Order to that effect. The Court's Order also indicated that Tracinda's motion for sanctions would be granted. The Court's reasoning for that decision and its determination regarding the amount of costs owed to Tracinda follows.

II. The Parties' Contentions

By its Motion, Tracinda contends that it is entitled to attorneys' fees and costs pursuant to *Federal Rules of Civil Procedure 16(f)*, *37(b) (2)*, and *37(c)(1)* as a result of Defendants' failure to comply with the September 25, 2002 discovery order issued by the Special Master and the Court's *Rule 16* Scheduling Order. Tracinda contends that Defendants' delay in producing the Valade Notes was consistent with their pattern of dilatory conduct in discovery throughout this litigation. Tracinda further contends that it has suffered such a high degree of prejudice that it need not show willfulness or bad faith on the part of Defendants to be entitled to sanctions. Specifically, Tracinda contends that timely production[*5] of the Valade Notes would have (1) permitted Tracinda to use them in developing its theories of the case, (2) impacted its decision regarding who to depose, (3) helped determined the order in which to depose witness, i.e. Valade would have been deposed earlier; (4) affected the substance of the depositions and trial testimony. In addition, Tracinda contends that motion practice in the case was negatively affected, because Tracinda could have bolstered its response to Defendants' summary judgment motion had it known about the missing Valade Notes.

In response, Defendants contend that the Special Master never made any findings that Defendants acted in a dilatory manner with respect to discovery, and with respect to the production issue concerning the Valade Notes, the Special Master found that Defendants and their counsel "did not intentionally or in bad faith withhold relevant documents from production." D.I. 944 at 3. Accordingly, Defendants contend that no basis exists for awarding Tracinda monetary sanctions.

III. DISCUSSION

A. Whether Tracinda Is Entitled To Its Costs In Connection With Defendants' Late Production Of The Valade Notes

In pertinent part, *Federal Rule of Civil Procedure 16(f)*[*6] provides:

If a party or party's attorney fails to obey a scheduling or pretrial order . . . the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in *Rule 37(b)(2)(B), (C), (D)*. In lieu of or in addition to any other sanction, the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees,

unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust.

The imposition of monetary sanctions under this rule does not require a showing of bad faith. n1 See *Martin Family Trust v. HECO/Nostalgia Enterprises, Co., 186 F.R.D. 601 (9th Cir. 1999)* (collecting sources and stating that "both courts and commentators agree that sanctions may be imposed for a party's unexcused failure to comply with a *Rule 16* order, even if that failure was not made in bad faith"). Rather, the "intent [of *Rule 16(f)*] is to impose the sanction where the fault lies." *In re Matter of the Sanctions of Jay C. Baker, 744 F.2d 1438, 1440-1441 (10th Cir. 1984)*[*7] (recognizing importance of scheduling orders and court's broad discretion to award sanctions to insure that lawyers and parties "fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial"). The purpose of sanctions under *Rule 16* is "to compensate opposing parties for inconvenience and expense incurred because of any noncompliance with the reasonable management orders of the court." Id.; see also 3 James W. Moore, Moore's Federal Practice § 16.921[5][b][ii] (3d ed. 2003) (stating that *Rule 16* sanctions serve the purpose of "compensation and punishment").

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

N1 See also *Ayers v. City of Richmond, 895 F.2d 1267, 1270 (9th Cir. 1990)* (affirming sanctions imposed on lawyer for failure to attend settlement conference because "the date 'slipped by him'"); *Santos v. U.S. Dept. of Housing and Urban Dev., 1992 WL 165677,* *10 (E.D. Pa. 1992) (recognizing that "court may impose a punitive sanction for even negligent noncompliance with *Rule 16*").

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*8]

Although the Special Master found in his January 12, 2004 Report that Defendants did not act intentionally or in bad faith in withholding the relevant documents from production, the Court concludes that sanctions are warranted in the circumstances of this case. The Court's *Rule 16* Scheduling Order provided for a discovery cut-off date of January 15, 2003. The Valade Notes were highly relevant to issues raised throughout this litigation, yet those notes were produced eleven months after the Court's discovery deadline, on the eve of the last day of trial. As a result of this late production, the Court was required to recess the nearly completed trial and refer this matter to the Special Master for further inquiry into the circumstances surrounding the late production. The remaining days of trial needed to be rescheduled, and trial could not be reconvened until the beginning of February 2004.

