# EXHIBIT A

7 of 9 DOCUMENTS

**WILLOW BAY ASSOCIATES, LLC, a Nevada limited liability company, Plaintiff,
v. IMMUNOMEDICS INC., a Delaware corporation, et al., Defendant.**

**C.A. No. 00-99-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2002 U.S. Dist. LEXIS 10566**

**June 12, 2002, Decided**

**SUBSEQUENT HISTORY:** Motion denied by, Summary judgment denied by, Summary judgment granted by, Claim dismissed by Willow Bay Assocs., LLC v. Immunomedics, Inc., 2003 U.S. Dist. LEXIS 4426 (D. Del., Mar. 21, 2003)

**DISPOSITION:** The Plaintiff's Motion for Reconsideration wass GRANTED. The Court's order entering summary judgment in favor of the defendants was VACATED.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For WILLOW BAY ASSOCIATES, LLC, plaintiff: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For IMMUNOMEDICS INC., defendant: W. Harding Drane, Jr., William J. Dorgan, Potter Anderson & Corroon, LLP, Wilmington, DE.

For THE ZANETT SECURITIES CORPORATION, counter-claimant: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For WILLOW BAY ASSOCIATES, LLC, counter-defendant: David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For IMMUNOMEDICS INC., counter-claimant: W. Harding Drane, Jr., William J. Dorgan, Potter Anderson & Corroon, LLP, Wilmington, DE.

For WILLOW BAY ASSOCIATES, LLC, counter-defendant: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On February 17, 2000, the plaintiff, Willow Bay Associates, LLC ("Willow Bay") filed a complaint in this court alleging that the defendant, Immunomedics, had breached its contract (a "non-circumvention" or [*2] "reciprocal confidentiality agreement") with Willow Bay. The court entered a schedule setting the dispositive motion deadline at February 15, 2001. The Pre-Trial conference was held on June 16, 2001. By this time, the dispositive motion deadline had lapsed, and the court directed the parties not to file any dispositive motions. Thus, no dispositive motions were filed.

The court scheduled the two day bench trial for Thursday, April 18, 2002 and Friday, April 19, 2002. n1 On Monday, April 15, 2002, the defendant wrote a letter-brief to the court which the defendant maintains was intended to bring a newly discovered case, *Bronner v. Park Place Entertainment Corp.*, 137 F. Supp. 2d 306 (S.D.N.Y. 2001), to the court's attention. However, the letter also asked the court to dismiss the case pursuant to the New York statute of frauds. n2 The plaintiff responded to the motion to dismiss on the next day, Tuesday, April 16, 2002. The plaintiff contended that the

Case 1:04-cv-00138-JJF     Document 92-2     Filed 06/30/2005     Page 3 of 59

Page 2
2002 U.S. Dist. LEXIS 10566, *

"motion to dismiss" should not be granted because, *inter alia*, "a whole host of factual issues" remained to be resolved by a jury.

> n1 The trial was rescheduled twice to accommodate the schedules of the court and the parties. [*3]

> n2 The parties agree that New York law governs this dispute.

The court held a telephone conference with the parties on Tuesday afternoon. During that teleconference, the court told the parties that it would hear oral argument on Wednesday, April 17, at 12:30 p.m. The court also directed the defendant to reply to the plaintiff's letter brief prior to oral argument.

During introductory remarks made during oral argument, the court indicated for the first time that it would consider the motion to dismiss as a motion for summary judgment. (D.I. 104 at 2.) The court heard argument from both parties. Although the plaintiff did not object to the court's conversion of the defendant's motion to dismiss into a motion for summary judgment, the plaintiff did state that it felt that genuine issues of fact precluding summary judgment remained. (*Id.* at 24.) After briefly adjourning the proceedings to take the arguments under advisement, the court returned to the bench and announced that it would grant the defendant's motion for summary judgment. (*Id.* at 28.) The court fully explained the reasons for [*4] its ruling. (*Id.* at 28-34.)

Presently before the court is the plaintiff's motion for reconsideration of the court's decision. The plaintiff argues that the court made a procedural error in converting the motion to dismiss into a motion for summary judgment without prior notice to the plaintiff. The plaintiff also argues that substantive errors flowed from this procedural defect, as the plaintiff was effectively prohibited from presenting evidence to support its position. The defendant argues that even if the court made a procedural error, the plaintiff was not prejudiced by such error because the statute of frauds defense was previously raised in this case. Additionally, the defendant contends that there were no new facts the plaintiff could present that would remove this contract from the purview of the New York statute of frauds.

After reviewing the parties' submissions, the transcripts of record, and the applicable law, the court will grant the plaintiff's motion. Upon reconsideration,

the court agrees that the plaintiff should have been afforded an opportunity to present any necessary facts to the court in opposition to the defendant's summary judgment motion. In order to [*5] correct this error, the court will vacate the April 17 order granting summary judgment and re-open the case. However, to balance the plaintiff's interest in presenting facts with the defendant's interest in raising the statute of frauds defense, the court will allow either party to submit a motion for summary judgment stating that it is entitled to judgment in its favor as a matter of law. In support of or in opposition to any such motion, the plaintiff will be permitted to present any necessary facts. The court will now explain its reasoning.

## II. STANDARD OF REVIEW

As a general rule, motions for reconsideration should be granted only "sparingly." *See Karr v. Castle*, 768 F. Supp. 1087, 1090 (D. Del. 1991). In fact, these types of motions are only granted if it appears that the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension. *See, e.g., Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)); [*6] *see also Karr*, 768 F. Supp. at 1090 (citing same).

In addition, the Third Circuit has explained that a district court should also grant a motion for reconsideration which alters, amends, or offers relief from a judgment when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence which was not available to the moving party at the time of the judgment; or (3) there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (relying on *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).

Nevertheless, as the *Brambles* court made clear, motions for reconsideration "should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." 735 F. Supp. at 1240. In these situations, such a motion should be denied because any other ruling would effectively encourage parties to engage in an endless debate with the court and, thus, delay the ultimate resolution of [*7] the litigation. *See Oglesby v. Penn Mut. Life Ins. Co.*, 877 F. Supp. 872, 892 (D. Del. 1994) (noting that motions for reconsideration "should not be abused to allow for a never-ending polemic between the litigants and the court"); *Brambles*, 735 F. Supp. at 1240 ("The procedural mechanism provided by

the rule should not be undermined to allow for endless debate between the parties and the [court.").

## III. DISCUSSION

A motion for reconsideration may be granted where there is a need to correct a legal or factual error which has resulted in a manifest injustice. See *Max's Seafood*, 176 F.3d at 677. In this case, the court made a procedural error in converting the motion to dismiss to a motion for summary judgment without providing notice to the plaintiff. Rule 12(b) of the Federal Rules of Civil Procedure dictates that if a motion to dismiss is treated as a motion for summary judgment under Rule 56, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b). Rule 56 also permits a party opposing summary judgment to present affidavits in support [*8] of its position. See FED. R. CIV. P. 56(c). The Third Circuit has stated that the district court's failure to provide notice to parties can constitute reversible error under certain circumstances. See *In re: Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 289 (3d Cir. 1999). However, the failure to provide notice is harmless error if the complaint would not survive a motion to dismiss. See *id.*

The court concludes that at minimum, the plaintiff's complaint might have survived a motion to dismiss. In ruling on a motion to dismiss, the factual allegations of the complaint must be accepted as true. See *Graves v. Lowery*, 117 F.3d 723, 726 (3d Cir. 1997); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. See *Jenkins v. McKeithen*, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be [*9] proved consistent with the allegations." See *Graves*, 117 F.3d at 726; *Nami*, 82 F.3d at 65 (both citing *Conley v. Gibson*, 355 U.S. 41, 45, 2 L. Ed. 2d 80, 78 S. Ct. 99-46 (1957)).

A review of the plaintiff's complaint indicates that there is probably a set of facts under which the plaintiff might prevail. Although the defendant has raised the statute of frauds as a defense, in both its April 16 letter brief and the April 17 oral argument, the plaintiff stated that there may be a set of facts under which the statute of limitations defense would be inapplicable. Since the court concludes that there is a set of facts under which the plaintiff could prevail and therefore survive a motion to dismiss, the court concludes that the conversion of the motion to dismiss into a motion for summary judgment without notice to the plaintiff was not harmless error.

The defendant contends that the plaintiff suffered no prejudice as a result of the court's conversion because the statute of limitations issue had previously been introduced into the case. The court agrees that the statute of limitations defense was raised well before the April 17 oral argument. However, the plaintiff [*10] does not request reconsideration because the issue was newly presented at oral argument. The basis for the plaintiff's request is that the court's conversion of the motion to dismiss into a motion for summary judgment without prior notice deprived the plaintiff of the opportunity to present its version of the facts to the court. The defendant has not cited any authority stating that the plaintiff does not have the right to such notice or the right to present facts prior to the entry of summary judgment. Moreover, even if the statute of frauds issue was known to the plaintiff, it was raised anew a mere three days before trial. Given the fact that the plaintiff had such a short period of time in which to defend the motion to dismiss and the fact that the court only told the plaintiff at the beginning of oral argument that it would convert the motion to dismiss, it is unfair to conclude that the plaintiff had a sufficient opportunity to present all facts necessary to resist the defendant's motion. n3

> n3 The court notes that the plaintiff did not raise the notice issue during oral argument and thus the notice issue could be considered waived. However, given the fact that the rapid evolution of events may not have given the plaintiff the opportunity to object to the conversion and the fact that the plaintiff did oppose the entry of summary judgment, the court finds that the plaintiff sufficiently preserved the notice issue for purposes of reconsideration.

[*11]

## IV. CONCLUSION

For all of these reasons, the court will vacate its April 17, 2002 order granting summary judgment in favor of the defendant and will re-open this case to permit the plaintiff to present any additional facts necessary to support its claim. However, both the plaintiff and the defendant will be prohibited from introducing new causes of action or new defenses not previously raised in this litigation. n4 Additionally, to ensure that both the plaintiff and the defendant are given a fair opportunity to fully address their claims and defenses, either party will be permitted to submit a motion for summary judgment for the court's consideration. The parties are directed to agree to a briefing schedule and submit it to the court within thirty

2002 U.S. Dist. LEXIS 10566, *

(30) days of this order. If the court finds that the statute of frauds is inapplicable, this case will be scheduled for trial.

> n4 For instance, the plaintiff's motion for reconsideration argues that the plaintiff might prevail on a quantum meruit theory. However, the plaintiff's complaint does not seek recovery based on quantum meruit - only breach of contract. At this late stage in the litigation, the plaintiff will not be permitted to pursue a cause of action which is not contained in the complaint and is therefore new to this litigation. *See Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 15 F. Supp. 2d 406, 409 (D. Del. 1998) (noting that a motion for reconsideration "may not be used as a vehicle to advance additional arguments that a party could have made before judgment but neglected to do so").

[*12]

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1.   The   Plaintiff's   Motion   for Reconsideration (D.I. 105) is GRANTED.

2. The Court's April 17, 2002 order entering summary judgment in favor of the defendants (D.I. 101) is VACATED.

3. The parties are hereby directed to submit a stipulated summary judgment briefing schedule to the court within thirty (30) days from the date of this order.

4. The clerk's office shall re-open this case.

5. The defendant's motion to strike the plaintiff's reply brief (D.I. 110) is DISMISSED as MOOT.

Dated: June 12, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| GTECH CORPORATION,<br><br>     Plaintiffs,<br><br>   v.<br><br>SCIENTIFIC GAMES INTERNATIONAL, INC.,<br>SCIENTIFIC GAMES HOLDINGS<br>CORPORATION, SCIENTIFIC GAMES<br>FINANCE CORPORATION, and SCIENTIFIC<br>GAMES CORPORATION,<br><br>     Defendants. | Civil Action No. 04-138-JJF |

## PLAINTIFF GTECH CORPORATION'S RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff, GTECH Corporation ("GTECH"), hereby serves the following objections and responses to Defendants', Scientific Games International, Inc., Scientific Games Holdings Corporation, Scientific Games Finance Corporation, and Scientific Games Corporation (collectively, "Defendants"), First Set of Interrogatories.

## GENERAL OBJECTIONS

1. GTECH objects to the interrogatories to the extent that the interrogatories, the instructions and/or definitions contained or incorporated therein are inconsistent with and/or attempt to impose obligations beyond those imposed by the Federal Rules of Civil Procedure and/or by the Local Rules of the United States District Court for the District of Delaware ("Local

Rules"), or to the extent that they contravene orders of this Court, or to the extent that they assume facts not in evidence or not otherwise accepted or conceded by GTECH.

2. GTECH objects to the interrogatories to the extent that they seek confidential technical and financial information. GTECH will produce such information only under an appropriate Protective Order entered by the Court in this Action.

3. GTECH objects to each interrogatory to the extent that they call for information covered by protective orders in other litigations, third-party confidentiality agreements, or other legal duties of confidentiality.

4. GTECH objects to each interrogatory to the extent that it calls for information that is protected by the attorney-client privilege and/or the attorney work-product doctrine or is otherwise immune from discovery. Such information will not be produced. Inadvertent disclosure of such information shall not constitute a waiver of the right of GTECH to object to the use of, and/or seek the return of, any such information that may be inadvertently disclosed. GTECH will comply with the Federal Rules of Civil Procedure and the Local Rules in identifying privileged material and work product immune material.

5. GTECH objects to each interrogatory to the extent that it seeks information not relevant to the claim or defense of any party in this Action and/or not reasonably calculated to lead to the discovery of admissible evidence.

6. GTECH objects to each interrogatory to the extent that it requests information that is not within the possession, custody, or control of GTECH, or that is publicly available, uniquely within the control of Defendants, or equally unavailable to both GTECH and Defendants, and therefore improperly seeks to extend GTECH's obligations beyond the requirements of the Federal Rules of Civil Procedure and the Local Rules.

2

7.    GTECH objects to each interrogatory to the extent that it seeks discovery of information available through other means that are less burdensome, less expensive, or more appropriate than through these interrogatories.

8.    GTECH objects to each interrogatory to the extent that it is vague, overly broad and unduly burdensome.

9.    GTECH objects to each interrogatory to the extent it seeks information without reference or limitation to any relevant time period as overbroad, unduly burdensome and seeking information that is neither relevant to the claim or defense of any party in this Action, nor reasonably calculated to lead to the discovery of admissible evidence.

10.    GTECH objects to each interrogatory to the extent that it incorporates, and seeks responses based on, erroneous statements of pertinent law.  No response by GTECH is not to be construed as agreement with Defendants' erroneous statements of pertinent law.

11.    The disclosure of any irrelevant information, whether or not in response to any interrogatory, is not to be construed as a waiver of any claim of irrelevancy.

12.    GTECH expressly reserves the right to supplement, amend, modify or correct these General Objections, as well as its specific Responses and Objections to Defendants' interrogatories.

13.    GTECH objects to the Definitions as vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Specifically, GTECH objects to the terms "affiliated companies" and "Interlott Technologies, Inc."

14.    All responses are made on an express reservation of the general objections and responses set forth above, and any specific objections set forth below.

3

## Interrogatory No. 1

With respect to your allegation that Scientific Games is infringing the Patents-In-Suit "under 36 U.S.C. 271(a), (b) and/or (c) by making, using, offering for sale, selling and/or importing into the Untied States products ... and/or by contributing to or inducing such infringement by others," identify each claim of the Patents-in-Suit that you contend is infringed and for each asserted claim, identify each allegedly infringing product and describe in detail the basis for your allegation of infringement (including whether literal or under the doctrine of equivalents), state each fact supporting that allegation, identify each person with knowledge relating to that fact and each document relating to that fact, and provide claim charts setting forth how each limitation of each asserted claim of the Patents-in-Suit is met by each allegedly infringing product.

