

LEXSEE 2002 U.S. DIST. LEXIS 10566

**WILLOW BAY ASSOCIATES, LLC, a Nevada limited liability company, Plaintiff,
v. IMMUNOMEDICS INC., a Delaware corporation, et al., Defendant.**

**C.A. No. 00-99-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2002 U.S. Dist. LEXIS 10566**

**June 12, 2002, Decided**

**SUBSEQUENT HISTORY:** Motion denied by, Summary judgment denied by, Summary judgment granted by, Claim dismissed by Willow Bay Assocs., LLC v. Immunomedics, Inc., 2003 U.S. Dist. LEXIS 4426 (D. Del., Mar. 21, 2003)

**DISPOSITION:** The Plaintiff's Motion for Reconsideration wass GRANTED. The Court's order entering summary judgment in favor of the defendants was VACATED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a limited liability company, sued defendant corporation for breach of contract. The corporation's motion to dismiss was converted to a summary judgment motion during oral arguments. The motion was granted. The company moved for reconsideration arguing that the court made a procedural error in converting the motion to dismiss into a motion for summary judgment without prior notice to the company.

**OVERVIEW:** The company also argued that substantive errors flowed from the procedural error of converting the motion to dismiss to one for summary judgment, as the company was effectively prohibited from presenting evidence to support its position. The corporation argued that even if the court made a procedural error, the company was not prejudiced by such error because the statute of frauds defense was previously raised in this case. Additionally, it contended that there were no new facts the company could present that would remove the contract from the purview of the New York statute of frauds. A review of the complaint

indicated that there was probably a set of facts under which the company might prevail. Since the court concluded that there was a set of facts under which the company could prevail and therefore survive a motion to dismiss, the court concluded that the conversion of the motion to dismiss into a motion for summary judgment without notice to the plaintiff was not harmless error.

**OUTCOME:** The company's motion for reconsideration was granted, and the order entering summary judgment in the corporation's favor was vacated. The corporation's motion to strike the company's reply was dismissed as moot.

**LexisNexis(R) Headnotes**

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN1] As a general rule, motions for reconsideration should be granted only sparingly. In fact, those types of motions are only granted if it appears that the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension.

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN2] A district court should also grant a motion for reconsideration which alters, amends, or offers relief from a judgment when there (1) has been an intervening change in the controlling law, (2) is newly discovered evidence which was not available to the moving party at the time of the judgment, or (3) is a need to correct a legal or factual error which has resulted in a manifest injustice.

Case 1:04-cv-00138-JJF    Document 101-3    Filed 07/25/2005    Page 3 of 23

Page 2
2002 U.S. Dist. LEXIS 10566, *

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN3] Motions for reconsideration should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided.

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN4] A motion for reconsideration may be granted where there is a need to correct a legal or factual error which has resulted in a manifest injustice.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN5] Fed. R. Civ. P. 12(b) dictates that if a motion to dismiss is treated as a motion for summary judgment under Fed. R. Civ. P. 56, all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*
[HN6] Fed. R. Civ. P. 56 permits a party opposing summary judgment to present affidavits in support of its position. Fed. R. Civ. P. 56(c).

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN7] A district court's failure to provide notice to parties of a conversion of a Fed. R. Civ. P. 12(b)(6) motion to dismiss to one for summary judgment under Fed. R. Civ. P. 56 can constitute reversible error under certain circumstances. However, the failure to provide notice is harmless error if the complaint would not survive a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN8] In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the factual allegations of the complaint must be accepted as true. Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the ' non-moving party.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN9] A court should dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

COUNSEL: [*1] For WILLOW BAY ASSOCIATES, LLC, plaintiff: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For IMMUNOMEDICS INC., defendant: W. Harding Drane, Jr., William J. Dorgan, Potter Anderson & Corroon, LLP, Wilmington, DE.

For THE ZANETT SECURITIES CORPORATION, counter-claimant: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For WILLOW BAY ASSOCIATES, LLC, counter-defendant: David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For IMMUNOMEDICS INC., counter-claimant: W. Harding Drane, Jr., William J. Dorgan, Potter Anderson & Corroon, LLP, Wilmington, DE.

For WILLOW BAY ASSOCIATES, LLC, counter-defendant: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

JUDGES: Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Gregory M. Sleet

OPINION:

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On February 17, 2000, the plaintiff, Willow Bay Associates, LLC ("Willow Bay") filed a complaint in this court alleging that the defendant, Immunomedics, had breached its contract (a "non-circumvention" or [*2] "reciprocal confidentiality agreement") with Willow Bay. The court entered a schedule setting the dispositive motion deadline at February 15, 2001. The Pre-Trial conference was held on June 16, 2001. By this time, the dispositive motion deadline had lapsed, and the court directed the parties not to file any dispositive motions. Thus, no dispositive motions were filed.

The court scheduled the two day bench trial for Thursday, April 18, 2002 and Friday, April 19, 2002. n1 On Monday, April 15, 2002, the defendant wrote a letter-brief to the court which the defendant maintains was

2002 U.S. Dist. LEXIS 10566, *

intended to bring a newly discovered case, *Bronner v. Park Place Entertainment Corp.*, 137 F. Supp. 2d 306 (S.D.N.Y. 2001), to the court's attention. However, the letter also asked the court to dismiss the case pursuant to the New York statute of frauds. n2 The plaintiff responded to the motion to dismiss on the next day, Tuesday, April 16, 2002. The plaintiff contended that the "motion to dismiss" should not be granted because, *inter alia*, "a whole host of factual issues" remained to be resolved by a jury.

n1 The trial was rescheduled twice to accommodate the schedules of the court and the parties. [*3]

n2 The parties agree that New York law governs this dispute.

The court held a telephone conference with the parties on Tuesday afternoon. During that teleconference, the court told the parties that it would hear oral argument on Wednesday, April 17, at 12:30 p.m. The court also directed the defendant to reply to the plaintiff's letter brief prior to oral argument.

During introductory remarks made during oral argument, the court indicated for the first time that it would consider the motion to dismiss as a motion for summary judgment. (D.I. 104 at 2.) The court heard argument from both parties. Although the plaintiff did not object to the court's conversion of the defendant's motion to dismiss into a motion for summary judgment, the plaintiff did state that it felt that genuine issues of fact precluding summary judgment remained. (*Id.* at 24.) After briefly adjourning the proceedings to take the arguments under advisement, the court returned to the bench and announced that it would grant the defendant's motion for summary judgment. (*Id.* at 28.) The court fully explained the reasons for [*4] its ruling. (*Id.* at 28-34.)

Presently before the court is the plaintiff's motion for reconsideration of the court's decision. The plaintiff argues that the court made a procedural error in converting the motion to dismiss into a motion for summary judgment without prior notice to the plaintiff. The plaintiff also argues that substantive errors flowed from this procedural defect, as the plaintiff was effectively prohibited from presenting evidence to support its position. The defendant argues that even if the court made a procedural error, the plaintiff was not prejudiced by such error because the statute of frauds defense was previously raised in this case. Additionally,

the defendant contends that there were no new facts the plaintiff could present that would remove this contract from the purview of the New York statute of frauds.

After reviewing the parties' submissions, the transcripts of record, and the applicable law, the court will grant the plaintiff's motion. Upon reconsideration, the court agrees that the plaintiff should have been afforded an opportunity to present any necessary facts to the court in opposition to the defendant's summary judgment motion. In order to [*5] correct this error, the court will vacate the April 17 order granting summary judgment and re-open the case. However, to balance the plaintiff's interest in presenting facts with the defendant's interest in raising the statute of frauds defense, the court will allow either party to submit a motion for summary judgment stating that it is entitled to judgment in its favor as a matter of law. In support of or in opposition to any such motion, the plaintiff will be permitted to present any necessary facts. The court will now explain its reasoning.

## II. STANDARD OF REVIEW

[HN1] As a general rule, motions for reconsideration should be granted only "sparingly." *See Karr v. Castle*, 768 F. Supp. 1087, 1090 (D. Del. 1991). In fact, these types of motions are only granted if it appears that the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension. *See, e.g., Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)); [*6] *see also Karr*, 768 F. Supp. at 1090 (citing same).

In addition, the Third Circuit has explained that [HN2] a district court should also grant a motion for reconsideration which alters, amends, or offers relief from a judgment when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence which was not available to the moving party at the time of the judgment; or (3) there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (relying on *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).

Nevertheless, as the *Brambles* court made clear, [HN3] motions for reconsideration "should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." 735 F. Supp. at 1240. In these situations, such a motion should be denied because any other ruling would effectively encourage parties to engage in an

endless debate with the court and, thus, delay the ultimate resolution of [*7] the litigation. *See Oglesby v. Penn Mut. Life Ins. Co.*, 877 F. Supp. 872, 892 (D. Del. 1994) (noting that motions for reconsideration "should not be abused to allow for a never-ending polemic between the litigants and the court"); *Brambles*, 735 F. Supp. at 1240 ("The procedural mechanism provided by the rule should not be undermined to allow for endless debate between the parties and the [court.").

