

LEXSEE

JOHNSON MATTHEY, INC., Plaintiff, -against- RESEARCH CORP. and RESEARCH, CORP. TECHNOLOGIES, INC., Defendants.

01 Civ. 8115 (MBM)(FM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2002 U.S. Dist. LEXIS 13560

July 23, 2002, Decided
July 24, 2002, Filed

**DISPOSITION:** Plaintiff was ordered to produce relevant documents.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Johnson Matthey Inc, PLAINTIFF: Edward V Eilardi, Skadden, Arps, Slate, Meagher & Flom, LLP, Kurt Hunciker, Duene, Morris, LLP, David S Tannenbaum, Duane, Morris, LLP, New York, NY USA.

For Research Corporation, Research Corporation Technologies, Inc, DEFENDANTS: Robert S Rifkind, Stephen S Madsen, Cravath, Swaine & Moore, John M Lundin, Schlam, Stone & Dolan, New York, NY USA.

**JUDGES:** FRANK MAAS, United States Magistrate Judge.

**OPINIONBY:** FRANK MAAS

**OPINION:**

### MEMORANDUM DECISION

FRANK MAAS, United States Magistrate Judge.

I. Introduction

Plaintiff Johnson Matthey, Inc. ("JM") brings this action against defendants Research Corp. ("RC") and Research Corp. Technologies, Inc. ("RCT") to recover certain royalties that JM allegedly is owed pursuant to a December 19, 1978, agreement (the "Agreement") between JM and RC. In March 1987, RC assigned all of its rights under the Agreement to RCT, an entity created for tax purposes. Because the parties did not find it necessary to differentiate between RC and RCT in their papers, I refer to them in the remainder of this Memorandum Decision, collectively, as "Research."

Fact discovery concluded on March 29, 2002. (Docket No. 6). Thereafter, [*2] this case was referred to me for the resolution of several outstanding discovery issues, most of which were decided during a conference on May 10, 2002. This Memorandum Decision addresses the remaining issues.

II. Relevant Facts

JM claims rights in certain compounds as a result of research conducted during the 1970s by one of its employees, together with others, at Michigan State University ("MSU"). (Compl. PP 8-22). Pursuant to the Agreement, JM agreed to waive its preexisting rights to purchase a nonexclusive, royalty-bearing license under the patents for several such compounds used to treat cancer, including "carboplatin" and "cisplatin," so that Research could exploit the commercial development of these compounds. (Id. PP 23, 26). In return, Research promised to pay JM 14.167 % of the "gross revenue" obtained from the licensing of these compounds. (See id. P 44).

Research subsequently granted the Bristol-Meyers Company ("Bristol") an exclusive license for the carboplatin and cisplatin technology. (Id. P 33). Pursuant to the license, Bristol had the right to market carboplatin and cisplatin and to utilize certain related "technical

information" n1 in return [*3] for the payment of royalties to Research. ((Id. PP 33, 38).

n1 Although the parties do not agree on the meaning of the term "technical information," JM has defined it as "the accumulated body of scientific developments that occurs after a product is patented, and which is directed towards the development of the drug so that it can be tested on humans, and thereafter achieve full commercial marketing." (Letter dated April 30, 2002, from Michael M. Baylson, Esq., to Chief Judge Mukasey at 6-7).

This action arises out of a dispute concerning certain royalties allegedly paid by Bristol to Research for technical information. In brief, Research contends that the Agreement provided for JM to share in any royalties paid by Bristol which arose out of (a) the marketing of carboplatin and cisplatin or (b) the sharing of technical information concerning cisplatin. (Letter dated Apr. 12, 2002, from Stephen S. Madsen, Esq., to Chief Judge Mukasey ("Madsen April 12 Letter"), at 2). In other words, Research contends that [*4] JM is not entitled to any royalties for Bristol's use of technical information concerning carboplatin. (Id. at 2). JM disagrees, alleging that it retained the right to exploit the carboplatin technical information and had not assigned that right to Research pursuant to the Agreement. (Id. PP 36-37). JM therefore seeks to recover any royalties that Research received from Bristol for carboplatin technical information on the theory that Research's acceptance of such payments constitutes "conversion." (Id. PP 90-96). In the alternative, JM argues that the Agreement defines the term "gross revenue" sufficiently broadly that Research must disgorge 14.167 % of any money that it received from Bristol for the carboplatin technical information on the theory that these sums are part of gross revenue. (Id. PP 74-82).

