IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GTECH CORPORATION,

       Plaintiff,

       v.

SCIENTIFIC GAMES INTERNATIONAL,
INC., SCIENTIFIC GAMES HOLDINGS
CORPORATION, SCIENTIFIC GAMES
FINANCE CORPORATION, and
SCIENTIFIC GAMES CORPORATION,

       Defendants.

C.A. No. 04-138-JJF

**REDACTED VERSION**

## SCIENTIFIC GAMES' (CORRECTED) OPENING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
 Attorneys for Defendants

Original Filing Date:  October 14, 2005

Redacted Filing Date (Corrected Version):  November 1, 2005

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS ................................................................................ ii

NATURE AND STAGE OF THE PROCEEDING ....................................... 1

SUMMARY OF ARGUMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................. 3

      A.    The '337 Patent ........................................................... 3

      B.    The '624 Patent ........................................................... 6

      C.    Scientific Games' Accused PlayCentral Kiosk ......... 10

ARGUMENT .................................................................................................. 11

    I.    CLAIM CONSTRUCTION PRINCIPLES ................................ 11

    II.    CLAIMS 20 AND 21 OF THE '337 PATENT ........................ 14

      A.    "Means for Separating" ............................................. 15

          1.    The "dull edge bursting blade" ................. 17

          2.    The "holding means" ................................ 18

          3.    The "bursting blade drive means" ............ 20

      B.    "Housing Means" ...................................................... 22

      C.    "Means . . . For Ordering" ........................................ 25

      D.    "Dispensing Means" .................................................. 26

    III.    CLAIM 18 OF THE '624 PATENT .......................................... 27

      A.    "Video Display Means" ............................................ 27

          1.    "Video Display Means" Is A Means-Plus-Function Limitation    27

          2.    "Plurality of Arrays" ................................. 28

          3.    "Lottery Ticket Representations" and "Ticket Images"    33

      B.    "Means For Dispensing" ........................................... 34

CONCLUSION ............................................................................................... 39

TABLE OF CITATIONS

Page(s)

Cases

*Alloc, Inc. v. Int'l Trade Comm'n,*
    342 F.3d 1361 (Fed. Cir. 2003)      30

*Asyst Tech., Inc. v. Empak, Inc.,*
    268 F.3d 1364 (Fed. Cir. 2001)      16

*B. Braun Med., Inc. v. Abbott Labs.,*
    124 F.3d 1419 (Fed. Cir. 1997)      14

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,*
    296 F.3d 1106 (Fed. Cir. 2002)      16, 36

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002)      *passim*

*Cephalon, Inc. v. Barr Labs., Inc.,*
    C.A. No. 05-29-JJF, slip op. at 3 (D. Del. Oct. 6, 2005)      12, 30

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
    __ F.3d __, 2005 WL 2403777 (Fed. Cir. 2005)      15

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n,*
    383 F.3d 1352 (Fed. Cir. 2004)      *passim*

*Greenberg v. Ethicon Endo-Surgery, Inc.,*
    91 F.3d 1580 (Fed. Cir. 1996)      13

*Laitram Corp. v. Rexnord, Inc.,*
    939 F.2d 1533 (Fed. Cir. 1991)      12, 14, 23, 29

*Medtronic Minimed Inc. v. Smiths Medical MD Inc.,*
    No. 03-776-KAJ, 2005 U.S. Dist. LEXIS 10583 (D. Del. 2005)      24

*Network, LLC v. Centraal Corp.,*
    242 F.3d 1347 (Fed. Cir. 2001)      12

*Nomos Corp. v. Brainlab USA, Inc.,*
    357 F.3d 1364 (Fed. Cir. 2004)      14

*Personalized Media Comms., LLC v. Int'l Trade Comm'n,*
    161 F.3d 696 (Fed. Cir. 1998)      13

iii.

TABLE OF CITATIONS (continued)

Page

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)    11

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)    11

*Sage Prods. v. Devon Indus., Inc.*,
    126 F.3d 1420 (Fed. Cir. 1997)    13

*Unidynamics Corp. v. Automatic Prods. Int'l, Ltd.*,
    157 F.3d 1311 (Fed. Cir. 1998)    13, 24

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)    11

Statutes

35 U.S.C. § 112, ¶ 6    *passim*

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff GTECH Corporation ("GTECH") filed this patent infringement action against Scientific Games International, Inc., Scientific Games Holdings Corporation, Scientific Games Finance Corporation, and Scientific Games Corporation (collectively, "Scientific Games") on March 4, 2004 (D.I. 1).   GTECH amended its Complaint on March 10, 2004 (D.I. 4).  GTECH never served the Complaint, or even advised Scientific Games that it had been filed.  Scientific Games nevertheless answered the Complaint on May 18, 2004 (D.I. 6).

GTECH has asserted two patents in this litigation -- U.S. Patent No. 4,982,337 ("the '337 patent") and U.S. Patent No. 5,222,624 ("the '624 patent").  GTECH's predecessor, Interlott Technologies, Inc. ("Interlott"), previously asserted the '337 patent against Pollard Banknote Limited and Pollard (U.S.) Ltd. in the Northern District of Ohio in November 2002. During the course of that litigation, GTECH acquired Interlott.  After the Ohio Court had issued its claim construction ruling, GTECH settled that litigation in February 2004, hired different lawyers and sued Scientific Games for infringement in this Court less than two weeks later.

The Court has scheduled a *Markman* hearing for November 18, 2005 (D.I. 105). No trial date has been set.  This is Scientific Games' opening claim construction brief.

## SUMMARY OF ARGUMENT

1.      The "means for separating" element of claim 20 of the '337 patent should be construed under 35 U.S.C. § 112, ¶ 6.  The function is to separate each ticket from a strip of tickets.   The corresponding structure disclosed in the specification is the combination of: (a) a burster wheel 68 with a dull, rounded edge that is moveably mounted; (b) two sets of rollers 60, 62, 64, 66 -- one set on each side of the perforation to be separated -- which hold the strip of tickets in tension as the burster wheel is brought into contact with the tickets; and

(c) a bursting blade drive means that includes a burster block 97, burster motor 100, cable spool arrangement 102, and tensioning spring 104.

