IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GTECH CORPORATION,

        Plaintiff,

      v.

SCIENTIFIC GAMES INTERNATIONAL,
INC., SCIENTIFIC GAMES HOLDINGS
CORPORATION, SCIENTIFIC GAMES
FINANCE CORPORATION, and
SCIENTIFIC GAMES CORPORATION,

        Defendants.

C.A. No. 04-138-JJF

**REDACTED VERSION**

## SCIENTIFIC GAMES' ANSWERING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
 Attorneys for Defendants

Original Filing Date:  October 28, 2005

Redacted Filing Date:  November 1, 2005

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS                                                              ii

INTRODUCTION                                                                    1

STATEMENT OF FACTS                                                             2

    A.    The '337 Patent                                2

    B.    The '624 Patent                                5

ARGUMENT                                                                       8

    I.    CLAIM 20 OF THE '337 PATENT                    8

    A.    Means-Plus-Function Elements Are Limited To The Single Embodiment Described In The Specification.                8

    B.    "Means For Separating"                          10

    C.    "Housing Means"                                 14

    II.    CLAIM 18 OF THE '624 PATENT                   18

    A.    Claim Terms Must Be Construed In The Context Of The Entire Patent, Including The Patent Specification.                18

    B.    "Plurality Of Arrays"                          21

    C.    "Lottery Ticket Representations" and "Ticket Images"                28

    D.    "Video Display Means"                          31

    E.    "Means For Dispensing"                         33

CONCLUSION                                                                     36

ii.

## TABLE OF CITATIONS

Page(s)

Cases

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002)      32

*Alloc, Inc. v. Int'l Trade Comm'n*,
    342 F.3d 1361 (Fed. Cir. 2003)      19, 22, 24, 30

*Asyst Tech., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001)      11

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004)      20, 22

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    296 F.3d 1106 (Fed. Cir. 2002)      11, 13, 34

*Cephalon, Inc. v. Barr Labs., Inc.*,
    __ F. Supp. 2d __, 2005 WL 2466454 (D. Del. 2005)      19, 22, 24, 30

*Cross Med. Prods. Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005)      10

*Faroudja Labs., Inc. v. Dwin Elec., Inc.*,
    76 F. Supp. 2d 999 (N.D. Cal. 1999)      9

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
    383 F.3d 1352 (Fed. Cir. 2004)      32, 34

*GNB Battery Tech., Inc. v. Exide Corp.*,
    876 F. Supp. 582 (D. Del. 1995), *aff'd*, 78 F.3d 605
    (Fed. Cir. 1996)      15

*IMS Tech., Inc. v. Haas Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000)      34

*Kraft Foods, Inc. v. Int'l Trading Co.*,
    203 F.3d 1362 (Fed. Cir. 2000)      27

*Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533 (Fed. Cir. 1991)      15, 32, 35

*Liposome Co. v. Vestar, Inc.*,
    1994 WL 738952 (D. Del. 1994)      15

## TABLE OF CITATIONS (cont'd)

*Lizardtech, Inc. v. Earth Resource Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005)      20

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)      18

*Medtronic Minimed Inc. v. Smiths Medical MD Inc.*,
    2005 WL 1308050 (D. Del. 2005)      15

*Netword, LLC v. Centraal Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001)      19, 20

*Nomos Corp. v. BrainLAB, Inc.*,
    195 F. Supp. 2d 606 (D. Del. 2002), *aff'd*,
    357 F.3d 1364 (Fed. Cir. 2004)      8, 10, 13, 27

*Northrop Grumman Corp. v. Intel Corp.*,
    325 F.3d 1346 (Fed. Cir. 2003)      32

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)      18, 21, 22

*Sage Prods., Inc. v. Devon Indus., Inc.*,
    126 F.3d 1420 (Fed. Cir. 1997)      14, 31

*Signtech USA, Ltd. v. Vutek, Inc.*,
    174 F.3d 1352 (Fed. Cir. 1999)      8, 14

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
    222 F.3d 958 (Fed. Cir. 2000)      29

*Unidynamics Corp. v. Automatic Products Int'l, Ltd.*,
    157 F.3d 1311 (Fed. Cir. 1998)      15, 16

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)      19

Statutes

35 U.S.C. § 112, ¶ 6      *passim*

<u>INTRODUCTION</u>

GTECH's proposed claim constructions are divorced from the reality of what is described in the specifications of the '337 and '624 patents, and seek impermissibly to broaden what the inventors actually invented.  In the "General Background" section of its brief (GTECH Op. Br. at 2-6), GTECH does three things in an effort to achieve that:

First, GTECH argues that the invention of the '337 patent was "the idea" of "separat[ing] tickets through pressure 'bursting,'" *i.e.*, that the invention solved the problem encountered by prior art "by bursting the tickets apart rather than cutting them with a sharp blade" (GTECH Op. Br. at 5-6).  In fact, "bursting" was in the prior art, and the invention of the '337 patent was a very specific means for separating tickets -- a dull-edged burster wheel driven across the perforation between the tickets, which are held in place by two sets of rollers.  That is the only means for separating tickets that is described or claimed in the '337 patent.[1]

Second, GTECH argues that the invention of the '624 patent was to "show the customer representations of the tickets for sale in a machine in a manner that would allow a customer to associate the visible representations with the tickets actually in the machine" (GTECH Op. Br. at 3-4).  In fact, the use of representations permitting customers to associate the representation with the actual ticket in the machine was also in the prior art.  The invention of the '624 patent -- as described over and over in the specification -- is the representation of these

---

[1]    GTECH cites col. 9, ln. 62 - col. 10, ln. 8 of the '337 patent in support of its argument (GTECH Op. Br. at 6).  That portion of the specification does not say that the invention of the '337 patent is "bursting."  It says that "[t]he present invention provides a novel separation mechanism which bursts the tickets . . . ."  That "novel separation mechanism," not bursting, is the invention of the '337 patent.

tickets in "a movable array," *i.e.*, showing the customer a movable strip of tickets of the sort in the machine.

Third, GTECH reverses the chronological order of the patents, arguing that the '624 patent solved one problem, and that the '337 patent solved "another problem." GTECH does that to suggest that the patents are wholly unrelated, ignoring entirely that the '624 patent was an improvement on the '337 patent. The '624 patent begins by referring to the '337 patent, stating that "it is an object of the present invention to improve upon" the '337 patent (D.I. 111, Ex. B, col. 1, ll. 9-17, 23-25). Specifically, the '624 patent says that its "feeding and bursting mechanism . . . is essentially identical to that disclosed" in the '337 patent, that the disclosure of that patent "is incorporated herein by reference" (*id.*, col. 4, ll. 48-55), and that "the bursting and feeding mechanism" is "disclosed more fully" in the '337 patent (*id.*, col. 5, ll. 14-16).

<u>STATEMENT OF FACTS</u>

A.    <u>The '337 Patent</u>

GTECH states that early lottery ticket vending machines "typically separated individual tickets from the strips by cutting, slicing, or chopping" (GTECH Op. Br. at 4). By contrast, according to GTECH, "bursting separates the tickets along a perforation or line of weakness between the tickets through application of pressure which causes the tickets to burst at their weakest spot -- ties along the perforated line of weakness . . ." (*id.* at 5).