In addition to its impact on judicial resources, including the Court's schedule and the management of the trial in this case, the Court also finds that Tracinda was prejudiced to some extent by the delay in production. While the Court tailored the remainder of the trial so as to reduce the prejudice[*9] to Tracinda, the Court could not completely obviate the effect of the late production on Tracinda's ability to develop its case, including most particularly its impact on Tracinda's decision of who to depose, the order of depositions and the substance of its deposition questioning, as well as the substance and conduct of the trial prior to the revelation of the documents.

Although Defendants have offered possible explanations for the delay in production, the Court concludes that those explanations do not amount to substantial justification for the disregard of the Court's Scheduling Order. Indeed, Defendants acknowledged that the Valade Notes were responsive to discovery requests designed by Tracinda and should have been produced during discovery. Thus, it is clear to the Court that, regardless of the reason for the failure to produce these documents, the fault for this production failure and the related delays and proceedings which followed, lies with Defendants. Accordingly, Tracinda is entitled to compensatory sanctions.

B. Whether The Costs Tracinda Seeks Are Reasonable

Having concluded that sanctions should be awarded to Tracinda, the Court must next determine the amount[*10] of the award. Initially, Tracinda requested reimbursement of all of its fees and expenses, and Defendants responded that it would be inappropriate for Tracinda to recover fees or costs incurred in connection with (1) the December 22, 2003 hearing before the Special Master, (2) Tracinda's appeal of the Special Master's findings, 3) Tracinda's motion for sanctions, and (4) the conclusion of trial. However, Tracinda has since modified its request. Specifically, Tracinda requests only half of the fees it incurred plus actual expenses, an amount totaling $556,061, in order to avert the need to litigate any

question concerning the reasonableness of the fees and expenses it seeks. n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 Tracinda's counsel represents that it expended 2300 hours resulting in fees of approximately $870,000. Tracinda has also specified that the costs and fees it seeks in connection with the conclusion of trial pertain to the reexamination of Messrs. Schrempp and Stallkamp.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Defendants have filed additional briefing challenging the reasonableness [*11]of the fees Tracinda requests. Specifically, Defendants contend that Tracinda's affidavit is insufficient to satisfy its burden of demonstrating the reasonableness of its fees, because Tracinda did not submit its actual billing records and only submitted a summary of the hours expended by its attorneys and others without any detail as to the task performed by each of these individuals. Defendants also challenge the amount sought by Tracinda on the grounds that Defendants should not be charged for (1) Tracinda's analysis of "other documents of Gary Valade," (2) Tracinda's preparation for the examination of Mr. Valade, and (3) Tracinda's re-examination of Stallkamp, because the re-examination did not focus on the Valde notes, because these tasks had to be performed regardless of the late production of the Valade Notes and/or are not connected to the late production of the Valade Notes.

In the Court's view, the categories of tasks objected to by Defendants are properly considered in the sanctions award to the extent that those tasks needed additional attention in light of the late production of the Valade Notes. The Court is further persuaded that the amount Tracinda seeks is reasonable, [*12]and therefore, the Court will not parcel out the actual expenses for any of the objected to activities referred to by Defendants. n3 Accordingly, the Court will order Defendants to remit to Tracinda $556,061 in costs.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 Tracinda is certainly entitled to recover the actual costs it incurred in connection with the Special Master's hearing and the re-examination of Messrs. Schrempp and Stallkamp as these activities were precipitated by Defendants' late production of the documents. The only costs remotely in question are the costs incurred by Tracinda in connection with its objection to the Special Master's Report. However, given that Tracinda has requested only 50% of the attorneys' fees it incurred and Tracinda bears no fault for any of the activities resulting from the late production of documents, the Court is persuaded that it should permit recovery of the sum requested by Tracinda without parceling out its costs for objecting to the Special Master's Report.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

IV. CONCLUSION

For the reasons discussed, [*13] the Court has entered an Order granting Tracinda's request for costs. Consistent with this Order and the reasoning espoused in this Memorandum Opinion justifying that Order, the Court will award Tracinda costs in the amount of $556,061.

An appropriate Order will be entered.

ORDER

At Wilmington, this 20 day of April 2005, for the reasons set forth in the Memorandum Opinion issued this date, and in accordance with the Order entered on March 31, 2005;

IT IS HEREBY ORDERED that Tracinda is awarded costs in the amount of $556,061.

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT JUDGE