## Response No. 1

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, GTECH specifically objects to the term "each asserted claim" as being vague since discovery has not yet been completed and all the claims to be asserted in this Action cannot yet be known. GTECH further objects to this interrogatory to the extent that it is premature given the early stages of the litigation. Details of claims of infringement are more appropriately addressed in expert discovery, for which the Court has set a schedule. In addition, GTECH specifically objects to this interrogatory because it is a compound interrogatory which asks discrete questions that should have been asked, and should be counted, as separate interrogatories.

Subject to the General Objections and the foregoing specific objections, GTECH contends that Defendants' ticket dispenser machines, including but not limited to the PlayCentral Kiosk, directly infringe at least claim 18 of U.S. Patent No. 5,222,624 (the "'624 Patent"), and at least claims 20, 21 and 28 of U.S. Patent No. 4,982,337 (the "'337 Patent"), literally and/or under the doctrine of equivalents.

4

With respect to the '624 patent, GTECH believes that infringement can be determined from a visual inspection of machines as they are presently installed, as well as from publicly available Scientific Games machine specifications and marketing material, e.g. "Scientific Games International PlayCentral™ Lottery Ticket Kiosk" ("R1"), Scientific Games International's "Proposal to Tennessee Lottery" ("R2"), Scientific Games International's 2004 Advertisement from LAFLEURS ("R3") and the September 2003 issue of *SGI Today* ("R4").

| Patent | Claim | Infringing Product |
|---|---|---|
| 5,222,624 | 18. A lottery ticket vending machine comprising, in combination, a housing, | *See, e.g.,* R1. |
| | display means for displaying an array of lottery ticket representations viewable from outside of said housing by a customer, said array representing tickets in said machine available for purchase, | *See, e.g.,* R2 & R4. |
| | acceptor means for receiving and accepting a means of monetary exchange, and | *See, e.g.,* R2. |
| | means for dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer, | *See, e.g.,* R1 & R2. |
| | in which said display means comprises video display means for displaying a plurality of arrays of ticket images on a video screen. | *See, e.g.,* R2 & R3. |

With respect to the '337 Patent, GTECH states that these claims are grounded on information and belief that literature for the Defendants' machines, such as the PlayCentral Kiosk, is marked with the U.S. Patent No. 5,950,898 ("R5"). The PlayCentral Kiosk is believed to operate as disclosed therein. In addition, GTECH states that these claims are also grounded on the references cited above for the '624 Patent.

5

| Patent | Claim | Infringing Product |
|---|---|---|
| 4,982,337 | 20. A ticket dispensing machine for dispensing tickets directly to the purchaser thereof, said dispenser comprising the combination of | |
| | housing means for storing a strip of tickets to be dispensed, | *See, e.g.,* R1. |
| | said housing means having an outlet opening accessible to the purchaser of tickets from said machine, | *See, e.g.,* R2. |
| | means operable for ordering a plurality of tickets in a single batch, | *See, e.g.,* R4. |
| | means for separating each of said tickets from said strip, | *See, e.g.,* R2 & R5. |
| | dispensing means for dispensing tickets through said outlet opening, and | *See, e.g.,* R2 & R5. |
| | control means for causing each ticket in said batch to be separated and dispensed separately from the other tickets in said batch regardless of the number of tickets in said batch. | *See, e.g.,* R2 & R5. |
| 4,982,337 | 21. A machine as in claim 20 in which said tickets are instant-winner lottery tickets. | *See, e.g.,* R1 & R2. |
| 4,982,337 | 28. A dispenser for dispensing tickets from a strip of tickets printed in a strip with the individual tickets being delineated from one another by lines of weakness, | |
| | moving means for moving said strip by a predetermined distance to a position in which one of said lines is near a separation location at which adjacent tickets are separated from one another, | *See, e.g.,* R1 & R5. |
| | said moving means comprising drive means for moving said strip by a pre-determined distance, and | *See, e.g.,* R1 & R5. |

6

| position detecting means for detecting the distance actually moved by said strip and producing an output signal to control said drive means to drive said strip until said output signal indicates that said strip actually has moved by said pre-determined distance to dispense one of said tickets, and to control means for severing a ticket from said strip. | *See, e.g.,* R1, R2, & R5. |
| --- | --- |

It is believed that the persons most knowledgeable about the accused products are current and former employees or agents of the Defendants.

**Interrogatory No. 2**

For each limitation of any asserted claim of the Patents-in-Suit written in means-plus-function or step-plus-function format pursuant to 35 U.S.C. § 112, ¶ 6, identify the structure or act corresponding to each such claim limitation described in the specification of the patent, identify each element or step of any allegedly infringing product that you contend has the same function and the same or equivalent structure or act, state each fact supporting that allegation, and identify each person with knowledge relating to that fact and each document relating to that fact.

**Response No. 2**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. GTECH further objects to this interrogatory to the extent that it seeks documents and information protected from disclosure by the attorney-client privilege or work product doctrine. GTECH also objects to this interrogatory to the extent it is premature given the current phase of this case. The function and supporting structure of elements is a claim construction issue, for which the Court has set a claim construction briefing schedule. Additionally, GTECH specifically objects to the term "any asserted claim" as being vague since

7

discovery has not yet been completed and all the claims to be asserted in this Action cannot yet be known.

Subject to the General Objections and the foregoing specific objections, GTECH does not contend that any elements of claim 18 of the '624 Patent are subject to interpretation pursuant to 35 U.S.C. §112, ¶6.   In the event the Court were to find otherwise, GTECH reserves the right to supplement this interrogatory.

Claims 20, 21 and 28 of the '337 Patent are written in means-plus-function or step-plus-function format pursuant to 35 U.S.C. §112, ¶6.

|          | Means |
|----------|-------|
| Claim 20 | means for separating |
|          | means operable for ordering a plurality of tickets in a single batch |
| Claim 28 | means for severing |
|          | position detecting means |

**Interrogatory No. 3**

For each asserted claim of the Patents-in-Suit, state GTECH's proposed construction of each claim term and identify any special or uncommon meaning, state in detail the basis for GTECH's construction, state each fact supporting GTECH's construction, identify each part of the specification or prosecution history that supports GTECH's construction, identify any extrinsic evidence that supports GTECH's construction, identify any item of evidence that is contrary to GTECH's construction, and identify each person with knowledge relating to GTECH's construction and each document relating to GTECH's construction.

**Response No. 3**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery

8

of admissible evidence. GTECH further objects to this Interrogatory to the extent that it seeks documents and information protected from disclosure by the attorney-client privilege or work product doctrine and to the extent that it is premature given the early stages of the litigation. Additionally, GTECH specifically objects to the term "each asserted claim" as being vague since discovery has not yet been completed and all the claims to be asserted in this Action cannot yet be known.

GTECH also objects to this interrogatory to the extent it is premature. The Court's scheduling order provides a scheduled period for claim construction briefing.

**Interrogatory No. 4**

State the date of conception and reduction to practice of each asserted claim of the Patents-in-Suit, describe in detail the circumstances surrounding the conception and reduction to practice of that claim, state whether there was diligence from conception to reduction to practice, and if there was, state each fact relating to such diligence, and identify each person with knowledge of any fact relating to conception, reduction to practice or diligence, and identify each document relating to conception, reduction to practice or diligence.

**Response No. 4**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. The conception and reduction to practice of the invention is not relevant to any presently asserted claim or defense in the case. GTECH further objects to this Interrogatory to the extent that it is premature given the early stages of the litigation. Additionally, GTECH specifically objects to the term "each asserted claim" as being vague since discovery has not yet been completed and all the claims to be asserted in this Action cannot yet be known.

9

Subject to the General Objections and the foregoing specific objections, GTECH states that it will rely on a date not later than February 17, 1989 for the '624 Patent and December 3, 1987 for the '337 Patent.

**Interrogatory No. 5**

For each of the named inventors of the Patents-in-Suit, and any other persons involved in the development of each invention of the Patents-in-Suit, state the last known address of such person, describe in detail that person's past and present relationship with GTECH, and identify any agreements that person has with GTECH.

**Response No. 5**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. GTECH further objects to this interrogatory to the extent that it seeks documents and information obtainable through other means that are less burdensome, less expensive, or more appropriate than through these interrogatories.

Subject to the General Objections and the foregoing specific objections, GTECH states the following:

| Name | Last Known Address |
|---|---|
| Robert L. Burr | 7515 Charmant Dr. Ste. 1407 San Diego, CA |
| Laird A. Campbell | Rte. 2, Box 223 Laceys Springs, Alabama |
| Donald H. Keagle | 2018 Hensel Avenue Huntsville, Alabama |
| Alfred L. Fulton | 9423 O'Jay Dr. Huntsville, Alabama |
| Ed Turek | 5691 Kugler Mill Rd. Cincinnati, OH |

10

Additionally, subject to a Protective Order being entered by the Court in this Action, GTECH will produce available, non-privileged documents from which information responsive to this interrogatory may be derived or ascertained.

**Interrogatory No. 6**

State the basis for your allegation that GTECH is the owner of the entire right, title and interest in the Patents-in-Suit, state each fact supporting that allegation, and identify each person with knowledge relating to that fact and each document relating to that fact.

**Response No. 6**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, and unduly burdensome. GTECH further objects to this interrogatory to the extent that it seeks documents and information obtainable through other means that are less burdensome, less expensive, or more appropriate than through these interrogatories. Subject to the General Objections and the foregoing specific objections, GTECH states that it is the owner of the entire right, title and interest in the Patents-in-Suit as documented with the United States Patent and Trademark Office.

Subject to the General Objections and the foregoing specific objections, GTECH will produce available non-privileged documents from which information responsive to this interrogatory may be derived or ascertained.

**Interrogatory No. 7**

Identify each item of prior art, or possible prior art, to any Patents-in-Suit, Related Patent, or Related Application, state the date GTECH or its counsel became aware of it, describe how GTECH or its counsel became aware of it, and identify each document relating to that prior art or possible prior art.

11

**Response No. 7**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Specifically, GTECH objects to the terms "possible prior art" as being undefined, vague, and ambiguous.

Subject to the General Objections and the foregoing specific objections, GTECH will produce available non-privileged documents from which information responsive to this interrogatory may be derived or ascertained.

**Interrogatory No. 8**

For each asserted claim of the Patents-in-Suit, describe in detail the first embodiment of each claimed invention in the United States, identify by name or other designation each product that GTECH contends embodies any claimed invention and the claims allegedly embodied, identify when each such embodiment was first offered for sale, sold, publicly used or disclosed, and the circumstances surrounding the offer, sale, use or disclosure, and identify each person with knowledge relating to these facts and each document relating to these facts.

**Response No. 8**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, GTECH specifically objects to the term "each asserted claim" as being vague since discovery has not yet been completed and all the claims to be asserted in this Action cannot yet be known. GTECH objects to the terms "the first embodiment of each claimed invention", "embodies any claimed invention", "claims allegedly embodied", "each such embodiment", and "circumstances surrounding", as vague, ambiguous, and overbroad.

12

Subject to the General Objections and the foregoing specific objections, GTECH will produce available non-privileged documents from which information responsive to this interrogatory may be derived or ascertained.

**Interrogatory No. 9**

State whether GTECH will rely on any secondary considerations or objective indicia of nonobviousness of any asserted claim of the Patents-in-Suit and, if so, state in detail GTECH's contentions with respect to each such consideration or indicia, state each fact supporting GTECH's contentions, and identify each person with knowledge of each such fact and each document relating to that fact.

**Response No. 9**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. GTECH further objects to this Interrogatory to the extent that it seeks documents and information protected from disclosure by the attorney-client privilege or work product doctrine and to the extent that it is premature given the early stages of the litigation. Additionally, GTECH specifically objects to the term "any asserted claim" as being vague since discovery has not yet been completed and all the claims to be asserted in this Action cannot yet be known.

GTECH also objects to this interrogatory as premature and irrelevant to any presently asserted claim or defense in the case. The Patents-in-Suit are lawfully issued and presumed valid.

**Interrogatory No. 10**

        For each asserted claim of the Patents-in-Suit, identify the field of the invention, state the level of ordinary skill in the art, state each fact relating to your contention, and identify each person with knowledge of that fact and each document relating to that fact.

**Response No. 10**

        In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Specifically, GTECH objects to the terms "field of the invention" as vague and overly broad. Additionally, GTECH specifically objects to the term "each asserted claim" as being vague since discovery has not yet been completed and all the claims to be asserted in this Action cannot yet be known. GTECH specifically objects to this interrogatory because it is a compound interrogatory which asks discrete questions that should have been asked, and should be counted, as separate interrogatories.

        GTECH also objects to this interrogatory as premature and irrelevant to any presently asserted claim or defense in the case. The Patents-in-Suit are lawfully issued and presumed valid.

**Interrogatory No. 11**

        State each fact supporting your allegation that GTECH has been or is being damaged by the alleged infringement of the Patents-in-Suit, state the nature and amount of the damages allegedly incurred, describe in detail the calculation of the amount of damages, including but not limited to the methods and factors used in the calculation, and identify each person with knowledge of each such fact and each document relating to that fact.

**Response No. 11**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

As to the extent of the injury suffered and the amount of damages, GTECH objects to the extent that this interrogatory is more appropriate for expert discovery, for which a schedule has been set by the Court.

Subject to the General Objections and the foregoing specific objections, GTECH will produce available non-privileged documents from which information responsive to this interrogatory may be derived or ascertained.

**Interrogatory No. 12**

State each fact supporting your allegation that defendants' infringement of the Patents-in-Suit "has been and will be willful," and identify each person with knowledge relating to each such fact and each document relating to that fact.

**Response No. 12**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to General Objections and the foregoing specific objections, GTECH states that Defendants have had knowledge of their willful conduct and are in the best position to supply information responsive to this request. On information and belief, GTECH asserts that Scientific Games has been aware of the Patents-in-Suit as least as early as its 1997 business interaction with On-Point Technologies regarding ticket vending machines.

15

**Interrogatory No. 13**

Describe in detail all communications that GTECH, or any representative of GTECH, has had with any third party, including but not limited to any state lottery agency, concerning this lawsuit, either or both of the Patents-in-Suit, or any allegation of infringement of any patent by any of the defendants, and identify each person with knowledge of any such communication and each document relating to any such communication.

**Response No. 13**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. The requested information is not relevant to any claim or defense presently asserted in this lawsuit, nor is it reasonably calculated to lead to such information.

**Interrogatory No. 14**

Identify each product that you contend competes with the PlayCentral Kiosk, describe the markets in which it competes, and identify each person with knowledge of that product and each document relating to that product.

**Response No. 14**

In addition to the General Objections, GTECH objects to this interrogatory as vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Specifically "competes with" and "relating to" are vague and ambiguous.

16

GTECH also objects to this interrogatory to the extent it is premature, and calls for information more appropriately obtained in expert discovery, for which the Court has set a schedule.

As to objections:

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Dated: August 18, 2004

Jos W. Ingerson (#1088)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: 302-571-6600
Facsimile: 302-571-1253

OF COUNSEL:

Thomas J. Meloro
Robert A. Whitman
Andrew L. Reibman
KENYON & KENYON
One Broadway
New York, New York 10004
Telephone: (212) 425-7200
Facsimile: (212) 425-5288

17

## CERTIFICATE OF SERVICE

I, Josy W. Ingersoll, Esquire, hereby certify that copies of the foregoing document were caused to be served on August 16, 2004 upon the following counsel of record:

### BY HAND DELIVERY

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

Josy W. Ingersoll

# EXHIBIT C

LEXSEE 2002 U.S. DIST. LEXIS 19110

R2 TECHNOLOGY, INC., and SHIH-PING WANG, Plaintiffs, v. INTELLIGENT
SYSTEMS SOFTWARE, INC., Defendant.