## III. DISCUSSION

[HN4] A motion for reconsideration may be granted where there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood*, 176 F.3d at 677. In this case, the court made a procedural error in converting the motion to dismiss to a motion for summary judgment without providing notice to the plaintiff. [HN5] Rule 12(b) of the Federal Rules of Civil Procedure dictates that if a motion to dismiss is treated as a motion for summary judgment under Rule 56, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b). [HN6] Rule 56 also permits a party opposing summary judgment to present affidavits in support [*8] of its position. *See* FED. R. CIV. P. 56(c). The Third Circuit has stated that the [HN7] district court's failure to provide notice to parties can constitute reversible error under certain circumstances. *See In re: Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 289 (3d Cir. 1999). However, the failure to provide notice is harmless error if the complaint would not survive a motion to dismiss. *See id.*

The court concludes that at minimum, the plaintiff's complaint might have survived a motion to dismiss. [HN8] In ruling on a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery*, 117 F.3d 723, 726 (3d Cir. 1997); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. *See Jenkins v. McKeithen*, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991). [HN9] A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be [*9] proved consistent with the allegations." *See Graves*, 117 F.3d at 726; *Nami*, 82 F.3d at 65 (both citing *Conley v. Gibson*, 355 U.S. 41, 45, 2 L. Ed. 2d 80, 78 S. Ct. 99-46 (1957)).

A review of the plaintiff's complaint indicates that there is probably a set of facts under which the plaintiff might prevail. Although the defendant has raised the statute of frauds as a defense, in both its April 16 letter

brief and the April 17 oral argument, the plaintiff stated that there may be a set of facts under which the statute of limitations defense would be inapplicable. Since the court concludes that there is a set of facts under which the plaintiff could prevail and therefore survive a motion to dismiss, the court concludes that the conversion of the motion to dismiss into a motion for summary judgment without notice to the plaintiff was not harmless error.

The defendant contends that the plaintiff suffered no prejudice as a result of the court's conversion because the statute of limitations issue had previously been introduced into the case. The court agrees that the statute of limitations defense was raised well before the April 17 oral argument. However, the plaintiff [*10] does not request reconsideration because the issue was newly presented at oral argument. The basis for the plaintiff's request is that the court's conversion of the motion to dismiss into a motion for summary judgment without prior notice deprived the plaintiff of the opportunity to present its version of the facts to the court. The defendant has not cited any authority stating that the plaintiff does not have the right to such notice or the right to present facts prior to the entry of summary judgment. Moreover, even if the statute of frauds issue was known to the plaintiff, it was raised anew a mere three days before trial. Given the fact that the plaintiff had such a short period of time in which to defend the motion to dismiss and the fact that the court only told the plaintiff at the beginning of oral argument that it would convert the motion to dismiss, it is unfair to conclude that the plaintiff had a sufficient opportunity to present all facts necessary to resist the defendant's motion. n3

n3 The court notes that the plaintiff did not raise the notice issue during oral argument and thus the notice issue could be considered waived. However, given the fact that the rapid evolution of events may not have given the plaintiff the opportunity to object to the conversion and the fact that the plaintiff did oppose the entry of summary judgment, the court finds that the plaintiff sufficiently preserved the notice issue for purposes of reconsideration.

[*11]

## IV. CONCLUSION

For all of these reasons, the court will vacate its April 17, 2002 order granting summary judgment in favor of the defendant and will re-open this case to permit the plaintiff to present any additional facts necessary to support its claim. However, both the plaintiff and the defendant will be prohibited from

2002 U.S. Dist. LEXIS 10566, *

introducing new causes of action or new defenses not previously raised in this litigation. n4 Additionally, to ensure that both the plaintiff and the defendant are given a fair opportunity to fully address their claims and defenses, either party will be permitted to submit a motion for summary judgment for the court's consideration. The parties are directed to agree to a briefing schedule and submit it to the court within thirty (30) days of this order. If the court finds that the statute of frauds is inapplicable, this case will be scheduled for trial.

> n4 For instance, the plaintiff's motion for reconsideration argues that the plaintiff might prevail on a quantum meruit theory. However, the plaintiff's complaint does not seek recovery based on quantum meruit - only breach of contract. At this late stage in the litigation, the plaintiff will not be permitted to pursue a cause of action which is not contained in the complaint and is therefore new to this litigation. *See Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 15 F. Supp. 2d 406, 409 (D. Del. 1998) (noting that a motion for reconsideration "may not be used as a vehicle to advance additional arguments that a party could have made before judgment but neglected to do so").

[*12]

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The Plaintiff's Motion for Reconsideration (D.I. 105) is GRANTED.

2. The Court's April 17, 2002 order entering summary judgment in favor of the defendants (D.I. 101) is VACATED.

3. The parties are hereby directed to submit a stipulated summary judgment briefing schedule to the court within thirty (30) days from the date of this order.

4. The clerk's office shall re-open this case.

5. The defendant's motion to strike the plaintiff's reply brief (D.I. 110) is DISMISSED as MOOT.

Dated: June 12, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT B

LEXSEE 1998 U.S. DIST. LEXIS 17445

UNITED STATES OF AMERICA, Plaintiff, v. SOUTH CHICAGO BANK, f/k/a
SOUTH CHICAGO SAVING BANK, ADVANCE BANK, s.b., f/k/a ADVANCE
BANK, f.s.b., JAMES A. FITCH, SR., VINCENT LIPETZKY, and BARBARA
KACZMARZEWSKI, a/k/a BARBARA KATZ, Defendants.

No. 97 CR 849 - 1, 2

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

1998 U.S. Dist. LEXIS 17445

October 16, 1998, Decided
October 30, 1998, Docketed

**DISPOSITION:** [*1] Motions by South Chicago Bank and Advance Bank to quash government's trial subpoenas granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For SOUTH CHIAGO BANK fka South Chicago Savings Bank, ADVANCE BANK S.B fka Advance Bank f.s.b, defendants: Dan K. Webb, Peter Charles McCabe, III, James F. Hurst, John Edmund Mooney, Shannon Kay McDaniel, Winston & Strawn, Chicago, IL.

For JAMES A FITCH, SR, defendant: Royal B. Martin, Jr., Martin, Brown & Sullivan, Ltd., Chicago, IL.

U. S. Attorneys: Jacqueline O. Stern, United States Attorney's Office, Chicago, IL.

**JUDGES:** James B. Zagel, United States District Judge.

**OPINIONBY:** James B. Zagel

**OPINION:**

### MEMORANDUM OPINION AND ORDER

In November 1991, officers of Advance Bank ("Advance") discovered evidence indicating that Advance president Barbara Kaczmarzewski ("Katz") had been stealing funds from the bank. On November 22, 1991, James Fitch, Sr., chairman of the board of

Advance Bancorp, Inc. ("Bancorp"), Advance's holding company, n1 confronted Katz with this information. She immediately resigned. Prior to joining Advance in 1990, Katz worked at South Chicago Bank ("SCB") which is also owned by Bancorp. Therefore, SCB realized that Katz's defalcations [*2] might have affected it, too.

> n1 Fitch also served in other significant positions with these banks, including chairman of the board of South Chicago Bank.

During the following weeks, Advance and SCB began investigations. Advance's board of directors voted to create the Special Audit Committee ("SAC") on November 25, 1991 and to retain the law firm of Barack Ferrazzano to investigate Katz's defalcations. Barack hired KPMG Peat Marwick ("KPMG") to assist. The SCB board of directors created the Special Fraud Audit Committee ("SFAC") on January 23, 1992. The SFAC hired Winston & Strawn to assist the investigation, and Winston retained accountants from Coopers and Lybrand.

During the investigations, the defendants, their attorneys, and their accountants produced multitudes of documents including audit reports, minutes from meetings of the boards of directors and special committees, witness interviews, forms for regulators, and correspondence. Around June 1993, Winston & Strawn produced a report (the "Winston Report") [*3] summarizing the investigation.

1998 U.S. Dist. LEXIS 17445, *

The government subpoenaed defendants to obtain documents. Now, the banks move to quash the subpoena with respect to five categories of documents on grounds that they are work product or covered by the attorney-client privilege:

> (1) documents prepared by KPMG;
> (2) minutes and notes from meetings of the boards of directors and special committees;
> (3) statements made by individual defendants and bank personnel;
> (4) the Winston Report; and
> (5) communications between the banks, their attorneys, and the special committees.