Shortly after Bristol started selling carboplatin to the public in 1986, JM complained that it was not receiving any royalties from Research for the carboplatin technical information. Eventually, in April 1989, the two sides held a meeting to discuss their differences. According to JM, during this meeting, the president of Research, and others, falsely represented [*5] that JM "was receiving full payments which were accurate and consistent with the [Agreement]," (id. P 55), and concealed the fact that Research was receiving payments from Bristol for the carboplatin technical information (id. P 58). JM contends that its representatives reasonably relied on Research's representations and assurances, "in part because of [a] fiduciary and/or special relationship that existed between JM and Research." (Id. P 61). JM argues that the statutes of limitation applicable to its claims should therefore be equitably tolled because Research fraudulently concealed its wrongdoing from JM. (JM Mem. at 15-17).

II. Discussion

A number of discovery issues remain for consideration. First, Research argues that JM's assertion of a fraudulent concealment claim as a basis for overcoming the statute of limitations requires broad disclosure of JM's attorney-client communications so that Research can determine when JM first learned the true facts concerning the royalties Research was receiving from Bristol for carboplatin technical information. Second, Research contends that JM should be required to disclose the remainder of a legal memorandum prepared [*6] by JM's counsel which was produced in redacted form at the April 1989 meeting. Third, Research seeks to compel the production of certain documents related to a British "license of right proceeding" brought by a third party which sought to compel Bristol and Research to grant a second license for carboplatin in the United Kingdom. Fourth, Research contests JM's efforts to resist disclosure of documents reflecting JM's communications with a non-attorney British patent agent. Fifth, Research challenges JM's claim of work product protection with respect to certain documents. Sixth, both sides have asked the Court to examine certain documents in camera to determine whether their production should be required. Finally, each side has raised questions about its adversary's privilege logs. These issues each are addressed below.

A. Implied Waiver of the Attorney-Client Privilege

The attorney-client privilege is one of the cornerstones of our system of justice, Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 683, 66 L. Ed. 2d 584 (1981), but it is not inviolate and may be waived. In re von Bulow, 828 F.2d 94, 100-01 (2d Cir. 1987). Indeed, [*7] the Second Circuit has held that "the privilege may be implicitly waived when [a party] asserts a claim that in fairness requires examination of protected communications." United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991). Thus, "even if the privilege holder does not attempt to make use of the privileged communication[,] he may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication." In re Kidder Peabody Secs. Litig., 168 F.R.D. 459, 470 (S.D.N.Y. 1996)(Dolinger, Mag. J.). This concept is sometimes referred to as the "at issue" doctrine. See Asset Value Fund Ltd. P'ship v. Care Group, 1997 U.S. Dist. LEXIS 17968, No. 97 Civ. 1487, 1997 WL 706320, at *3 (S.D.N.Y. Nov. 12, 1997)(Francis, Mag. J.).

The leading case concerning implied or "at issue" waiver is Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975), which was cited approvingly by the Second Circuit in Bilzerian, 926 F.2d at 1292. In Hearn, the court discussed a number of situations in which implied waivers of the attorney-client privilege were found, noting as follows: [*8]

> All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

Hearn, 68 F.R.D. at 581 (emphasis added).