2.      The "housing means" element of claim 20 of the '337 patent should be construed under § 112, ¶ 6.  The function of the "housing means" of claim 20 is to store a strip of tickets so they can be dispensed.  The corresponding structure disclosed in the specification is a box-like unit 14 with a control panel 32 mounted on the front surface 28 for use by the vendor for initiating the dispensing of a lottery ticket and a back surface 30 that faces the customer with a dispensing outlet 34 from which the customer receives the dispensed ticket.

3.      The "means . . . for ordering" element of claim 20 of the '337 patent should be construed under § 112, ¶ 6.  The function of the "means . . . for ordering" is "ordering a plurality of tickets in a single batch."  The corresponding structure disclosed in the specification is a control panel 32, keypad 37, push-buttons 38 and control circuit 40.

4.      The "dispensing means" element of claim 20 of the '337 patent should be construed under § 112, ¶ 6.  The function is "dispensing tickets through said outlet opening." The corresponding structure disclosed in the specification is a pair of exit rollers 64, 66.

5.      The "video display means" element of claim 18 of the '624 patent should be construed under § 112, ¶ 6.  The function is "displaying a plurality of arrays of ticket images on a video screen."  The structure disclosed in the specification corresponding to that function is a CPU 190.

6.      The phrase "plurality of arrays" in claim 18 of the '624 patent should be construed to mean more than one array, where each array is a movable strip of lottery tickets from the same game.

7.    The terms "lottery ticket representations" and "ticket images" in claim 18 of the '624 patent should be construed to mean graphical representations of actual lottery tickets.

8.    The "means for dispensing" element of claim 18 of the '624 patent should be construed under § 112, ¶ 6.  The function is dispensing tickets in a number corresponding to the amount of money input into said machine by the customer.  The corresponding structure disclosed in the specification is a keypad 28, the feeding and bursting mechanism 112 (as described in the '337 patent and incorporated into the '624 patent), outlet openings 220, 222 in the housing through which the tickets exit the housing, outfeed rollers 158, 166, and a receptacle 140 that receives the tickets that fall through the outlet opening.

STATEMENT OF FACTS

A.    The '337 Patent

The '337 patent issued to Robert Burr, Laird Campbell, Donald Keagle and Alfred Fulton on January 1, 1991, from an application filed on December 3, 1987 (Ex. A).  The '337 patent describes a lottery ticket vending machine designed to sit on a countertop (*id.*, col. 7, ll. 3-5).  The tickets are perforated and stored in the machine in fan-fold form (*id.*, col. 9, ll. 20-24).

The machine is operated by a sales agent.  It has a front surface with a control panel that includes a keypad and push-buttons for use by the agent (Ex. A, col. 2, ll. 49-54; col. 7, ll. 5-9, 14-21, 41-44).  The back of the machine faces the customer, and includes an opening through which the tickets are dispensed to the customer (*id.*, col. 2, ll. 49-54; col. 7, ll. 10-11).  The front and back surfaces of the vending machine are depicted in Figures 3 and 4:



The patent explains that it is important to have a machine with a front surface facing the vendor and a back surface facing the customer -- to speed up the dispensing of tickets: "It is a further object of the present invention to provide an apparatus for dispensing lottery tickets including a control panel mounted at the front and accessible to the sales agent and a dispensing outlet at the back and accessible to the customer so as to speed up the dispensing of the tickets" (Ex. A, col. 2, ll. 49-54).  This design speeds up the dispensing of tickets by eliminating the need for the sales agent physically to receive the ticket and hand it to the customer (*id.*, col. 7, ll. 16-25):

> [T]he sales agent may quickly and efficiently enter a sales command, for example in the form of the number of tickets to be dispensed, on control panel **34** [sic **32**] at front surface **28**, while the tickets are automatically presented . . . at back surface **30**.  This structure eliminates the need for the sales agent to physically receive the lottery tickets from unit **14** and to personally hand the lottery tickets to the customer, as is done in conventional lottery ticket dispensers.

*See also id.,* col. 8, ll. 5-9 ("This significantly speeds up the ticket selling process, as the sales agent may concentrate on receiving money and giving change, a task which is both easier to perform and more likely to be accurate when the agent is not handling tickets.").

The '337 patent describes only one mechanism for separating the perforated tickets -- using a movably mounted dull edge "burster wheel" that exerts pressure on the

perforations between the tickets to separate them: "[B]urster wheel **68** is advantageously in the form of a circular burster blade which, in an advantageous aspect, has a dull, rounded edge which does not cut stream of tickets **50**, but rather exerts pressure against the top of stream of tickets **50** . . ." (Ex. A, col. 10, ll. 58-62).

        The strip of tickets is held tightly by two sets of pinch rollers -- one on each side of the perforation to be separated (Ex. A, col. 3, ll. 57-59; col. 10, ln. 64 - col. 11, ln. 2). The burster wheel is then moved into contact with the strip of tickets by a bursting blade drive means that includes a burster block, a motor, a cable spool arrangement, and a tensioning spring (*id.*, col. 3, ll. 60-63; col. 13, ll. 24-26). The separation mechanism is depicted in Figure 7:



The '337 patent explains the operation as follows (*id.*, col. 13, ll. 23-31):

> Burster wheel **68** is shown mounted on a burster block **98** driven by a burster motor **100** through a cable spool arrangement **102** including tensioning spring **104**. When burster block **98** is moved from the illustrated rest position towards interception with dispensing path **57** through the action of cable spool device **102**, burster wheel **68** will come into contact with stream of tickets **50** at the side thereof initially and then across stream of tickets **50** to burst the same apart.

B.     The '624 Patent

The '624 patent issued to Robert Burr on June 29, 1993, based on a February 17, 1989 application (Ex. B).  The '624 patent is an improvement patent over the '337 patent.  *See id.*, col. 1, ll. 9-13, 24-26 ("Described in my joint U.S. patent application . . . now U.S. Pat. No. 4,982,337, is a lottery ticket dispensing mechanism which is very advantageous. . . . Although the machine of the above-described pending application is highly advantageous, it is an object of the present invention to improve upon it . . . .").  The '624 patent expressly incorporates the dispensing mechanism of the '337 patent (*id.*, col. 4, ll. 48-55), which is depicted in Figure 4:

> The feeding and bursting mechanism **112** is essentially identical to that disclosed in the ['337 patent] . . ., except that it has been rotated through 90° to dispense tickets downwardly. . . .  [T]he disclosure of that mechanism, and all other disclosure in the ['337 patent] hereby is incorporated herein by reference.