REDACTED

Scientific Games' PATs used a separating mechanism manufactured by Rowe

3.

International, Inc., which is described in U.S. Patent No. 4,157,670 to Herring.  *See* Ex. S;

REDACTED          The Rowe dispenser moved a strip of tickets until the perforation to be

separated was in the proper location.  *See* Ex. S, col. 2, ll. 33-40 ("[M]y invention contemplates

. . . a drive means [that] advances a string of tickets . . . toward a sensing means responsive to the

leading edge of the string to interrupt the drive means with the line of weakness . . . located

slightly beyond the breaking edge of a breaker blade . . . .").

           The Rowe dispenser then used a bar to bend the tickets at the perforation to be

separated, held the tickets, and moved a bursting blade into contact with the perforation to be

separated.  *See* Ex. S, col. 6, ll. 10-13, 19-26 ("[B]lade **192** moves upwardly along a path parallel

to the path of movement of the string of tickets toward the line of weakness **44** along which the

leading ticket has been folded by the folder bar **142**.").

REDACTED

REDACTED

The Rowe dispenser was not the only prior art mechanism that burst lottery tickets. The mechanism described in U.S. Patent No. 3,894,669 to Wescoat used a "blunt breaker bar" (Ex. X, col. 1, ll. 67-68) to separate lottery tickets. *See id.*, Abstract ("The breaker bar impacts near a perforated line, with a karate type blow, to separate each successive ticket."); col. 1, ll. 56-59 ("[T]he bar can strike with a sharp karate type blow exactly on the line, or even slightly away therefrom, and still cause the ticket to separate exactly on the line . . . ."); col. 3, ln. 18 ("[T]he breaker bar delivers its blunt karate type blow.").

It was also well-known in the prior art to apply pressure to perforations to separate other types of materials, such as business forms. For example, U.S. Patent No. 4,623,081 to Hain described the use of a "movable burster rod" that separated the perforation. *See* Ex. Y, Abstract ("During this movement, the rod (**82**) progressively bursts the form (**22**) along the aligned weakened line from one edge of the form to the other, thereby effecting a reliable bursting of the form . . . ."); col. 6, ll. 57-62 ("In the course of the bursting movement of the burster rod **82**, the rod **82** first contacts the right hand end . . . of the leading weakened line **26** and then progressively bursts the form **22** along this line **26** from the right hand edge of the form **22** to its left hand edge."). *See also* Ex. Z, col. 1, ll. 23-26 ("The placement of the bursting bar would be set to cause the preweakened zone of the continuous forms to arrive at a point directly beneath the bursting area of the bursting bar . . . .").

Not surprisingly, nowhere does the '337 patent even suggest that the invention was "bursting" perforated tickets. The '337 patent describes its invention very clearly. The "separation means" of the '337 patent is "a dull edge bursting blade moveably mounted . . . , holding means for holding the stream of tickets . . . , and bursting blade drive means for bringing

the bursting blade into bursting contact with the stream of tickets . . ." (D.I. 111, Ex. A, col. 3, ll. 54-63). That structure is the only bursting structure disclosed in the '337 patent, and it is described over and over again as the invention. The '337 patent also includes as "a further aspect of the present invention, apparatus for dispensing lottery tickets compris[ing] a box-like module having opposed front and back surfaces" with the control panel on the front surface and a dispensing outlet on the back surface, as shown in Figures 3 and 4 (*id.*, col. 3, ll. 29-42).

B.    The '624 Patent

GTECH describes the invention of the '624 patent as lottery ticket vending machines that show the customer what is available for purchase from the machine. *See* GTECH Op. Br. at 3 ("Mr. Burr recognized that a ticket vending machine . . . must show the customer representations of the tickets for sale in the machine . . . .").

Mr. Burr's invention was not lottery ticket vending machines that show the customer what is available for purchase from the machine.

REDACTED

The lottery ticket vending machine described in the '624 patent was not the first instant ticket vending machine with a video screen. There were a number of prior art vending machines with video screens already on the market when Mr. Burr filed the application for the '624 patent, including the Scientific Games' PAT.

REDACTED

REDACTED


Another company, Syntech, also offered an instant ticket vending machine with a video touch screen in the mid-1980's.  *See* Ex. AA at SGI105568 ("Syntech was . . . the first with a touch-screen terminal, and the first to sell rub-off instant tickets through that terminal.").


REDACTED


During prosecution, Mr. Burr distinguished his invention from the prior art by arguing that it showed lottery tickets that move as they are dispensed (D.I. 111, Ex. C at GTECH 000176-77, 000179):

> [T]he present invention provides a stand-alone unattended ticket vending machine in which . . . representations of the tickets move past a window during dispensing so that the customer can see the tickets moving while they are being dispensed.  This adds interest and excitement, and increases ticket sales.
>
> *    *    *
>
> In the sale of tickets, the movement of the tickets past the window has a special, synergistic effect in that it arouses the interest and purchasing proclivity of the customer, and also gives assurance of the reliable dispensing of lottery tickets.
>
> *    *    *

> Moreover, since the string of peanut bags [in a cited prior art reference] is not motor-driven, one gets no fascination from the movement of a stream of items past the window similar to that which one gets when viewing tickets such as lottery tickets moving past a window under the force of an automatic electric-powered driving mechanism.

Mr. Burr also submitted a declaration in which he stated that the "major improvement" of his invention was the movement of tickets past windows: "The windows, with the tickets moving past them while being dispensed, proved to be a major improvement" (D.I. 111, Ex. D at GTECH 000029). Mr. Burr told the patent examiner that the movement of the tickets was "at the heart of the commercial success" of his invention (*id.* at GTECH 000066).

The importance of the movement of the tickets is described repeatedly in the '624 patent. The Abstract of the '624 patent introduces the invention by stating that "[l]ottery tickets are displayed in the window and move past the window as they are being dispensed" (D.I. 111, Ex. B, Abstract). It finishes by stating that "[i]n another embodiment, representations of the tickets are displayed in a movable array on a video screen" (*id.*).

The only embodiments in the '624 patent involve movement. The patent makes clear that the movement of the tickets is the key to the "windows" embodiment: "The machine preferably has one or a plurality of windows with mechanism for moving an array of lottery tickets past each of the windows so that different types of lottery tickets can be seen, but not touched, by the customers" (*id.*, col. 1, ll. 45-49). The movement of the tickets is also critically important to the alternative video embodiment: "In another embodiment of the vending machine, graphic representations of the lottery tickets are displayed on a video screen, rather than through windows. The lottery ticket images are moved in the same manner as tickets are moved past windows" (*id.*, col. 1, ll. 64-68). *See also id.*, col. 10, ll. 67-68 ("The array moves in the same manner as the tickets move past the windows in FIGS. 1 and 2."); REDACTED

REDACTED

The patent describes how "[t]he motion of the tickets"

bolsters customer confidence and interest (D.I. 111, Ex. B, col. 2, ll. 5-7).