C.A. No. 02-472 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2002 U.S. Dist. LEXIS 19110

October 9, 2002, Decided

**SUBSEQUENT HISTORY:** Patent interpreted by R2
Tech. v. Intelligent Sys. Software, Inc., 2003 U.S. Dist.
LEXIS 7436 (D. Del., Apr. 30, 2003)

**DISPOSITION:** [*1] Defendants' motion to transfer
DENIED. Defendants' motion for more definite
statement DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For R2 Technology Inc, Shih-Ping Wang,
PLAINTIFFS: Maryellen Noreika, Morris, Nichols,
Arsht & Tunnell, Wilmington, DE USA.

For Intelligent Systems Software, Inc, Issi Acquisition
Corporation, Icad Inc, DEFENDANTS: Linda
Richenderfer, Saul Ewing LLP, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES
DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On June 3, 2002, the plaintiffs, R2 Technology, Inc.
and Shih-Ping Wang (collectively "R2"), filed the above-
captioned action alleging patent infringement of a
medical device that analyzes mammograms and marks
possible signs of breast cancer. On July 11, 2002, R2
filed its First Amended Complaint. Rather than respond
to this complaint, however, the defendants, Intelligent

Systems Software, Inc. ("ISSI"), ISSI Acquisition
Corporation, Inc. ("ISSI Acquisition"), and Icad, inc.
("Icad") (collectively "the defendants" or "Icad"), moved
to transfer this case to the Southern District of Florida
and for a more definite statement of the complaint. For
the following reasons, [*2] the court will deny both of
the defendants' motions.

### II. DISCUSSION

R2 is a privately-owned Delaware corporation, with
its principal executive offices located in Northern
California. It manufactures, and sells, proprietary
medical systems to assist radiologists in cancer detection.
In 1998, the United States Food and Drug Administration
("FDA") approved R2's ImageChecker product.
ImageChecker is the first commercially manufactured
computer-aided detection ("CAD") system for analyzing
mammograms by marking suspicious image features. In
effect, ImageChecker operates as a second pair of "eyes"
to assist radiologists in detecting breast cancer. R2 has
also obtained numerous other CAD-related patents.

Icad is a Delaware corporation with twenty-nine
employees located in offices in New Hampshire and
Florida. It is a public corporation and is listed on the
NASDAQ. Like R2, Icad develops, manufactures, and
sells a CAD system that analyzes mammograms. It
obtained FDA approval to sell its MammoReader
throughout the United States earlier this year.

#### A. Motion to Transfer

Icad first moves to transfer this action to the United
States District Court for the Southern District of [*3]
Florida pursuant to 28 U.S.C. § 1404(a). n1 Section
1404(a) provides that "for the convenience of [the]
parties and [the] witnesses, in the interest of justice," the

court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). While R2 and Icad do not expressly agree that this action could have been filed in the Southern District of Florida, there can be little dispute that this is so because Icad's principal place of business is located within that judicial district. *See* 28 U.S.C. § 1400(b) (stating that "any action for patent infringement may be brought in the judicial district where the defendant resides . . . .").

> n1 Icad does not dispute that the present court has personal jurisdiction over it, nor does it dispute that venue is proper in the District of Delaware.

Having satisfied the initial section 1404(a) requirement, the court will, therefore, move on with the inquiry as directed [*4] by the Third Circuit. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). In *Jumara*, the Third Circuit provided a list of factors to assist the district court in determining "whether, on balance, the litigation would conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court may consider. *See id.*

Upon consideration of the applicable *Jumara* factors, the court finds that Icad has not met its burden of demonstrating that transfer is appropriate. In reaching this conclusion, the court relies on the following considerations, among others: (1) although Icad is a relatively small corporation, it has a nationwide presence and is publicly traded on the NASDAQ; (2) both parties are incorporated in Delaware and should reasonably expect to litigate in the forum; (3) there is nothing in the record to suggest that any potential third-party fact witnesses are unwilling or unable to testify before the court; (4) discovery will not be unduly hampered by litigating the case in Delaware; (5) no documents will be unavailable [*5] for trial in Delaware; and (6) Florida does not have a greater interest in adjudicating this case because this is a patent infringement action where the parties market their products nationally. *See Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 207 (D. Del. 1998). Thus, in light of these considerations, the court cannot conclude that the 'balance of convenience' tips strongly in favor of transfer.

**B. Motion for a More Definite Statement**

Icad also moves for a more definitive statement pursuant to Federal Rule of Civil Procedure 12(e). In making its argument, Icad points out that the First Amended Complaint is only ten paragraphs long.

Paragraph eight alleges that the defendants "have directly and contributorily infringed, and have induced others to infringe one or more claims" of the patents-in-suit "by making, using, selling, and/or offering to sell Computer-Aided Detection systems, which are identified by the trade name 'MammoReader.'" To cure this alleged defect, Icad asks that R2 be required to file another amended complaint that "identifies, for each of the three patents-in-suit, the claims at issue and states, for each defendant, whether the alleged [*6] infringement of each such claim is direct, contributory, and/or inducement to infringe." Because the court does not believe that the complaint is "so vague or ambiguous" that Icad could not be "reasonably . . . required to frame a responsive pleading" to it, the court will deny Icad's motion.

The decision of whether to grant or deny Icad's motion rests within the sound discretion of the district court. *See Scriptgen Pharmaceuticals, Inc. v. 3-Dimensional Pharmaceuticals, Inc.*, No. 98-583-GMS, slip. op. at 3 (D. Del. Feb. 22, 1999) (citing 5A CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1377, at 600-601 & n.3 (2d ed. 1990)). Courts generally view motions for a more definitive statement with disfavor. *See Frazier v. Southeastern Pennsylvania Transp. Auth.*, 868 F. Supp. 757, 763 (E.D. Pa. 1994); *Geir v. Educational Serv. Unit No. 16*, 144 F.R.D. 680, 685 (D. Neb. 1992). They do so because the Federal Rules of Civil Procedure require that a pleading contain only a "short and plain statement of the claim showing that the party is entitled to relief." FED. R. CIV. P. 8. As a result, a party may only move for a more definitive [*7] statement in an effort to remedy an unintelligible pleading. *See In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 207 (E.D.N.Y. 1997).

Furthermore, the Rule 8 standard does not change in an action for patent infringement. *See* ,Scriptgen Pharmaceuticals, Inc. 98-583-GMS, slip. op. at 3; *see also* FED. R. CIV. P. 84, Appendix of Forms, Form 16 (Complaint for Infringement of Patent). Indeed, it is apparent from the form patent infringement complaint that a complaint need only identify the patent, not the specific claims, being asserted. *See* FED. R. CIV. P. 84, Appendix of Forms, Form 16; *see also Gen-Probe, Inc. v. Amoco Corp., Inc.*, 926 F. Supp. 948, 960 (S.D. Cal. 1996) (stating that "the Federal Rules do not require that the plaintiff plead with particularity the specific patent claims that have been infringed . . .").

Icad does not dispute that there is no requirement in the Federal Rules of Civil Procedure that R2 plead with the specificity Icad now requests. It nevertheless argues that the facts of this case are such that the court should exercise its discretion in Icad's favor. In essence, Icad argues that because there are three defendants in this [*8]

2002 U.S. Dist. LEXIS 19110, *

case, and three patents with a possible eighty-two claims, the court should require a more stringent pleading standard. For the following reasons, the court disagrees.

First, it is not entirely clear that the defendants are, in fact, three "distinct entities." Although the complaint technically names three defendants, ISSI, ISSI Acquisition, and Icad, these companies appear to be the same entities using different names. Indeed, Icad's CEO, Kip Speyer, explained that ISSI merged into Icad on June 28, 2002, and that ISSI Acquisition is merely a shell company that has "no staff and has had no operations than to facilitate the acquisition of ISSI" Speyer Decl., PP3-6. Moreover, the three defendants are represented by the same counsel. Thus, the court is not persuaded by Icad's argument that each of the three defendants will have to independently analyze the infringement claims. Nor is the court persuaded by the fact that there are a possible eighty-two claims in this action. See *Scriptgen*, 98-583-GMS, slip op. at 3 (citing *Thomson S.A. v. TimeWarner, Inc.*, No. 94-83 slip op. at 4 (D. Del. June 2, 1994) (Longobardi, C.J.) (reaching the same conclusion in a case involving four [*9] patents which contained a total of three hundred and twenty-two claims)).

Further, after reviewing R2's First Amended Complaint, the court concludes that it otherwise conforms to federal pleading requirements. In addition to setting forth an allegation of jurisdiction and identifying the patents-in-suit, the complaint plainly and succinctly states that the defendants are being sued for their alleged direct and contributory infringement and for having induced others to infringe one or more of the claims by "making, using, selling, and/or offering to sell Computer-Aided Detection systems." Therefore the court will deny Icad's motion.

### III. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

> 1. The Defendants' Motion to Transfer (D.I. 12) is DENIED.

> 2. The Defendants' Motion for a More Definite Statement (D.I. 12) is DENIED.

> 3. The Defendants shall file an Answer to the Plaintiffs' First Amended Complaint within twenty (20) days of the date of this order.

Dated: October 9, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT D

2 of 3 DOCUMENTS

**BAYER AG, Plaintiff, v. SONY ELECTRONICS, INC., et al., Defendants.**

Civil Action No. 95-8-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2001 U.S. Dist. LEXIS 25559

December 20, 2001, Decided

**SUBSEQUENT HISTORY:** Findings of fact/conclusions of law at, Judgment entered by Bayer AG v. Sony Elecs., Inc., 229 F. Supp. 2d 332, 2002 U.S. Dist. LEXIS 21330 (D. Del., 2002)

**PRIOR HISTORY:** Bayer AG v. Sony Elecs., Inc., 202 F.R.D. 404, 2001 U.S. Dist. LEXIS 12851 (D. Del., 2001)

**DISPOSITION:** [*1] Bayer's request to compel production granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** Rudolf E. Hutz, Esquire of CONNOLLY, BOVE, LODGE, & HUTZ, Wilmington, Delaware. Attorney for Plaintiff.

Douglas E. Whitney, and Mary B. Graham, Esquires of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware. Attorney for Defendant.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

### FARNAN, DISTRICT JUDGE

Presently before the Court in this patent infringement action are letters to the Court regarding discovery disputes. (D.I. 409, 410, 411, 414, 415, 416, 418, 419, 420). For the reasons discussed, the Court will grant in part and deny in part the requests.

### BACKGROUND

Plaintiff Bayer AG ("Bayer") filed this action [*2] against Defendant Sony Electronics, Inc. ("SEL") for infringement of United States Patent No. 4,290,799 ("the '799 Patent") through the sale of recording medial containing certain metal powders. (D.I. 1). Subsequently, Bayer filed a second action against Sony Corporation, Inc. ("Sony") and Defendant Dowa Mining Co. ("Dowa") (collectively, "Defendants"), which was eventually consolidated with the first action for actively inducing SEL's infringement of the '799 Patent. The instant disputes arose during discovery in the consolidated action.

### STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure 26(b)(1), the parties "may obtain discovery regarding any matter ... that is relevant to the claim or defense of any party ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).

### DISCUSSION

**I. Dr. Schroeder**

Defendants request that the Court order Bayer to make Dr. Schroeder available for deposition prior to trial if Bayer intends to call him live at trial. (D.I. 418 [*3] at 2). Bayer objects to this request because Dr. Schroeder, who is no longer a Bayer employee, has already been deposed for seventy-six hours over thirteen days. (D.I. 415 at 1). The Court is persuaded by Defendants'

2001 U.S. Dist. LEXIS 25559, *

submissions that Dr. Schroeder's previous depositions are now stale and that because new issues have arisen another deposition is required to adequately prepare for Dr. Schroeder's live testimony. However, the Court recognizes the burden of producing Dr. Schroeder for another deposition as well as at trial. Therefore, the Court will grant this request only if Bayer intends to call Dr. Schroeder as a live witness.

## II. Infringement of Claims 3 and 5

In the Proposed Pretrial Order Bayer asserts infringement of Claims 3 and 5 of the '799 Patent. (D.I. 412 at Ex. 15). Defendants object to the assertion of infringement of Claims 3 and 5 after this extended litigation, particularly on the eve of trial. (D.I. 418 at 4). In reply, Bayer contends that because discovery with regard to Claims 3 and 5 was not forthcoming from Defendants there was a corresponding delay in the assertion of infringement of Claims 3 and 5. (D.I. 419 at 2). The Court is persuaded that Bayer [*4] did not have sufficient discovery to assert infringement of Claims 3 and 5 until recently, particularly in light of the Court's recent ruling on discovery. Therefore, the Court will not preclude Bayer from asserting the infringement of Claims 3 and 5 of the '799 Patent, literally or by the doctrine of equivalents, at trial.

## III. Doctrine of Equivalents For Claims 1 and 2

In the Proposed Pretrial Order Bayer asserts the right to rely on the doctrine of equivalents with respect to Claims 1 and 2. (D.I. 412). Defendants object because Bayer has not previously asserted the doctrine of equivalents with respect to Claims 1 and 2. (D.I. 412 at Ex. 15). In reply, Bayer contends that they never limited themselves to literal infringement by always asserting "at least claims 1 and 2 of the patent in suit are literally infringed." (D.I. 415 at 4). However, in its letter dated December 10, 2001, Bayer asserts that it does not "believe it needs to rely on the doctrine of equivalents." (D.I. 415 at 5). With the understanding that Bayer does not intend to assert the doctrine of equivalents with respect to Claims 1 and 2 at trial, the Court will grant Defendant's application to preclude [*5] these claims.

## IV. Preliminary Work Documents Underlying Experimental Work Relied On By Professor O'Grady and Dr. Buxbaum

The parties have agreed to exchange all preliminary work documents underlying the experimental work relied on by their experts. (D.I. 416 at 6; D.I. 420). Accordingly, the Court will enter an order reflecting the agreement.

## V. Bayer's October 23, 2001 Letter

Bayer requests the production of (1) Dowa records showing chemical analysis and structure determinations of Dowa metal powder, (2) Sony's chemical analysis and structure determinations of Dowa metal powders, (3) Sales and profit records of Sony, and (4) Dowa's process specifications for each of the metal powders sold to Sony and used in metal particle tapes sold in the United States. (D.I. 409 at 3-4). In reviewing this request, the Court finds that the documents are relevant to the subject matter of this litigation and therefore should be produced.

Additionally, Bayer requests that Sony Japan's Investments be produced. (D.I. 409 at 4). Bayer contends that the information is relevant to a laches defense. (D.I. 409 at 4). Defendants failed to respond to this request. (D.I. 410; D.I. 411). [*6] Accordingly, the Court presumes that laches will not be a principal defense presented by Sony at trial, and therefore will deny the request.

An appropriate Order will be entered.

## ORDER

At Wilmington this 20 day of December 2001, for the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY ORDERED that:

> A. If Bayer intends to call Dr. Schroeder live at trial, Bayer must produce Dr. Schroeder for deposition. The deposition shall be limited to three (3) hours of direct testimony, with the total time testifying not to exceed six (6) hours. The deposition must take place no later than ninety-six (96) hours before trial. If Bayer does not intend to call Dr. Schroeder live at trial, the request is denied.

> B. Bayer may not assert infringement of Claims 1 and 2 of the '799 Patent by the doctrine of equivalents at trial.

> C. Bayer may assert infringement of Claims 3 and 5 of the '799 Patent, literally or by the doctrine of equivalents, at trial.

> D. Dowa shall produce all its preliminary work documents concerning its underlying efforts to reproduce Bayer's patent examples and the prior art.

> E. Bayer shall produce all its preliminary [*7] work documents concerning the relevant experimental work performed by Dr. Buxbaum.