**A. Attorney-Client Privilege**

The Seventh Circuit follows Wigmore's eight-point definition of attorney-client privilege which provides that:

> "(1) Where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived."

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (citing 8 John Henry Wigmore, Evidence in Trials at Common [*4] Law s. 2292 (John T. McNaughton rev. 1961)). "The party seeking to invoke the privilege bears the burden of proving all its essential elements." *Id.* (citation omitted).

1. Documents Prepared by KPMG Peat Marwick for the Fraud Audit

KPMG formed a fraud audit team to focus on the funds converted by Katz. Separately and prior to engaging the fraud audit team, Advance hired KPMG to conduct a routine year-end audit of its books. Several KPMG employees participated in both audits, and the record shows information flowed freely between the two teams. Now, the parties squabble over whether the following documents created by KPMG are covered by the attorney-client privilege.

Michele O'Connor file memos (P204-08; P553-57)

This memorandum provides details regarding an interview with Katz and an Ad Hoc Committee regarding the Advance investigation. The government contends that Advance waived the privilege covering this memorandum by producing the handwritten notes underlying it. I find that Advance did not waive the privilege covering the memorandum because it did not actually disclose the memorandum, and its disclosure of the notes was inadvertent.

Kevin Spataro File Memo (P524-26) [*5]

This memorandum describes the Advance investigation. The government argues that it is not privileged because Spataro was a member of the year-end, not the fraud, audit team. Advance asserts in a generalized fashion that as long as the accountant provides assistance to attorneys representing the Bank in an investigation begun in anticipation of litigation, the privilege should apply. But I observe that Advance does not claim this document is privileged. Given that an accountant, not the client or the attorney, prepared this document, and that this accountant was not hired as part of the fraud audit team to advise the attorneys, I find it is not a confidential communication between an attorney and client. Thus, Advance must produce it to the government.

12/2/91 Ad Hoc Committee Meeting Agenda

The fraud audit team prepared this agenda for an Ad Hoc SAC meeting that James Haugh, a KPMG auditor who was not on the fraud audit team, attended. Advance argues that as long as the accountants were assisting counsel in connection with their investigation, the document is privileged. While it may be reasonable to conclude that a disclosure to a member of the fraud audit team was for purposes [*6] of rendering legal advice, this conclusion is not reasonable with respect to a year-end auditor, especially lacking any factual evidence that this outside auditor was actually assisting with legal advice. Instead, Haugh's presence at the meeting provides evidence which is corroborated throughout the record that the banks were sloppy about maintaining the confidentiality of their documents. This one must be produced.

The Work Papers Memorandum (P546-58)

The fraud audit team prepared this memorandum to assist counsel with its investigation. I find no evidence that it was ever disclosed to third parties. Therefore, I conclude that defendants do not have to produce it.

KPMG Work Papers (P24738-41, 24744-51)

These work papers were prepared to assist Barack in its investigation at Advance. Now Advance generally contends that they are "privileged." I find Advance has

not sustained its burden of showing that these communications, which did not occur between attorney and client and were created by a third party, meet the privilege requirements. Therefore, Advance must produce them.

2. Minutes and Notes of Boards of Directors, SAC, and SFAC Meetings

The government contends that [*7] the banks made "all minutes of the meetings of stockholders, directors, and committees of directors" available to their year-end auditors and that Bancorp gave Reliance Surety Co., its insurer, access to numerous minutes of the meetings of the banks' boards of directors and internal audit committees in support of insurance claims for losses stemming from the defalcations. The banks contend that the notes and minutes of Board and special committee meetings that they have not produced to the government contain communications from counsel and are, therefore, absolutely protected by the attorney-client privilege.

Voluntary disclosure of confidential information to third persons has long been considered inconsistent with maintaining privilege. *See In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 254 (1996); (citing *Westinghouse*, 951 F.2d 1414, 1424). And auditors are not generally part of the circle of persons, including secretaries and interpreters, for example, with whom confidential information may be shared without destroying the privilege. *See Massachusetts Institute of Technology*, 129 F.3d 681 at 684; *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 819, [*8] 79 L. Ed. 2d 826, 104 S. Ct. 1495 (1984) (accountants' role as public watchdogs demands independence from the client, so they are outside the circle of third parties with whom confidential information may be shared).

Here, the banks' year-end audit team-- as opposed to the fraud audit team-- was outside the circle of persons with whom confidential information could be shared because they were performing work in the ordinary course of business, not for the sake of legal advice. By voluntarily disclosing the minutes from the meetings of the boards of directors and special fraud committees to the year-end auditors in full and to their insurance company in part, the banks have relinquished the right to assert the privilege now against the government. *See Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir. 1997) (citations omitted) ("the cases generally reject a right of 'selective waiver'").

Alternatively, the banks seek to limit the scope of the waiver. They argue that the notes and minutes they produced to the government were so generalized and lacking in substantive information regarding the defalcation investigation that they should not be held to constitute [*9] a waiver for all other notes and minutes. I

find this argument irrelevant as to the minutes because the banks voluntarily disclosed all of them to third parties. However, the notes from the meetings raise a different issue because apparently the banks only disclosed some of them. Under the doctrine of partial waiver, the disclosure of a part of a privileged document or a set of such waives the privilege as to the rest of it. *Dellwood Farms*, 128 F.3d at 1127 (citing Westinghouse, 951 F.2d at 1423, n.7). The rationale underlying partial waiver is that a party should not be able to gain a tactical advantage by disclosing favorable portions of privileged documents and withholding unfavorable portions. *Id.; Graco Children's Products, Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd.*, 1995 U.S. Dist. LEXIS 8157, 1995 WL 360590, at *8 (N.D. Ill. Jun. 14). The banks claim that the notes they have refused to produce contain privileged communications. But based on the record it is apparent that the notes already produced to the government also contained privileged communications. So, guided by principles of fairness and the concomitant value in preventing tactical disclosures I find that the banks waived [*10] the privilege as to all of the notes by disclosing some of them.

3. Statements by Individual Defendants, Bank Personnel

The government contends that the banks waived the privilege with respect to employee interviews by disclosing this information various ways. For instance, FBI Special Agent Griggs attended a December 27, 1991 interview of Katz that Barack attorneys and two KPMG accountants conducted, and the banks later provided insurer Reliance with Barack's summary of this interview. Also, Winston attorneys orally summarized the results of witness interviews they conducted in a meeting with the FDIC in November 1992. Advance contends that it did not waive the privilege because Winston attorneys merely provided an oral summary of the general content of the interviews to regulators, not the interviews themselves.

To begin with, I find that the banks waived the privilege with respect to any information actually disclosed to third parties. I also find that the banks failed to maintain any confidentiality regarding the December 27, 1991 Katz interview and waived any privilege that might have attached to Barack's summary of it by disclosing it to their insurer Reliance.

Privileged [*11] communications the banks selectively disclosed to third parties but not to the government do not necessarily implicate the fairness rationale for extending the waiver beyond that which was disclosed. *In re Consolidated Litig. Concerning Int'l Harvester's Disposition of Wisc. Steel*, 666 F. Supp.

1148, 1157 (N.D. Ill. 1987) (citing *In re Sealed Case*, 219 U.S. App. D.C. 195, 676 F.2d 793, 809 & n.54 (D.C. Cir. 1982)); *see also In re Von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) (extrajudicial disclosure of privileged information does not waive privilege as to all undisclosed portions). Here, the defendants did not gain a strategic advantage against the government by selectively disclosing interview information, extrajudicially, to the FDIC or its insurer. Also, with the exception of the Barack written summary disclosed to Reliance, defendants did not apparently turn over any actual documents resulting from the employee interviews. Therefore, I conclude that defendants did not waive the privilege to withhold undisclosed interview documents from the government in this litigation. *See Dellwood Farms*, 128 F.3d at 1126 (finding no deliberate privilege waiver where government played [*12] excerpts from evidentiary tapes but did not turn actual tapes over to anybody).

### 4. The Winston & Strawn Report

On June 7, 1993, Winston submitted a report (the "Winston Report") to the SFAC. Then, Winston gave a copy of the report to the Illinois Commissioner of Banks & Trusts ("Commissioner"). Did this waive the privilege?

The government argues that it did because the banks may not selectively waive the privilege as to the Commissioner and resurrect the privilege now. *See, e.g., Permian Corp. v. United States*, 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981) (parties may not waive the privilege for some and invoke it as to communications already compromised for the party's own benefit). The banks contend that they did not waive the privilege because they did not disclose the Winston Report voluntarily. Rather, the banks contend they disclosed it pursuant to the Commissioner's demand grounded in his statutory authority. *See* 205 ILCS 5/48(6)(d). The banks also allege that they took steps to maintain the privilege by executing a confidentiality agreement with the Commissioner.