The earliest reported case in this District to apply the Hearn factors to a claim of implied waiver was Connell v. Bernstein-Macaulay, Inc., 407 F. Supp. 420, 423 (S.D.N.Y. 1976). [*9] In that case, the plaintiffs sought to avoid the one-year statute of limitations applicable to their securities claims on the theory that the defendants had induced them to delay filing suit while the defendants allegedly sought to restore an ailing company to financial health. Citing the Hearn factors, Judge Knapp concluded that it was appropriate to deem the attorney-client privilege waived when (1) a litigant seeks to avoid a statutory protection (such as a statute of limitations) by claiming that his adversary is estopped from relying upon it, and (2) there is a good faith basis to believe that the protected communications would shed light on the validity of this claim. Thereafter, in Bohack Corp. v. Iowa Beef Processors, Inc., 1981 U.S. Dist. LEXIS 11002, No. 77 C 1673, 1981 WL 2018, at *2 (E.D.N.Y. Jan. 13, 1981), Judge Mishler concluded that Judge Knapp's reasoning in Connell was persuasive, and, on that basis, found an implied waiver because the plaintiff had not merely commenced an action, but had "resorted to equity in order to nullify the protection at law . . . otherwise afforded to [its] adversary." Other cases in this District and elsewhere have also applied the Hearn [*10] or Connell formulation to find a broad implied waiver of the attorney-client privilege. See, e.g., WLIG-TV, Inc. v. Cablevision Sys. Corp., 879 F. Supp. 229, 233 (E.D.N.Y. 1994)(Caden, Mag. J.); Fed. Deposit Ins. Corp. v. Wise, 139 F.R.D. 168, 172 (D. Colo. 1991); Byers v. Burleson, 100 F.R.D. 436 (D.D.C. 1983).

As Judge Schwartz noted in Allen v. West Point-Pepperell, Inc., 848 F. Supp. 423, 429 (S.D.N.Y. 1994), "expansive interpretation of 'at issue' waiver under Hearn and its progeny has . . . been the subject of significant legal and academic criticism." For example, in Rhone-Poulenc Rorer, Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994), the Third Circuit held that the mere fact that a party's state of mind is at issue in a litigation should not effect a broad waiver of the attorney-client privilege. In reaching this determination, the court distinguished cases in which the advice of counsel has been directly placed in issue -- such as malpractice actions brought by a client against a former lawyer or tax cases in which the defendant relies upon an advice-of-counsel affirmative [*11] defense -- from those in which the advice of counsel is merely relevant. The court held that in the latter category of cases, attorney-client communications should be shielded from disclosure, although a party may still be required to disclose the facts known to it, even if those facts were communicated to, or learned from, a lawyer. Id. at 864. See also Laborers Local 17 Health Benefit Fund v. Philip Morris, Inc., 1998 U.S. Dist. LEXIS 11158, No. 97 Civ. 4550, at *15 n.4 (S.D.N.Y. July 22, 1998)(Dolinger, Mag. J.)("mere assertion of a fraud theory or other legal claim implicating the plaintiff's knowledge is insufficient to trigger a broad waiver of the plaintiff's attorney-client privilege" but the facts known by the plaintiff's trustees may be discovered even if they first learned of them from counsel); Paramount Comm., Inc. v. Donaghy, 858 F. Supp. 391, 395 (S.D.N.Y. 1994)(Sweet, J.)(concluding that waiver of the attorney-client privilege should properly be found only when "the attorney-client relationship was relied upon, in some fashion, affirmatively to support the asserting party's claims, or there was evidence that [*12] the attorneys themselves independently took actions or made decisions relevant to the case"); Standard Chartered Bank PLC v. Ayala Holdings (U.S.), Inc., 111 F.R.D. 76, 82 (S.D.N.Y. 1986)(Grubin, Mag. J.)(concluding that acceptance of an implied waiver argument would render the privilege "a

Case 1:04-cv-00138-JJF    Document 101-4    Filed 07/25/2005    Page 5 of 8

Page 4
2002 U.S. Dist. LEXIS 13560, *

nullity in all the vast commercial litigation in which fraud or reliance is an issue," but that the defendant still must "disclose its thoughts and knowledge, whether or not acquired from conversations with its attorneys").