The improvement described in the '624 patent is a customer-operated lottery ticket vending machine that uses windows on the front to display actual lottery tickets that move as they are dispensed.  *See* Ex. B, col. 1, ll. 45-49 ("The machine preferably has one or a plurality of windows with mechanism for moving an array of lottery tickets past each of the windows so that different types of lottery tickets can be seen, but not touched, by the customers.").  The vending machine with the windows is depicted in Figure 1 of the patent:



The patent explains that the "windows" invention is significant because it provides the customer with a better understanding of the game that he or she is purchasing and with increased confidence that the machine will actually dispense the tickets requested (Ex. B, col. 1, ll. 34-42; col. 2, ll. 1-5):

> In accordance with the present invention, . . . a representation of the tickets is displayed by the machine at all times so that customers can see what they are buying. Then, as the tickets are being dispensed, the visible representation moves by an amount corresponding to the number of tickets dispensed.

> * * *

> The customer, by being able to see a representation of the lottery tickets prior to selecting them, better understands the terms of the game and has greater confidence that the machine will vend lottery tickets to him in a flawless manner.

The movement of the tickets as they are dispensed is the key to the invention of the '624 patent. The Abstract introduces the invention by stating that "[l]ottery tickets are displayed in the window and *move past the window as they are being dispensed*, thus allowing

the buyer to see the messages and terms on the tickets themselves" (Ex. B, Abstract; emphasis added).  *See also id.*, col. 2, ll. 5-7 ("The motion of the tickets during dispensing further bolsters that confidence and is attractive."); col. 1, ll. 37-42 ("[A]s the tickets are being dispensed, the visible representation [of the tickets] moves by an amount corresponding to the number of tickets dispensed.").

The '624 patent discloses an alternative embodiment using a video display, rather than windows.  The purpose is the same.  The video display simulates tickets moving as they are dispensed:  "In another embodiment of the vending machine, graphic representations of the lottery tickets are displayed on a video screen, rather than through windows.  The lottery ticket images are moved in the same manner as tickets are moved past windows" (Ex. B, col. 1, ll. 64-68).  *See also id.*, col. 10, ll. 65-68 ("[E]ach of the arrays of ticket images A, B, C, D, E and F can be made to move downwardly as a ticket is issued.  The array moves in the same manner as the tickets move past the windows in FIGS. 1 and 2.").  The display for the alternative video embodiment -- which shows two ticket images in each of six windows -- is depicted in Figure 8:



During prosecution, Mr. Burr distinguished his invention from the prior art on the grounds that the tickets moved as they were dispensed.  In a January 22, 1991 Office Action, the examiner rejected certain claims of the application because simply showing the customer the

product available for purchase in a vending machine was known in the prior art (Ex. C at GTECH 000153). In response, Mr. Burr distinguished his invention by emphasizing the importance of having the tickets move past the window as they are dispensed (*id.* at GTECH 000176-77, 000179):

> [T]he present invention provides a stand-alone unattended ticket vending machine in which . . . representations of the tickets move past a window during dispensing so that the customer can see the tickets moving while they are being dispensed. This adds interest and excitement, and increases ticket sales.
>
> *   *   *
>
> In the sale of tickets, the movement of the tickets past the window has a special, synergistic effect in that it arouses the interest and purchasing proclivity of the customer, and also gives assurance of the reliable dispensing of lottery tickets.
>
> *   *   *
>
> Moreover, since the string of peanut bags [in the cited prior art reference] is not motor-driven, one gets no fascination from the movement of a stream of items past the window similar to that which one gets when viewing tickets such as lottery tickets moving past a window under the force of an automatic electric-powered driving mechanism.

The examiner again rejected certain claims on the same basis (Ex. C at GTECH 000194; *see also* Ex. D at GTECH 000024). In response, Mr. Burr submitted a declaration in which he emphasized that his invention involved the movement of tickets past windows: "The windows, with the tickets moving past them while being dispensed, proved to be a major improvement" (*id.* at GTECH 000029). In an Amendment that accompanied his declaration, Mr. Burr distinguished the prior art on the grounds that his invention showed actual tickets moving past windows as they are dispensed (*id.* at GTECH 000066):

> [T]he commercial success of the invention, which is far in excess of what might be expected, demonstrates the unobviousness of the invention. The Groves and Knee references simply do not show or

suggest the extraordinary increase of ticket sales produced by driving an array of tickets past a window in the dispensing device.

\*     \*     \*

[T]he movement of the ticket array past the window is at the heart of the commercial success . . . .

REDACTED

C.     Scientific Games' Accused PlayCentral Kiosk

GTECH has accused Scientific Games' PlayCentral machine of infringing claims 20 and 21 of the '337 patent and claim 18 of the '624 patent.

The PlayCentral machine is fundamentally different from the lottery ticket vending machine described and claimed in the '337 patent. The PlayCentral machine is a customer-activated terminal, not a clerk-activated terminal. The PlayCentral machine does not have a control panel and dispensing outlet on opposite sides of the machine (as described in the '337 patent). The PlayCentral machine also does not use a movable burster wheel; it uses a stationary blade for separating tickets. The PlayCentral machine does not have two sets of rollers that hold the strip of tickets on either side of the perforation to be separated. And the PlayCentral machine does not have a drive means for bringing the stationary blade into contact with the strip of tickets.

The PlayCentral machine is also fundamentally different from the lottery ticket vending machines described and claimed in the '624 patent. The PlayCentral machine does not

show strips of tickets that move as they are dispensed.  The PlayCentral machine presents the customer with an icon-based menu for selecting the tickets to be purchased, and never shows more than one actual ticket at a time on the video screen.  The PlayCentral also does not use the separating mechanism of the '337 patent, which is incorporated by reference into the '624 patent.

<u>ARGUMENT</u>

I.    <u>CLAIM CONSTRUCTION PRINCIPLES</u>

The Federal Circuit recently reaffirmed that patent claims must be interpreted in the context of how the terms are used in the patent itself.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-18 (Fed. Cir. 2005) (en banc).  The Federal Circuit reaffirmed that claim terms should be given "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention . . . ."  *Id*. at 1313.  Because a person of ordinary skill in the art is deemed to read the claim terms in the context of the entire intrinsic record, including the specification, the court emphasized that patent claims "must be read in view of the specification, of which they are a part."  *Id*. at 1315.