ARGUMENT

I.     CLAIM 20 OF THE '337 PATENT

    A.     Means-Plus-Function Elements Are Limited To The Single
           Embodiment Described In The Specification.

GTECH argues repeatedly that claims "are not limited to the *example* preferred

embodiments described in the specification of the patents" (GTECH Op. Br. at 2; emphasis in

original).  In fact, means-plus-function elements are so limited.  *See Signtech USA, Ltd. v. Vutek,*

*Inc.*, 174 F.3d 1352, 1356 (Fed. Cir. 1999) ("Although patentees are not necessarily limited to

their preferred embodiment, . . . interpretation of a means-plus-function element requires this

court to consult the structure disclosed in the specification, which often, as in this case, describes

little more than the preferred embodiment.").

As this Court has noted, "means-plus-function elements present a slightly

different twist on claim construction. . . .  'By choosing means-plus-function language to recite

the . . . claim element, the patentee necessarily restricted the scope of this element to the

structure disclosed in the specification and its equivalents.'"  *Nomos Corp. v. BrainLAB, Inc.*,

195 F. Supp. 2d 606, 612 (D. Del. 2002) (quoting *Signtech USA*, 174 F.3d at 1357), *aff'd*, 357

F.3d 1364 (Fed. Cir. 2004).

In *BrainLAB*, this Court construed the means-plus-function elements of the patent

to be limited to the structure corresponding to the single embodiment disclosed in the

specification.  195 F. Supp. 2d at 611-12.  The patent in that case described an apparatus for

verifying the position of a cancerous lesion on a patient's body.  *Id.* at 608-09.  One of the claim

elements was "a means for generating at least one ultrasound image . . . ." *Id.* at 611.  Plaintiff argued that the corresponding structure was "any ultrasound probe."  *Id.*  Defendant argued that the patent disclosed a fixed ultrasound probe in a particular position (*id.*):

> According to [defendant], the specification of the '026 Patent does not disclose, for example, the use of a handheld ultrasound device or how such a device would work in the patented system. Accordingly, [defendant] maintains that the corresponding structure is not any ultrasound probe as [plaintiff] contends, but a fixed ultrasound probe and a bracket that maintains the ultrasound probe in a particular position over the treatment table.

The Court agreed with defendant, holding that the corresponding structure was not any ultrasound probe, but a fixed ultrasound probe in a particular position:  "Each time the ultrasound probe is mentioned in the specification, it is mentioned in connection with the bracket or fixation device and in a position which is perpendicular to the treatment table. . . . [T]he specification does not reveal any other embodiments for the ultrasound probe."  *Id.* at 611-12. The Court stated that where there is only one embodiment disclosed in a patent, the structure corresponding to a means-plus-function claim element is limited to the structure of that embodiment (*id.* at 615):

> "[T]he Federal Circuit has emphatically stated that where a 'preferred embodiment' or 'alternative embodiment' is in fact the only embodiment disclosed, the claim is limited to that embodiment."  [*Faroudja Labs., Inc. v. Dwin Elec., Inc.*, 76 F. Supp. 2d 999, 1013 (N.D. Cal. 1999).]
>
> . . . As in *Faroudja*, in this case, the preferred embodiment is the only embodiment disclosed in the patent.  Although the specification suggests that other possibilities may exist for the position sensing system, these possibilities are not identified or described in any detail.  Accordingly, in these circumstances, the Court concludes that it is inappropriate to construe the claim language beyond the contours of that which is described in the specification.

The Federal Circuit affirmed, stating: "This is the only embodiment of the invention described in the '026 patent. As a result, the corresponding structure is limited to that embodiment, which includes a fixation device, and its equivalents." *Nomos Corp. v. BrainLAB USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004); *see also Cross Med. Prods. Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 2005 WL 2403777, at *7 (Fed. Cir. 2005) ("[B]ecause there is only one embodiment described in the specification . . . there is no basis on which to extend the limitation to cover alternative, non-disclosed structure not shown to be structurally equivalent.").

It is undisputed that there is only one embodiment of a lottery ticket vending machine disclosed in the '337 patent. Accordingly, the structure corresponding to the means-plus-function elements of claim 20 is limited to the structure of that single embodiment.

B.     "Means For Separating"

The parties agree that the "means for separating" of claim 20 is a means-plus-function element, and that the corresponding structure includes three elements -- "a separator member, which functions in combination with a 'holding means' and a 'drive means'" (GTECH Op. Br. at 32).[2] The parties also agree that the structure for the "separator member" is "the dull

---

[2]     GTECH implies that the Ohio court in the Pollard litigation adopted its proposed claim construction for the "means for separating" (GTECH Op. Br. at 32, n.12). That is incorrect. Interlott argued that the structure for the "means for separating" was only the burster wheel (D.I. 111, Ex. G at 32). The Court rejected that argument, concluding that the structure was the burster wheel, the holding means and the drive means (*id.* at 34). The Ohio court, however, did not identify the structure corresponding to the holding means and the drive means: "As this Court's expertise does not extend to engineering matters, the Court refuses to determine whether the rollers, bursting block and other elements . . . should be included as part of the 'holding means' and 'drive means'" (*id.* at 34-35).

edged burster wheel [68]" (*id.*), and that the structure corresponding to the "holding means" is the "rollers [60, 62, 64, 66] disclosed in the preferred embodiment" (*id.* at 33).

The parties' disagreement is with respect to the "bursting blade drive means." GTECH seeks to expand the scope of the claimed invention beyond the single embodiment described in the specification by arguing that the "drive means" is a motor. *See* GTECH Op. Br. at 34 ("[T]he only structure necessary for performance of this function is the motor because it is the motor that drives."). GTECH argues that any additional structure is necessary only to provide direction for the motion of the burster wheel: "The additional structure of the burster block, cable spool arrangement, tensioning spring, etc., are structure which works in conjunction with the driving to provide direction to the motion of the separator member of the preferred embodiment, but direction is not a requirement of the function of this claim element" (*id.*).

The motor is not sufficient, however, for performing the required function. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002) ("[C]orresponding structure must include all structure that actually performs the recited function."); *Asyst Tech., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1372 (Fed. Cir. 2001) ("Because the 'fourth means' encompasses both the local process controller 20 and the communication means 50, it also necessarily encompasses structure that connects the two, i.e., communication line 51.").

The function of the "bursting blade drive means" is "bringing the bursting blade into bursting contact with the stream of tickets at the bursting position to burst the leading ticket from the next following ticket" (D.I. 111, Ex. A, col. 3, ll. 60-63). The patent states that the burster motor works in combination with the burster block, cable spool arrangement, and tensioning spring to achieve that function (*id.*, col. 13, ll. 23-31):

Burster wheel **68** is shown mounted on a burster block **98** driven by a burster motor **100** through a cable spool arrangement **102** including tensioning spring **104**. When burster block **98** is moved from the . . . rest position towards interception with dispensing path **57** through the action of cable spool device **102**, burster wheel **68** will come into contact with stream of tickets **50** at the side thereof initially and then across stream of tickets **50** to burst the same apart.

The motor alone cannot achieve the function of the "bursting blade drive means."

Five GTECH witnesses testified to that fact.