2001 U.S. Dist. LEXIS 25559, *

F. Bayer's request to compel production of (1) Dowa Records Showing Chemical Analysis And Structure Determinations Of Dowa Metal Powder, (2) Sony's Chemical Analysis and Structure Determinations Of Dowa Metal Powders, (3) Sales And Profit Records Of Sony, and (4) Dowa's Process Specifications For Each Of The Metal Powders Sold To Sony And Used In Metal Particle Tapes Sold In The United States is **GRANTED.**

G. Bayer's request to compel production of Sony Japan's Investments is **DENIED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

# EXHIBIT E

FOCUS - 3 of 7 DOCUMENTS

INTERNATIONAL TRUCK AND ENGINE CORPORATION and
INTERNATIONAL TRUCK INTELLECTUAL PROPERTY CO., LLC, Plaintiffs,
v. CATERPILLAR, INC., Defendant.

CAUSE NO. 1:03-CV-265

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
INDIANA, FORT WAYNE DIVISION

2004 U.S. Dist. LEXIS 27447; 73 U.S.P.Q.2D (BNA) 1754

May 26, 2004, Decided

**DISPOSITION:** Defendant's motion to preclude was denied, defendant's motion to strike was denied, plaintiff's motion to compel was granted, and defendant's motion for oral argument on the motion to compel was denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For International Truck and Engine Corporation, International Truck Intellectual Property Co LLC, Plaintiffs: C Erik Chickedantz, Jeffrey P Smith, Hawk Haynie Kammeyer & Chickedantz LLP, Fort Wayne, IN; Gregory P Casimer PHV, Matthew G McAndrews PHV, Raymond P Niro Jr PHV, Robert P Greenspoon PHV, Niro Scavone Haller and Niro, Chicago, IL.

For Caterpillar Inc, Defendant: Gregory J Commins PHV, Michael J Stimson PHV, Pamela S Kane PHV, Robert G Abrams PHV, William K West Jr PHV, Howrey Simon Arnold & White LLP, Washington, DC; John T Menzie, Burt Blee Dixon Sutton & Bloom LLP, Fort Wayne, IN; Peter J Chassman PHV, Howrey Simon Arnold & White LLP, Houston, TX.

For Caterpillar Inc, Counter Claimant: Gregory J Commins PHV, Michael J Stimson PHV, Pamela S Kane PHV, Robert G Abrams PHV, William K West Jr PHV, Howrey Simon Arnold & White LLP, Washington, DC; John T Menzie, Burt Blee Dixon Sutton & Bloom LLP, Fort Wayne, IN; Peter J Chassman PHV, Howrey Simon Arnold & White LLP, Houston, TX.

For International Truck Intellectual Property Co LLC, International Truck and Engine Corporation, Counter Defendants: C Erik Chickedantz, Jeffrey P Smith, Hawk Haynie Kammeyer & Chickedantz [*2] LLP, Fort Wayne, IN; Gregory P Casimer PHV, Matthew G McAndrews PHV, Raymond P Niro Jr PHV, Robert P Greenspoon PHV, Niro Scavone Haller and Niro, Chicago, IL.

**JUDGES:** Roger B. Cosbey, United States Magistrate Judge.

**OPINIONBY:** Roger B. Cosbey

**OPINION:**

### MEMORANDUM OF DECISION AND ORDER

### I. INTRODUCTION

In this patent infringement suit, Defendant Caterpillar, Inc. ("Caterpillar") moves to preclude Plaintiffs International Truck and Engine Corporation and International Truck Intellectual Property Co. (collectively, "ITEC") from asserting certain claims and accusing certain products that ITEC did not disclose until late in discovery. Caterpillar further moves to strike portions of two expert reports that address these late-asserted claims and accused products. Also, ITEC moves to compel Caterpillar to produce documents and a knowledgeable deponent regarding these claims and accused products. After considering the motions and the relevant law, the Court finds that Caterpillar's motion to preclude should be DENIED, Caterpillar's motion to strike should be DENIED, and ITEC's motion to compel should be GRANTED. Finally, Caterpillar moves for

oral argument on ITEC's motion to compel; as [*3] oral argument is clearly unnecessary, that motion will also be DENIED.

## II.    CATERPILLAR'S    MOTION    TO PRECLUDE

On October 20, 2003, Caterpillar propounded an interrogatory to ITEC directing it to name "each claim of the Patent-in-Suit that you allege is infringed" and identify "each Caterpillar product . . . which you allege infringes [the patent]." (Mem. in Supp. of Caterpillar's Mot. to Preclude, Ex. A at 7-8.) ITEC's November 24, 2003 response, although objecting that the interrogatory was premature, stated that claims 30 and 50 of the patent are infringed and identified "Caterpillar's Model 773 and 627 land vehicles" as infringing products. (Id., Ex. C at 3-4.) ITEC supplemented this response on February 20, 2004, adding claims 51, 55, and 56 as infringed claims and identifying twelve additional Caterpillar products (by model number) which infringe. (Id., Ex. E at 4-6.) ITEC's supplemental response further stated that "all models containing the Caterpillar Monitoring System" are infringing products, and promised to provide precise model numbers after further discovery. (Id.) On March 29, 2004, two days before the close of fact discovery, ITEC further amended [*4] its response, adding five more infringed claims and thirty-four more infringing products ("New Claims and Products"). (Id., Ex. B.) Caterpillar now moves to preclude ITEC from asserting the New Claims and Products, pursuant to Fed. R. Civ. P. 26(e)(2) and 37(c)(1).

Rule 26(e)(2) creates a duty for parties to "seasonably . . . amend a prior response to an interrogatory . . . if the party learns that the response is in some material respect incomplete or incorrect." Rule 37(c)(1) adds teeth to this duty by providing that "[a] party that without substantial justification fails to . . . amend a prior response to discovery as required by Rule 26(e)(2) is not, unless such failure is harmless, permitted to use as evidence . . . [any] information not so disclosed." Exclusion under Rule 37(c)(1) is mandatory unless the sanctioned party shows that its violation of Rule 26 was either justified or harmless. David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003). The district court has broad discretion to determine whether a violation is justified or harmless, and it "need not make explicit [*5] findings" concerning justification or harmlessness. Id. Four factors should guide the court's use of its discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. Id.

The parties argue at length about whether ITEC's late supplementation was justified: ITEC claims that it was not able to supplement earlier because of Caterpillar's tardy document production, Caterpillar retorts that ITEC had the documents it needed for supplementation back in February, and so on. However, the Court need not wade into this morass, because ITEC has clearly shown that its delay was harmless. Discovery in this case is ongoing, and the trial date of March 22, 2005, is ten months away. (See Docket # 20, 40.) While Caterpillar complains that it has not had an opportunity to perform discovery on the New Claims and Products, this can easily be cured by a motion to reopen fact discovery and/or extend expert discovery (currently scheduled to close on June 11, 2004). Moreover, [*6] eleven days after filing its motion to preclude, Caterpillar moved to amend its answer to add a new defense theory. (See Caterpillar's Mot. for Leave to Am. Answer.) Caterpillar's cries of prejudice from ITEC's New Claims and Products are not believable in the face of its simultaneous attempt to add a brand-new defense.

Caterpillar cites three unpublished cases in support of exclusion, but all three feature parties whose tardiness was far more prejudicial than ITEC's. In Cali v. Hilton Hotels Corp., 1989 U.S. Dist. LEXIS 8946, at *4-5, 10, No. 88 Civ. 0653, (S.D.N.Y. August 2, 1989), the court excluded new claims because (1) plaintiffs continuously "conducted discovery in an unfair and abusive fashion"; (2) plaintiffs supplemented their discovery responses on the last day of discovery and over sixteen months after the interrogatories were originally served; and (3) trial was only a few days away. None of these elements are present here. Similarly, Ty, Inc. v. Publ'ns Int'l, Ltd., 2004 U.S. Dist. LEXIS 1681, at *8-10, No. 99 C 5565 (N.D. Ill. February 9, 2004), featured exclusion where a party tried to add fourteen new witnesses (two of whom [*7] were the opposing party's trial attorneys) after the discovery cutoff and after a summary judgment motion had been filed, offering "no explanation, let alone a reasonable one" for its delay. Finally, in AMEX, LLC v. Mopex, Inc., 2002 U.S. Dist. LEXIS 25085, at *19, 22-24, 00 Civ. 5943 (S.D.N.Y. July 29, 2002), the court excluded a new claim proffered "long after the completion of fact discovery," when the case was "otherwise ready for dispositive motion practice and . . . trial," and where there was "no colorable explanation" for the delay. All three of these cases involved egregious and highly prejudicial delays in supplementation, and thus they have little application to the minimally prejudicial delay in this case.

In short, ITEC's late supplementation was harmless, as trial is ten months away and any prejudice suffered by Caterpillar can be easily remedied by a motion to reopen fact discovery and/or extend expert discovery, should

2004 U.S. Dist. LEXIS 27447, *; 73 U.S.P.Q.2D (BNA) 1754

Caterpillar desire such remedies. Accordingly, Caterpillar's Rule 26(e)(2) and 37(c)(1) motion to exclude ITEC's New Claims and Products is denied. n1 *See David*, 324 F.3d at 857.

n1 Curiously, Caterpillar also invokes Rule 11(b)(3) in its motion, alleging that ITEC has failed "to provide any evidentiary basis" for adding the newly accused products. (Caterpillar's Reply Mem. at 9-10.) However, Caterpillar does not urge Rule 11 sanctions, nor could it, as Rule 11 requires a motion for sanctions to "be made separately from other motions or requests." Fed. R. Civ. P. 11(c)(1)(A). If Caterpillar believes that ITEC's New Claims and Products lack evidentiary support, that matter is properly addressed in a Rule 56 motion for summary judgment and/or a Rule 11 motion for sanctions, not in the instant Rule 26 and 37 motion, which concerns only the promptness of ITEC's supplementation. *See* Fed. R. Civ. P. 11(d) (providing that Rule 11 "[does] not apply to disclosures and discovery requests, responses, objections, and motions that are subject to the provisions of Rules 26 through 37); *Ill. Tool Works, Inc. v. Metro Mark Prods., Ltd.*, 43 F.Supp.2d 951, 963 (N.D. Ill. 1999).

[*8]

## III. CATERPILLAR'S MOTION TO STRIKE

Caterpillar moves to strike the portions of two expert witness reports that address the New Claims and Products. (*See* Mem. in Supp. of Caterpillar's Mot. to Strike.) The motion is cursory, merely summarizing the arguments proffered in Caterpillar's motion to preclude and urging that the same reasons demand that the expert reports be stricken. (*See id.*) As the Court rejects those arguments and denies the motion to preclude *supra*, the motion to strike is also denied.

## IV. ITEC'S MOTION TO COMPEL

As noted previously, on February 20, 2004, ITEC supplemented its interrogatory responses, adding claims 51, 55, and 56 as infringed claims and identifying twelve additional Caterpillar products (by model number) which infringe. ITEC's supplemental response further stated that "all models containing the Caterpillar Monitoring System" are infringing products, and promised to provide precise model numbers after further discovery.

On March 25, 2004, ITEC served an "Amended Rule 30(b)(6) Notice of Deposition and Rule 30(b)(5) Document Request" on Caterpillar (Mot. to Compel, Ex. A), specifying the topics to be discussed at Caterpillar's

[*9] March 29, 2004, deposition and requesting documents relevant to those topics. *See* Fed. R. Civ. P. 30(b)(6) (providing for deposition of a corporation); 30(b)(5) (providing for contemporaneous document requests). Several of the topics made reference to "accused products," a term defined elsewhere in the Notice as "each respective model identified in Plaintiffs' [interrogatory responses], including those models identified by a description of features rather than a specific model number." (Mem. in Supp. of Pl.'s First Mot. to Compel Disc., Ex. A.)

On March 29, 2004, ITEC further supplemented its interrogatory responses to add the New Claims and Products. However, at Caterpillar's deposition that same day, Caterpillar refused to recognize the New Claims and Products as legitimately at issue in the case; accordingly, it did not produce a witness competent to testify on those subjects (among others), nor did it produce all relevant documents. n2 (Penne Dep. at 50, 52, 58, 61-62; Render Dep. at 5-8; Dep. of Wayne Brandt at 14-17; Dep. of Andrew Vitale at 50-52; 71-72; Mot. to Compel, Ex. I.)

n2 Specifically, Caterpillar failed to produce documents responsive to Topic 11 of the Amended Notice of Deposition, due to its insistence on defining "accused product" to not include the New Claims and Products and defining "sales" far more narrowly than the Amended Notice of Deposition. (*See* Mot. to Compel, Ex. I.) Also, Caterpillar failed to produce witnesses on Topics 1, 2, 3, 7, 11, 13, and 17; some of these failures were because of its narrow definition of "accused product" (*e.g.*, Dep. of Dean Penne at 58), but others were unrelated (*e.g.*, Dep. of Michael Render at 5-8).

[*10]

Rule 30(b)(6) allows a party to depose a corporation by serving a notice and subpoena naming the corporation as a deponent and describing "with reasonable particularity the matters on which examination is requested." The named corporation must then designate one or more individuals to testify on those matters. Fed. R. Civ. P. 30(b)(6). If the corporation fails to make a designation or a designated individual fails to answer a question, the deposing party may move for an order compelling a designation or answer. Fed. R. Civ. P. 37(a)(2)(B). If the corporation believes the discovery sought is objectionable, it still must comply with the discovery, unless it has a pending Rule 26(c) motion for a protective order. Fed. R. Civ. P. 37(d); *Bregman v. Dist. of Columbia*, 182 F.R.D. 352, 355 (D.D.C. 1998) ("Confronted with a notice of deposition (or any other

Case 1:04-cv-00138-JJF    Document 92-2    Filed 06/30/2005    Page 37 of 59

Page 4

2004 U.S. Dist. LEXIS 27447, *; 73 U.S.P.Q.2D (BNA) 1754

type of discovery) a party must either comply with the discovery demand or seek a protective order. . . ."). Similarly, a party who fails to comply with a Rule 30(b)(5) document request can be ordered [*11] to compel the requested material unless it timely moves for a protective order. Fed. R. Civ. P. 37(d); *Bregman*, 182 F.R.D. at 355.

Here, Caterpillar did not move for a protective order and does not claim that it complied with ITEC's discovery requests. Instead, it proffers three arguments why it should not be required to comply, none of which are persuasive.

First, Caterpillar complains that because ITEC amended its interrogatory responses to add the New Claims and Products on the same day as Caterpillar's deposition, it lacked sufficient notice to produce witnesses and documents relevant to the New Claims and Products. This contention is dubious, as ITEC made clear a month earlier that any product containing the Caterpillar Monitoring System was an "accused product"; its March 29, 2004, amendment merely added specific model numbers of products containing the Caterpillar Monitoring System. Presumably, Caterpillar knows which of its products contain that system, and thus knew a month before its deposition that those products were in play in this case. However, even if one accepts Caterpillar's claim that it was surprised by [*12] the New Claims and Products on the day of its deposition, this only explains why Caterpillar failed to produce witnesses and documents *then*. It is not an excuse for failing to produce *now*, nearly two months after ITEC specifically identified the New Claims and Products.

Second, Caterpillar regurgitates the arguments from its motion to preclude. Most (though not all) of Caterpillar's discovery failures relate to the New Claims and Products, and since the New Claims and Products should be excluded from this litigation, Caterpillar argues, it should not have to produce witnesses and documents concerning them. However, as discussed *supra*, Caterpillar's arguments for exclusion are unpersuasive. Since the New Claims and Products will thus not be excluded, Caterpillar must produce discovery relevant to them.