Does the attorney-client privilege survive disclosure to a regulatory government agency [*13] pursuant to the agency's request? A majority of circuits have refused to create a new privilege allowing people to disclose confidential communications to government agencies without waiving the privilege. *See United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 685 & n.3 (1st Cir. 1997) (observing that the Second, Third, Fourth, Federal, and D.C. Circuits ruled that limited disclosures to government agencies destroy the privilege); *but see Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977) (*en banc*) (concluding in only a paragraph of analysis that this kind of disclosure does not

comprise a total waiver). The First Circuit observed that the general principle that disclosure negates the privilege is worth maintaining because it makes the law more certain and predictable, eases its administration, and avoids difficult line-drawing. *Massachusetts Inst. of Tech.*, 129 F.3d at 685.

In addition to this legal basis, factual reasons also favor rejecting the banks' privilege claim. The banks did not seek any judicial or other means to avoid disclosing the report to the Commissioner. And yet, the banks must have realized at the time they disclosed [*14] that the Commissioner's agreement to "keep the Report confidential within the regulatory agency" did not guard against revealing the report to other governmental agencies. *See Westinghouse*, 951 F.2d at 1427 (Department of Justice's agreement to maintain confidentiality within the department did not support preservation of the privilege against other entities in unrelated case). Moreover, this is not a case where a party disclosed mere portions or summaries of privileged materials: SCB placed an actual copy of the report in the possession of the Commissioner. Cf. Dellwood Farms, 128 F.3d at 1122 (Seventh Circuit found that the government did not waive its privilege by allowing its adversaries to listen to portions of evidentiary tapes without turning over the actual tapes). Finally, allowing selective disclosure here would interfere with the criminal investigative process and the government's ability to obtain evidence that the Commissioner is statutorily empowered to turn over to law enforcement agencies. *See* 205 ILCS 5/48.3(a)(1)-(3) (setting forth a myriad of state and federal agencies and financial institutions to which the Commissioner may disclose information about [*15] banks). For all these reasons, the banks must produce the Winston Report to the government.

### 5. Communications Between the Banks, Special Fraud Committees, and Attorneys

Finally, the banks contend that documents related to communications between the Barack and Winston law firms, bank personnel, and the special fraud audit committees at each bank "conceivably" include confidential communications and are, thus, privileged. It is the banks who have the burden of proving that communications are privileged, and their blanket contention that all these documents could conceivably contain privileged communications does not succeed. Therefore, the banks must produce them. If the banks find specific documents that actually merit protection, they may submit those to the court for *in camera* review along with concise arguments as to why they are privileged.

### B. The Work Product Doctrine

The purpose of the work product doctrine is to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategies free from unnecessary intrusion by her adversaries. *See United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998); *In re Special September 1978 Grand* [*16] *Jury (II)*, 640 F.2d 49, 62 (7th Cir. 1980). To fulfill this purpose, Federal Rule of Civil Procedure 26(b)(3) provides,

> [A] party may obtain discovery of documents ... prepared in anticipation of litigation or for trial ... only upon a showing that the party seeking discovery has substantial need of the materials ... and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

The threshold issue under the work product doctrine is whether documents were prepared "in anticipation of litigation." *See Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983).

The government contends that a document qualifies as work product only if the anticipation of litigation is the primary motive for creating it, and the banks disagree. The Seventh Circuit has mentioned, but not expressly adopted, the primary motivation test. *Binks Mfg.*, 709 F.2d at 1119. I observe that this test has been a source of some controversy among the circuits. *See Adlman*, 134 F.3d at 1198 (analyzing a line of Fifth Circuit cases exemplifying the primary motivation test and cases from the Seventh and D.C. [*17] Circuits and district courts in Illinois, Massachusetts, New York, and Pennsylvania that did not apply it). Rather than take a stance in this word game (although perhaps it is more significant than that), I follow well established and widely accepted standards.

A document is considered to be "prepared in anticipation of litigation" if "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation." *Adlman*, 134 F.3d at 1201 (quoting Wright, Miller, and Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)) (emphasis added) (citing also *Binks Mfg.*, 709 F.2d at 1118-19). Documents prepared in the ordinary course of business or based upon a mere contingency of litigation are not work product, *Binks Mfg.*, 709 F.2d at 1119, and neither are documents that would have been created in essentially similar form irrespective of litigation. *Adlman*, 134 F.3d at 1202.

The government argues that the banks conducted the fraud investigations that generated the documents at issue here for business, not legal, purposes and that the threat of [*18] litigation was remote. The banks point to the discovery of Katz's defalcation, receipt of grand jury subpoenas, receipt of FBI inquiries, and filing of a criminal referral form with the FDIC and claim that they anticipated litigation with Katz, the RTC, shareholders, and the U.S. Attorney.

After reviewing the record, I find that the banks faced remote threats of litigation at best. Katz stated in her resignation letter that she might seek legal counsel, but her threat was contingent upon the banks slandering her. In actuality, a lawsuit by Katz must have appeared unlikely given the considerable evidence of her illegal activities. A letter dated October 10, 1992 by SCB director Richard Sundstrom to the FDIC shows that a lawsuit by the banks against Katz was remote because, *inter alia*, they doubted she had any funds. The letter also shows that the banks had still not decided whether to take action against her.

The only evidence of potential RTC litigation is a letter dated December 23, 1991 from the RTC to Advance demanding payment of a substantial sum of money owed and expressing frustration over Katz's failure to respond to earlier demands. I have read the letter. I find that [*19] the RTC's statement that it would take whatever actions necessary if it did not receive payment by January 2, 1992 was perhaps a veiled threat of litigation, but it was contingent, and the fact the RTC had already been making this demand for ten months indicates litigation was remote. The banks' allegation that there was an "ever present possibility of a derivative action" by shareholders is self-evident proof that this threat of litigation was a mere possibility, not a likely event.

Did the grand jury subpoenas indicate that the banks would face litigation? The banks make a general claim that documents created at or around the time of a grand jury investigation in the criminal context are likely created in anticipation of litigation. But when the banks received the grand jury subpoenas in November 1991, they appeared to be the victims, not the perpetrators, of fraud. The banks' behavior after receiving the subpoenas, *i.e.*, their cooperation with the FBI and acceptance of FBI recommendations as to how they might protect themselves, do not indicate that the banks thought they would face criminal charges. *See* SCB Bd. Mtg. 1/23/92 at 2. In addition, the government contends that [*20] grand jury subpoenas are routine in bank fraud cases because of legal prohibitions against bank disclosure without them, and the banks do not dispute this. These factors lead me to conclude that the banks did not view

1998 U.S. Dist. LEXIS 17445, *

the subpoenas as indications that they would likely face criminal proceedings.

It seems likely that the banks contemplated a possibility of litigation. Nonetheless, the record supports the government's contention that the banks undertook their fraud investigation because of business purposes. For example, according to the minutes from its January 23, 1992 meeting, the SCB board of directors appointed the Special Fraud Audit Committee "to investigate, review and analyze the facts and circumstances of any possible wrongdoing at the Bank", and granted the special committee authority to retain the Winston law firm "to assist ... with the investigation." Other documents state similar goals, and I did not find any specific references to litigation. I accept the banks' contention that their lawyers managed the fraud investigation and provided them with legal advice, but this is not equivalent to preparing for litigation.

The banks contend that documents produced for dual purposes [*21] may constitute work product and that this case is like *Special September 1978 Grand Jury*, 640 F.2d at 62, where the Seventh Circuit found that an investigative report prepared for business purposes constituted work product because it was also prepared "in anticipation of criminal proceedings which could result from the Grand Jury's investigation."

I find that case distinguishable, however, because a sequence of events prior to the creation of the work product documents made litigation more there likely than here. In *Special September 1978 Grand Jury*, a grand jury issued a subpoena requiring an Association to produce a list of political contributions made by it or on its behalf. Several weeks later the Sun Times published an article describing illegal political contributions by the Association, and several weeks after that the Chief of Public Disclosure of the Illinois State Board of Elections wrote an association member about Illinois reporting requirements. Unlike this case, the party that hired the attorneys who created the work product document, was also the party accused of illegalities, and the grand jury sought information concerning its activities, not the activities [*22] of some other person. In contrast, here the banks hired attorneys to investigate the wrongdoing of Katz, the grand jury was investigating Katz too, and the banks cooperated with the grand jury.