In this case, JM's counsel improperly instructed the witnesses deposed by Research not to testify to their knowledge of the facts if that knowledge came from counsel. (See, e.g., Cleave Dep. at 308). To compound the error, Research's counsel, rather than focusing on the facts known by the witnesses, at times framed his questions in terms of their communications with counsel. (See, e.g., id. at 340)("What did Mr. Talley say to you and what did you say to him?"). In these circumstances, it is appropriate that Research's counsel be permitted to reopen the depositions where this issue arose for the limited purpose of asking questions which will elicit [*13] when JM's officers first learned the relevant facts and from whom.

B. Waiver Through Partial Disclosure

Research contends that JM also waived its attorney-client privilege by selectively revealing to Research during the April 1989 meeting a portion of a legal memorandum prepared by its counsel, Paul Kokulis, Esq. (Madsen April 12 Letter at 8). According to Research, JM should, at a minimum, be required to disclose the remaining text of the memo because "there is a substantial possibility that the undisclosed portion of the memo qualifies or undercuts the portion that was disclosed." (Id. at 8-9). In short, Research asks that this Court apply the "fairness doctrine" to prevent a misleading partial disclosure.

In von Bulow, 828 F.2d at 102, the Second Circuit held that extrajudicial disclosures of privileged information do not automatically result in a broad subject matter waiver and generally constitute a waiver only of the particular matters "actually disclosed." See also Lehman Bros. Commercial Corp. v. Minmetals Intn'l Non-Ferrous Metals Trading Co., 1996 U.S. Dist. LEXIS 8688, No. 94 Civ. 8301, 1996 WL 345915, at *2 (S.D.N.Y. June 21, 1996)(Keenan, J.)(disclosure [*14] of document in prelitigation settlement negotiations constitutes an "extrajudicial" disclosure even when litigation is imminent). Nevertheless, if the party making the partial disclosure subsequently engages in trial conduct which renders the partial disclosure prejudicial, the adverse party may make an application for appropriate relief. See von Bulow, 828 F.2d at 102 n.1; North River Ins. Co. v. Columbia Cas. Co., 1995 U.S. Dist. LEXIS 9570, No. 90 Civ. 2518, 1995 WL 408214, at *2 (S.D.N.Y. July 11, 1995)(Francis, Mag. J.).

In this case, JM has indicated that it will make no use of the Kokulis memorandum at trial. Accordingly, Research is not entitled to more fulsome disclosure of the memorandum or any related documents at this time. If JM's conduct of the trial requires reexamination of this ruling, as the von Bulow court indicated, "the district court may, in its discretion, reevaluate the scope of [JM's] waiver" at trial. von Bulow, 828 F.2d at 102 n.1.

C. Applicability of the Common Interest Exception

Research also seeks to compel the production of certain documents sent by JM employees to attorneys at Bristows, a British law firm, in connection [*15] with the "license of right" proceeding in Britain in 1989. In that proceeding, an Australian company sought to compel Research to license it to manufacture carboplatin in the United Kingdom on the theory that the demand for this product was "not being met on reasonable terms" as required by British law. (See letter dated May 23, 2002, from Mr. Madsen to the Court, at 2 & Exs. A & B). The issues raised by this proceeding were apparently whether Research should be required to grant a second carboplatin license and, if so, at what royalty rate. (Id.). Research contends that the communications between JM and Bristows concerning these issues cannot be withheld under the attorney-client privilege or work product doctrine because Bristows was acting as counsel for Bristol and Research, rather than JM, at the time. For its part, JM argues that these communications are nevertheless privileged because they were undertaken in furtherance of a common legal interest.

The common interest exception is not an independent privilege, but an extension of the attorney-client privilege which "serves to protect the confidentiality of communications passing from one party to the attorney for another [*16] party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). Thus, the exception affords two parties with a common legal interest a safe harbor in which they can openly share privileged information without risking the wider dissemination of that information.