The Federal Circuit reaffirmed that the specification is "'the single best guide to the meaning of a disputed term.'"  *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  Thus, "'[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'"  *Id*. at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  As this Court recently stated in *Cephalon, Inc. v. Barr Labs., Inc.*, ___ F. Supp. 2d ___, 2005 WL 2466454, at *1 (D. Del. 2005), "a claim term can be given its correct construction only within the context of 'what the inventors actually invented and intended to envelop with the claim'" (quoting *Phillips*, 415 F.3d at 1316).

Although the use of extrinsic evidence, like dictionaries, is not precluded, dictionary definitions may not be used to broaden the claim scope as revealed by the context of the intrinsic record. *See Phillips*, 415 F.3d at 1321. In construing patent claims, courts must focus "at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad [dictionary] definition and whittling it down." *Id.*; *see also Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose.").

Claim limitations expressed in "means-plus-function" form are the ultimate example of looking to the patent specification to understand what is covered by the claim terms. Under 35 U.S.C. § 112, ¶ 6, a patentee may express a claim limitation "as a means or step for performing a specified function." A means-plus-function limitation, however, does not cover every means for performing the specified function. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991). Rather, means-plus-function limitations cover only "the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. Means-plus-function limitations cover the structures disclosed in the specification that perform the recited function, and their equivalents. *See Personalized Media Comms., LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998).

The use of the word "means" in a patent claim invokes a presumption that § 112, ¶ 6 applies. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002); *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996) ("[T]he use of the term 'means' has come to be so closely associated with 'means-plus-function' claiming that it is

fair to say that the use of the term 'means' (particularly as used in the phrase 'means for') generally invokes section 112(6) . . . .").

The presumption that a claim element that uses the word "means" is a means-plus-function element can be overcome only if:  (a) the claim recites no function; or (b) the claim "goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function."  *Sage Prods. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997).  The mere recitation of some structure, however, does not prevent the application of § 112, ¶ 6.  *See Unidynamics Corp. v. Automatic Prods. Int'l, Ltd.*, 157 F.3d 1311, 1319 (Fed. Cir. 1998); *Laitram*, 939 F.2d at 1536.  Moreover, structural language in a patent claim does not rebut the means-plus-function presumption if the recited structure describes only what the means limitation *does*, not what it *is*.  *See Laitram*, 939 F.2d at 1536 ("The recitation of some structure in a means plus function element does not preclude the applicability of section 112(6) . . . [if it] merely serves to further specify the function of that means.").

The proper interpretation of a means-plus-function limitation proceeds in two steps.  *See Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1361 (Fed. Cir. 2004).  First, the court must identify the claimed function.  *Id.*  Second, the court must consult the specification to determine the "corresponding structure that is necessary to accomplish the stated function."  *Id.*  Structure disclosed in the specification is "corresponding" if the "specification or prosecution history clearly links or associates that structure to the function recited in the claim."  *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

When the preferred embodiment is the only corresponding structure disclosed in the specification, the court must limit a means-plus-function element to cover the preferred embodiment and its equivalents.  *See Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1368

(Fed. Cir. 2004) ("This is the only embodiment of the invention described in the . . . patent.  As a result, the corresponding structure is limited to that embodiment . . . and its equivalents."); *see also Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, __ F.3d __, 2005 WL 2403777, at *6-*8 (Fed. Cir. 2005) ("[B]ecause there is only one embodiment described in the specification . . . there is no basis on which to extend the limitation to cover alternative, non-disclosed structure not shown to be structurally equivalent.").

II.    <u>CLAIMS 20 AND 21 OF THE '337 PATENT</u>

GTECH has asserted claims 20 and 21 of the '337 patent.[1]  Those claims read as follows:

> 20.    A ticket dispensing machine for dispensing tickets directly to the purchaser thereof, said dispenser comprising the combination of housing means for storing a strip of tickets to be dispensed, said housing means having an outlet opening accessible to the purchaser of tickets from said machine, means operable for ordering a plurality of tickets in a single batch, means for separating each of said tickets from said strip, dispensing means for dispensing tickets through said outlet opening, and control means for causing each ticket in said batch to be separated and dispensed separately from the other tickets in said batch regardless of the number of tickets in said batch.

> 21.    A machine as in claim 20 in which said tickets are instant-winner lottery tickets.

---

[1]    GTECH sought to add claims 22 and 24 of the '337 patent after the close of fact discovery, but the Court precluded GTECH from asserting those claims (D.I. 87, ¶ 1; D.I. 89 at 3).

A.     "Means for Separating"

Claim 20 of the '337 patent requires a "means for separating each of said tickets from said strip." The parties agree that this claim element should be construed under § 112, ¶ 6.[2]

The first step is to identify the claimed function. *See Gemstar-TV Guide*, 383 F.3d at 1361. The claimed function is to separate each ticket from a strip of tickets. The next step is to analyze the specification to identify the corresponding structure for the claimed function. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002) ("[C]orresponding structure must include all structure that actually performs the recited function."); *Asyst Tech., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1372 (Fed. Cir. 2001) ("Because the 'fourth means' encompasses both the local process controller 20 and the communication means 50, it also necessarily encompasses structure that connects the two, i.e., communication line 51.").

The only structure described in the '337 patent corresponding to the "means for separating" includes three distinct elements -- all of which must work in combination to perform the function of separating the tickets (Ex. A, col. 3, ll. 55-63, emphasis added):[3]

> [T]he separation means includes a *dull edge bursting blade moveably mounted* adjacent a predetermined bursting position along the path, *holding means* for holding the stream of tickets against substantial deflection from the path at the bursting position, and *bursting blade drive means* for bringing the bursting blade into bursting contact with the stream of tickets at the bursting position to burst the leading ticket from the next following ticket.

---

[2]     *See* Plaintiff GTECH Corporation's Response to Defendants' First Set of Interrogatories, dated August 16, 2004, at 8 (Ex. F).

[3]     In the *Pollard* case, Interlott argued that the structure for the means for separating of claim 20 was only the burster wheel (Ex. G at 32). The Court rejected that argument, finding that the structure was the burster, the holding means and the drive means (*id.* at 34).

REDACTED

---

[4]    *See Voice Tech. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999) ("An inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims.").