REDACTED

REDACTED

The "means for separating" of claim 20 should be construed to include all the structure necessary to achieve the function of separating each ticket from a strip of tickets. *See Cardiac Pacemakers*, 296 F.3d at 1119 ("[C]orresponding structure must include all structure that actually performs the recited function."). The Court should reject GTECH's attempt to expand the scope of its invention beyond the single embodiment disclosed in the patent specification by including any "drive means" that has a motor. *See Nomos Corp.*, 357 F.3d at 1368 ("This is the only embodiment in the invention described in the '026 patent. As a result, the corresponding structure is limited to that embodiment . . . .").

The corresponding structure disclosed in the specification for the "means for separating" is the combination of: (a) a burster wheel 68 with a dull, rounded edge that is moveably mounted; (b) two sets of rollers 60, 62, 64, 66 -- one set on each side of the perforation

to be separated -- which hold the strip of tickets in tension as the burster wheel is brought into contact with the tickets; and (c) a bursting blade drive means that includes a burster motor 100, a burster block 98, cable spool arrangement 102, and tensioning spring 104.

      C.     "Housing Means"

The parties' dispute with respect to the "housing means" of claim 20 is whether it is a means-plus-function element. Once again, GTECH seeks to expand the scope of its claimed invention beyond the single embodiment described in the patent specification by arguing that the "housing means" is not a means-plus-function element, and that it should cover both clerk-activated terminals (as described in the patent specification) and customer-activated terminals (which are not described in the patent specification).[3]

The use of the phrase "means for" in association with the "housing means" of claim 20 creates a presumption that the "housing means" should be construed under 35 U.S.C. § 112, ¶ 6. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997) ("The use of the word 'means,' which is part of the classic template for functional claim elements, gives rise to 'a presumption that the inventor used the term advisedly to invoke the statutory mandates for means-plus-function clauses.'"); *Signtech USA*, 174 F.3d at 1358 ("To avoid having its claims limited . . . , the claim drafter for this patent might have chosen language to avoid application of 35 U.S.C. § 112, ¶ 6.").

---

[3]     GTECH argues that the "housing means" is not a means-plus-function element, but has not come forward with an alternative construction for the "housing means" under 35 U.S.C. § 112, ¶ 6. Accordingly, if the Court determines that the "housing means" is a means-plus-function element, the Court should adopt Scientific Games' proposed construction (*see* SciGames Op. Br. at 22-25).

GTECH dismisses the use of "means for" by calling it "perfunctory" (GTECH Op. Br. at 28). It was not perfunctory, however, in the earlier *Pollard* litigation, where Interlott (GTECH's predecessor) acknowledged that the "housing means" of claim 20 is a means-plus-function element (D.I. 111, Ex. O at GTECH 033461). *See GNB Battery Tech., Inc. v. Exide Corp.*, 876 F. Supp. 582, 599 (D. Del. 1995), *aff'd*, 78 F.3d 605 (Fed. Cir. 1996) ("[T]he significance of the prior statements is that they are relevant to show how [the patentee] read the claims of the McGuire patent . . . when it was not advocating the validity of claims in its own patent . . . ."), *aff'd*, 78 F.3d 605 (Fed. Cir. 1996); *Liposome Co. v. Vestar, Inc.*, 1994 WL 738952, at *14 (D. Del. 1994) ("[T]he statements . . . are relevant as evidence of how [the patentee] had in fact read the words of the claim at a time when it was not looking at them as a necessary step in building a claim for relief . . . .").

Interlott had good reason to acknowledge in the previous litigation that the "housing means" is a means-plus-function element. The term "housing" is not sufficient structure for performing the claimed function. The Federal Circuit has made clear that "[t]he recitation of some structure in a means plus function element does not preclude the applicability of § 112, ¶ 6." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991). In *Unidynamics Corp. v. Automatic Products Int'l, Ltd.*, 157 F.3d 1311, 1319 (Fed. Cir. 1998), the court held that the word "spring" in the phrase "spring means tending to keep the door closed" was not sufficient structure, and interpreted that claim element under § 112, ¶ 6: "The recitation of 'spring,' which is structural language, [does not take] the limitation out of the ambit of the construction dictate of § 112, ¶ 6. . . ." *See also Medtronic Minimed Inc. v. Smiths Medical MD Inc.*, 2005 WL 1308050, at *6-8 (D. Del. 2005) (construing "processor means" and "port means" limitations under § 112, ¶ 6, even though the words "processor" and "port" are structural).

Like the word "spring" in *Unidynamics*, the word "housing" in claim 20 of the '337 patent is not sufficient to rebut the presumption that "housing means" is a means-plus-function element. The claimed function for the "housing means" is "storing a strip of tickets *to be dispensed*."

REDACTED

The only structure disclosed in the '337 patent for "storing a strip of tickets to be dispensed" is "a box-like module having opposed front and back surfaces, . . . control panel means mounted at the front surface of the module . . . [and] a dispensing outlet manually accessible at the back surface for receiving a dispensed lottery ticket . . ." (D.I. 111, Ex. A, col. 3, ll. 29-37). *See also id.*, Abstract ("The tickets are dispensed at one end of the unit which faces the customer. A control panel for the vendor is located at the opposite end"); col. 7, ll. 5-

---

[4]   GTECH argues that Scientific Games seeks improperly to include "dispensing" as part of the function of the "housing means" (GTECH Op. Br. at 30). GTECH misunderstands Scientific Games' position. Scientific Games does not argue that the claimed function of the "housing means" is "dispensing," but rather that the structure necessary to achieve the claimed function -- "storing a strip of tickets to be dispensed" -- requires corresponding structure that will store tickets so they can be dispensed, and that the term "housing" alone is not sufficient structure for achieving that function.

16 ("Unit **14** includes a housing with a front surface **28** which . . . is intended to face the sales agent or vendor standing behind a counter **26**. An opposed back surface **30** of unit **14** is intended to face the customers . . . ."). Indeed, Figures 3 and 4 of the patent depict a housing that has a front surface with a control panel, and a back surface with a dispensing outlet.

If the "housing means" of claim 20 is not construed under § 112, ¶ 6, GTECH will have succeeded in expanding the scope of its claimed invention beyond the single embodiment disclosed in the patent specification -- to cover clerk-activated terminals (as disclosed in the patent), as well as customer-activated terminals (not disclosed in the patent). In prosecuting the application for the '624 patent, the inventor, Mr. Burr, said that his '337 patent disclosed only a clerk-activated terminal with an outlet opening on the back surface of the housing: "[The '337 patent] shows a[n] instant winner lottery ticket dispenser which is intended to be attended by an agent. [The dispenser] is designed to dispense tickets from the rear of the unit . . . [and is] not suitable for use as [an] unattended ticket vending device[]" (D.I. 111, Ex. C at GTECH 000175-76).

In procuring his own patents, Mr. Perin, GTECH's expert, also told the Patent Office that the '337 patent does not disclose a customer-activated terminal (D.I. 111, Ex. P at SGI107159-60): "Burr et al. does not disclose a customer unit having an input device that permits a customer to select a ticket . . . . [T]here is no disclosure or suggestion in Burr et al. to provide a customer unit having an input device . . . ."