Finally, Caterpillar contends that ITEC's motion to compel should be denied because it is untimely. Caterpillar cites *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 646 (7th Cir. 2001), and several unpublished cases where motions to compel filed after the close of discovery were denied as untimely. However, in *Packman*, the court denied the plaintiff's [*13] motion to compel where "despite the court's warning that she should not tarry' in filing a motion to compel . . . she

waited to file her motion to compel until after discovery had closed, the summary judgment briefing schedule had been set, and defendants had filed their summary judgment motion." 267 F.3d at 646. These conditions are not present in the instant case, where ITEC filed its motion shortly after the end of fact discovery and well in advance of any dispositive motions. Caterpillar's other authorities are similarly inapplicable, as they also contain aggravating circumstances not present here. n3 Further, Caterpillar's allegation of untimeliness is particularly unpersuasive given that the primary discovery failure of which ITEC complains (the failure to produce witnesses at deposition) occurred only two days before the fact discovery deadline.

n3 In *Banks v. CBOCS West, Inc.*, 2004 U.S. Dist. LEXIS 5941, at *4, 6, 10, No. 01 C 0795 (N.D. Ill. April 7, 2004), the motion was filed over two months after the close of discovery, the movant knew that "unresolved discovery issues existed" weeks before the close of discovery, and granting the motion would have been prejudicial to the defendant. Here, ITEC could not have known that Caterpillar would fail to produce witnesses until it actually failed to produce them at its deposition, two days before the close of fact discovery; also, as discussed in section II, *supra*, any prejudice to Caterpillar is minimal and easily remediable.

In *Koerts v. MCI Telecomms. Corp.*, 1996 U.S. Dist. LEXIS 7866, at *2, No. 95 C 1039 (N.D. Ill. June 7, 1996), the movant waited ten months after serving interrogatories and one month after the discovery deadline to move to compel answers and proffered no excuse for the delay. ITEC's slight delay in moving to compel is not comparable. Similarly, in *C.R. Bard, Inc. v. M3 Systems, Inc.*, 1994 U.S. Dist. LEXIS 7493, at *4, No. 93 C 4788 (N.D. Ill. June 6, 1994), the motion was denied because, *inter alia*, there was no reason to believe that any discoverable documents remained unproduced. Here, Caterpillar does not claim that the missing discovery does not exist, but rather quibbles with the timing and specificity of ITEC's requests.

[*14]

In short, Caterpillar did not fulfill its discovery obligations, did not seek a protective order to relieve those obligations, and proffers no compelling excuse for its failures. Accordingly, the Court exercises its broad discretion in discovery matters, *Packman*, 267 F.3d at 646, to grant ITEC's motion to compel. n4

2004 U.S. Dist. LEXIS 27447, *; 73 U.S.P.Q.2D (BNA) 1754

n4 Caterpillar also moves for oral argument on ITEC's motion to compel, but its reasons for oral argument are no more than a rehash of the substantive arguments presented in its response brief. (*See* Caterpillar's Req. for Oral Argument with Regard to Pls.' First Mot. to Compel Disc.) As those arguments are unlikely to become more persuasive simply by virtue of being spoken, Caterpillar's motion for oral argument is denied.

## V. CONCLUSION

For the reasons given above, Caterpillar's motion to preclude is DENIED, Caterpillar's motion to strike is DENIED, ITEC's motion to compel is GRANTED, and Caterpillar's motion for oral argument on the motion to compel is DENIED.

Caterpillar [*15]   is hereby ORDERED to (1) produce within ten days of this order all documents and things in its custody or control responsive to Topic 11 of ITEC's Amended Notice of Deposition, with the admonishment to include the New Claims and Products in the definition of "accused product" and to use ITEC's definition of "sales" rather than the narrower definition Caterpillar has previously urged; and (2) produce within ten days after such document production one or more Rule 30(b)(6) designees to testify concerning Topics 1, 2, 3, 7, 11, 13, and 17 of ITEC's Amended Notice of Deposition, to be deposed at a date to be determined by the parties.

The parties are further ORDERED to confer and discuss whether the discovery deadlines (or any other deadlines) should be extended in light of this Order. If the parties agree that any deadlines should be extended, they are to file an agreed motion setting out new deadlines.

Enter for this 26th day of May, 2004.

Roger B. Cosbey,

United States Magistrate Judge

# EXHIBIT F

# United States Patent [19]

## Burr et al.

[11] **Patent Number:** **4,982,337**

[45] **Date of Patent:** **Jan. 1, 1991**

[54] **SYSTEM FOR DISTRIBUTING LOTTERY TICKETS**

[76] Inventors: Robert L. Burr, 7515 Charmant Dr. Ste. 1407, San Diego, Calif.; Laird A. Campbell, Rte. 2, Box 223, Laceys Springs, Ala.; Donald H. Keagle, 2018 Hensel Ave.; Alfred L. Fulton, 9423 O'Jay Dr., both of Huntsville, Ala. 35803

[21] Appl. No.: **128,070**

[22] Filed: **Dec. 3, 1987**

[51] Int. Cl.$^5$ ...................... G06F 15/28; A63B 71/00

[52] U.S. Cl. .................................... 364/479; 83/209; 83/242; 221/7; 225/100; 273/139; 364/412

[58] Field of Search ............... 364/479, 412, 200, 900; 902/23, 1, 13, 22, 31; 273/138 R, 132 A, 139, 269; 83/205, 209, 165, 76, 242, 243, 42; 235/379, 381; 377/5, 15; 226/44; 221/1, 4, 7, 8, 9, 26, 32; 225/4, 5, 27, 32, 93, 100, 101, 10.16

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,621,964 | 11/1971 | Riddle et al. | 221/7 X |
| 3,894,669 | 7/1975 | Wescoat | 225/103 |
| 3,931,761 | 1/1976 | Carrus | 364/900 |
| 4,094,451 | 6/1978 | Wescoat | 225/96 |
| 4,140,259 | 2/1979 | Kostka | 225/16 |
| 4,157,670 | 6/1979 | Herring | 83/165 |
| 4,192,618 | 3/1980 | Konour, Jr. et al. | 226/44 X |
| 4,261,497 | 4/1981 | Roetter et al. | 225/100 |
| 4,275,456 | 6/1981 | Tanaka et al. | 364/900 |
| 4,322,612 | 3/1982 | Lange | 364/412 X |
| 4,373,726 | 2/1983 | Churchill et al. | 273/139 X |
| 4,375,189 | 3/1983 | Berner et al. | 225/100 X |
| 4,494,197 | 1/1985 | Troy et al. | 364/900 X |
| 4,652,998 | 3/1987 | Koza et al. | 364/900 X |
| 4,704,518 | 11/1987 | Brunn et al. | 364/412 X |
| 4,716,799 | 1/1988 | Hartmann | 364/479 X |
| 4,832,341 | 5/1989 | Muller et al. | 273/138 A X |

*Primary Examiner*—Joseph Ruggiero
*Attorney, Agent, or Firm*—Gregor N. Neff

[57] **ABSTRACT**

A system and method for distributing lottery tickets includes a large number of remote, ticket-dispensing units which are connected intermittently, e.g., once each day or week to a central computer. The units record the numbers of tickets sold and transmit the sales data to the central computer, which in turn performs all the necessary accounting functions. Sales reports and invoice data may be sent by the central computer to each unit for printing, which avoids the need to mail the reports/invoices. The tickets are stored in fan-fold form and are burst, rather than cut, apart for dispensing. The tickets are dispensed at one end of the unit which faces the customer. A control panel for the vendor is located at the opposite end. Tickets of different length may be dispensed with an imprint of the vendor's name.

**35 Claims, 8 Drawing Sheets**



U.S. Patent        Jan. 1, 1991        Sheet 1 of 8        4,982,337

F I G. 1





F I G.8A



F I G.8B



**U.S. Patent**    Jan. 1, 1991    Sheet 2 of 8    **4,982,337**

## F I G. 2A

```
DAILY  SALES  RPT
FOR  00/00/00

AGENT  #      000000
MACH   #    00000000
SALES       $0000. 00
PAID         $000 . 00
NET         $0000 . 00
SE                 00
```

## F I G. 2C

```
WEEKLY  INVOICE
FOR  W/E  00/00/00

AGENT    #     000000
MACH     #   00000000

SALES    $0000 .00
PAY       $000 .00
COMM     $000 .00
NET DUE  $0000 .00
```

## F I G. 2B

```
WEEKLY  SALES  RPT
FOR  W/E  00/00/00

AGENT  #      000000
MACH   #    00000000
SALES
PAID
NET
SE
```

## F I G. 2D

```
        CURRENT SALES
00/00/00           0000 :00

AGENT   #        000000
MACH    #      00000000
FOR CURRENT DAY
SALES           $0000 .00
PAID             $000 .00
NET             $0000 .00
SE                    00

FOR THIS  REPORT
SALES           $0000 .00
PAID             $000 .00
NET             $0000 .00
SE                    00
```



FIG. 3

FIG. 4

FIG. 9



F I G. 5

TICKET FAN FOLDS IN STACK 51

F I G. 6

TICKET STOCK

DIRECTION

TO 34

Case 1:04-cv-00138-JJF    Document 92-2    Filed 06/30/2005    Page 45 of 59



F I G. 7

F I G. 10





F I G. 11

U.S. Patent     Jan. 1, 1991     Sheet 8 of 8     4,982,337

F I G. 12



4,982,337

1

## SYSTEM FOR DISTRIBUTING LOTTERY TICKETS

### FIELD OF THE INVENTION

The present invention relates generally to ticket dispensing systems and more particularly relates to a system and method for distributing lottery tickets.

### BACKGROUND OF THE INVENTION

State-sponsored lotteries are now a popular and accepted method of generating revenue in place of taxes. One popular form of the lotteries is the Lotto-type game where the player selects his own numbers, for example by filling out a computer card, and receives a lottery ticket which has been printed with his selected numbers. A drawing is then held at a later time to determine the winning numbers. Another popular form of lottery uses the so-called instant lottery tickets, on which winning or non-winning combinations are preprinted before distribution so that no later drawing is necessary and the player knows immediately after purchasing his ticket whether or not he has won.

The usual system for distributing Lotto-type lottery tickets includes a large number of ticket-dispensing remote units located at drug stores, supermarkets, liquor stores and the like. Each unit is independent and is operated by the store owner, who customarily receives a portion of the ticket price for each lottery ticket sold. The usual system for distributing instant lottery tickets, on the other hand, is entirely clerical, with the tickets being stored in a drawer and counted out by hand. The store owner typically is responsible for keeping track of the number of tickets sold, making redemption payments up to a certain amount for certain types of winning tickets and for providing such sales and pay-out information to the state. The state in turn calculates the money due from or owing to the store owner and sends an invoice and/or money payment. Given the very large number of stores which now sell lottery tickets, it would be highly desirable to simplify the accounting procedure so as to avoid any mistakes or improprieties by the store owner and to assure proper and prompt payment of all monies due. It would also be valuable to the state to know on a daily basis whether each store owner has a sufficient supply of tickets, as well as how much money is due that day.

Another consideration in lottery ticket distribution is the speed with which the lottery tickets may be sold. It is a frequent occurrence in large cities for long lines of ticket buyers to form at lunch time or after work in order to buy tickets. As mentioned above, the ticket seller has conventionally had to count out and hand instant lottery tickets himself to the customers. It would be highly advantageous and to have a ticket-dispensing unit which would itself dispense instant or other lottery tickets at an outlet where they are easily accessible to the customer.

Still another consideration in a lottery ticket-dispensing unit is security. Particularly when instant tickets are being dispensed, the unsold tickets should be locked up in the unit or drawer to prevent their theft. Since the unit or drawer must be periodically opened to allow a new supply of lottery tickets to be inserted, it is desirable to keep track of when and how often the tickets are replaced. In addition, it may be necessary, for security reasons, to keep track of which lottery tickets were sold from which location, both to detect and prevent forger-

2

ies and unauthorized sales and to assist the customers in making complaints, suggestions or the like.

Particularly when a large number of tickets is stored within the dispensing unit, it is an advantageous feature of the present invention to dispense tickets stored in fan-fold form so that they may be rapidly fed out from storage without the risk of unintentionally dispensing too many tickets when separated tickets are stored. There is as yet no standardization in the size of the tickets, which come in various widths and lengths. Furthermore, tickets easily can slip in the dispensing mechanism, or for other reasons can be fed inaccurately. Therefore, it would be highly advantageous to provide a ticket dispensing mechanism to separate the tickets from one another while ensuring that the separation of the tickets occurs only at the joinder line therebetween, dispite the variation in the size of tickets and slippage or inaccuracy in the dispensing mechanism.

### OBJECTS AND SUMMARY OF THE INVENTION

Accordingly, it is an object of the present invention to provide a system and method for distributing lottery tickets which avoid the above-described difficulties of the prior art.

It is another object of the present invention to provide a system and method for distributing lottery tickets in which sales data for a number of different ticket-dispensing units is automatically transmitted to a central data processor for system-wide accounting evaluation.

It is yet another object of the present invention to provide a system and method for distributing lottery tickets in which accounting information may be automatically calculated at each appropriate ticket-dispensing unit for print-out thereat.

It is still another object of the present invention to provide a method and system for distributing lottery tickets in which communication between the central data processor and the dispensing units is periodically established so as to transfer the sales data during limited intervals of time, thereby avoiding the need for a permanent communication link.

It is still another object of the present invention to provide a method and system for dispensing lottery tickets in which an accurate and current account of the ticket supply and monies due is available both to a controlling authority and to the sales agents.

It is a further object of the present invention to provide an apparatus for dispensing lottery tickets including a control panel mounted at the front and accessible to the sales agent and a dispensing outlet at the back and accessible to the customer so as to speed up the dispensing of tickets.

It is still a further object of the present invention to provide a method and apparatus for dispensing tickets in which the tickets are stored in a fan-fold strip or stream and are separable from each other along lines of weakness.

It is yet a further object of the present invention to provide a method and apparatus for dispensing tickets in which the tickets are separated by bursting the lines of weakness to provide an automatic mechanical alignment of the tickets.

It is yet a further object of the present invention to provide a method and apparatus for dispensing lottery tickets in which each access to a ticket storage area is detected and recorded.

4,982,337

3

In accordance with an aspect of the present invention, a system for distributing lottery tickets comprises central processing means, a plurality of remote units for dispensing lottery tickets, each remote unit including memory means for storing sales data indicating at least a number of lottery tickets dispensed by the respective remote unit, and communication means actuable for selectively placing the data processing means in communication with at least one remote unit, the remote unit transferring the sales data to the data processing means and the data processing means transferring at least message data to the remote unit through the communication means. Advantageously, the communication means includes dial-up modem means which may be actuated at pre-selected intervals, for example, once a day, to transmit data between the data processing means and one remote unit.

In accordance with this aspect of the present invention, a method of distributing lottery tickets comprises the steps of dispensing lottery tickets at a plurality of remote locations, memorizing at each remote location sales data indicating at least a number of lottery tickets dispensed at the respective location, transferring the memorized sales data from at least one remote location to a central data processing location over an electronic communication system and transferring message data from the central data processing location to the remote location over the system.

In accordance with a further aspect of the present invention, apparatus for dispensing lottery tickets comprises a box-like module having opposed front and back surfaces, ticket storage means within the module for storing a plurality of lottery tickets, control panel means mounted at the front surface of the module and being actuable for initiating dispensing of the lottery ticket, a dispensing outlet manually accessible at the back surface for receiving a dispensed lottery ticket from the ticket storage means and ticket dispensing means responsive to the control panel means for dispensing a lottery ticket from the ticket storage means to the dispensing outlet, whereby the dispensed lottery ticket may be manually removed from the apparatus.