The nature of the documents at issue and the circumstances surrounding their creation also indicate they were not generated in anticipation of litigation. First, the KPMG documents. According to the minutes from their November 25, 1991 meeting, Advance's board of directors hired KPMG to "assist in the audit of corporate funds," not to prepare for litigation. In fact, one of the banks' attorneys told KPMG that its engagement in

connection with the defalcation did not include an evaluation of "any material third party claims." More specifically, the banks seek to avoid producing a flip chart the fraud audit team prepared and used during a SAC meeting on December 2, 1991 to assist the attorneys in understanding the scope of their investigation on work product grounds. The work product doctrine may encompass any document prepared in anticipation of litigation by or for the attorney. *In re Special September 1978 Grand Jury*, 640 F.2d 49, 62 (7th Cir. 1980). The government does not offer a reasonable [*23] argument as to why the flip chart should be produced, so Advance need not do so.

Second, the minutes of the directors and committee meetings are taken in the ordinary course of business. *See U.S. v. Massachusetts Institute of Technology*, 957 F. Supp. 301, 305 (D. Mass. 1997) (minutes of directors' meetings are prepared in the ordinary course of business, they are not work product); see also Fed. R. Civ. P. 26(b)(3) advisory committee note ("Materials assembled in the ordinary course of business . . . or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision.") Although the special fraud committees were created for the purpose of investigating fraud, I see no evidence that their meetings were held for litigation purposes. If the banks possess undisclosed attorney notes from these meetings that they do not wish to produce and that contain information concerning litigation, they may submit them for *in camera* review accompanied by concise explanations of why they constitute work product.

Third, I have already concluded that statements by individual defendants and bank employees, except the Katz interview, are protected from disclosure [*24] by attorney-client privilege. I find that the Katz interview is not work product either. It was conducted because of the banks' need to assess her defalcations, not because of litigation.

Fourth, the banks refer obliquely to communications between the banks, the committees, and the attorneys. Their allegations do not even specify particular documents, and so I refuse to find these documents are work product.

Finally, the contents of the Winston Report demonstrate that it is not a litigation-oriented document and that Winston's role was not to prepare for litigation. The recommendations and conclusions in the report show that Winston's role was to advise and assist the SCB special committee in conducting an investigation, filing requisite criminal forms and insurance claims, and recommending remedial steps to avoid fraud in the future.

1998 U.S. Dist. LEXIS 17445, *

Assuming, *arguendo*, that the Winston Report constituted work product, I find that the banks waived this protection by disclosing the report to the Illinois Commissioner. The general rule is that a party waives protection if it discloses its work product to an adversary. *See, e.g., Westinghouse*, 951 F.2d at 1428 (citing *United States v. American* [*25] *Tel. And Tel. Co.*, 206 U.S. App. D.C. 317, 642 F.2d 1285, 1299 (D.C. Cir. 1980) and 8 Wright & Miller, Federal Practice & Procedure § 2024 at 210). The courts have interpreted adversaries to include government agencies investigating a party. *See id.* (the Department of Justice and the Securities Exchange Commission were adversaries of Westinghouse which was the target of their investigation). So, too, here the Illinois Commissioner was an adversary of the banks because it was investigating their activities, and it is irrelevant that the Commissioner agreed to keep the Winston Report confidential. *See In re Chrysler Motors Corp. Overnight Eval. Prog. Litig.*, 860 F.2d 844 (8th Cir. 1988) (court allowed U.S. Attorney access to work product that had been previously disclosed to an adversary even though the latter party agreed not to disclose to anyone else).

In sum, the record indicates that the documents at issue here would have been created in essentially similar form irrespective of litigation because they were generated for the business-related purposes of analyzing the banks' losses due to the defalcations, identifying and correcting internal controls to prevent future [*26] losses, and fulfilling reporting requirements for regulators and shareholders. The banks have not fulfilled their burden of showing that they generated these documents because of litigation.

### C. One Final Issue

The government seeks production of documents prepared by or for the banks' internal audit departments. The banks do not dispute this request, and so I find that they have waived arguments against production.

## CONCLUSION

The motions by South Chicago Bank and Advance Bank to quash the government's trial subpoenas are granted in part and denied in part.

ENTER:

James B. Zagel

United States District Judge

DATE: 16 Oct 1998

# EXHIBIT C

LEXSEE 2002 U.S. DIST. LEXIS 13515

AKAMAI TECHNOLOGIES, INC., Plaintiff(s), v. DIGITAL ISLAND, INC., Defendant(s).

No. C-00-3508 CW (JCS)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

2002 U.S. Dist. LEXIS 13515

May 30, 2002, Decided

**DISPOSITION:** [*1] Akamai's Motion To Compel DENIED. Akamai's Amended Motion For Sanctions DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For AKAMAI TECHNOLOGIES, INC., Plaintiff: Kenneth M. Fitzgerald, Latham & Watkins, San Diego, CA. Timothy P. Crudo, Latham & Watkins, San Francisco, CA.

For DIGITAL ISLAND INC, defendant: Steven E. Schon, Annette L. Hurst, Martin R. Glick, Gina M. Roccanova, Margaret W. Rosequist, Howard Rice Nemerovski Canady, Falk & Rabin, San Francisco, CA.

For DIGITAL ISLAND INC, Counter-claimant: Steven E. Schon, Annette L. Hurst, Martin R. Glick, Gina M. Roccanova, Margaret W. Rosequist, Howard Rice Nemerovski Canady, Falk & Rabin, San Francisco, CA.

For AKAMAI TECHNOLOGIES, INC., Counter-defendant: Kenneth M. Fitzgerald, Latham & Watkins, San Diego, CA. Timothy P. Crudo, Latham & Watkins, San Francisco, CA.

**JUDGES:** JOSEPH C. SPERO, United States Magistrate Judge.

**OPINIONBY:** JOSEPH C. SPERO

**OPINION:**

ORDER DENYING PLAINTIFF AND COUNTERDEFENDANT AKAMAI TECHNOLOGIES, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS [Docket No. 144] AND DENYING PLAINTIFF AND COUNTERDEFENDANT AKAMAI TECHNOLOGIES, INC.'S AMENDED MOTION FOR SANCTIONS [Docket No. 149]

Plaintiff and Counter Defendant Akamai Technologies, Inc. [*2] 's Motion to Compel [Docket No. 144] and Amended Motion for Sanctions [Docket No. 149] came on for hearing on Friday, May 3, 2002, at 9:30 a.m. For the reasons stated below, both Motions are DENIED.

**I. INTRODUCTION**

Akamai Technologies and Digital Island are direct competitors in the field of Internet content storage and delivery. Among the claims that each brings against the other in this action are claims of false advertising and unfair competition, under both federal and state law. Akamai's Motion to Compel, as well as its Amended Motion for Sanctions, arise out of Digital Island's provision to Akamai of a legal memorandum authorized by Digital Island's counsel in this matter. That memo, concerning damages, was turned over at a meeting that was convened for the sole purpose of discussing settlement. Akamai argues that by turning over this document, Digital Island waived attorney-client and work product privilege as to: 1) the damages memorandum; 2) communications between Digital Island and its counsel concerning its damages claim; and 3) any documents relating to its damages claim.

**II. BACKGROUND**

2002 U.S. Dist. LEXIS 13515, *

On April 9, 2001, David Judson (in-house counsel [*3] for Akamai) and Howard Lasky (in-house counsel for Digital Island) met to discuss settlement of this action and of a separate patent infringement action between Akamai and Digital Island. Declaration of David Judson ("Judson Decl.") at P2. At that meeting, Mr. Lasky gave Mr. Judson a memorandum ("the Damages Memorandum") written by an attorney at Howard, Rice, Nemerovski, Canady, Falk & Rabkin (Digital Island's outside counsel) containing legal authority in support of Digital Island's demand for "very substantial unfair competition damages." Declaration of Howard Lasky ("Lasky Decl.") at P6; *see also* Damages Memorandum, Exh. A to Judson Decl. Each page of the Damages Memorandum was stamped "Confidential" and in the Comment section of the fax cover sheet attached to the memorandum the words "CONFIDENTIAL-- ATTORNEY-CLIENT PRIVILEGE" were written in bold print. *See* Damages Memorandum, Exh. A to Judson Decl.