To invoke the "common interest" exception here, JM must show that (1) it shared a common legal interest with Research and Bristol; (2) the statements were designed to further that interest; and (3) the privilege has not been waived. Strougo v. BEA Assocs., 199 F.R.D. 515, 525 (S.D.N.Y. 2001)(Sweet, J.). "The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC, 2002 U.S. Dist. LEXIS 10919, No. 01 Civ. 9291, 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002)(Martin, J.)(quoting North River Ins., 1995 U.S. Dist. LEXIS 9570, 1995 WL 5792 at *3).

Case 1:04-cv-00138-JJF   Document 101-4   Filed 07/25/2005   Page 6 of 8

Page 5
2002 U.S. Dist. LEXIS 13560, *

JM contends that it shared two legal interests with Research and Bristol. First, JM alleges that it owned significant amounts of carboplatin [*17] technical information, including detailed manufacturing information, which was "protected in the closed part of the hearing" in Britain. (Affidavit of Ian Carmichael Wishart, sworn to on May 27, 2002, P 11). However, JM's complaint in this action alleges that it never assigned to Research any interest in that body of information. (Compl. PP 36-37). If so, Bristol, as Research's licensee, also could not have had any shared legal interest in that res. Second, JM contends that it had a legal interest in the outcome of the proceeding because the granting of a license as of right would have diminished its royalty income under the Agreement. A shared desire to succeed in an action does not, however, rise to the level of a common legal interest. SR Int'l, 2002 U.S. Dist. LEXIS 10919, 2002 WL 1334821 at *3; Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999)(Sweet, J.). The shared desire to maximize royalty income is, instead, simply a commercial concern.

This case is consequently a far cry from In re Regents of the University of California, 101 F.3d 1386 (Fed Cir. 1996), upon which JM places substantial reliance. In Regents, a United States [*18] patentee and its exclusive licensee cooperated in the prosecution of foreign patent applications. Id. at 1388-89. As part of this effort, their attorneys communicated frequently about matters relating to the United States patent. Id. at 1389. In a subsequent suit challenging the validity and enforceability of the patent, the plaintiff contended that attorney-client privilege did not protect these communications because the licensee was a third party. Id. The Federal Circuit rejected this argument, observing that a patentee and its exclusive licensee share a common legal interest in ensuring that the patent is valid and enforceable.

Here, however, JM ceded its rights in connection with the carboplatin patent pursuant to the Agreement. In addition, unlike Regents, neither the validity of JM's alleged interest in the carboplatin technical information, nor the validity of Research's patent, nor the viability of Bristol's license thereunder was at issue in the proceeding in the United Kingdom. At worst, if a second license in the United Kingdom had been granted, JM's royalties under the Agreement might have declined somewhat. This possibility does [*19] not give rise to a legal interest in the outcome of the proceeding.

Moreover, even if JM could establish the existence of a common legal interest, it would not be able to avoid the disclosure to Research of its privileged communications with Bristows. Although the common interest exception bars the disclosure of such communications to third parties, it does not affect the rights of a party's former joint defense partner in subsequent litigation involving the two of them. In re Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974, 406 F. Supp. 381, 386 (S.D.N.Y. 1975)(Conner, J.)("To be sure, what is divulged by and to the clients [pursuant to a joint defense agreement] cannot be deemed confidential inter sese; in any later controversy between or among those clients, the privilege could not stand as a bar to full disclosure . . . ."); Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc., 213 B.R. 433, 437, 437 n.5 (Bankr. S.D.N.Y. 1997)(Brozman, B.J.)("The few cases and voluminous commentary that do address the issue state that subsequent litigation inter sese operates to waive the joint defense privilege in [the allied lawyer or common interest [*20] situation]."); Jerald S. Solovy, et al., Protecting Confidential Legal Information, Order No. H0-00GS, at *111 (PLI April, 2002)(available on Westlaw).

Accordingly, JM must disclose to Research the documents numbered 119, 122, 130-31, 134-39, 143-44, 147, and 154-55 on its privilege log.