REDACTED

1.    <u>The "dull edge bursting blade"</u>

The only "dull edge bursting blade moveably mounted" described in the '337 patent is a circular burster wheel with a dull, rounded edge:   "[B]urster wheel **68** is advantageously in the form of a circular burster blade which . . . has a dull, rounded edge . . ." (Ex. A, col. 10, ll. 58-63).  *See also id.,* col. 10, ln. 40 ("burster wheel"); col. 10, ln 55 ("burster wheel"); col. 11, ln. 8 ("burster wheel"); col. 11, ln. 12 ("burster wheel"); col. 11, ln. 24 ("burster wheel"); col. 11, ln. 29 ("burster wheel"); col. 11, ln. 32 ("burster wheel"); col. 11, ln. 41 ("burster wheel"); col. 11, ln. 47 ("burster wheel"); col. 11, ln. 54 ("burster wheel"); col. 13, ln. 23 ("burster wheel"); col. 13, ll. 28-29 ("burster wheel").

In applying for later patents, Interlott (GTECH's predecessor) repeatedly argued to the Patent Office that the separation means of the '337 patent was limited to a burster wheel with a dull, rounded edge.  For example, Edmund Turek, the founder of Interlott, told the Patent Office that the "bursting blade" described in the '337 patent is limited to a "circular bursting wheel" with "a dull rounded edge" (Ex. H, col. 2, ll. 65-67; col. 3, ll. 1, 3-5):

> The separation mechanism of the '337 patent comprises a bursting wheel which separates the leading ticket from the next following ticket . . . .  The burster wheel of the '337 patent is in the form of a circular burster blade which has a dull rounded edge . . . .

Interlott argued to the Patent Office that the '337 patent is limited to a separation means with a burster wheel with a dull, rounded edge (Ex. I at SGI108040).

> I am intimately familiar with the burster mechanism and, particularly, the burster wheel shown and disclosed in the Burr ['337] patent.  Therefore, I can factually state that the burster

wheel of the Burr patent only includes a rounded or semi-circular outer edge.

REDACTED

2.      The "holding means"

The only structure described in the '337 patent for the "holding means for holding the stream of tickets against substantial deflection from the path at the bursting position" is two sets of rollers -- one on each side of the perforation to be separated -- which hold the strip of tickets in tension as the burster wheel is brought into contact with the tickets (Ex. A, col. 10, ln. 64 - col. 11, ln. 2):

> When line of weakness **56** is at bursting position **70**, exit rollers **64**, **66** grip a portion of the leading ticket **52**, while exit feed rollers **60**, **62** similarly grip a following portion of the stream of tickets **50**, with the result that stream of tickets **50** is held between the two sets of rollers against substantial deflection from dispensing path **57.**

19.

REDACTED

3.    The "bursting blade drive means"

The separating means also requires a "bursting blade drive means," which functions to "bring the bursting blade into bursting contact with the stream of tickets" (Ex. A, col. 3, ll. 60-63; col. 13, ll. 23-32, 36-38).  The only bursting blade drive means described in the patent includes a burster block, burster motor, cable spool arrangement, and tensioning spring (*id.*, col. 13, ll. 23-25):

> Burster wheel **68** is shown mounted on a burster block **98** driven by a burster motor **100** through a cable spool arrangement **102** including tensioning spring **104**.  When burster block is moved from the . . . rest position towards interception with dispensing path **57** through the action of cable spool device **102**, burster wheel **68** will come into contact with stream of tickets **50** at the side thereof initially and then across stream of tickets **50** to burst the same apart.

REDACTED

REDACTED

The "means for separating" element of claim 20 should be construed under § 112, ¶ 6. The function is to separate each ticket from a strip of tickets. The corresponding structure disclosed in the specification is the combination of: (a) a burster wheel 68 with a dull, rounded edge that is moveably mounted; (b) two sets of rollers 60, 62, 64, 66 -- one set on each side of the perforation to be separated -- which hold the strip of tickets in tension as the burster wheel is brought into contact with the tickets; and (c) a bursting blade drive means that includes a burster block 97, burster motor 100, cable spool arrangement 102, and tensioning spring 104.

B.    <u>"Housing Means"</u>

Claim 20 requires a "housing means for storing a strip of tickets to be dispensed, said housing means having an outlet opening accessible to the purchaser of the tickets from said machine." The use of the term "means" triggers the presumption that § 112, ¶ 6 applies. *See CCS Fitness*, 288 F.3d at 1369. GTECH can rebut this presumption only if the claim recites no function, or if the claim recites sufficient structure to perform the recited function. *See Sage*, 126 F.3d at 1427-28. The claim recites a function -- "storing a strip of tickets to be dispensed" -- but fails to recite sufficient structure for performing the claimed function.

The function is "storing a strip of tickets *to be dispensed*." The term "housing" does not provide sufficient structure for performing that function. The recited function is not simply to store the tickets, but to store them so they can be dispensed. The term "housing" does not provide sufficient structure concerning how the tickets will be stored in the machine so as to be dispensed.

REDACTED

Moreover, any suggestion that the term "housing" standing alone provides sufficient structure is contrary to established case law. The Federal Circuit has stated that "[t]he recitation of some structure in a means plus function element does not preclude the applicability of § 112, ¶ 6." *Laitram*, 939 F.2d at 1536. More than just a hint of structure is required to avoid § 112, ¶ 6, and to rebut the presumption that a claim element containing the word "means" is a means-plus-function element. *Id*. In *Unidynamics*, the Federal Circuit held that the word "spring" in the phrase "spring means tending to keep the door closed" was not sufficient structure, and interpreted that claim element under § 112, ¶ 6:

> The recitation of "spring," which is structural language, [does not take] the limitation out of the ambit of the construction dictate of § 112, ¶ 6. . . .  The use of the term "means" generally (but not always) shows that the patent applicant has chosen the option of means-plus-function format invoking § 112, ¶ 6 construction. . . . The recitation of the word "spring" does not vitiate the patentee's choice.

157 F.3d at 1319.  Interestingly, the court in that case held that the corresponding structure from the specification that performed the function of the "spring means" was a spring.  *Id*. at 1322. Even though the claim element included the word "spring," the court held that the use of the word "spring" in the claim limitation was insufficient to rebut the presumption that "spring means" should be construed under § 112, ¶ 6 to encompass the spring disclosed in the specification and its equivalents.  *Id*.; *see also Medtronic Minimed Inc. v. Smiths Medical MD Inc.*, 2005 WL 1308050, at *6-*8 (D. Del. 2005) (construing "processor means" and "port means" limitations under § 112, ¶ 6, even though the words "processor" and "port" are structural).