REDACTED

The Court should construe the "housing means" element under § 112, ¶ 6, and find that the corresponding structure disclosed in the patent specification for the "housing means" is a box-like unit 14 with a control panel 32 mounted on the front surface 28 for use by

the vendor for initiating the dispensing of a lottery ticket and a back surface 30 that faces the customer with a dispensing outlet 34 from which the customer receives the dispensed ticket.[5]

II.    CLAIM 18 OF THE '624 PATENT

A.    Claim Terms Must Be Construed In The Context Of The Entire Patent, Including The Patent Specification.

GTECH seeks to expand the scope of claim 18 beyond what the inventor invented and described in his patent, by relying on abstract dictionary definitions, arguing that "[t]he lottery ticket vending machine of claim 18 is defined . . . using well-known terms in the relevant art and everyday English" (GTECH Op. Br. at 11). GTECH's approach to claim construction is flatly inconsistent with the basic claim construction principles set forth by the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).

In *Phillips*, 415 F.3d at 1313, the Federal Circuit reaffirmed that courts must construe patent claims by focusing on how a person of ordinary skill in the art would understand a claim term to have been used throughout the patent:

> [T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

The Federal Circuit reaffirmed that the patent specification is critical to understanding how the patentee used the claim terms:

> The claims, of course, do not stand alone. Rather, they are part of "a fully integrated written instrument," [*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (*en*

---

[5]    GTECH states that "[d]efendants have not provided any positions with regard to claims 22 and 24 in its interrogatory responses or expert reports" (GTECH Op. Br. at 35, n.13). There was no reason to do so. The Court has precluded GTECH from asserting claims 22 and 24 (D.I. 87, ¶ 1; D.I. 89 at 3).

banc), *aff'd*, 517 U.S. 370 (1996)], consisting principally of a
specification that concludes with the claims.   For that reason,
claims "must be read in view of the specification, of which they
are a part."  *Id.* at 979.  As we stated in *Vitronics*, the specification
"is always highly relevant to the claim construction analysis.
Usually, it is dispositive; it is the single best guide to the meaning
of a disputed term."  [*Vitronics Corp. v. Conceptronic, Inc.*, 90
F.3d 1576, 1582 (Fed. Cir. 1996).]

*Id.* at 1316.  "It is . . . entirely appropriate for a court, when conducting claim construction, to

rely heavily on the written description for guidance as to the meaning of the claims."  *Id.* at 1317;

*see also Neterord, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("The claims are

directed to the invention that is described in the specification; they do not have meaning removed

from the context from which they arose.").

Indeed, as this Court recently held, "the consistent use of a claim term by the

inventor in the specification may serve to limit the scope of a claim."  *Cephalon, Inc. v. Barr

Labs., Inc.*, ___ F. Supp. 2d ___, 2005 WL 2466454, at *4 (D. Del. 2005).  In *Cephalon*, the

patentee argued that the claim terms should not be limited by requiring the absence of "free

liquid."  *Id.* at *3.  Defendant argued that the claim terms should be construed to require the

absence of "free liquid."  *Id.*  The Court agreed with the defendant, construing the claim terms to

require the absence of free liquid -- because that was how the patentee had consistently described

the invention throughout the patent specification and prosecution history (*id.* at *4):

[T]he inventors consistently referred to the "present invention" as
teaching the formation of drug-containing lollipops through the
compression of "dry" or "solid" powders.  There is nothing in the
written description or the prosecution history to suggest that they
intended the disputed phrases to cover methods or articles using
free liquid.

The Federal Circuit also has held that the consistent use of a claim term

throughout the patent may limit the scope of a disputed claim term.  In *Alloc, Inc. v. Int'l Trade

Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003), the court noted that "[a] patent applicant may

consistently and clearly use a term in a manner either more or less expansive than its general

usage in the relevant art, thereby expanding or limiting the scope of the term in the context of the

patent claims."  The technology in that case was flooring panels, and the question was whether

the claim terms required "play" in the position of the flooring panels.  *Id.*  The Federal Circuit

construed the claim terms to require "play" -- because that was how the inventors had

consistently described the invention throughout the patent specification:

> [T]he specification teaches that the invention as a whole, not
> merely a preferred embodiment, provides for play in the
> positioning of floor panels. . . .  Moreover, all the figures and
> embodiments disclosed in the asserted patents imply play, or . . .
> expressly disclose play.  Indeed, the patents do not show or suggest
> any systems without play.  Thus, the '907 family of patents
> describe only flooring systems with play between the locking
> groove and the locking element.

*Id.* at 1369-70; *see also Netword*, 242 F.3d at 1352 ("Although the specification need not present

every embodiment or permutation of the invention and the claims are not limited to the preferred

embodiment of the invention, . . . neither do the claims enlarge what is patented beyond what the

inventor has described as the invention.").

In *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004), the

court required the claimed hernia plugs to be "pleated," because the claimed invention was

"defined globally as requiring a pleated surface."  The court noted that "[s]tatements that

describe the invention as a whole, rather than statements that describe only preferred

embodiments, are more likely to support a limiting definition of a claim term."  *Id.*; *see also*

*Lizardtech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 2005 WL 2429824 (Fed. Cir.

2005) (construing claim to require "seamless" discrete wavelet transform (DWT) because

"[t]hroughout the patent, the wavelet-based compression process is referred to as seamless," and

"[t]he prosecution history also makes clear that the DWT-based compression process . . . creates a seamless DWT").

B.    "Plurality Of Arrays"

GTECH argues that the term "arrays" in claim 18 should be construed to mean "a grouping, arrangement, or ordering of two or more things, which would include rows or columns" (GTECH Op. Br. at 19). Nowhere does the patent talk about "a grouping, arrangement or ordering" or about "rows or columns." That is not how the term "arrays" is used in the patent specification. The term "arrays" is used throughout the patent to refer to movable strips of lottery tickets.

GTECH's proposed definition is based on an abstract dictionary definition of the term "arrays" -- taken from Webster's Ninth New Collegiate Dictionary (GTECH Op. Br. at 19 & Ex. K). The Federal Circuit in *Phillips*, however, rejected the use of abstract dictionary definitions in claim construction -- because they do not necessarily bear any relationship to the way the term was used in the patent specification:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. . . . [H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

415 F.3d at 1321. The Federal Circuit noted that starting with a dictionary definition runs the risk of broadly defining a claim term and extending the scope of a patent claim beyond what was intended or deserved:

> The patent system is based on the proposition that claims cover only the invented subject matter. . . . The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly

> limits that definition, the error will systematically cause the
> construction of the claim to be unduly expansive. . . .  Thus, the
> use of the dictionary may extend patent protection beyond what
> should properly be afforded by the inventor's patent.

*Id.* at 1321-22; *see also Cephalon*, 2005 WL 2466454, at *3 ("Rather than beginning with a broad, dictionary definition and then limiting it in accordance with the specification and prosecution history, the preferred approach is to focus 'at the outset on how the patentee used the claim term in the claims, specification, and prosecution history . . . .'") (quoting *Phillips*, 415 F.3d at 1321).

The '624 patent specification consistently uses the term "arrays" to refer to one (and only one) thing:  movable strips of lottery tickets.  *See Alloc*, 342 F.3d at 1370 ("[W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims."); *Cephalon*, 2005 WL 2466454, at *4 ("[T]he consistent use of a claim term by the inventor in the specification may serve to limit the scope of a claim.").