In accordance with yet another aspect of the present invention, apparatus for dispensing tickets comprises ticket storage means for storing a plurality of tickets connected in a fan-fold stream headed by a leading ticket, the tickets being separable from each other along lines of weakness, transport means for feeding the stream of tickets from the ticket storage means along a predetermined dispensing path, separation means for separating the leading ticket from the stream along a leading line of weakness between the leading ticket and a next following ticket and manually accessible outlet means for receiving the separated ticket. Advantageously, the separation means includes a dull edge bursting blade moveably mounted adjacent a predetermined bursting position along the path, holding means for holding the stream of tickets against substantial deflection from the path at the bursting position, and bursting blade drive means for bringing the bursting blade into bursting contact with the stream of tickets at the bursting position to burst the leading ticket from the next following ticket. In a further development of this aspect of the present invention, the separation means includes feed alignment means including sensor means for detecting a present position of the leading ticket relative to the bursting position, means for determining a transport direction and a displacement distance neces-

4

sary to bring the leading line of weakness to the bursting position and transport control means for generating a transport control signal indicative of the transport direction and displacement distance, the transport means being responsive to the transport control signal for transporting the ticket stream in transport direction by the displacement distance.

These and other objects, features and advantages of the present invention will become clear from the following detailed description of a preferred embodiment of the present invention taken in connection with the accompanying drawings, throughout which like reference numerals identify like elements and parts.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram illustrating a preferred embodiment of the system for distributing lottery tickets according to the present invention;

FIG. 2A is an exemplary daily sales report produced by the present invention;

FIG. 2B is an exemplary weekly sales report produced by the system according to the present invention;

FIG. 2C is an exemplary weekly invoice produced by the system according to the present invention;

FIG. 2D is an exemplary current sales report produced by the system according to the present invention;

FIG. 3 is a front elevational view of the preferred embodiment of a ticket-dispensing unit according to the present invention;

FIG. 4 is a partial rear elevational view of the embodiment of FIG. 3;

FIG. 5 is a schematic view of the ticket transport mechanism of the preferred embodiment;

FIG. 6 is a schematic view of a leading edge ticket sensor of the preferred embodiment;

FIG. 7 is a perspective view of the ticket drive and burster assembly of the preferred embodiment;

FIG. 8A is a diagrammatic illustration for explaining the alignment process of the ticket drive and burster assembly of FIG. 7;

FIG. 8B is a second diagrammatic illustration for explaining the alignment process of FIG. 8A;

FIG. 9 is a perspective mechanical view of an imprinter assembly of the preferred embodiment;

FIG. 10 is a functional block diagram of the preferred embodiment;

FIG. 11 is an electronic block diagram corresponding to FIG. 10; and

FIG. 12 is a flowchart illustrating certain operations of the preferred embodiment.

## GENERAL DESCRIPTION

Referring now to the drawings, and initially to FIG. 1 thereof, a system 10 for dispensing lottery tickets includes a central computer 12 and three remote ticket-dispensing units 14, 16 and 18. Although the illustrated embodiment includes three such ticket-dispensing units, it will be understood that any number of units may be employed, and indeed it is anticipated that a very large number of units will be employed in a state-wide or nation-wide lottery system. For the purposes of the present description, the lottery will be assumed to be a state-wide lottery run by a state authority. However, the present invention is applicable to other lotteries such as nation-wide or city-wide lotteries.

Each unit 14, 16, 18 is located at a separate location across the state in, for example, grocery stores, liquor stores and the like, and functions completely indepen-

4,982,337

5

dently of the other units. Each remote unit 14, 16, 18 is independently operated by a sales agent or vendor, generally the store owner who sells the lottery tickets as part of his business, receiving a percentage of the purchase price of each ticket sold from the state agency which runs the lottery. However, each unit 14, 16, 18 can be placed independently and selectively in communication with central computer 12 through a respective modem 20, 22, and 24. Each modem 20, 22, 24 is advantageously positioned within its associated unit 14, 16, 18 at the particular location, or alternatively, it may be located adjacent thereto. Advantageously, each of the modems 20, 22 and 24 is a dial-up modem which is actuated by its own conventional touch-tone telephone circuitry to access a telephone line between each of modems 20, 22, 24 and the central computer 12.

In accordance with an aspect of the present invention, each unit 14, 16, 18 independently records each ticket sale and stores sales data indicating at least the number of tickets sold and, more generally, the numbers, types and prices of different tickets sold. At periodic intervals, such as several times a day, once each day or once each week,, each unit 14, 16, 18 is placed in communication with the 12 by central computer dialing-up the respective modem 20, 22, 24. Once temporary communication is established, the sales data is transmitted from the units 14, 16, 18 to the central computer 12.

Central computer 12 operates as a central data processor to perform all the necessary accounting functions, including determining such information as the volume of sales and money due to or from each sales agent at his particular location. In addition, each unit 14, 16, 18 itself performs accounting functions on its own sales data. The transfer of the sales information from each unit 14, 16, 18 takes only a very short period of time, usually on the order of seconds, and so the time during which modems 20, 22 and 24 access the telephone lines is very brief, resulting in significant cost savings over systems which may require a continuous or extended connection over the phone lines to a central control station.

Thus, in accordance with the present invention, it is unnecessary for the sales agent to prepare any paperwork to keep track of ticket sales, to make any accounting of the sales or to otherwise report such sales to the state authority. Similarly, it is unnecessary for the state authority to physically collect such sales data from the numerous individual sales agents. Instead, central computer 12, at the appropriate time several times a day, once each day or once each week, simply actuates each modem 20, 22, 24 by dialing the telephone number assigned thereto, as is conventional, and the sales data is transmitted from the respective unit 14, 16, 18 to central computer 12 without further intervention or action by either the agent or the state authority. This insures that sales data is sent promptly to central computer 12 with minimum risk of tampering and without the possible delays or losses which occur when such data is sent by mail.

Furthermore, both the state authority using central computer 12 and the sales agent using his unit 14 have access to a current, up-to-the minute sales accounting of how many tickets have been sold and how much money is due. The state authority can then determine each sales agent's current stock of tickets and can resupply him before the stock runs out. This capability is commercially advantageous and helps to stabilize cash flow.

6

Also, the information can be used to efficiently close out a particular game. Central computer 12 may account for each unit 14, 16 and 18 separately, and may also combine the sales data from all the units so as to provide a state-wide summary.

Of course, the sales data advantageously includes more data than just the number of tickets sold. It should include, for example, an agent number identifying the sales agent, a machine number identifying the particular remote unit, the sales agent's commission, frequently in the form of the percentage of the sales price, winning ticket values which the sales agent has redeemed, and the ticket purchase price, frequently in one dollar increments. Other sales data which may be automatically recorded by units 14, 16, 18 may be transmitted from an electronic cash register or entered by the agent on a control panel, as discussed below. This sales data, plus other types of sales data related to the particular use, may also be included and transmitted to central computer 12.

Remote units 14, 16, 18 are responsive to acounting data calculated from the respective sales data stored therein to print a report for the sales agent, summarizing the accounting results. The format of these reports may vary with the particular lottery system used, but may advantageously take the form of the exemplary reports illustrated in FIGS. 2A–D. FIG. 2A illustrates a daily sales report, FIG. 2B illustrates a weekly sales report, FIG. 2C illustrates a weekly invoice and FIG. 2D illustrates a current sales report. As shown, each report is individualized to the particular unit 14, 16, 18.

Since each unit 14, 16, 18 can record both the number of tickets sold at the particular location and also the amount of money paid by the sales agent in redeeming certain types of winning tickets, the reports are then a thorough reflection of the sales and redemption activity and may completely replace the use of invoices between the state authority and individual sales agents.

Central computer 12 can be programmed to dial up any modem 20, 22, 24 in off hours to interrogate it and get an up-to-the minute accounting, which is an advantage in increasing cash flow. Modems 20, 22, 24 may alternatively include a timer mechanism programmed so as to automatically dial up central computer 12 at preselected intervals to ensure that the sales data is regularly transmitted. For security reasons, the sales agent advantageously should not have the responsibility for connecting central computer 12 and modems 20, 22, 24.

Central computer 12 is operative to send message data indicative of messages to units 14, 16, 18. These messages may be individualized for the respective units 14, 16, 18, for example stating whether the particular sales agent is behind in his payments. Alternatively, central computer 12 may send the same message to all units 14, 16 and 18. Such a message may be, for example, advertising announcing a new game or a special jackpot. These messages may be intended either for the agent or for the customers and, as discussed below, an advantageous embodiment of unit 14, 16, 18 includes separate message display sections for the two types of messages.

Referring now to FIGS. 3 and 4, a preferred embodiment of unit 14 will now be described. It will be understood that units 14, 16, 18 and all others within the lottery ticket distributing system are intended to be identical. Therefore, while a detailed description is given only with respect to unit 14, it will be understood

4,982,337

7

that this description applies equally well to all other units within the system.

Referring first to FIG. 3, unit 14 is constructed as a box-like module advantageously designed to rest upon the surface of a counter 26 or the like. Unit 14 includes a housing with a front surface 28 which, when unit 14 is positioned on counter 26 and is in operation, is intended to face the sales agent or vendor standing behind a counter 26.

An opposed back surface 30 of unit 14 is intended to face the customers when unit 14 is in operation. In accordance with an advantageous aspect of the present invention, a control panel 32 including all necessary agent-operated controls is mounted at front surface 28, while a dispensing outlet 34 is manually accessible at back surface 30 by the customers. Thus, the sales agent may quickly and efficiently enter a sales command, for example in the form of the number of tickets to be dispensed, on control panel 34 at front surface 28, while the tickets are automatically presented in response to the command in dispensing outlet 32 at back surface 30. This structure eliminates the need for the sales agent to physically receive the lottery tickets from unit 14 and to personally hand the lottery tickets to the customer, as is done in conventional lottery ticket dispensers.

As illustrated in FIG. 3, control panel 32 is mounted at front surface 28 on an upper portion 36 thereof. Upper portion 36 is inclined relative to front surface 28 for ergonomic reasons; that is, to permit comfortable access to control panel 32. The angle of inclination of panel 32 is limited so that control panel 32 remains in substantially opposed relation to back surface 30. The angle of inclination is limited not only so that control panel 32 may be easily viewed and operated by the sales agent, but also so that it will be substantially blocked from view by any customer standing in front of counter 26 and facing back surface 30. This minimizes the chances of any interference by the customer in reaching towards control panel 32 in an attempt to operate unit 14 in an unauthorized manner.

Control panel 32 includes a keypad 37 having a plurality of push-buttons 38 for entering data and commands into a control circuit 40 (FIG. 10) which is located inside of the unit 14. Control circuit 40 is a microprocessor-based circuit or minicomputer which controls the operation of unit 14. It will be described in greater detail below.

Push-buttons 38 include numerical buttons bearing the digits 0–10, and an entry button for entering the corresponding numbers into control circuit 40. Push-buttons 38 further may include a cash button, a report button, a sign-on button, a ticket length load button, a storage access button, and all other buttons necessary for entering all appropriate data and commands in accordance with the functions described below.

In particular, when unit 14 has been activated, any number of tickets from 1 through 999 may be dispensed simply by depressing the appropriate numerical push-button and the entry button 38. Thus, if the sales agent depresses the numerical push-button 38 bearing the digit "1", a confirming number will appear on an operator LCD display 42, discussed below, and the sales agent may depress entry button 38 and a single lottery ticket will be dispensed and deposited in dispensing outlet 34 at back surface 30 (FIG. 4). The customer simply reaches into dispensing outlet 34 to remove the ticket.

Alternatively, if the sales agent depresses the numerical push-button bearing the digit "5" and then the entry

8

button, remote unit 14 will automatically deposit five separated lottery tickets into dispensing outlet 34. There is no need for the sales agent either to count out the tickets or to physically receive the tickets and hand them to the customer. This significantly speeds up the ticket selling process, as the sales agent may concentrate on receiving money and giving change, a task which is both easier to perform and more likely to be accurate when the agent is not handling tickets.

Each ticket sold is counted, advantageously in response to operation of the mechanism which provides a separated ticket to dispensing outlet 34, and the number is stored as sales data in memory within control circuit 40 (FIG. 10). Other sales data, such as the price of the tickets also may be stored in memory. When communication with central computer 12 is established, the sales data is send out from the memory by control circuit 40 and fed out over the phone line to the central computer 12.

Control circuit 40 similarly receives message data from the central computer 12 and stores it in the memory along with the sales data and the accounting data calculated therefrom. The report push-button 38 causes a selected one of the reports illustrated in FIGS. 2A–D to be printed, for example on a tape by a thermal printer 140 (FIG. 10) and issued in the front surface 28, through a slot 27.

As mentioned above, central computer 12 may send messages to unit 14. Some of these messages will be intended for the sales agent and not for customers, and so are considered to be control messages rather than advertising messages. To display these control messages, a display device, such as the conventional LCD display 42 is provided in control panel 32 on the inclined surface 36 adjacent keypad 37. In accordance with conventional techniques, central computer 12 can transmit message data indicative of these messages through modem 20 whenever modem 20 is actuated to transmit sales data from unit 14 to central computer 12. This down-loading of message data is achieved without any need to request the same by the sales agent. The placement of LCD display 42 on inclined surface 36 further shields the control message displayed thereon from the eyes of customers.

Alternatively, the control or other messages may be printed by thermal printer 140 on the tape and presented through slot 27.

A key 44 is also provided on control panel 32 for the purpose of controlling the operating mode of unit 14. In a locked or "off" mode of operation, unit 14 is disabled both from receiving commands from control panel 32 and from communicating with central computer 12 through modem 20.

In a "normal" mode of operation, unit 14 is enabled to receive commands entered on control panel 32 and to dispense tickets, but remains disabled from communication with central computer 12.

In a "communication" mode of operation, unit 14 is enabled for receiving commands through control panel 32 and is responsive to modem 20 to permit two-way communication between the unit 14 and the central computer 12. In the communication mode, unit 14 and modem 20 will answer a telephone call from central computer 12, or may be actuated, as by dialing the telephone circuitry within modem 20 to place a telephone call to central computer 12, and to thereafter exchange information. Key 44 has three different posi-

4,982,337

9

tions respectively associated with the three different operating modes of unit 14.

Advantageously, key 44 must be inserted into unit 14 and turned to place unit 14 in either of the normal or communication modes, and is removable from unit 14 only when it is in the locked position to place unit 14 in the locked mode.

A second message display device 46, advantageously an LCD device, is located at back surface 30, advantageously on an upper inclined portion 48 thereof, for easy viewing by the customers. When message data from central computer 12 contains an advertising slogan or the like, a corresponding message will be displayed on LCD display 46. Control circuit 40 in remote unit 14 distinguishes between the two types of data and selects the appropriate LCD device 42, 46 or thermal printer 140 (FIG. 10) to display the message.

## TICKET SEPARATOR OR "BURSTER"

A highly advantageous aspect of the present invention is that the lottery tickets within unit 14 are stored in a fan-fold strip or "stream" and are not, as in most conventional lottery tickets dispensers, stored in stacks of pre-cut tickets for individual dispensing. Prior art ticket dispensers which did store the tickets in pre-cut form had the difficulty that two tickets could be dispensed accidently instead of a single ticket when two tickets within the stack were stuck together.

The present invention essentially eliminates the risk that two or more tickets may be dispensed unintentionally. This is accomplished, in part by storing the tickets in fan-fold form, and by providing a highly advantageous ticket separation or "burster" mechanism for separating the leading ticket from the stream of tickets. This novel separation mechanism alleviates a difficulty which arises when tickets are to be dispensed from a fan-fold stream.

In particular, a common item fed from a fan-fold stream is the paper used to feed a printer controlled by a computer or the like. Such paper is relatively thin and flexible and often has a column of perforations or holes at either side so that it can be driven by a tractor feed mechanism of the printer. Such a feed mechanism provides automatic lengthwise and widthwise alignment of the paper as it is fed through the printer. However, lottery tickets conventionally do not have such columns of perforations and, indeed, are constructed from laminated layers of paper or cardboard so as to be relatively stiff.