The accounts of Mr. Lasky and Mr. Judson differ widely with respect to the terms on which the Damages Memorandum was provided. According to Mr. Lasky, he and Mr. Judson "made it clear at the outset of [their] discussions that the exchanges [they] were to engage in were [*4] not to be used for any purpose other than settlement." Lasky Decl. at P5. When Mr. Judson expressed doubt about Digital Island's legal ability to prove unfair competition damages, Mr. Lasky told Mr. Judson that he had a short legal memorandum on the issue, prepared by Digital Island's outside counsel, which he "stated [he] was willing to share with [Judson] solely for the purposes of the settlement [they] were trying to accomplish." Lasky Decl. at P7. In contrast, Mr. Judson states that Mr. Lasky gave him the memorandum "voluntarily and without any conditions." Judson Decl. at P2. Mr. Judson states, "indeed, I thought it was odd that he would just hand the memorandum over to me." *Id.*

On December 21, 2001, Akamai served its Fourth Request for the Production of Documents on Digital Island ("Fourth Request"). Motion to Compel at 3-4. Included in the Fourth Request were two requests for documents related to damages, Requests 33 and 34. Motion to Compel at 7-8. Request 33 seeks "all documents comprising, referring, or relating to any communications between you and your counsel regarding your damages claim in this action." *Id.* Request 34 seeks "all memoranda, notes or other [*5] documents from your attorneys' files relating to your damage claim in this action." Digital Island objected to both requests on the basis of work product and attorney-client privilege. *Id.* In response, Akamai asserted that it was entitled to documents responsive to these requests because Digital Island had waived its right to assert work product and

attorney-client privilege by turning over the Damages Memorandum. *See* Declaration of Kenneth M. Fitzgerald in Support of Plaintiff and Counterdefendant Akamai Technologies, Inc.'s Motion to Compel Production of Documents and Motion for Sanctions ("Fitzgerald Decl.") at P3.

Akamai now brings this Motion to Compel and Amended Motion for Sanctions seeking production of the documents responsive to Requests 33 and 34 of the Fourth Request, as well as sanctions under Fed. R. Civ. P. 37(a)(4)(A) on the basis that Digital Island's nondisclosure was not "substantially justified." Akamai asserts that Digital Island has waived attorney-client and work product privilege by voluntarily producing the Damages Memorandum.

In its Opposition, Digital Island makes the following arguments. First, Digital Island asserts that an implied- in-fact contract [*6] was created when Mr. Lasky gave the Damages Memorandum to Mr. Judson on the condition that it would be used for settlement purposes only and Mr. Judson did not state that this condition was not acceptable. Digital Island asserts that this contract should be enforced and on that basis, Akamai's motions should be denied. Second, Digital Island argues that even if privilege was waived, the scope of the waiver should be construed narrowly to encompass only the document itself. In support of this argument, Digital Island points to the absence of any "fairness concern" requiring a broader waiver. Digital Island also points to case law holding that in considering questions relating to waiver in the context of settlement negotiations, courts should take into account the important public policy of facilitating settlement. With respect to the work product privilege, Digital Island argues the facts here are not sufficient to justify a finding of waiver--even as to the Damages Memorandum itself--given the near absolute immunity from production for opinion work product. Further, Digital Island asserts, even if the work product privilege is waived as to the Damages Memorandum, that waiver does not [*7] give rise to subject matter waiver. Therefore, the only document for which the work product privilege could have been waived is the Damages Memorandum.

At oral argument, the parties waived the right to seek an evidentiary hearing on the question of whether they entered into a contract prohibiting the use of the Damages Memorandum for purposes other than settlement. The parties further stipulated that the Court may make credibility findings on this issue based on the evidence in the record.

**IV. ANALYSIS**

## A. There Was An Enforceable Agreement Between The Parties That Disclosure Would Not Result In Waiver

Akamai asserts that voluntary production of any privileged document results in waiver of the attorney-client and work product privileges, not only as to the document itself but also as to all other documents on the same subject matter. *See* Motion to Compel at 4-5 (citing to *Weil v. Investment / Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981)). Akamai argues further that this rule applies even if the document was disclosed in the context of settlement negotiations *and* even if the parties explicitly agreed that [*8] the document would be used for settlement purposes only. Motion to Compel at 5-6 (citing to *Atari Corp. v. Sega of America*, 161 F.R.D. 417, 420 (N.D. Cal. 1994); *Khandji v. Keystone Resorts Management, Inc.*, 140 F.R.D. 697, 700 (D. Co. 1992)). Digital Island, on the other hand, argues that it did not waive the attorney-client or work product privileges because there was an implied contract between Mr. Judson and Mr. Lasky that the Damages Memorandum would be used solely for the purpose of negotiating a settlement. Digital Island's position is correct.

In support of the position that Digital Island waived the attorney-client and work product privileges, Akamai relies on two cases in which courts held that a disclosure made in the context of settlement discussions gave rise to waiver of the attorney-client and/or work product privilege. *See Atari v. Sega of America*, 161 F.R.D. 417 (N.D. Cal. 1994); *Khandji v. Keystone Resorts Management, Inc.*, 140 F.R.D. 697 (D. Co. 1992). These cases do not support Akamai's position. They merely stand for the proposition that disclosure during settlement negotiations *may* give rise [*9] to waiver, so long as there is not an explicit agreement to the contrary among the parties.

In *Atari*, Atari alleged that Sega had infringed one of its patents. 161 F.R.D. at 418. The inventor of the patent at issue was David Stubben, a former employee of Atari who was later employed by Sega as an expert witness. *Id.* Sega videotaped an interview with Stubben in which Stubben stated that the Sega product did not infringe Atari's patent. *Id.* Sega's counsel gave the videotape to Atari's counsel at a meeting at which settlement was discussed. *Id.* at 419. Subsequently, Atari sought to subpoena Stubben to produce all documents upon which he relied upon in forming the opinion expressed in the videotape and Sega brought a motion to quash. *Id.* at 418. Sega opposed the subpoena, asserting attorney-client privilege, work product privilege under Fed. R. Civ. P. 26(b)(3), and privilege under Fed.R.Civ.P. 26(b)(4)(B), which provides protection for non-testifying witnesses. *Id.* at 419. Sega argued that it had not waived

the protections afforded under these doctrines because the videotape was provided in the context of settlement [*10] negotiations. *Id.* at 419.

The Court in *Atari* disagreed, holding that Sega was required to produce "all documents relied upon in forming the opinions stated in . . . Stubben's videotaped statement given to Sega representatives . . ." *Id.* at 420. The court stated that:

> Any voluntary disclosure inconsistent with the confidential nature of the work product privilege waives the privilege. . . . Waiver of a privilege may occur by voluntary disclosure to an adverse party during settlement negotiations, despite any agreement between the parties to keep the information confidential.

*Id.* The Court went on to hold that the disclosure by Sega was the type of disclosure that resulted in waiver of privilege. The court further concluded that the waiver was not limited to the videotape itself but rather, covered all documents that Stubben relied upon in forming the opinions articulated in the videotape. *Id.*

The *Atari's* court's language could be read broadly to hold that any disclosure of privileged material made during a settlement conference gives rise to waiver, even if the parties have explicitly agreed that it will not. However, [*11] the Court there was not confronted with a situation in which a party, having allegedly entered into an agreement with opposing counsel that there would be no waiver, then sought to avoid the consequences of that agreement. Rather, the court's discussion of the facts in *Atari* makes clear that its holding was much narrower. In particular, the court in *Atari* based its holding on its factual determination that the videotape was given to Atari's counsel as "voluntary discovery" notwithstanding the fact that it was provided during a settlement conference. *Id.* at 419. The court discussed at some length the evidence supporting this conclusion. First, the court noted that although the tape was given to Atari during a meeting to discuss settlement, counsel were actually discussing voluntary discovery when the tape was handed over. *Id.* The court quoted Sega's counsel as saying the following when he turned over the tape:

> There's another point that I want to raise into this question of voluntary discovery and how it will go from here. We have a tape which you may or may not have seen, but it is of Mr. Stubben explaining

the reasons why he feels that our games [*12] do not use the invention of this patent. If you'd like to see that tape, we'd be happy to show it to you right now.

*Id.* The court went on to point to the following additional evidence that the videotape was turned over as voluntary discovery: 1) the fact that the videotape contained no markings indicative of Sega's intent to protect the videotape as privileged material; 2) when Atari's counsel asked Sega's counsel whether the videotape was to be part of discovery, Sega's counsel responded in the affirmative; and 3) when Atari's counsel sent a letter to Sega's counsel confirming that the videotape was to be considered part of discovery, Sega's counsel did not object to that understanding in his letter of response. *Id.* at 419-420.

Akamai also relies heavily on *Khandji v. Keystone Resorts Management, Inc.*, 140 F.R.D. 697 (D. Co. 1992). In that case, the plaintiff's counsel provided a brochure, created in preparation for a settlement conference to assist in settlement discussion, to the defendant's counsel. *Id.* at 699. Attached to the brochure was a letter stating that defendant's counsel was to make no copies of the brochure [*13] and was to return it to the plaintiff's counsel by a certain date. *Id.* When defendant's counsel received the letter and brochure, he called the plaintiff's counsel and told him that he did not intend to adhere to the conditions set in the letter and that he was going to provide copies of the brochure to his client and insurance carrier. *Id.* The plaintiff then sought to compel the defendant's counsel to return the brochure. *Id.* The court denied the plaintiff's motion, holding that work product protection that would otherwise have protected the document from discovery was waived by the plaintiff's voluntary disclosure of the document. *Id.* at 700.