D. Documents Created by Foreign Patent Agent

Foreign patent agents who are not members of the bar in this country or in their own countries are generally not treated as the functional equivalent of counsel for purposes of determining the applicability of the attorney-client privilege under American law. See Novamont N. Am. Inc. v. Warner-Lambert Co., 1992 U.S. Dist. LEXIS 6622, No. 91 Civ. 6482, 1992 WL 114507, at *2 (S.D.N.Y. May 6, 1992)(Katz, Mag. J.)(discussing the "seminal decision in Kahn v. Gen. Motors Corp., 1992 U.S. Dist. LEXIS 1489, No. 88 Civ. 2982, 1992 WL 28119, at *2 (S.D.N.Y. Feb. 11, 1992)(Gershon, Mag. J.)). For that reason, at the May 10 hearing, I directed JM to produce any documents which related to communications with Ian Wishart, a non-attorney British patent agent employed by JM, insofar as they concerned the Agreement. (Tr. 11). I further directed that if any of these documents had [*21] to be redacted so that discussions of JM's patent rights would remain confidential, JM could submit the proposed elisions to me for in camera review. (Id.).

By letter dated June 4, 2002, Research complained that JM is improperly withholding certain Wishart documents that discuss the royalty rate to which JM was entitled simply because those documents were generated in connection with the British license as of right proceeding. (See letter dated June 4, 2002, from Mr. Madsen to the Court ("Madsen June 4 Letter"), at 5-7). In Research's view, the key to determining the discoverability of the Wishart documents "is not the

context in which the communications were made, but their content." (Id. at 6).

When contested communications arise in the context of a foreign patent proceeding, principles of comity will often cause the courts of this country to apply the law of the foreign jurisdiction in order to resolve privilege questions. See Aktiebolag v. Andrx Pharms., Inc., 208 F.R.D. 92 (S.D.N.Y. 2002)(Jones, J.). In this case, subject matter jurisdiction is based on diversity of citizenship. (Compl. P 5). Accordingly, to the extent that there may be differences [*22] between state and federal practice, any privilege questions must be decided under New York law. See In re Am. Tobacco Co., 880 F.2d 1520, 1527 (2d Cir. 1989).

New York courts apply a traditional "center of gravity" or "grouping of contacts" analysis to determine which jurisdiction's privilege law should be applied. See Elliott Assocs. L.P. v. Peru, 176 F.R.D. 93, 95 (S.D.N.Y. 1997)(Sweet, J.); Brandman v. Cross & Brown Co., 125 Misc. 2d 185, 479 N.Y.S.2d 435 (Sup. Ct. Kings County 1984). This is consistent with the approach taken by several judges in this District in patent cases:

> In assessing the potential availability of foreign privilege law governing communications with patent agents, most courts have engaged in a form of traditional choice of law "contacts" analysis . . . . and have thus looked to whether the client was domestic or foreign, and whether the foreign patent agent was working on foreign patent matters or assisting in efforts to obtain a United States patent . . . . The working standard in these cases has been summarized in general terms as follows: "any communications touching base with the United States will [*23] be governed by the federal discovery rules while any communication related to matters solely involving [a foreign country] will be governed by the applicable foreign statute." . . . Communications by a foreign client with foreign patent agents "relating to assistance in prosecuting patent applications in the United States" are governed by American privilege law whereas communications "relating to assistance in prosecuting patent applications in their own foreign country" or "rendering legal advice . . . on the patent law of their own country" are, as a matter of comity, governed by the privilege "law of the foreign country in which the patent application is filed," even if the client is a party to an American lawsuit.

Aktiebolag, 208 F.R.D. at 92 (quoting Golden Trade S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 519 (S.D.N.Y. 1992)(Dolinger, Mag. J.)(citations omitted).