Like the word "spring" in *Unidynamics*, the word "housing" in claim 20 of the '337 patent is insufficient to rebut the presumption that "housing means" is a means-plus-function claim element.  To hold otherwise would vitiate the patentee's decision to invoke § 112, ¶ 6 by including the words "means for" in the claim.

The first step in construing a means-plus-function element is to identify the claimed function.  *See Gemstar-TV Guide*, 383 F.3d at 1361.  The claimed function of the "housing means" is "storing a strip of tickets to be dispensed."

The next step is to identify the corresponding structure in the patent specification that performs the claimed function.  *See Gemstar-TV Guide*, 383 F.3d at 1361.  The only structure described in the '337 patent for "storing a strip of tickets to be dispensed" is "a box-like module having opposed front and back surfaces, . . . control panel means mounted at the front

surface of the module . . . [and] a dispensing outlet manually accessible at the back surface for receiving a dispensed lottery ticket . . ." (Ex. A, col. 3, ll. 29-37).  *See also id.*, Abstract ("The tickets are dispensed at one end of the unit which faces the customer.  A control panel for the vendor is located at the opposite end"); col. 7, ll. 5-16 ("Unit **14** includes a housing with a front surface **28** which . . . is intended to face the sales agent or vendor standing behind a counter **26**.  An opposed back surface **30** of unit **14** is intended to face the customers . . . .").

The drawings in the patent are consistent with this description.  Figures 3 and 4 of the patent depict a housing that has a front surface with a control panel, and a back surface with a dispensing outlet, as depicted above on page 4.

The patent makes clear that it is important to have a machine with a front surface facing the vendor and a back surface facing the customer -- to speed up the dispensing of tickets: "It is a further object of the present invention to provide an apparatus for dispensing lottery tickets including a control panel mounted at the front and accessible to the sales agent and a dispensing outlet at the back and accessible to the customer so as to speed up the dispensing of the tickets" (Ex. A, col. 2, ll. 49-54).

REDACTED

In prosecuting the application for the '624 patent, Mr. Burr distinguished his '337 patent by telling the patent examiner that it disclosed only an agent-operated dispensing unit with an outlet opening on the back surface of the housing:  "[The '337 patent] shows an instant winner lottery ticket dispenser which is intended to be attended by an agent.  [The dispenser] is

designed to dispense tickets from the rear of the unit . . . [and is] not suitable for use as [an] unattended ticket vending device[]" (Ex. C at GTECH 000175-76).

Similarly, in attempting to procure his own patents, Mr. Perin, GTECH's technical expert, told the Patent Office that the '337 patent was limited to an agent-operated machine, and did not disclose a customer-operated terminal (Ex. P at SGI107159-60; emphasis added):

> Referring to Figs. 3 and 4 of Burr et al., a dispensing unit 14 is positioned on a counter 26 facing the sales clerk standing behind the counter. . . .  With Burr et al., the ticket selection is verbally communicated to the retail agent; and the purchased tickets are dispensed directly to the customer.  *Burr et al. does not disclose a customer unit having an input device that permits a customer to select a ticket . . . .  [T]here is no disclosure or suggestion in Burr et al. to provide a customer unit having an input device . . . .*

## REDACTED

The "housing means" element of claim 20 should be construed under § 112, ¶ 6. The function of the "housing means" of claim 20 is to store a strip of tickets so they can be dispensed.  The corresponding structure disclosed in the specification is a box-like unit 14 with a control panel 32 mounted on the front surface 28 for use by the vendor for initiating the dispensing of a lottery ticket and a back surface 30 that faces the customer with a dispensing outlet 34 from which the customer receives the dispensed ticket.

C.    "Means . . . For Ordering"

Claim 20 requires a "means operable for ordering a plurality of tickets in a single batch."  The parties agree that this claim element should be construed under § 112, ¶ 6 (*see* Ex. F at 8).

The claimed function is "ordering a plurality of tickets in a single batch." The only corresponding structure described in the patent is a control panel 32, keypad 37, push-buttons 38, and control circuit 40 (Ex. A, col. 7, ll. 41-43, 48-54):

> Control panel **32** includes a keypad **37** having a plurality of push-buttons **38** for entering data and commands into a control circuit **40** . . . . Push-buttons **38** include numerical buttons bearing the digits 0-10, and an entry button for entering the corresponding numbers into control circuit **40**. Push-buttons **38** further may include a cash button, a report button, a sign-on button, a ticket length load button, a storage access button, and all other buttons necessary for entering all appropriate data and commands . . . .

In the *Pollard* litigation, the parties agreed -- and the Court held -- that the structure for this means included a "control panel 32, keypad 37, push buttons 38, and control circuit 40" (Ex. G at 3).

The function of the "means . . . for ordering" element of claim 20 is "ordering a plurality of tickets in single batch." The corresponding structure is a control panel 32, keypad 37, push buttons 38 and control circuit 40.

### D.    "Dispensing Means"

Claim 20 requires a "dispensing means for dispensing tickets through said outlet opening." The use of the word "means" invokes the presumption that § 112, ¶ 6 applies. *See CCS Fitness*, 288 F.3d at 1369. Because the claim element includes a function ("dispensing tickets through said outlet opening") and does not recite any corresponding structure for performing the claimed function, this claim element should be construed pursuant to § 112, ¶ 6.

The function is "dispensing tickets through said outlet opening." The corresponding structure described in the patent specification is a pair of exit rollers: "Exit rollers **64**, **66** operate as 'kick-out' rollers to discharge the separated leading ticket **52** from dispensing path **57** into dispensing outlet **34**" (Ex. A, col. 10, ll. 45-51).

III.    CLAIM 18 OF THE '624 PATENT

GTECH has also asserted claim 18 of the '624 patent.  Claim 18 reads as follows:

> 18.    A lottery ticket vending machine comprising, in combination, a housing, display means for displaying an array of lottery ticket representations viewable from outside of said housing by a customer, said array representing tickets in said machine available for purchase, acceptor means for receiving and accepting a means of monetary exchange, and means for dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer, in which said display means comprises video display means for displaying a plurality of arrays of ticket images on a video screen.

A.    "Video Display Means"

Claim 18 requires a "video display means for displaying a plurality of arrays of ticket images on a video screen."