The Abstract of the '624 patent introduces the claimed invention by stating that "[l]ottery tickets are displayed in the window and move past the window as they are being dispensed" (D.I. 111, Ex. B, Abstract).  The Abstract further states that, in the claimed video embodiment, "representations of the tickets are displayed in a *movable array* on a video screen" (*id.*; emphasis added).  *See C.R. Bard*, 388 F.3d at 864 ("Statements that describe the invention as a whole . . . are more likely to support a limiting definition of a claim term.").[6]

---

[6]    GTECH argues that the term "arrays" should not be construed to refer to movable arrays, because otherwise the reference to "movable arrays" in the patent would be redundant (GTECH Op. Br. at 20).  GTECH seeks to do exactly what *Phillips* said should not be done -- to expand the term beyond what the specification says by relying on a broad dictionary definition.  The abstract dictionary definition of the term "arrays" is not

(continued . . .)

The patent explains that the "windows" embodiment includes windows for displaying strips of lottery tickets -- which it calls "arrays of lottery tickets" (D.I. 111, Ex. B, col. 1, ll. 45-49; emphasis added):

> The machine preferably has one or a plurality of windows with mechanism for moving *an array of lottery tickets* past each of the windows so that different types of lottery tickets can be seen, but not touched, by the customers. . . .

The patent further explains that the "arrays of lottery tickets" are visible through the windows at all times (*id.*, col. 3, ll. 1-5; emphasis added):

> Clearly visible through each of the four windows is an *array . . . of lottery tickets*. The tickets are visible at all times, both when they are stationary, and when they are moving during the ticket dispensing operation of the machine.

Those "arrays" unquestionably are strips of tickets.

The patent also explains that the "video" embodiment includes lottery ticket images that move (D.I. 111, Ex. B, col. 1, 64-68; emphasis added):

> In another embodiment of the vending machine, graphic representations of the lottery tickets are displayed on a video screen, rather than through windows. *The lottery ticket images are moved in the same manner as tickets are moved past windows.*

The arrays of lottery ticket images in the "video" embodiment are intended to simulate the strips of lottery tickets in the "windows" embodiment (*id.*, col. 9, ln. 67 - col. 10, ln. 2, col. 10, ll. 12-15; emphasis added):

> FIGS. 8 through 10 show an alternative embodiment of the invention in which a video display is used, instead of separate windows, to display *arrays of the different tickets*. . . . Instead of the four windows in the unit **10**, a video display **218** is provided for

---

(. . . continued)
> limited to movable arrays (as GTECH has argued). The inventor indicated in the patent specification, however, that the "arrays" of his invention were "movable arrays."

> displaying *a plurality of arrays of lottery tickets*.  Each *array* is
> designated by one of the letters A, B, C, D, E and F in FIG. 8.

The arrays of lottery tickets in the "video" embodiment move "in the same manner" as the arrays

of tickets in the "windows" embodiment (*id.*, col. 10, ln. 65 - col. 11, ln. 4; emphasis added):

> [E]ach of the arrays of ticket images A, B, C, D, E and F can be
> made to move downwardly as a ticket is issued.  *The array moves
> in the same manner as the tickets move past the windows in
> FIGS. 1 and 2. . . .*  Although only 2 tickets are shown in each of
> the *arrays* A, B, C, D, E and F, it should be understood that each
> *array* can be made to contain more tickets, if it is desired to do so.

The dotted line shown in A, B, C, D, E and F of FIG. 8 (and also on the other figures showing

lottery ticket arrays, such as FIG. 2) represents the perforation between two tickets.[7]

The patentee used the term "arrays" throughout the '624 patent to refer to

movable strips of lottery tickets.  *See Alloc*, 342 F.3d at 1369-70 ("[T]he specification teaches

that the invention as a whole, not merely a preferred embodiment, provides for play in the

positioning of floor panels. . . .  Indeed, the patents do not show or suggest any systems without

play."); *Cephalon*, 2005 WL 2466454, at *4 ("There is nothing in the written description or the

prosecution history to suggest that they intended the disputed phrases to cover methods or

articles using free liquid.").  Nowhere in the '624 patent specification is the term "arrays" used to

refer to anything other than movable strips of lottery tickets.

The prosecution history of the '624 patent also describes the claimed invention as

involving movable strips of lottery tickets.  Mr. Burr argued during prosecution that his invention

---

[7]     GTECH relies heavily on the statement in the patent that ". . . each of the arrays of ticket
images . . . can be made to move" (D.I. 111, Ex. B, col. 10, ll. 65-66), arguing that it
means that "both moving and non-moving arrays" are included within the scope of the
invention (GTECH Op. Br. at 20).  There are no "non-moving" arrays, however,
described or depicted anywhere in the '624 patent.

was different from the prior art because the tickets moved as they were dispensed (D.I. 111, Ex. C at GTECH 000179):

> [S]ince the string of peanut bags [in the cited prior art reference] is not motor-driven, one gets no fascination from the movement of a stream of items past the window similar to that which one gets when viewing tickets such as lottery tickets moving past a window under the force of an automatic electric-powered driving mechanism.

Mr. Burr also submitted a declaration in which he told the examiner that the moving tickets were a "major improvement" over the prior art (D.I. 111, Ex. D at GTECH 000029). Mr. Burr also told the examiner that the moving tickets were "the heart of the commercial success" of his invention (*id.* at GTECH 000066).[8]

REDACTED

---

[8] Although Mr. Burr made these arguments after claim 18 had been allowed, they are nevertheless relevant to understanding how the video embodiment of claim 18 operates, since the patent states that the video embodiment and the windows embodiment function the same way. *See* D.I. 111, Ex. B, col. 1, ll. 67-68 ("The lottery ticket images are moved in the same manner as tickets are moved past windows."); col. 10, ll. 67-68 ("The array moves in the same manner as the tickets move past the windows in FIGS. 1 and 2.").

REDACTED

GTECH argues -- incorrectly -- that Scientific Games' proposed construction of the term "arrays" violates the doctrine of claim differentiation (GTECH Op. Br. at 20-21).[9] Claims 13, 21, 23 and 24 of the '624 patent relate to the "windows" embodiment, not the "video embodiment" of claim 18. For that reason alone, the scope of claim 18 is different from the scope of claims 13, 21, 23 and 24. *See Kraft Foods*, 203 F.3d at 1369 ("[T]hat the claims are presumed to differ in scope does not mean that every limitation must be distinguished from its counterpart in another claim, but only that at least one limitation must differ.").

GTECH also points to claim 19, but provides only a partial quote of what that claim says. GTECH says that claim 19 adds the following limitation: "separately scrolling each of said arrays to produce motion" (GTECH Op. Br. at 20-21). In fact, the additional limitation of claim 19 is:

> . . . [M]eans for separately scrolling each of said arrays to produce motion as tickets represented by a selected array are being dispensed.

Because the additional element of claim 19 is in means-plus-function form, it is narrower than claim 18 under any construction, since it is limited to the specific structure disclosed in the specification for performing the claimed function. Indeed, the additional limitation makes sense only if the "arrays" of claim 18 refer to strips of lottery tickets that move. The only "said arrays" described in the patent that are capable of scrolling are strips of lottery tickets. *See Nomos Corp.*, 357 F.3d at 1368 ("[C]laim differentiation, which is a 'guide, not a rigid rule,' does not override the requirements of § 112, ¶ 6 when the 'claim will bear only one interpretation.'").