The problem faced and solved by the transport mechanism in accordance with the present invention is how to ensure that each ticket as it becomes the leading ticket will be separated from the next following ticket precisely along the joinder line between the tickets. In such a fan-fold scheme, a line of weakness, for example a perforation line, is provided to define each ticket and to permit fan-folding of the stream of connected tickets. In the illustrated embodiment shown in FIG. 5, each fold contains a single ticket, for clarity of illustration, but in a preferred embodiment a number of tickets, for example five, may be provided within each fold.

Simply to provide a knife edge or cutting blade to slice through the stream of tickets is disadvantageous, since such a knife edge may cut through the tickets at any point, such as in the middle of a ticket. Therefore, a highly precise alignment device usually must be provided with such a knife edge to bring it into precise alignment with the joinder line between tickets.

10

The present invention provides a novel separation mechanism which bursts the leading ticket from the next following ticket along the line of weakness therebetween, instead of cutting the two tickets apart. Not only does this inherently reduce the risk of producing only half a ticket, but also it provides an automatic mechanical alignment of the tickets to their proper position for bursting.

A separate alignment mechanism is also provided to adapt the burster mechanism to tickets of different, selected lengths and cooperates with the burster mechanism to provide precise, rapid separation of each ticket from the stream.

More particularly, an advantageous embodiment of the ticket transport/separation system in unit 14 is schematically illustrated in FIG. 5. A plurality of individual tickets 49 are connected in a fan-fold strip or stream 50 which is drawn from the top of a stack 51. The tickets 49 are provided by the state authority in fan-fold stack form, which is compact and easily transportable, especially when including, for example, as many as 1500 tickets. The illustrated embodiment shows a single ticket 49 within each fold, but it will be understood that a greater number of tickets could be provided within each fold.

Referring now to FIG. 6, the ticket strip 50 is headed by a leading ticket 52 which is connected to a next following ticket 54 along a line of weakness 56, and it will be understood that each successive following ticket is separable from its neighbors by similar lines of weakness.

Returning to FIG. 5, ticket strip 50 is fed along a dispensing path 57 from a storage area 58 holding stack 51 within unit 14 towards the dispensing outlet 34, and is transported along dispensing path 57 by a transport mechanism including opposed upper and lower feed rollers 60, 62 and opposed upper and lower exit rollers 64, 66.

The leading ticket 52 is separated from next following ticket 54 by a burster wheel 68 positioned adjacent dispensing path 57 at a bursting position 70. Consequently, feed rollers 60, 62 (also see FIG. 7) are driven separately from exit rollers 64, 66 so that feed rollers 60, 62 transport the stream of tickets 50 from the storage area 58 up to the bursting position 70. Exit rollers 64, 66 operate as "kick-out" rollers to discharge the separated leading ticket 52 from dispensing path 57 into dispensing outlet 34. As shown in FIG. 7, a drive motor 72 is provided to drive feed rollers 60, 62, while a separate "kick-out" motor 74 is provided to drive the exit rollers 64, 66.

When stream of tickets 50 has been transported to bring the line of weakness 56 between the leading ticket 52 and next following ticket 54 to the bursting position 70, a burster wheel 68 is moved into bursting contact therewith in order to separate leading ticket 52 from next following ticket 54. As indicated schematically in FIG. 5, and in perspective in FIG. 7, burster wheel 68 is advantageously in the form of a circular burster blade which, in an advantageous aspect, has a dull, rounded edge which does not cut stream of tickets 50, but rather exerts pressure against the top of stream of tickets 50 in a direction to deflect it from dispensing path 57.

When line of weakness 56 is at bursting position 70, exit rollers 64, 66 grip a portion of the leading ticket 52, while exit feed rollers 60, 62 similarly grip a following portion of the stream of tickets 50, with the result that stream of tickets 50 is held between the two sets of

4,982,337

**11**

rollers against substantial deflection from dispensing path 57. This enables the bursting force from bursters 68 to separate the tickets 52, 54. However, the grip on stream of tickets 50 by upper and lower feed rollers 60, 62 and upper and lower exit rollers 64, 66, respectively, permits a slight deflection of strip of tickets 50 from dispensing path 57 in response to pressure exerted by the burster wheel 68. This slight deflection provides a highly advantageous and novel alignment system in accordance with the present invention. The alignment system operates as follows.

In order for burster wheel 68 to effectively burst the leading ticket 54 from stream tickets 50 at line of weakness 56, it must be sufficiently aligned with lines of weakness at least close to the line. A separate alignment mechanism, discussed below, is used to bring line of weakness 56 to within at least a predetermined incremental distance of bursting position 70. Even within this incremental distance it is still advantageous to have line of weakness 56 precisely aligned with bursting position 70, for best results. As in any such system thus is a certain amount of slippage and tolerance which tends to prevent perfect alignment. In accordance with the present invention, the very action of burster wheel 68 in combination with exit rollers 64, 66 and feed rollers 60, 62 provides a mechanical alignment to correct any errors within the incremental distance.

Specifically, as illustrated in FIG. 8A, the force from burster wheel 68 is exerted at bursting position 70 along the direction of arrow A. In FIG. 8A, it is assumed that line of weakness 56 has fallen short of bursting position 70 by a distance a. Since the force from burster wheel 68 is not exerted directly on the line of weakness 56, the tickets will not immediately begin to burst apart but instead will be deflected slightly downwardly and will tend to bend first at the line of weakness 56 into a V shaped configuration indicated in dashed lines in the drawings. Consequently, tickets 52 and 54 will tend to slip longitudinally along the dispensing path 57 so as to bring the low point of the V-shaped ticket-array into contact with the burster wheel.

In FIG. 8A, the ticket strip 50 moves in the direction of arrow B until the line of weakness 56 is properly aligned with bursting position 70. Correspondingly, as shown in FIG. 8B, when the line of weakness 56 is slightly in advance of the bursting position 70 by distance b, the force of burster wheel 68 will cause the strip 50 to move slightly along the dispensing path in the direction of arrow C, reverse-feeding the strip 50 to again bring line of weakness 56 into precise alignment with bursting position 70. This is an advantage of the burster mechanism of the present invention

If tickets 49 are always of a predetermined, uniform length, the position of burster wheel 68 along dispensing path 57 could be predetermined and the mechanical self-alignment action just described could be sufficient to maintain proper alignment. The system according to the present invention has the additional feature, however, of accepting and dispensing tickets of different lengths and includes an alignment mechanism for bringing line of weakness 56 to within at least a predetermined incremental distance of bursting position 70 regardless of the length of tickets 49.

As illustrated in FIG. 5, a ticket sensor 76 is positioned along dispensing path 57 at a sensing position 78 downstream from bursting position 70 and upstream of the exit rollers 64 and. 66. Ticket sensor 76 operates as a leading edge detector to detect the leading edge 80 of the

**12**

leading ticket 52 (FIG. 6) after the previous leading ticket has been separated and dispensed by the action of upper and lower exit rollers 64, 66 while the feed rollers 60, 62 are held stationary.

As shown in FIG. 6, ticket sensor 76 is a conventional optical sensor having a U-shaped cavity 82 through which the ticket strip 50 passes to interrupt a light beam supplied to a light sensor 84. In accordance with known principles, light sensor 84 will detect the light beam from the time when the previous leading ticket is dispensed until the time that leading edge 80 of leading ticket 52 enters cavity 82 to interrupt the light beam. The distance between ticket sensor 76 and bursting position 70 is predetermined in the construction of the dispensing unit 14. If this predetermined distance is, for example, ¼ inch and tickets 49 are identified as 2 inches long, then detection of leading edge 80 will indicate that the strip of tickets 50 must be driven an additional 1¾ inch to bring line of weakness 56 to bursting position 70. The spacing of exit rollers 64, 66 relative to feed rollers 60, 62 is advantageously such that both leading ticket 52 and next following ticket 54 will be respectively gripped thereby regardless of the length of leading ticket 52. The length of tickets 49 may therefore vary, but only within a predetermined range, for example, 1¼ inches to 2 inches. The length may be entered on control panel 32 by actuation of length load push-button 38 if tickets of different lengths are being sold, or may be set by the central computer 12. Of course, if longer or shorter tickets are to be used, the relative positions of feed rollers 60, 62, exit rollers 64, 66, bursting position and sensing position 78 may be adjusted. This creates the appropriate gripping of the ticket strip 50 by the two pairs of rollers. Wider spacing may be acceptable depending on the rigidity of tickets 49.

Referring now to FIGS. 5 and 7, in order to achieve the proper movement of stream of tickets 50 to bring line of weakness 56 to bursting position 70, the illustrated embodiment uses an alignment mechanism including a code wheel 86 and code wheel sensor 88. In accordance with known techniques, code wheel 86 is divided into a plurality of divisions 90 each corresponding to a single predetermined incremental distance of ticket movement along dispensing path 57. Code wheel sensor 88 detects the rotation of code wheel 86 through each division 90 and produces a pulse in response thereto. As shown in FIGS. 5 and 7, the code wheel is mounted on the same shaft 97 as the upper feed rollers 60 which move the ticket strip 50. Code wheel 86 will therefore measure each incremental distance moved by stream of tickets 50 and control circuit 40 (FIG. 10) counts the number of pulses to permit movement of strip of tickets 50 by the appropriate distance to bring line of weakness 56 to bursting position 70.

Control circuit 40 also determines the direction of movement, since stream of tickets 50 will need to be forward fed or reverse-fed, depending on the particular unit 14 and the length of tickets 49. For example, if the predetermined incremental distances is ¼ inch and stream of tickets 50 must be moved 1½ inches in the forward direction to bring line of weakness 56 into bursting position 70, feed rollers 60, 62 are driven forwardly until code wheel 86 produces six pulses, moving the stream of tickets 50 forwardly for six incremental distances to total 1½ inches. In actuality, the incremental distance will generally be much smaller than ¼ inch, and the number of pulses provided will be correspondingly much greater so as to provide sufficient accuracy of

4,982,337

13

alignment. Code wheel 86 is controlled to produce the proper number of pulses by control circuit 40 in response to the previously-entered ticket length setting stored therein. It will be apparent that tickets of a greater or lesser length may readily be accommodated by producing a greater or fewer number of pulses from code wheel 86.

FIG. 7 is a more structurally complete illustration of the ticket drive and bursting assembly. In particular, it will be seen that drive motor 72 operates through a gear train including gears 92 and 94 to drive lower feed 62 directly and upper feed roller 60 thereby, the "kick-out" motor 74 drives lower exit rollers 66 directly through a gear train partially illustrated at 96. Upper exit rollers 64 are driven by rollers 66.

Code wheel 86 is shown mounted on the same shaft 97 on which upper feed roller 60 is mounted to provide an accurate measurement of ticket displacement. Although driven lower feed roller 62 may slip while stream of tickets 50 is stationary, upper feed roller 60 is rotated only when stream of tickets 50 moves, thereby providing an accurate output from code wheel 86.

Burster wheel 68 is shown mounted on a burster block 98 driven by a burster motor 100 through a cable spool arrangement 102 including tensioning spring 104. When burster block 98 is moved from the illustrated rest position towards interception with dispensing path 57 through the action of cable spool device 102, burster wheel 68 will come into contact with stream of tickets 50 at the side thereof initially and then across stream of tickets 50 to burst the same apart. Limit switches 106, 108 provide respective indications of the limit positions for burster block 98 including tensioning burster block 98 from crashing into the side of the mechanism.

Burster block 98 is moved from right to left to burst the leading ticket 52, then left to right to burst the next leading ticket 54, and so on. Limit switches 106, 108 will therefore indicate the position of burster block 98 after each bursting motion. Thus, each bursting motion of burster block 98 from left to right or right to left represents the separation of a single ticket 49 and so may be used to digitally count the number of tickets sold. Each bursting motion may be sensed through one of limit switches 106, 108 or by a separate sensor, and control circuit 40 is responsive thereto to increment the number of tickets sold as part of the stored sales data. The longest contemplated ticket length which may be input on control panel 32 is selected to be less than twice the shortest contemplated ticket length. For instance, the shortest length may be 1 ¼ inches while the longest length is 2 inches. This is a security measure to prevent a dishonest employee from setting the stored length to twice the actual ticket length, thus dispensing two tickets for each bursting motion of burster block 98. Of course, if the length is set only at central computer 12 or only with a special access code at control panel 32, this length limitation is unnecessary.

## IMPRINTING

In accordance with a further aspect of the present invention, vendor identification data, such as the name and address of the sales agent, is automatically printed on each ticket 49 prior to dispensing. This assists the customer if he has any complaints by identifying where and from whom he bought the ticket, or if the particular game permits only the sales agent who sold ticket 49 to redeem it. This is also useful in detecting fraud should

14

dispensing unit 14 be stolen and set in operation at another location.

As illustrated in FIG. 9, an imprinter assembly 110 includes an imprinter roller 112 including an impression of the vendor identification data, a pressure roller 114 in driving contact with imprinter roller 112 on the opposite side of dispensing path 57 so as to receive stream of tickets 50 therebetween, and an inker roller 116 in rolling contact with imprinter roller 112 so as to provide an ink supply thereto. Imprinter assembly 110 is not driven by any motor, but rather imprinter and pressure rollers 112, 114 are rotated by the motion of the strip of tickets 50 therebetween, while inker roller is rotated by the rotation of imprinter roller 112 to bring the impression on imprinter roller 12 into inked contact at least once with each ticket 49. Of course, the position of the inked contact on ticket 49 will depend on the length thereof, but the diameter of imprinter roller 112 is calculated so that the vendor identification data will appear at least once on each ticket 49 within the predetermined range of ticket lengths.

## ACCESS MONITORING

A further security feature of unit 14 is intended to alert the sales agent to theft of tickets normally stored in unit 14. As mentioned above, the tickets are normally stored in a fan-fold stack 51 in storage area 58 of unit 14. Storage area 58 is accessible only through a normally closed locked door 118 (FIG. 4). A lid switch 120 (see lower right-hand portion of FIG. 10) is connected to the door 118 and to control circuit 40 so as to detect each opening of the door permitting access to the interior storage area 58 to remove tickets therefrom and deposit tickets therein. Each such opening may cause an alarm to sound and is also recorded in control circuit 40. Operation of an access control push-button 38 on control panel 32 will produce a print-out of the number of openings each day on the tape issued through the slot 39—the same tape which is used to provide various reports. The sales agent, being financially responsible for each ticket received from the state authority, will be aware of each time he has opened door 118 to deposit tickets. Therefore any additional openings will indicate to the sales agent that someone else has been tampering with unit 14 and provides an additional security check. Such an access detecting system may also be applied to a locked drawer or other area in which tickets may be stored.

## CONTROL CIRCUIT

FIG. 10 is a functional block diagram of control circuit 40 in unit 14 and the various devices and systems which it controls through software and firmware. Briefly reviewing the previously discussed features, modem 20 provides the conduit for message data from central computer 12 over the phone lines and the sales data from unit 14 stored in the memory 122. Proceeding counterclockwise from modem 20, the sales data, accounting data and the like are stored in memory 122, advantageously in the form of a random access memory.

Lid switch 120 which detects each opening of door 118 provides its data to memory 122. Key switch 124 detects the three different positions of key 44 and provides a signal to modem 20 to permit communication between modem 20 and unit 14 only in the communication mode, and signals to exit or "kick-out" motor 74,

4,982,337

15

drive motor 72 and burster motor 100 to permit dispensing of tickets in the normal and communication modes.

Code wheel 86 receives signals from leading edge ticket sensor 76, which also provides a feed-jam alarm signal an exit jam alarm signal. Burst position limit switches 106, 108 similarly provide a burst-jam alarm signal should the burster assembly become inoperative, as well as a count of tickets sold.

Customer LCD display 46 and operator LCD display 42 may be controlled through keypad 37 to blink or scroll the respective messages. Operator LCD display 42 is also adapted to display error messages generated by control circuit 40 in response to various alarm signals, such as those generated by lid switch 120, ticket sensor 86, etc.