The Court in *Khandji* explained its holding as follows:

> Because the work product doctrine is intended to protect the integrity of the adversary system, a voluntary disclosure of information to an adversary constitutes a waiver of the privilege. . . . Such a waiver occurs even when disclosure is made during the course of settlement negotiations. The mere fact that opposing parties may have a common interest in settling claims does not neutralize the fact of disclosure, because that common interest always [*14] exists between

opposing parties in any attempt at settlement. . . .

> In addition, a waiver of the privilege occurs despite any agreement between the parties to keep the information confidential. Such an agreement does not alter the fact that the work product doctrine has been breached voluntarily. . . . *Such an agreement may, however, constitute an enforceable contract between the parties.* . . .

> In the present case, Plaintiffs' counsel voluntarily provided the brochure to defense counsel, waiving any potential work product privilege. There was no contract or agreement between the parties regarding conditions on the use of the brochure. In fact, defense counsel specifically informed Plaintiffs' counsel that he did not intend to abide by any limitations on its use. Thus, even if the Court were to find that the brochure is the type of document generally protected by the work product doctrine, it would have to find that any such protection has been waived by the conduct of Plaintiffs' counsel.

*Id.* (citations omitted) (emphasis added). Thus, the court in *Khandji*, like the court in *Atari*, based its holding, in part, on the fact that there was no agreement [*15] between the parties that the document would be used for settlement purposes only. Moreover, the *Khandji* court explicitly recognized that while disclosure to an adverse party ordinarily results in waiver, that result does not apply as between parties that enter into an enforceable contract concerning limitations on use of the document.

Here, the facts are distinguishable on their face from those in *Atari* and *Khandji*. In contrast to *Atari*, there is no suggestion that the Damages Memorandum was produced as voluntary discovery in the context of a broader discussion of discovery in the action. Mr. Judson did not make any effort to confirm that the Damages Memorandum was intended as voluntary discovery, as did Atari's counsel. Nor is there any other evidence that it was intended as such. Mr. Judson also did not make clear to opposing counsel that he did not intend to abide by the condition stated by Mr. Lasky when he gave Mr. Judson the Damages Memorandum, in contrast to the attorney in *Khandji*.

Rather, the evidence makes clear that there was an implied contract between Digital Island and Akamai

2002 U.S. Dist. LEXIS 13515, *

governing the terms under which the Damages Memorandum was provided. Mr. [*16] Lasky, counsel for Digital Island, has sworn that he and Mr. Judson agreed that all exchanges at their settlement meeting would be used only for settlement purposes. Lasky Decl. at P5. Mr. Lasky agreed further to give the Damages Memorandum to Mr. Judson for such settlement only purposes. Under this circumstance, Mr. Judson had a duty to speak if he was rescinding his earlier agreement to limit the use of their settlement exchanges. *See McAulay v. Jones*, 110 C.A. 2d 302, 242 P.2d 650 (1952) (an implied contract may arise where an offeree who is under a duty to speak fails to do so).

On the other hand, Mr. Judson stated that there was no agreement on the use of the Damages Memorandum at all. Supp. Judson Decl. at P4. Mr. Lasky's version of events is more credible. The Court finds that Mr. Judson's version of events is not credible. First, the two counsel at the meeting were very sophisticated in-house counsel for significant companies. Indeed, Mr. Lasky was formerly a Howard, Rice attorney. Second, the face of the Damages Memorandum includes explicit and obvious warnings of its privileged and confidential nature. Third, the disclosure took place, all agree, at a meeting [*17] just to discuss settlement. It is extremely unlikely that Mr. Lasky "accidentally" waived the privilege in this context--it is much more likely that there was an agreement as he described.

This conclusion is buttressed by the actions of Mr. Judson. Rather than immediately seek to compel the production of documents as a result of the supposed waiver of the privilege, he did nothing for months. It was not until late December, 2001,--eight months later--that Akamai even requested other privileged documents on the subject of the waiver. This delay is consistent with the Court's conclusion that the parties agreed at the time not to use the Damages Memorandum for anything other than settlement purposes. If Akamai thought that it had such a waiver in hand, it is much more likely that they would have asserted it promptly.

Akamai's argument that it waited until settlement discussions were over to assert a waiver--and that this explains the delay--is unavailing. The settlement discussions were over by the end of August, 2001, and no effort was made to assert the purported waiver until late December, 2001. That delay alone suggests that Mr. Judson did not think, in April, that the privilege [*18] was waived. Moreover, there is no suggestion that Akamai ever raised the possibility of a waiver while settlement discussions were ongoing. n1

n1 In making this conclusion, the Court does not mean to imply, and specifically does not find,

that Mr. Judson was in any way untruthful in his declarations in this case. To the contrary, there is nothing to suggest or support such a conclusion. However, under the circumstances of this case, it is clear that although Mr. Judson has accurately relayed to the Court his recollection of the events surrounding disclosure of the Damages Memorandum, his recollection is in error.

The Court finds that Mr. Judson's assertion that no conditions were placed on the use of the Damages Memorandum is not credible. Based on the circumstances, and the sworn statement of Mr. Lasky, the Court finds that there was a contract between the parties that the Damages Memorandum would be used only for settlement purposes.

The Court concludes that the implied contract between Digital Island and [*19] Akamai is enforceable. As discussed above, both *Atari* and *Khandji* imply that an agreement between the parties that disclosure will not result in waiver as between the contracting parties is enforceable. A number of other courts have, in fact, enforced such agreements. *See, e.g., Ames v. Black Entertainment Television*, 1998 U.S. Dist. LEXIS 18053, 1998 WL 812051 (S.D.N.Y. 1998) (enforcing agreement made during deposition allowing general counsel to answer certain questions without waiving attorney-client privilege with respect to a communications on same subject matter); *Dowd v. Calabrese*, 101 F.R.D. 427, 439-440 (D.D.C. 1984) (enforcing stipulation made during deposition that testimony on a particular subject would not give rise to waiver of attorney-client or work product privilege); *Eutectic Corp. v. Metco, Inc.*, 61 F.R.D. 35, 42-43 (E.D.N.Y. 1973) (enforcing provision in protective order executed by the parties providing that no privilege would be waived except where expressed in writing). Therefore, the Court concludes that Akamai may not use the Damages Memorandum for any purpose other than settlement discussions, and may not assert that Digital Island's [*20] provision of the Damages Memorandum to Akamai resulted in the waiver of any privilege. n2

n2 Akamai cites to *In re Chrysler Motors Corp. Overnight Evaluation Program Litigation*, 860 F.2d 844 (8th Cir. 1989) in support of its assertion that a privilege is waived by disclosure even if the parties agree to keep information confidential. Akamai's reliance on *In re Chrysler* is misplaced. That case is distinguishable because the party seeking to compel production of the item at issue--a computer tape that had been provided to opposing counsel in another action--

was not a party to the agreement to keep the tape confidential. *Id.* at 845.

### B. Even In The Absence Of An Implied Contract, The Waiver Would Not Have Gone Beyond The Damages Memorandum Itself

Even if there were no contract limiting use of the Damages Memorandum, the Court finds that the waiver of privilege that would have resulted from Digital Island's provision of that memorandum to Akamai would be limited to [*21] the document itself. The Court addresses attorney-client privilege and the work product privilege separately.

#### 1. Attorney-Client Privilege

Where waiver of attorney-client privilege has occurred, the scope of that waiver should be determined with reference to considerations of fairness. *See In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 255 (6th Cir. 1996); *see also    Weil v. Investment / Indicators, Research and Management, Inc.*, 647 F.2d at 25 (holding that although inadvertent disclosure of privileged document resulted in waiver, because there was no showing of prejudice, the scope of the waiver was limited "to communications about the matter actually disclosed"). n3 Thus, for example, where a party has placed the advice of its counsel in issue in its litigation, the waiver of attorney-client privilege that results from disclosure is likely to go beyond the document whose disclosure gave rise to the waiver. *See, e.g., Chevron Corp. v. Pennzoil*, 974 F.2d 1156 (9th Cir. 1992).

n3 In its Reply, Akamai asserts that *Weil* does not support the conclusion that a limited waiver should be found here because *Weil* was distinguishable from the facts here. Reply at 11. In particular, Akamai asserts that in *Weil* there was a dispute about whether or not the disclosure at issue was voluntary. *Id.* (citing to *Weil*, 647 F.2d at 23, n. 9). Akamai's position has no merit. In *Weil*, the court noted that there were *two* disclosures at issue. 647 F.2d at 23. The first was a statement made during a deposition by an officer of the defendant that he had been advised to take certain actions by his attorney. *Id.* The second was a letter that was disclosed by the defendant to the SEC. *Id.* The court noted that there was a conflict in the evidence as to whether the letter was disclosed voluntarily. 647 F.2d at 23. However, the court did not reach the question of whether disclosure of the letter resulted in waiver, relying instead on the deposition

testimony, which addressed the same subject matter as the letter. 647 F.2d at 25 n. 14. Thus, the dispute as to whether the letter was voluntarily disclosed is not relevant to the court's holding in *Weil*.