The contacts between JM and Mr. Wishart in this case were centered in the United Kingdom. Although the parties have disagreed regarding the proper characterization of the license of right proceeding, it is undisputed that it took place before the British courts and focused [*24] on whether the issuance of a second license in the United Kingdom should be compelled. Moreover, British law protects communications between a patent agent and his client in much the same manner as attorney-client communications are protected under American law. See VLT Corp. v. Unitrode Corp., 194 F.R.D. 8, 19 (D. Mass. 2000)(citing 33 Halsbury's Statutes of England and Wales § 280 (4th ed. 1987)).

Consequently, to the extent that the Wishart documents concern royalty payments or other issues arising under the Agreement, New York law governs and they must be disclosed. On the other hand, to the extent that they concern only the license of right proceeding, such documents are privileged and need not be produced. Recognizing that these bright line rules may in practice prove difficult to apply, JM is directed to produce to the Court within ten days any Wishart documents which are not voluntarily produced to Research so that they may be reviewed in camera.

E. Work Product

JM has relied on the work product doctrine to resist turning over certain documents that it received from attorneys working on behalf of a similarly-situated plaintiff which brought [*25] its own suit against Research. In that action, filed in the New York state courts, the plaintiff is challenging the quantum of royalties that it is receiving as a result of its participation in the research conducted at MSU. (5/10/02 Tr. at 30). The contested documents appear to consist of papers that were filed in the other suit and inconsequential cover memos. n2 Public records, however, are not items for which a claim of privilege can be asserted. United States v. Gasparik, 141 F. Supp. 2d 361, 369 (S.D.N.Y. 2001)(Scheindlin, J.). JM is therefore directed to turn over to Research within ten days the documents numbered 79 and 80 in its privilege log.

n2 The court papers evidently were redacted by the other plaintiff before they were sent to JM in accordance with the terms of a confidentiality stipulation in the other suit.

Following the May 10 conference, Research also has contested JM's assertion of a claim of work product protection for the documents numbered 52, 53, 171, 208-212 in JM's privilege [*26] log. Research contends that these documents are not privileged because they "were prepared neither by nor for JM counsel." (Madsen June 4 Letter at 8-9). The fact that the privilege log does not list an attorney as an author or recipient of any of these documents does not mean that work product protection is unavailable. See Atlantic Richfield Co. v. Current Controls, Inc., 1997 U.S. Dist. LEXIS 13082, No. 93 Civ. 0950, 1997 WL 538876, at *3 (W.D.N.Y. Aug. 21, 1997)("It is of no consequence that most of the subject documents were prepared by non-attorneys."). Indeed, the text of Rule 26(b)(3) itself makes clear that a litigant may withhold on work product grounds any document "prepared in anticipation of litigation or for trial by or for [that] party or by or for that . . . party's representative." In that regard, Research has indicated that all of the documents at issue were prepared in anticipation of litigation, (see letter dated June 6, 2002, from Mr. Baylson to the Court), and there is no reason to second guess that representation.

F. In Camera Inspection

After I indicated at the May 10 conference that certain communications between JM and a former employee of JM were protected [*27] by the attorney-client privilege, Research asked that I examine certain documents in camera before making a final determination. JM similarly asked me to review several documents in camera in connection with my ruling that Research would not be required to produce any documents relating to a 1995 lawsuit between Research and MSU because those documents were not relevant. Having examined these additional documents, I adhere to my prior rulings. n3

n3 Research also asked that I examine in camera a draft of a letter from JM's general counsel to one of its former employees which related to litigation. (See Madsen June 4 Letter at 7). However, this letter was never sent to the employee. Accordingly, JM's claim of work product protection is well founded.

G. Remaining Issues

Finally, by letters sent to the Court after the May 10 conference, both sides take issue with aspects of their opponent's privilege logs. There is no indication, however, that the parties made efforts to resolve these questions [*28] informally before raising them with the Court. For this reason, the Court declines to address these matters at this juncture.

IV. Conclusion

For the reasons outlined in this opinion, JM must produce the relevant documents within ten days. In addition, the parties should confer to determine whether any additional depositions are needed.

SO ORDERED.

Dated: New York, New York

July 23, 2002

FRANK MAAS

United States Magistrate Judge