1.    "Video Display Means" Is A Means-Plus-Function Limitation

The use of the word "means" triggers the presumption that the "video display means" should be construed under § 112, ¶ 6.  *See CCS Fitness*, 288 F.3d at 1369.  Moreover, the presumption is not rebutted because the claim recites a function ("displaying a plurality of arrays of ticket images on a video screen"), and fails to recite sufficient structure for performing the claimed function.  *See Sage*, 126 F.3d at 1427-28.

The only possible structure recited in claim 18 for the "video display means" is a "video screen."  It makes no sense, however, to refer to "[a *video screen*] for displaying a plurality of arrays of tickets images on a *video screen*."  Indeed, such a construction would be inconsistent with established Federal Circuit case law.  The recitation of some structure in a claim element that uses the word "means" does not rebut the presumption that it is a means-plus-function element, if "[t]he recited structure tells only what the [means clause] *does*, not what it

*is*, structurally." *Laitram*, 939 F.2d at 1536. Here, the recitation of a "video screen" in claim 18 does not rebut the presumption that the "video display means" is a means-plus-function element. It merely describes the function of the "video display means." It tells what the video display means *does*, not what it *is* structurally. The video display means causes a "plurality of arrays of ticket images" to be displayed on a video screen. The video screen itself is not what causes the "plurality of arrays of ticket images" to be displayed on the video screen.

The only structure described in the '624 patent for displaying images on a video screen is a CPU 190 (*see* Figure 10). The "video display means" element of claim 18 should be construed under § 112, ¶ 6. The function is "displaying a plurality of arrays of ticket images on a video screen." The structure disclosed in the specification corresponding to that function is a CPU 190.

### 2.    "Plurality of Arrays"

Claim 18 requires that the video display means display a "plurality of arrays" of ticket images. The specification of the '624 patent makes clear that the term "array" refers to a movable strip of lottery tickets from the same game. *See Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims."); *Cephalon*, 2005 WL 2466454, at *4 ("[T]he consistent use of a claim term by the inventor in the specification may serve to limit the scope of a claim.").

The specification of the '624 patent makes clear that the arrays of ticket images on the video screen are meant to simulate strips of actual lottery tickets that move as they are dispensed: "[E]ach of the arrays of ticket images A, B, C, D, E and F can be made to move downwardly as a ticket is issued. The array moves in the same manner as the tickets move past

the windows in FIGS. 1 and 2" (Ex. B, col. 10, ll. 65-68).  The specification also states that even though the video display embodiment depicted in Figure 8 shows an array of two tickets from each game, it is possible to have an array of more than two tickets:  "Although only 2 tickets are shown in each of the *arrays* A, B, C, D, E and F, it should be understood that each *array* can be made to contain more tickets, if it is desired to do so" (*id.*, col. 11, ll. 1-4; emphasis added).  The dotted line shown in each of A through F of FIG. 8 (and also on the other figures showing ticket arrays, such as FIG. 2) is the perforation between two tickets.

REDACTED

REDACTED

It is also clear from the '624 patent that the term "array" refers to a movable strip of tickets.  The movement of the tickets as they are dispensed is the key to the invention of the '624 patent.  The Abstract introduces the invention by stating that "[l]ottery tickets are displayed in the window and *move past the window as they are being dispensed*, thus allowing the buyer to see the messages and terms on the tickets themselves," and that, in the video embodiment, the array of tickets is movable:  "[R]epresentations of the tickets are displayed in a *movable array* on a video screen" (Ex. B, Abstract; emphasis added).[5]

Indeed, the purpose of the alternative video display embodiment is the same as the "windows" embodiment.  The video display simulates tickets moving as they are dispensed (Ex. B, col. 1, ll. 64-68; emphasis added):

> In another embodiment of the vending machine, graphic representations of the lottery tickets are displayed on a video screen, rather than through windows.  *The lottery ticket images are moved in the same manner as tickets are moved past windows.*

See also *id.*, col. 10, ll. 65-68 ("The array moves in the same manner as the tickets move past the windows in FIGS. 1 and 2.");

REDACTED

---

[5]     *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term.").

During prosecution, Mr. Burr argued that his invention was different from the prior art because the tickets moved as they were dispensed (Ex. C at GTECH 000176-77, 000179):

> [T]he present invention provides a stand-alone unattended ticket vending machine in which . . . representations of the tickets move past a window during dispensing so that the customer can see the tickets moving while they are being dispensed.  This adds interest and excitement, and increases ticket sales.
>
> *    *    *
>
> In the sale of tickets, the movement of the tickets past the window has a special, synergistic effect in that it arouses the interest and purchasing proclivity of the customer, and also gives assurance of the reliable dispensing of lottery tickets.
>
> *    *    *
>
> Moreover, since the string of peanut bags [in the cited prior art reference] is not motor-driven, one gets no fascination from the movement of a stream of items past the window similar to that which one gets when viewing tickets such as lottery tickets moving past a window under the force of an automatic electric-powered driving mechanism.

Mr. Burr submitted a declaration during prosecution in which he told the examiner that the moving tickets were a "major improvement":  "The windows, with the tickets moving past them while being dispensed, proved to be a major improvement" (Ex. D at GTECH 000029).   Mr. Burr also told the examiner that the moving tickets were "the heart of the commercial success" of his invention (*id.* at GTECH 000066):

> [T]he commercial success of the invention, which is far in excess of what might be expected, demonstrates the unobviousness of the invention.  The Groves and Knee references simply do not show or suggest the extraordinary increase of ticket sales produced by driving an array of tickets past a window in the dispensing device.
>
> *    *    *

[T]he movement of the ticket array past the window is at the heart
of the commercial success . . . .

REDACTED

REDACTED

It is clear from reading the '624 patent that the term "plurality" in claim 18 refers to more than one game being depicted on the screen and available for purchase from the machine.  *See* Ex. B, Abstract ("When more than one window is provided in the machine, the buyer can select among a *plurality* of different instant winner lottery games.") (emphasis added).

The phrase "plurality of arrays" should be construed to mean more than one array, where each array is a movable strip of lottery tickets from the same game.

3.      "Lottery Ticket Representations" and "Ticket Images"

The terms "lottery ticket representations" and "ticket images" are used synonymously in claim 18 to refer to graphical representations of actual tickets to be dispensed by the vending machine.

Claim 18 states that the "lottery ticket representations . . . represent[] tickets in said machine available for purchase."  The patent specification makes clear that the term "representation" refers to either an actual ticket or "a video image of a ticket":  "either the ticket itself or a video image of a ticket should be considered to be a 'representation' of the ticket" (Ex. B, col. 11, ll. 31-33).  The specification also states that "ticket images" are "digitized graphic representations of lottery tickets," which "are digitized by conventional graphic digitizing means" (*id.*, col. 10, ll. 45-48).