---

[9]     *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) ("[C]laim differentiation only creates a presumption that each claim in a patent has a different scope; it is 'not a hard and fast rule of construction.'").

The Court should reject GTECH's abstract dictionary definition of the term "arrays," and instead focus on how the term is used throughout the patent. The only "arrays" described or depicted anywhere in the '624 patent are movable strips of lottery tickets from the same game. That was the central feature of the invention.[10]

The phrase "plurality of arrays" should be construed to mean more than one array, where each array is a movable strip of lottery tickets from the same game.

### C.     "Lottery Ticket Representations" and "Ticket Images"

GTECH argues that the terms "lottery ticket representations" and "ticket images" mean different things in claim 18 (GTECH Op. Br. at 18). According to GTECH, the term "lottery ticket representations" would be understood "by one of ordinary skill in the art to have its ordinary and customary meaning, *i.e.*, a visual representation of the lottery tickets available for sale from the machine so as to communicate to the customer what tickets were sold inside the machine" (*id.* at 14). The term "ticket images" refers to "graphical representations of the tickets for sale in the machine" (*id.* at 15).

The patent specification expressly defines the term "lottery ticket representation" to mean either an actual ticket or "a video image of a ticket": "either the ticket itself or a video image of a ticket should be considered to be a 'representation' of the ticket" (D.I. 111, Ex. B, col. 11, ll. 31-33). In the context of claim 18, which covers only the video embodiment, the term "representation" cannot be "the ticket itself." Consequently, in claim 18, the terms "lottery ticket

---

[10]     GTECH argues incorrectly that Scientific Games attempts to limit the term "plurality" to refer to "the number of games depicted on the screen and available for purchase from the machine" (GTECH Op. Br. at 22). Scientific Games agrees with GTECH that the term "plurality" should be construed to mean more than one. *See* SciGames Op. Br. at 33.

representations" and "ticket images" are synonymous and both refer to a video image (or graphical representation) of an actual lottery ticket.[11]

This definition is consistent with claim 18, which says "lottery ticket representations . . . representing tickets in said machine available for purchase."  It is also consistent with the purpose of the video embodiment -- to simulate (on a video display) tickets moving as they are dispensed, in the same way that actual tickets move in the "windows" embodiment:  "In another embodiment of the vending machine, graphic representations of the lottery tickets are displayed on a video screen, rather than through windows.  *The lottery ticket images are moved in the same manner as tickets are moved past windows*" (D.I. 111, Ex. B, col. 1, ll. 64-68; emphasis added).  *See also id.*, col. 10, ll. 67-68 ("The array moves in the same manner as the tickets move past the windows in FIGS. 1 and 2.").

REDACTED

GTECH argues that Scientific Games' proposed construction of the terms "lottery ticket representations" and "ticket images" incorrectly requires "an entire ticket or complete picture of the entire ticket for sale" (GTECH Op. Br. at 17).  The '624 patent, however, describes

---

[11]    *See Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 968 (Fed. Cir. 2000) ("[I]t is readily apparent that the terms 'body portion' and 'layer' are used interchangeably in the specification, and therefore should be construed in the same manner.").

and depicts only actual lottery tickets.  Nowhere in the patent specification did the inventor describe or depict anything other than an entire or complete lottery ticket as a "lottery ticket representation" or "ticket image."  *See Alloc*, 342 F.3d at 1369-70 ("[T]he patents do not show or suggest any systems without play."); *Cephalon*, 2005 WL 2466454, at *4 ("There is nothing in the written description or the prosecution history to suggest that they intended the disputed phrases to cover methods or articles using free liquid.").

GTECH also argues that boilerplate language in the final paragraph of the '624 patent specification -- that "[v]arious changes or modifications in the embodiments described may occur to those skilled in the art and these can be made without departing from the spirit or scope of the invention" (D.I. 111, Ex. B, col. 11, ll. 27-30) -- broadens the scope of the disclosure (GTECH Op. Br. at 18).  However, the only "changes or modifications" that the patent identifies "without departing from the spirit or scope of the invention" are two possible alternatives for what should be considered a "lottery ticket representation" -- "either the ticket itself or a video image of a ticket should be considered to be a 'representation' of the ticket" (*id.*, col. 11, ll. 31-32).

GTECH also highlights language in the patent about "means other than the specific ones described" being used to create the lottery ticket representations (GTECH Op. Br. at 18).  Those other means for creating lottery ticket representations, however, have nothing to do with what the lottery ticket representations are.

REDACTED

The terms "lottery ticket representations" and "ticket images" should be construed to mean graphical representations (or video images) of actual lottery tickets.[12]

D.    "Video Display Means"

GTECH argues that the "video display means" of claim 18 is not a means-plus-function element, because "sufficient structure is recited in claim 18 for these display means, namely a video screen . . ." (GTECH Op. Br. at 13).

The use of the phrase "means for" in association with the "video display means," however, creates a presumption that the "video display means" should be construed under § 112, ¶ 6. *See Sage Prods.*, 126 F.3d at 1427 ("The use of the word 'means,' which is part of the classic template for functional claim elements, gives rise to 'a presumption that the inventor used the term advisedly to invoke the statutory mandates for means-plus-function clauses.'").

There is no dispute about what is displayed on the video screen -- a plurality of arrays of ticket images.  The only question is whether the video screen is the structure that causes the plurality of arrays of ticket images to be displayed on the video screen -- or whether some other structure is necessary to cause the plurality of arrays of ticket images to be displayed on the video screen.  It makes no sense, however, to refer to the video screen as "displaying a plurality of arrays of tickets images *on a video screen*."  *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("The signals that are monitored by the 'means for monitoring' cannot be part of the structure that does the monitoring.").

---

[12]    GTECH argues that the '624 patent states that the "ticket images" do not need to show "all of the details of the ticket" (GTECH Op. Br. at 18).  The patent states that "[i]n FIG. 2, each of four windows shows most of the front faces of three lottery tickets" (D.I. 111, Ex. B, col. 3, ll. 17-20).  What is depicted in Figure 2 and described in the patent are actual lottery tickets.

GTECH dismisses this argument as an "artificial substitution of language," and argues that it "is contradicted by Federal Circuit law" (GTECH Op. Br. at 14 & n.4). However, the only case that GTECH cites -- *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336 (Fed. Cir. 2002) -- is inapposite. There, one of the claim elements was "gearbox means for rotating said blade means, said gearbox means comprising a pair of rotatable shafts projecting downwardly from said frame means and defining a biaxial plane." *Id.* at 1343. The "gearbox means" in that case was a classic example of a claim element that recited sufficient structure for performing the claimed function. *Id.* at 1348 ("Such detailed recitation of structure clearly removes these limitations from the ambit of § 112, paragraph 6."). Moreover, the claim element used the transitional phrase "comprising" to indicate that it was expressly defining the structural elements corresponding to the "gearbox means." That is very different from the "video display means" in this case, which is used for "displaying a plurality of arrays of ticket images *on a video screen.*"

The Federal Circuit has made clear that the recitation of some structure in a claim element that uses the word "means" does not rebut the presumption that it is a means-plus-function element -- if "[t]he recited structure tells only what the [means clause] *does*, not what it *is*, structurally." *Laitram*, 939 F.2d at 1536. The recitation of a "video screen" in claim 18 describes the function of the "video display means." It tells what the video display means *does*, not what it *is* structurally. The video display means causes a "plurality of arrays of ticket images" to be displayed on a video screen. The video screen itself is not what causes the "plurality of arrays of ticket images" to be displayed. *See Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1362 (Fed. Cir. 2004) ("[T]he written description indicates that

the combination of a CPU, video display generator, and video switcher is required to perform the function of displaying the television schedule in a grid format on the television screen.").