Control panel keypad 37 is operative to send signals to all the various devices, while beeper 126 provides an alarm indication for a variety of error conditions, including an electrical "brown-out" sensed by brown-out sensor 128, a lid opening sensed by lid switch 120, jam alarms from drive motor 72, burst motor 100 and burst limit switches 106, 108, a printer paper empty sensor 129 and in response to operation of keypad 37.

It is contemplated that the sales agent will redeem certain types of winning tickets and will deposit the money from all sales into a cash register Such a cash register may be electronic and connected to control circuit 40 through an RS-232 cable 130 to automatically record this type of sales data. An additionally, an external sign may also be attached to control circuit 40 by RS-232 cable 130 to receive the same type of advertising messages as displayed on customer LCD display 46. For example, the external sign may be mounted outside the store where unit 14 is located.

FIG. 11 is a more detailed electronic block diagram corresponding to functional block diagram FIG. 10 and illustrates the currently contemplated best mode circuit elements for implementing the difference devices and operations of control circuit 40 and unit 14.

## FLOW CHARTS

FIG. 12 is a flow chart illustrating a control program 200 for unit 14 in performing some of the above-described functions. In accordance with known techniques, a CPU 150 (FIG. 11) within control circuit 40 executes control programs such as program 200 out of a read-only memory (ROM) 152. Control program 200 starts at step 201 and thereafter in steps 202, 203 and 204, determines whether CPU 150 has received an input from keypad 37, an input from central computer 12 or an input through another portion of control circuit 40 from the various devices connected thereto. Otherwise, control proceeds to another portion of program 200 to perform a function not illustrated in FIG. 12. At step 202, if an input was received from keypad 37, program 200 proceeds to step 205, wherein it is determined whether a ticket number command has been received, ordering the dispensing of N tickets. If such a ticket number command has been received, program 200 proceeds to step 206 wherein stream of tickets 50 is moved to bring line of weakness 68 to bursting position 70, with a following ticket being printed during such movement. In step 207, leading ticket 52 is burst from next following ticket 54 and in step 208 the dispensing of another ticket is recorded as sales data. In step 209, it is determined whether N tickets have been dispensed and if not, control returns to step 206 so that the next leading ticket 52 may be dispensed. If N tickets have been dispensed in

16

step 209, control returns to step 202. In step 205, if a ticket number command has not been received, program 200 proceeds to step 210 wherein it is determined whether the length L of the tickets needs to be set. If so, in step 211 the new length is stored and control returns to step 202. If at step 210 it is determined that some other command has been entered from keypad 37, control proceeds to another portion of program 200 (not illustrated) where such command may be executed.

If instead of an input from keypad 37, an input from central computer 12 has been received, then program 200 proceeds from step 203 to step 212 to determine whether an accounting procedure is to be followed. If so, program 200 proceeds to step 213, wherein sales data may be transmitted to central computer 12 and/or accounting data may be calculated, and then control returns to step 202. Of course, accounting data may also be calculated at other times without a specific input from central computer 12. On the other hand, if at step 212 it is determined that something other than an accounting procedure is to follow, program 200 proceeds to step 214 wherein it operates in response to any message or other data received from central computer 12 to display a message and to operate under the control of central computer 12 to perform the commanded function, and thereafter control returns to step 202.

If it is determined at step 204 that an input is received from some device connected to control circuit 40, program 200 proceeds to step 215 wherein it determines whether lid switch 120 has detected the opening of door 118 to ticket storage area 58. If so, control proceeds to step 216 wherein the alarm may be sounded and the access to ticket storage area 58 is recorded. If at step 215 control program 200 determines that some other input has been received from devices connected to control circuit 40, program 200 proceeds to step 217 wherein the appropriate action recognizing an error, displaying an error message, sounding an alarm or other appropriate action is taken, whereafter control returns to step 202.

FIG. 12 illustrates only some of the functions of unit 14 and illustrates those only in very general terms. It will be understood by one skilled in the art that the order of some of the steps in program 200 may be altered, with additional steps being added to handle the additional functions described above and to include further functions consistent with the described operation of unit 14.

The above description has been given on a single preferred embodiment of the system and method for distributing lottery tickets in accordance with the present invention, and it will be apparent to one skilled in the art that many modifications and changes may be made without departing from the spirit or scope of the present invention. For instance, the burster mechanism is advantageous for all types of tickets and the like stored in a fan-fold stream. Also, the unit could be adapted for Lotto-type games by the addition of a card reader and controllable printer receiving the separated tickets, or the unit could be adapted as a player-activated terminal, for example in an isolated area. Therefore, the scope of the present invention should be determined by reference to the appended claims.

We claim:

1. Apparatus for dispensing lottery tickets, comprising:

a box-like module having opposed front and back surfaces;

4,982,337

17

ticket storage means within said module for storing a plurality of lottery tickets;

control panel means mounted at said front surface of said module and being actuatable for initiating dispensing of a lottery ticket;

a dispensing outlet manually accessible at said back surface for receiving a dispensed lottery ticket from said ticket storage means; and

ticket dispensing means responsive to said control panel means for dispensing a lottery ticket from said ticket storage means to said dispensing outlet, whereby said dispensed lottery ticket may be manually removed from said, apparatus.

2. Apparatus according to claim 1, wherein said control panel means is actuable to generate a ticket number specification signal indicating a selected number of tickets, said ticket dispensing means being responsive to said ticket number specification signal to dispense said number of tickets.

3. Apparatus according to claim 2, wherein said lottery tickets stored within said ticket storage means are connected, and wherein said dispensing means includes means for individually separating each ticket to be dispensed from the remaining tickets regardless of the number of tickets being dispensed in one order.

4. Apparatus according to claim 1, wherein said lottery tickets stored within said ticket storage means are connected in a fan-fold stream, said lottery tickets being delineated from each other along lines of weakness, and said separating means including means for bursting said lottery tickets apart along said lines of weakness.

5. Apparatus according to claim 2, wherein said module further includes message display means mounted at said back surface adjacent said dispensing outlet.

6. Apparatus according to claim 5, further comprising central data processing means and means for selectively connecting said data processing means with said module for transmitting at least message data thereto, said message display means being responsive to said message data to display a message indicative thereof.

7. Apparatus according to claim 6, wherein said module includes a second message display means mounted at said front surface adjacent said control panel means, said central data processing means further transmitting control message data to said module and said second message display means being responsive to said control message data to display a control message indicative thereof.

8. Apparatus for dispensing lottery tickets, comprising:

ticket storage means for storing a plurality of lottery tickets connected in fan-fold stream headed by a leading ticket, said tickets being separable from each other along lines of weakness;

transport means for feeding said stream of tickets from said ticket storage means along a predetermined dispensing path;

separation means for separating said leading ticket from said stream of tickets along a leading line of weakness between said leading ticket and a next following ticket by bursting said tickets apart along said leading line;

manually accessible outlet means for receiving the separated ticket;

wherein said separation means includes a dull-edged bursting blade movably mounted adjacent a predetermined bursting position along said path, holding means for holding said stream of tickets against

18

substantial deflection from said path at said bursting position and bursting blade drive means for bringing said bursting blade into bursting contact with said stream of tickets at said bursting position to burst said leading ticket from said next following ticket;

wherein said separation means includes feed alignment means for controlling said transport means to bring said leading line of weakness to said bursting position; and

wherein said alignment means includes sensor means for detecting a present position of said leading ticket relative to said bursting position, determining means for determining a transport direction and a displacement distance necessary to bring said leading line of weakness to said bursting position, and transport control means for generating a transport control signal indicative of said transport direction and displacement distance, said transport means being responsive to said transport control signal for transporting said stream of tickets in said transport direction by said displacement distance;

9. Apparatus for dispensing tickets, comprising; ticket storage means for storing a plurality of tickets connected in a fan-fold stream headed by a leading ticket, said tickets being separable from each other along lines of weakness; transport means for feeding said stream of tickets from said ticket storage means along a predetermined dispensing path; separation means for separating said leading ticket from said stream of tickets along a leading line of weakness between said leading ticket and a next following ticket; and manually accessible outlet means for receiving the separated ticket, wherein said separation means includes a dull-edged bursting blade movably mounted adjacent a predetermined bursting position along said path, holding means for holding said stream of tickets against substantial deflection from said path at said bursting position and bursting blade drive means for bringing said bursting blade into bursting contact with said stream of tickets at said bursting position to burst said leading ticket from said next following ticket wherein said separation means includes feed alignment means for controlling said transport means to bring said leading line of weakness to said bursting position wherein said alignment means includes sensor means for detecting a present position of said leading ticket relative to said bursting position, determining means for determining a transport direction and a displacement distance necessary to bring said leading line of weakness to said bursting position, and transport control means for generating a transport control signal indicative of said transport direction and displacement distance, said transport means being responsive to said transport control signal for transporting said stream of tickets in said transport direction by said displacement distance wherein said transport control means is responsive to transportation of said stream of tickets by a predetermined incremental distance to generate a transport pulse, said determining means calculates an integral number substantially equal to said displacement distance divided by said incremental distance, and said transport control means permits transports by said transport means during generation of said number of said transport pulses to bring said leading line of weakness of said bursting position.

10. Apparatus according to claim 9, wherein said transport means includes code wheel means for generating said transport pulses.

4,982,337

**19**

11. Apparatus according to claim 8, wherein said sensor means detects a leading edge of said leading ticket and said alignment means includes memory means for memorizing a length of said leading ticket.

12. Apparatus according to claim 11, wherein all said tickets have a selected uniform length.

13. Apparatus according to claim 12, further comprising data entry means for entering said uniform length into storage in said memory means.

14. Apparatus according to claim 13, wherein said determining means calculates said number once in response to entry of said uniform length and stores said number in said memory means, said determining means thereafter supplying said stored number to said transport control means for each ticket.

15. Apparatus according to claim 8, wherein said ticket storage means includes a door which may be opened to selectively place tickets in said ticket storage means and remove tickets therefrom and access detector means for detecting and counting each opening of said door.

16. Apparatus according to claim 8, further comprising imprinter means for printing vendor identification data on each, said ticket.

17. Apparatus according to claim 16, wherein said vendor identification data includes a name and address of a vendor associated with said apparatus.

18. Apparatus according to claim 16, wherein said imprinter means is located adjacent said path upstream of the position of said separation means.

19. Apparatus according to claim 18, wherein said imprinter means includes a stamper roller bearing an impression of said vendor identification data and an opposed, closely spaced pressure roller adapted to drivingly receive said stream of tickets therebetween, and an inker roller in rolling contact with said stamper roller, motion of said stream of tickets by said transport means causing said stamper, inker and pressure rollers to rotate so as to bring said impression into inked contact with each said ticket at a predetermined position thereon.

20. A ticket dispensing machine for dispensing tickets directly to the purchaser thereof, said dispenser comprising the combination of housing means for storing a strip of tickets to be dispensed, said housing means having an outlet opening accessible to the purchaser of tickets from said machine, means operable for ordering a plurality of tickets in a single batch, means for separating each of said tickets from said strip, dispensing means for dispensing tickets through said outlet opening, and control means for causing each ticket in said batch to be separated and dispensed separately from the other tickets in said batch regardless of the number of tickets in said batch.

21. A machine as in claim 20 in which said tickets are instant-winner lottery tickets.

22. Apparatus for dispensing tickets from a strip of tickets dilineated from one another by lines along which the material of said strip is weakened, said apparatus comprising, in combination, means for moving said strip towards a dispensing position, a separation member, means for holding said strip adjacent one line along which said strip is to be separated, and causing said strip to bend along said one line at said dispensing position to facilitate tearing of said strip by engagement with said separator member along said one line while said strip is bend, and including drive means for creating motion of said separator member and said strip relative to one

**20**

another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line.

23. Apparatus as in claim 22 in which said means for holding said strip includes means for releasing said strip under the pull exerted by the deflecting contact of said separator member with said strip to adjust the longitudinal position of said strip in order to align said one line with said member.

24. Apparatus for dispensing tickets from a strip of tickets dilineated from one another by lines along which the material of said strip is weakened, said apparatus comprising, in combination, means for moving said strip towards a dispensing position, means for holding said strip adjacent one line along which said strip is to be separated, and bending said strip along said line to facilitate tearing of said strip along said one line, including separation means having a separator member and drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line, and including means for causing said separator member to break through said strip in one locale and then traverse the strip along said line.

25. Apparatus according to claim 24 in which said drive means includes means for mounting said separator member to traverse said strip, starting from a position in which said separator member is out of contact with said strip.

26. Apparatus according to claim 25 in which said separator member includes a blunt-edged wheel rotatably mounted to roll along said one line.

27. Apparatus according to claim 22 in which said tickets are lottery tickets stored in fan-fold form.

28. A dispenser for dispensing tickets from a strip of tickets printed in a strip with the individual tickets being delineated from one another by lines of weakness, moving means for moving said strip by a pre-determined distance to a position in which one of said lines is near a separation location at which adjacent tickets are separated from one another, said moving means comprising drive means for moving said strip by a pre-determined distance, and position detecting means for detecting the distance actually moved by said strip and producing an output signal to control said drive means to drive said strip until said output signal indicates that said strip actually has moved by said pre-determined distance to dispense one of said tickets, and to control means for severing a ticket from said strip.

29. A dispenser as in claim 28 in which said detecting means includes a rotary code member drivably coupled to said strip, and means for detecting the incremental movements of said wheel and converting them into electrical signals.

30. A dispenser for dispensing tickets from a strip of tickets printed in a strip with the individual tickets being delineated from one another by lines of weakness, moving means for moving said strip by a pre-determined distance to a position in which one of said lines is near a separation location at which adjacent tickets are separated from one another, said moving means comprising drive means for moving said strip by a pre-determined distance, position detecting means for detecting the distance actually moved by said strip and producing an output signal to control said drive means in which said

4,982,337

21

detecting means includes a rotary code member drivably coupled to said strip, means for detecting the incremental movements of said wheel and converting them into electrical signals and including an idler roller driven by the motion of said strip and drivably coupled to a said shaft, said code wheel being mounted on said shaft.

**31.** A dispenser as in claim **28** including a front edge detector to detect the front edge of a ticket to be separated, memory means for storing information corresponding to the distance said strip is to be driven after its front edge is detected and before separation, and means for comparing the stored information with the output of said position detecting means, and for actuating separating means when a pre-determined comparison condition is reached.

**32.** A dispenser for dispensing tickets from a strip of tickets printed in a strip with the individual tickets being delineated from one another by lines of weakness, moving means for moving said strip by a pre-determined distance to a position in which one of said lines is near a separation location at which adjacent tickets are separated from one another, said moving means comprising drive means for moving said strip by a pre-determined distance, position detecting means for detecting the distance actually moved by said strip and producing an output signal to control said drive means including a front edge detector to detect the front edge of a ticket to

22

be separated, memory means for storing information corresponding to the distance said strip is to be driven after its front edge is detected and before separation, means for comparing the stored information with the output of said position detecting means, and for actuating separating means when a pre-determined comparison condition is reached, including separator means at said separation location, means for causing said dispenser to issue a plurality of tickets, the number of which corresponds to an order for a batch of tickets, and means for operating said separator means to separate each of said tickets from the others in said batch.

**33.** A dispenser as in claim **28** including separator means for pushing on said strip with a separator member in the vicinity of said one line while gripping said strip on opposite sides of said one line to bend said strip along said line and tear said tickets apart along said one line.

**34.** A dispenser as in claim **31** including input means for storing corresponding information in said memory means for tickets of a different size from the first-named tickets.

**35.** A dispenser as in claim **28** in which said tickets are lottery tickets, and including housing means for storing said tickets in fan-fold form, said dispensing apparatus being mounted in said housing.

* * * * *

30

35

40

45

50

55

60

65