[*22]

In *Chevron*, Plaintiff Chevron Corporation sought to enjoin a purchase of Chevron stock by Defendant Pennzoil Corporation on the basis that Pennzoil's disclosure statement was materially misleading. 974 F.2d at 1157. One of the issues in the case was whether it was reasonable for Pennzoil to buy the Chevron stock as an investment only, which was relevant to the broader question of whether or not the disclosure statement was misleading. *Id.* at 1161-1162. Pennzoil asserted that it believed that it was reasonable to purchase the Chevron stock as an investment based on the advice of its counsel. *Id.* at 1162. Pennzoil also submitted a declaration by a Pennzoil senior executive, apparently in support of its summary judgment motion, stating that "insofar as the decision to proceed with an investment in Chevron was based upon tax considerations, it was made in reliance upon the advice of our tax counsel." *Id.* Chevron asserted that this disclosure concerning an attorney-client communication gave rise to a subject matter waiver, and the court agreed. *Id.* The Court explained as follows:

> The privilege which protects attorney-client [*23] communications may not be used both as a sword and a shield. *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991). Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived . . . . To the extent that Pennzoil claims that its tax position is reasonable because it was based on advice of counsel, Pennzoil puts at issue the tax advice it received. In his declaration, Chairman Liedtke stated that insofar as Pennzoil's decision to proceed with the Chevron investment was based on tax considerations, that decision was made based upon the advice of counsel. Pennzoil cannot invoke the attorney-client privilege to deny Chevron access to the very information that Chevron must refute in order to demonstrate that Pennzoil's Schedule 13D is materially misleading.

Case 1:04-cv-00138-JJF    Document 101-3    Filed 07/25/2005    Page 22 of 23

Page 7
2002 U.S. Dist. LEXIS 13515, *

974 F.2d at 1162. However, the court in *Chevron* declined to find the disclosure at issue justified a broad waiver of attorney-client privilege. Rather, the scope of the waiver was limited to the specific "subsidiary issues" raised by the disclosure. "Pennzoil was not required, as a result of the limited [*24] disclosure, to provide Chevron with every document or communication that touched on the more general tax deferral question." *Id.*

In contrast to cases such as *Chevron*, where disclosure of privileged communications creates a real possibility of unfairness unless a subject matter waiver is found, where the disclosure does not result in any obvious legal prejudice, courts have declined to find any waiver except as to the particular document or testimony that has already been disclosed. *See, e.g., In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987). In *von Bulow*, the Defendant, Claus von Bulow, had previously been convicted of, and then, following a successful appeal, acquitted of, attempting to murder his wife. *Id.* at 96. Following the acquittal, von Bulow and his attorney, Alan Dershowitz, collaborated on a book "chronicling the events surrounding the first criminal trial, the successful appeal, and von Bulow's ultimate acquittal." *Id.* at 96. In the subsequent civil action against von Bulow, Plaintiff Martha von Bulow asserted that publication of the book by von Bulow and Dershowitz waived the attorney-client privilege not only [*25] as to the communications revealed in the book but also as to all communications on the subjects raised in the book. *Id.* at 97. The district court agreed but the Second Circuit, exercising its mandamus powers, reversed. *Id.*

The Court found that the waiver of attorney-client privilege applied only to those communications that were actually disclosed in the book. *Id.* The court explained its holding as follows:

> This rule protecting the party, the fact finder, and the judicial process from selectively disclosed and potentially misleading evidence does not come into play when, as here, the privilege-holder or his attorney has made extrajudicial disclosures, and those disclosures have not subsequently been placed at issue during litigation. In fact, the cases finding, as the district court did here, implied waivers on account of fairness involved material issues raised by a client's assertions during the course of a judicial proceeding. See, e.g., *Hunt v. Blackburn*, 128 U.S. 464, 470-71, 32 L. Ed. 488, 9 S. Ct. 125, 127; *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195,

201 (2d Cir.), *cert. denied*, 280 U.S. 579, 50 S. Ct. 32, 74 L. Ed. 629 (1929); [*26] *Smith v. Alyeska Pipeline Serv. Co.*, 538 F. Supp. 977, 979 (D.Del.1982) ("A client ... may waive the privilege by deliberately injecting into the case the advice which he received from his attorney.") (emphasis added), aff'd, 758 F.2d 668 (Fed.Cir.1984), *cert. denied*, 471 U.S. 1066, 105 S. Ct. 2142, 85 L. Ed. 2d 499 (1985); *United States v. Aronoff*, 466 F. Supp. 855, 862 (S.D.N.Y.1979); *International Tel. & Tel. Corp. v. United Tel. Co. of Fla.*, 60 F.R.D. 177, 185-86 (M.D.Fla.1973) ("If the client or his attorney at his instance takes the stand and testifies to privileged communications in part this is a waiver as to the remainder ... about the same subject"); *Beckette v. State*, 31 Md. App. 85, 355 A.2d 515, 521 (Md. Ct. Spec. App.1976) (client's decision to call attorney as witness waived attorney-client privilege).

*Id. See also Chevron*, 974 F.2d at 1162 (citing to *von Bulow* with approval).

Here, as in *von Bulow*, the disclosure at issue does not implicate considerations of fairness that require a subject matter waiver that goes beyond the Damages Memorandum. [*27] Digital Island has not injected the advice of its counsel into the litigation. Akamai will not have to challenge any assertion that Digital Island is not subject to liability or damages due to its reliance on the Damages Memorandum. Digital Island has simply provided Akamai, in settlement discussions, a very general legal memorandum summarizing case law that Akamai's own counsel could easily have researched themselves. Digital Island's limited disclosure does not prejudice Akamai in any way. On the other hand, were the Court to finding a broad subject matter waiver of attorney-client privilege based on disclosure of the Damages Memorandum, Digital Island would likely suffer extreme prejudice. Such a result would be inconsistent with the case law governing waiver, especially in light of the fact that the disclosure was made to facilitate settlement. *See Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 45-46 (D. Md. 1974) (holding that the Court should consider the fact that the disclosure was made in the context of a settlement negotiation in determining the scope of the waiver). Thus, even if the parties had not entered into an agreement limiting the use of the [*28] Damages Memorandum, Digital Island would not have waived

2002 U.S. Dist. LEXIS 13515, *

attorney-client privilege with respect to any document except the Damages Memorandum itself.

**2. Work Product Privilege**

Akamai asserts that a subject matter waiver may arise under the work product doctrine, just as it may under the attorney-client privilege doctrine. Digital Island, on the other hand, argues vehemently that there is no such thing as a subject matter waiver with respect to work product, citing to *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1222 (4th Cir. 1976) (holding that rules governing subject matter waiver with respect to attorney client privilege do not apply to the work product doctrine). The Court finds Akamai's position on this issue unconvincing.

Akamai cites to the following language in *Hartford Ins. Co. v. Garvey*, 109 F.R.D. 323 (N.D. Cal. 1985) in support of the proposition that there may be a subject matter waiver of work product protection:

> When the disclosure [of work product] is made to the adverse party . . . the distinction between waiver of attorney-client privilege and of work product disappears, as disclosure to the adverse party is inherently inconsistent with the adversary [*29] system. Thus, the principles of waiver of attorney-client privilege apply to the analysis of waiver of work product immunity by production [to the adverse party].

109 F.R.D. at 328. While this broad statement could be read to import into the law governing work product the principles related to subject matter waiver that have been developed in the context of attorney-client privilege, such a reading would be unjustified. The court in *Hartford Ins. Co.* was addressing only the narrow question of whether work product protection had been waived with respect to a handful of specific documents that were inadvertently produced. The court did not address, or even suggest, that production of these documents might give rise to a subject-matter waiver that went beyond the documents that were actually produced.

However, the Court need not reach the question of whether the work product privilege is subject to the same rules that govern subject matter waiver in the context of attorney-client privilege. Even assuming that it is, there is no fairness consideration that would warrant extending the waiver of work product privilege beyond the Damages Memorandum, for the reasons discussed above. [*30]

**IV. CONCLUSION**

For the reasons stated above, Akamai's Motion To Compel is DENIED. Similarly, Akamai's Amended Motion For Sanctions is DENIED.

IT IS SO ORDERED.

DATED: May 30, 2002

JOSEPH C. SPERO

United States Magistrate Judge