This construction of the terms "lottery ticket representation" and "ticket image" is consistent with the purpose of the alternative video embodiment disclosed in the '624 patent -- to simulate (on a video display) tickets moving as they are dispensed, in the same way that the actual tickets move in the mechanical embodiment of the claimed invention:   "In another embodiment of the vending machine, graphic representations of the lottery tickets are displayed on a video screen, rather than through windows.  The lottery ticket images are moved in the same manner as tickets are moved past windows" (Ex. B, col. 1, ll. 64-68).

REDACTED

The terms "lottery ticket representations" and "ticket images" should be construed to mean graphical representations of actual lottery tickets.

B.     "Means For Dispensing"

Claim 18 requires a "means for dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer."  The use of the word "means" invokes the presumption that this element should be construed under § 112, ¶ 6.  *See CCS Fitness*, 288 F.3d at 1369.  Because this element appears in connection with a function ("dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer") and there is not sufficient structure recited in the claim for

performing the claimed function, the presumption is not rebutted and this element should be construed under § 112, ¶ 6. *See Sage*, 126 F.3d at 1427-28.

The claimed function is "dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer." The function includes not only dispensing tickets from the machine, but also dispensing a number of tickets corresponding to the amount of money input into the machine by the customer.

The next step is to examine the specification to determine the corresponding structure that is required to accomplish the stated function. *See Gemstar-TV Guide*, 383 F.3d at 1361; *Cardiac Pacemakers,* 296 F.3d at 1119 ("[C]orreponding structure must include all structure that actually performs the recited function.").

The patent specification explains that the number of tickets dispensed is indicated by the customer through the use of a keypad 28, which permits the customer to order a number of tickets corresponding to the amount of money put into the machine (Ex. B, col. 3, ll. 25-29, 50-54; col. 6 ll. 17-19. The machine takes the input from the customer, and directs the feeding and bursting mechanism 112 to cause a number of tickets to be issued corresponding to the number ordered by the customer (*id.*, col. 6, ll. 19-22; Fig. 10). It is the feeding and bursting mechanism 112 that performs the function of dispensing "the proper number of tickets" -- *i.e.*, a number of tickets corresponding to the number ordered -- by separating the proper number of tickets from a strip of tickets and issuing those tickets through the outlet opening. *See id.*, col. 10, ll. 25-30 ("[T]he unit 112 . . . selects the appropriate unit to feed through the burster unit, separates the proper number of tickets, and dispenses them through the outlet opening 220.").

The '624 patent expressly incorporates the structure of the "lottery ticket dispensing mechanism" of the '337 patent (Ex. B, col. 1, ln. 12) -- including "the feeding and

bursting mechanism" -- as the structure that dispenses the tickets (*id.*, col. 4, ll. 48-55; emphasis added):

> The feeding and bursting mechanism **112** is essentially identical to that disclosed in the above-identified copending patent application ['337 patent], except that *it has been rotated through 90° to dispense tickets downwardly*. It will not be described in detail herein; rather, the disclosure of that mechanism, and all other disclosure in the pending application, hereby is incorporated herein by reference.

*See also* Ex. E at 95-98 ("[T]he ['624] patent refers back to the '337 patent as the means [for dispensing].").  Figures 4 and 5 of the '624 patent depict "lottery ticket feed and dispensing mechanisms" as disclosed in the '337 patent, "except that [they have] been rotated through 90° to dispense tickets downwardly" (Ex. B, col. 4, ll. 10-14; col. 4, ll. 50-52).

Notwithstanding this clear description of the means for dispensing tickets, GTECH contends that the structure corresponding to the "means for dispensing" in claim 18 encompasses only a keypad, an opening in the housing through which the tickets exit the housing, outfeed rollers, and a receptacle that receives the tickets that fall through the outlet opening.  That position makes no sense.  Claim 18 requires dispensing tickets from the machine in a number corresponding to the amount of money input into the machine by the customer.  *See Gemstar-TV Guide*, 383 F.3d at 1363 ("[I]t is essential to identify correctly the function recited in a means-plus-function limitation in order to construe such a limitation properly.").  Without the feeding and bursting mechanism separating the proper number of tickets from the strip of tickets, the tickets would not be dispensed through the outlet opening in a number corresponding to the amount of money put into the machine, as required by the functional statement of the claim limitation.  Indeed, without the feeding and bursting mechanism, they would not be dispensed at all.

The keypad, outfeed rollers, and receptacle are not sufficient to perform the dispensing function by themselves.  It is necessary to feed and separate the tickets in order to dispense them "in a number corresponding to the amount of money input into [the] machine by [the] customer."  The keypad may be where the process starts and the receptacle may be where the process ends, but it is also necessary to feed the tickets through the mechanism, and to separate the correct number of tickets.

REDACTED

REDACTED

The "means for dispensing" element of claim 18 should be construed under § 112, ¶ 6. The function is dispensing tickets in a number corresponding to the amount of money input into said machine by the customer. The corresponding structure disclosed in the specification is a keypad 28, the feeding and bursting mechanism 112 (as described in the '337 patent and

incorporated into the '624 patent), outlet openings 220, 222 in the housing through which the tickets exit the housing, outfeed rollers 158, 166, and a receptacle 140 that receives the tickets that fall through the outlet opening.

<u>CONCLUSION</u>

For the foregoing reasons, Scientific Games respectfully requests that the Court construe the terms of the patents in suit as set forth above.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Rodger D. Smith II*

_____
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rsmith@mnat.com
  Attorneys for Defendants

Original Filing Date:  October 14, 2005

Redacted Filing Date (Corrected Version):  November 1, 2005

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on November 1, 2005, I caused to be electronically filed Scientific Games' Opening Claim Construction Brief (Corrected) (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Josy W. Ingersoll
> Young, Conaway, Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE  19899

and that I caused copies to be served upon the following in the manner indicated:

> BY HAND
>
> Josy W. Ingersoll
> Young, Conaway, Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE  19899
>
> BY FEDERAL EXPRESS
>
> Thomas J. Meloro, Esquire
> Kenyon & Kenyon
> One Broadway
> New York, NY  10004

> _/s/ Rodger D. Smith II_
> Rodger D. Smith II (#3778)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com