The "video display means" element of claim 18 should be construed under § 112, ¶ 6.  The function is "displaying a plurality of arrays of ticket images on a video screen."  The corresponding structure disclosed in the specification is a CPU 190.

E.    "Means For Dispensing"

The parties' dispute concerning the "means for dispensing" is whether the corresponding structure includes the feeding and bursting mechanism 112 (as described in the '337 patent and incorporated into the '624 patent).

GTECH argues that the '624 patent does not "clearly associate or link [the feeding and bursting mechanism 112] with the function of dispensing tickets in a number corresponding to the amount of money input into the machine by the customer" (GTECH Op. Br. at 24).  That is simply incorrect.  The specification does link the feeding and bursting mechanism with the function of dispensing "tickets in a number corresponding to the money input into the machine by the customer."  In fact, the specification refers to that the feeding and bursting mechanism as part of the structure responsible for dispensing "the proper number of tickets" (D.I. 111, Ex. B, col. 10, ll. 24-30; emphasis added):

> When the customer selects one of the three lottery ticket arrays A, B or C, *the unit 112* . . . selects the appropriate strip to feed through the burster unit, *separates the proper number of tickets, and dispenses them through the outlet opening 220*.

The '624 patent expressly incorporates the feeding and bursting mechanism from the '337 patent -- which it calls a "lottery ticket *dispensing* mechanism" (D.I. 111, Ex. B, col. 1, ln. 12).  The '624 patent also explains that the orientation of the feeding and bursting mechanism

is changed to permit the unit to "*dispense* tickets downwardly" (*id.*, col. 4, ll. 48-55; emphasis added):

> The feeding and bursting mechanism **112** is essentially identical to that disclosed in the above-identified copending patent application ['337 patent], except that *it has been rotated through 90° to dispense tickets downwardly.*

Without the feeding and bursting mechanism feeding the tickets through the mechanism and separating the proper number of tickets from the strip of tickets, the tickets would not be dispensed through the outlet opening in a number corresponding to the amount of money put into the machine. Indeed, without the feeding and bursting mechanism, the tickets would not be dispensed at all. *See Gemstar-TV Guide*, 383 F.3d at 1363 ("[I]t is essential to identify correctly the function recited in a means-plus-function limitation in order to construe such a limitation properly.").

The keypad, outfeed rollers, and receptacle are not sufficient to perform the claimed function by themselves. It is necessary to feed and separate the tickets to dispense them "in a number corresponding to the amount of money input into [the] machine by [the] customer." *See Cardiac Pacemakers,* 296 F.3d at 1119 ("[C]orresponding structure must include all structure that actually performs the recited function."). The keypad may be where the process starts and the receptacle where it ends, but it is also necessary to feed the tickets through the mechanism and separate the correct number.

GTECH argues that Scientific Games "attempt[s] to read the separating function" into the "means for dispensing" (GTECH Op. Br. at 24). Although the feeding and bursting mechanism may correspond to the separating function described in the patent, that does not mean that the feeding and bursting mechanism does not also correspond to the "means for dispensing." *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1431-32 (Fed. Cir. 2000)

("transferring" and "recording" functions are both "performed by the disclosed tape cassette transport").

GTECH also argues that the structure corresponding to the "means for dispensing" cannot include the feeding and bursting mechanism because claims 13, 21 and 23 of the '624 patent (and claim 20 of the '337 patent) include a "separator means," as well as a "dispensing means" (GTECH Op. Br. at 25).[13]  Claim 13, however, makes clear that the "dispensing means" includes both the separating and the dispensing of the tickets:  "after passing by said window and separating said tickets from one another, said dispensing means being adapted to dispense one or more tickets separated from said strip . . ." (D.I. 111, Ex. B, col. 12, ll. 58-61).

Moreover, the claimed functions for the "dispensing means" are different in each of those claims.  Claims 21 and 23 requires a "means for *dispensing through said outlet opening a pre-determined number of tickets to an operator of said machine.*"  Similarly, claim 20 of the '337 patent requires a "dispensing means for *dispensing tickets through said outlet opening.*"  Those functions are different from the claimed function of the dispensing means in claim 18, which requires a "means for *dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer.*"[14]

---

[13]    *See Laitram*, 939 F.2d at 1538 ("[T]he judicially developed guide to claim interpretation known as 'claim differentiation' cannot override [35 U.S.C. § 112, ¶ 6]."); *Nomos Corp.*, 357 F.3d at 1368 ("[C]laim differentiation . . . does not override the requirements of § 112, ¶ 6 when the 'claim will bear only one interpretation.'").

[14]    GTECH also argues that the "means for dispensing" cannot include the feeding and bursting mechanism, because another claim of the original application (original claim 25) was "directed to separating the tickets" (GTECH Op. Br. at 25).  Original claim 25, however, had nothing to do with separating tickets (*see* D.I. 111, Ex. C at GTECH 000129).  Moreover, the structure corresponding to a means-plus-function element is determined by what is in the specification, not by a dependent claim that never issued.

(continued . . .)

The function of the "means for dispensing" is dispensing tickets in a number corresponding to the amount of money input into the vending machine by the customer. The corresponding structure disclosed in the specification is a keypad 28, the feeding and bursting mechanism 112 (as described in the '337 patent and incorporated into the '624 patent), outlet openings 220, 222 in the housing through which the tickets exit the housing, outfeed rollers 158, 166, and a receptacle 140 that receives the tickets that fall through the outlet opening.

CONCLUSION

For the foregoing reasons and those stated in Scientific Games' Opening Brief, Scientific Games respectfully requests that the Court adopt its proposed constructions of the claim terms of the patents in suit.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rsmith@mnat.com
  Attorneys for Defendants

Original Filing Date:  October 28, 2005

Redacted Filing Date:  November 1, 2005

490777

---

(. . . continued)

> *See Nomos Corp.*, 357 F.3d at 1368-69 ("[O]ur interpretation of the corresponding structure comes from the written description, not from dependent claim 3 . . . .").

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on November 1, 2005, I caused to be electronically filed Scientific Games' Answering Claim Construction Brief (Redacted Vesion) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Josy W. Ingersoll
> Young, Conaway, Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE  19899

and that I caused copies to be served upon the following in the manner indicated:

> BY HAND
>
> Josy W. Ingersoll
> Young, Conaway, Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE  19899
>
> BY FEDERAL EXPRESS
>
> Thomas J. Meloro, Esquire
> Kenyon & Kenyon
> One Broadway
> New York, NY  10004

> _____*/s/ Rodger D. Smith II*_____
> Rodger D. Smith II (#3778)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com