REDACTED--Public Version

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GTECH CORPORATION,           )
                             )
           Plaintiff,        )
                             )        Civil Action No. 04-138-JJF
       v.                    )
                             )
SCIENTIFIC GAMES INTERNATIONAL, INC., )
SCIENTIFIC GAMES HOLDINGS    )
CORPORATION, SCIENTIFIC GAMES )
FINANCE CORPORATION, and SCIENTIFIC )
GAMES CORPORATION,           )
                             )
           Defendants.       )

## PLAINTIFF GTECH CORPORATION'S
## OPENING CLAIM CONSTRUCTION BRIEF

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Karen E. Keller (#4489)
Andrew A. Lundgren (#4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

OF COUNSEL:
Thomas J. Meloro
Larissa A. Soccoli
Andrew L. Reibman
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

Dated: October 14, 2005

063055.1001

REDACTED--Public Version

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   GENERAL BACKGROUND ON THE ASSERTED PATENTS ..................................... 2

      A.    The '624 Patent ........................................................................................ 2

      B.    The '337 Patent ........................................................................................ 4

III.  ARGUMENT ...................................................................................................... 6

      A.    Legal Standards ........................................................................................ 6

            1.    Claim Terms Should be Given Their Ordinary and Customary
                  Meaning ........................................................................................ 6

            2.    It is Improper to Import Limitations from the Specification into the
                  Claims .......................................................................................... 7

            3.    Claim Construction of Means-Plus-Function Claim Elements .................. 8

      B.    Plaintiff's Proposed Construction of the Asserted Claim Terms .......................... 11

            1.    '624 Patent -- Claim 18 .................................................................. 11

                  a)    Undisputed Terms of Claim 18 .................................................. 12

                        (1)    Element [A] - "A lottery ticket vending machine" ........... 12

                        (2)    Element [B] - "housing" ................................................... 12

                        (3)    Element [D] – "acceptor means for receiving and
                               accepting a means of monetary exchange" ...................... 12

                  b)    Disputed Elements and Terms of Claim 18 ................................. 13

                        (1)    Element [C1] - "display means for displaying an array of
                               lottery ticket representations viewable from outside of said
                               housing by a customer, said array representing tickets in
                               said machine available for purchase," .............................. 13

                               Element [C2] - "in which said display means comprises
                               video display means for displaying a plurality of arrays of
                               ticket images on a video screen." ...................................... 13

                               (a)    "lottery ticket representations" .............................. 14

                               (b)    "ticket images" ..................................................... 15

REDACTED--Public Version

(c)     "array"................................................................ 19

(d)     "plurality" ......................................................... 22

(2)   Element [E] -- "means for dispensing said tickets in a
      number corresponding to the amount of money input into
      said machine by said customer"....................................... 22

2.   '337 Patent – Claim 20 ........................................................... 25

a)   Undisputed Terms of Claim 20 ..................................... 26

(1)   Element [A] -- "A ticket dispensing machine for
      dispensing tickets directly to the purchaser thereof, said
      dispenser comprising the combination of" ...................... 26

(2)   Element [D] – "means operable for ordering a plurality of
      tickets in a single batch," ................................. 26

(3)   Element [F] – "dispensing means for dispensing tickets
      through said outlet opening, and" .................................... 27

(4)   Element [G] -- "control means for causing each ticket in
      said batch to be separated and dispensed separately from
      the other tickets in said batch regardless of the number of
      tickets in said batch." .................................................... 27

b)   Disputed Terms of Claim 20 ........................................ 28

(1)   Element [B] – "housing means for storing a strip of tickets
      to be dispensed," ........................................................... 28

(2)   Element [C] – "said housing means having an outlet
      opening accessible to the purchaser of tickets from said
      machine," ...................................................................... 31

(3)   Element [E] – "means for separating each of said tickets
      from said strip," ........................................................... 32

3.   '337 Patent - Claim 21 .......................................................... 34

4.   '337 Patent - Claim 22 .......................................................... 34

a)   Construction of Elements and Terms of Claim 22........................ 35

(1)   Element [A] – "Apparatus for dispensing tickets from a
      strip of tickets dilineated [sic] from one another by lines
      along which the material of said strip is weakened, said
      apparatus comprising, in combination" ............................. 35

REDACTED--Public Version

(2)    Element [B] – "means for moving said strip towards a dispensing position," ........................................................ 35

(3)    Element [C] – "a separation member," ............................. 36

(4)    Element [D] – "means for holding said strip adjacent one line along which said strip is to be separated, and causing said strip to bend along said one line at said dispensing position to facilitate tearing of said strip by engagement with said separator member along said one line while said strip is bend [*sic*]", ............................................................ 36

(5)    Element [E] – "and including drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line." ........................................................ 37

b)    '337 Patent - Claim 24 ................................................................ 37

c)    Construction of Elements and Terms of Claim 24 ........................ 38

(1)    Elements [A] –[C] .......................................................... 38

(2)    Element [D] – "including separation means having a separator member and drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line," ........................................................ 38

(3)    Element [E] – "and including means for causing said separator member to break through said strip in one locale and then traverse the strip along said line." ...................... 39

IV.    CONCLUSION ............................................................................................. 40

DB02:5073130.1                                        063631.1001

REDACTED--Public Version

## TABLE OF AUTHORITIES

**Cases**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336 (Fed. Cir. 2002) ........................... 14, 29

*Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308 (Fed. Cir. 1999) .......................................... 8, 9, 10

*Bilstad v. Wakalopulos*, 386 F.3d 1116 (Fed. Cir. 2004) .............................................................. 22

*Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998) ....................... 21

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)7

*Envirco Corp. v. Clestra Cleanroom*, 209 F.3d 1360 (Fed. Cir. 2000) .............................. 8, 13, 29

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572 (Fed. Cir. 1996) ................... 18

*Free Motion Fitness v. Cybex Int'l, Inc.*, 2005 U.S. App. LEXIS 19886 (Fed. Cir. Sept. 16, 2005) ..................................................................................................................................................... 21

*Generation II Orthotics, Inc. v. Med. Tech., Inc.*, 263 F.3d 1356 (Fed. Cir. 2001) ............... 23, 30

*Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352 (Fed. Cir. 2004) .................................. 7

*IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430
    (Fed. Cir. 2000) ........................................................................................ 8, 9, 10, 16, 32

*Intervet America, Inc. v. Kee-Vet Labs.*, 887 F.2d 1050 (Fed. Cir. 1989) ..................................... 7

*Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999) ......................... 8

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 2005 U.S. App. LEXIS 21426.. 18, 23, 24, 30

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995 ...................................... 6, 7

*McCarty v. Lehigh Valley R.R.*, 160 U.S. 110, 116, 40 L. Ed. 358, 16 S. Ct. 240 (1895) .............. 8

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir. 2001) ............................................. 9

*Med. Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003) ...... 24

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ..................................... 9, 24

*Personalized Media Communications v. ITC*, 161 F.3d 696 (Fed. Cir. 1998) ............................. 29

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ................................................. 6, 7, 18, 21

REDACTED--Public Version

*Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294  (Fed. Cir. 1999)........................ 23, 28, 30, 31

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107 (Fed. Cir. 1985)................................. 8

*York Prods. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568 (Fed. Cir. 1996).................. 22

**Statutes**

35 U.S.C. § 112....................................................................................................................... passim

REDACTED--Public Version

Plaintiff GTECH Corporation ("GTECH") hereby submits this opening brief in support of its proposed claim constructions of the terms of the asserted claims of the patents-in-suit, U.S. Patent Nos. 5,222,624 (the "'624 patent," Ex. A), and 4,982,337 (the "'337 patent," Ex. B).

## I.    INTRODUCTION

Claim construction in this case presents a classic example of Defendants who repeatedly and improperly read limitations from the specification into the asserted claims in an attempt to narrow the claims to escape their embrace. This case deals with lottery ticket vending machines, machines which sell "scratch-off" or "instant" lottery tickets. There are two patents-in-suit, the '624 patent and the '337 patent, which cover various aspects of these machines. Both patents use clear, unambiguous language in the asserted claims. For example, the asserted claim of the '624 patent, claim 18, claims "display means" for displaying a "plurality" of "arrays" of "ticket images." The '624 patent utilizes these terms consistent with their ordinary meaning. "Plurality" is described in the '624 patent as meaning "more than one," a definition which is used in the specification and is consistent with its ordinary meaning, and its customary usage in patent drafting. The term "ticket image" in the '624 patent means a graphical representation of a ticket, a definition which is given in the specification and which is the term's ordinary meaning. An "array" as described in the '624 specification and consistent with its ordinary meaning, is a grouping or ordering of two or more things. In the case of claim 18, those "things" are "ticket images." These terms are examples of how the elements of claim 18 are simple, straightforward and understandable.

In contrast, Defendants propose improperly limited constructions for these terms which deviate from their ordinary meaning. Defendants attempt to redefine and limit the claims to cover only the exact *example* embodiments shown in the specification. For example, Defendants argue "plurality" is limited only to the number of games depicted on the screen and the exact

REDACTED--Public Version

number of games available for purchase from the machine, "arrays" are strips of tickets from the same game that move, and "ticket images" are limited to *only* exact pictures of the tickets for sale in the machine. Defendants' constructions of the disputed claim terms of the '337 patent are similarly limited.

Defendants' strained constructions, however, violate at least five crucial points of law: First, claims, and the elements and terms thereof, are not limited to the *example* preferred embodiments described in the specification of the patents. Second, not all terms that use the words "means for" are governed by 35 U.S.C. § 112, ¶ 6 ("§ 112, ¶ 6"). Where the claim recites sufficient structure for performing the recited function, the "means for" element is outside the ambit of § 112, ¶ 6. Third, § 112, ¶ 6 applies only to interpreting the *means* that performs a recited function, *not* the function itself. Fourth, additional functions cannot be imported into a claim element, and structure not linked to the function claimed does not limit that element. Fifth, means-plus-function elements are interpreted to cover not just the specifically linked structure *but also equivalents thereof* – which Defendants ignore.

## II.   GENERAL BACKGROUND ON THE ASSERTED PATENTS

### A. The '624 Patent

In the mid to late 1980s, Robert Burr set out to solve a problem he recognized concerning the sale of instant lottery tickets. Until the early 1980s, instant lottery tickets were sold by retailers at the counter. Sales were thus limited because customers could not buy lottery tickets from unattended locations, or from locations where clerk time could not be dedicated to handling instant tickets (e.g. supermarkets, drug stores). As a result, sales of instant lottery tickets were not very good. In an attempt to address this problem, in the mid 1980s, some machines were introduced, without much success, with the idea of selling instant lottery tickets. For example, Scientific Games introduced in Iowa a Player Activated Terminal ("PAT"). These machines

2

REDACTED--Public Version

were primarily intended to vend "online" or "lotto" type lottery tickets, not pre-printed scratch-off or instant tickets. If the functionality to sell instant tickets was enabled on the machines at all, they sold at most a single type of instant ticket game at one time. Multiple instant ticket games could not be stored and vended from the machine and the machines' "user interface" did not change when the type of instant ticket changed, so the user had no way of knowing from the user interface what instant games were available.

These vending machines not only did not allow the customers to see what they were buying, but they only sold one type of instant ticket. In contrast, retailers selling at the counter sold many types of instant tickets to allow customers a range of choices, e.g., by hanging them in view of the customer at convenience store checkout counters. Mr. Burr understood that instant lottery tickets are generally the result of "impulse" purchases. Instant tickets attract the attention of the customer through bright colors and bold graphics and by the display of a selection of multiple games. Mr. Burr recognized that a ticket vending machine must therefore dispense a variety of instant ticket games and must show the customer representations of the tickets for sale in the machine in a manner that would allow a customer to associate the visible representations with the tickets actually in the machine. This would allow a customer to visually identify a range of possible selections, and choose one or more of the tickets that were available for purchase from the machine. The use of representations of the instant tickets for sale stimulated the impulse purchase by using colors and graphics associated with the tickets for sale in the machine that would capture the customer's attention in the same way as those "hanging" instant tickets at the retailer's counter. This would give the customer confidence that the ticket he or she purchased was the one he or she intended to purchase.

3

REDACTED--Public Version

The '624 patent embodies Mr. Burr's concept. The patent specification specifically describes two *example* preferred embodiments of this concept: an instant ticket vending machine with live tickets that are shown through transparent windows on the front of the machine (a "windows" embodiment"), and a machine that shows graphic representations of the tickets to the customer on a video screen (a "video" embodiment). Both example embodiments showed the customer representations of what they could purchase - the ticket actually in the machine in the windows example and a graphical representation that corresponds to the ticket actually in the machine in the video example. Claim 18, the asserted claim of the '624 patent in this case, is related to the "video embodiment," although not limited by the specifics of the preferred example video embodiment.

### B.    The '337 Patent

There was another problem with the early instant tickets machines beyond its user interface which Mr. Burr, along with Messrs. Keagle, Fulton and Campbell, the inventors of the '337 patent, solved. Instant tickets usually were dispensed from fan-folded strips of connected tickets. Early instant ticket vending machines typically separated individual tickets from the strips by cutting, slicing, or chopping. With cutting, the instant tickets were fed through a separating mechanism which used a sharp blade or other device designed to cut the ticket strip at fixed intervals, generally determined by the length of the ticket, with the intention that the tickets would be separated on a designated separation line between two tickets. (This separation line may or may not have been a perforation or line of weakness.) This "cutting" approach, however, was unreliable. The cutting mechanism would often contact and cut through the strip in locations other than along the designated line between two tickets, causing imperfect and often unusable tickets to be dispensed. Once cut in the wrong spot, the cutting error could multiply (because the cutting mechanism would continue to cut at fixed intervals) as multiple tickets in a

4

REDACTED--Public Version

pack were separated. This was highly problematic because winning instant tickets are generally "bearer instruments" which are redeemable by the holder of the ticket like cash. Tickets cut and rendered defective and/or unplayable cause a number of problems in terms of accounting and redeeming.

Also, when multiple tickets were desired by a customer, earlier machines either required that each ticket be purchased separately, or dispensed the tickets in a single connected strip. Separate purchases slowed down the purchase process. Dispensing multiple tickets in a single strip presented a security issue, because an unscrupulous customer could try to grab the strip while it was dispensed to pull more than the purchased number of tickets out of the machine. Leaving the customer to separate the individuals tickets from the dispensed strip also allowed for potential destruction or damage to those tickets when the customer tore them apart.

The inventors of the '337 patent had the idea for a new instant ticket vending machine that would reliably separate tickets through pressure "bursting," and then dispense the separated tickets to a customer. The new machine could dispense a plurality of individually separated tickets that were ordered in a single batch rather than forcing the customer to order tickets one by one in separate transactions.

"Bursting" is a highly reliable method of separating instant tickets from fan-folded strips. Unlike machines that cut, sliced, or chopped tickets apart, bursting separates the tickets along a perforation or line of weakness between the tickets through application of pressure which causes the tickets to burst at their weakest spot – ties along the perforated line of weakness -- in a sequential, not instantaneous, manner. This approach inherently corrects for minor errors in ticket position; pressure applied near but not at the perforations will still cause the tickets to burst apart at the perforations.

5

REDACTED--Public Version

The '337 patent discloses an instant ticket vending machine that houses tickets in fan-folded strips, reliably separates those tickets one by one through bursting, and then dispenses the separated tickets to a customer, with the machine having the capability of dispensing a plurality of individually separated tickets that were ordered in a single batch. The machine solves the previously-encountered problems of ticket slippage and dispenser inaccuracy by bursting the tickets apart rather than cutting them with a sharp blade, as the specification of the '337 patent points out. (*See* '337 patent, col. 9:62- col. 10:8). Tickets are thus consistently separated at the perforation or other line of weakness, ensuring that tickets are not separated anywhere other than at the line where they are joined.

### III.  ARGUMENT

#### A.  Legal Standards

##### 1.  Claim Terms Should be Given Their Ordinary and Customary Meaning

Claim construction is the first step in a patent infringement analysis and is solely a question of law that must be resolved by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "Construing" a patent claim, though, does not properly involve changing its ordinary and customary meaning without basis, as an accused infringer (such as Scientific Games here) often asserts in the hope of escaping the embrace of a claim it infringes.

As the Federal Circuit recently reconfirmed, *en banc*, in the case of *Phillips v. AWH Corp.*, " the words of a claim 'are generally given their ordinary and customary meaning.'" 415 F.3d 1303, 1313 (Fed. Cir. 2005)(citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *See Phillips*, 415 F.3d at 1314; *see also Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352,

6

REDACTED--Public Version

1358 (Fed. Cir. 2004) ("customary meaning" refers to the "customary meaning in [the] art

field").

### 2. It is Improper to Import Limitations from the Specification into the Claims

In *Phillips*, the Federal Circuit recently stated:

> The claims, of course, do not stand alone. Rather, they are part of
> "a fully integrated written instrument,' . . . consisting principally of
> a specification that concludes with the claims. For that reason,
> claims "must be read in view of the specification, of which they
> are a part."

*Phillips,* 415 F.3d at 1315 (quoting *Markman,* 52 F.3d at 978-79).

While claims should be construed in light of a patent's specification, that is not a license

to use the claim construction exercise to import limitations into a claim that do not otherwise

exist in the claim language. As the Federal Circuit has explained:

> [T]his court has consistently adhered to the proposition that courts
> cannot alter what the patentee has chosen to claim as his invention,
> that limitations appearing in the specification will not be read into
> claims, and that interpreting what is *meant* by a word *in* a claim "is
> not to be confused with adding an extraneous limitation appearing
> in the specification, which is improper."

*Intervet America, Inc. v. Kee-Vet Labs.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) (emphasis in

original) (*quoting E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430,

1433 (Fed. Cir. 1988)). Rather, it is the claims themselves that must govern when defining the

invention:

> If everything in the specification were required to be read into the
> claims, *or if structural claims were to be limited to devices
> operated precisely as the specification-described embodiment is
> operated*, there would be no need for claims. Nor could an
> applicant, regardless of the prior art, claim more broadly than that
> embodiment. Nor would a basis remain for the statutory necessity
> that an applicant conclude his specification with claims particularly
> pointing out and distinctly claiming the subject matter which the

7

REDACTED--Public Version

applicant regards as his invention. 35 U.S.C. § 112. It is the
claims that measure the invention.

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (emphasis

added); *see also Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 989-90 (Fed. Cir.

1999) ("'If we once begin to include elements not mentioned in the claim in order to limit such

claim . . . we should never know where to stop.'") (quoting *McCarty v. Lehigh Valley R.R.*, 160

U.S. 110, 116, 40 L. Ed. 358, 16 S. Ct. 240 (1895)).

### 3. Claim Construction of Means-Plus-Function Claim Elements

35 U.S.C. §112, ¶ 6 allows patent applicants to claim an element of a combination

functionally, without reciting structure for performing those functions. *Envirco Corp. v. Clestra*

*Cleanroom*, 209 F.3d 1360, 1364 (Fed. Cir. 2000). Construction of "means-plus-function" claim

elements to which 35 U.S.C. §112, ¶6 applies requires a multi-step construction process. It

includes first determining if the element is a means-plus-function element, and if it is, then

identifying the claim function and determining the corresponding structure or acts disclosed in

the specification. These are questions of law for the court to resolve. *IMS Technology, Inc. v.*

*Haas Automation, Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000).

As a threshold matter, the court must decide if a claim term is a means-plus-function

element governed by § 112, ¶ 6. If a claim element uses the word "means" and recites a

function, a presumption is invoked that the claim element is a means-plus-function element.

*Envirco*, 209 F.3d at 1364 (citing *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir.

1999)). This is only a presumption, however, which will fall if the claim itself recites sufficient

structure to perform the claimed function. *Id.* In such a case, the claim element is not governed

by § 112, ¶ 6. *Id.* at 1364-5.

8

063631.1001

REDACTED--Public Version

If the claim element is determined to be a means-plus-function element governed by §
112, ¶ 6 because it recites a specified function, but not the structure, material or acts for
performing that function, the court must then identify the function recited in the claim, "staying
true to the claim language and the limitations expressly recited by the claims." *Omega Eng'g,
Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003). Next, it must ascertain the
corresponding structure in the specification that performs that function. *Id.* A disclosed
structure is corresponding "only if the specification or the prosecution history clearly links or
associates that structure to the function recited in the claim," *i.e.*, it must be "necessary to
perform the claimed function." *Id.* (citations omitted).

A means-plus-function claim element governed by § 112, ¶ 6 is "construed to cover the
corresponding structure, material, or acts described in the specification *and equivalents thereof.*"
*IMS Technology*, 206 F.3d at 1429-30 (emphasis added) (citing §112, ¶ 6). Thus, while the
construction of a §112, ¶ 6 means-plus-function element is controlled by the corresponding
structure disclosed in the specification for performing the function recited in the claim, it is not
limited to just that disclosed structure; a means-plus-function element is also statutorily defined
to include *equivalents*[1] of that disclosed structure for performing the recited function. *Id.*; *see
also McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1347 (Fed. Cir. 2001) ("Drafters of
means-plus-function claim limitations are statutorily guaranteed a range of equivalents extending
beyond that which is explicitly disclosed in the patent document itself."). An accused device that

---

[1]   These § 112, ¶ 6 "equivalents" are equivalents that existed prior to or at the time of the issuance of the
patent. "After arising" equivalents are not included literally within the claim element's scope, but may be
included under the Doctrine of Equivalents, discussed in fn. 2 below, which assesses equivalents at the
time of infringement. *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320-21 (Fed. Cir. 1999)
(citations omitted).

9

063631.1001

REDACTED--Public Version

performs the identical function claimed with the same structure described in the specification or an equivalent thereof, *literally* meets that claim element.[2]

Notably, § 112, ¶ 6 does *not* limit all terms in a means-plus-function claim element to what is disclosed in the specification and equivalents thereof. *IMS Technology*, 206 F.3d at 1432. Rather, when a claim recites insufficient structure for performing the function, § 112, ¶ 6 applies *only* to interpretation of the *means* that performs that recited function, *not* the function itself. *Id.* For example, in *IMS Technology*, the Federal Circuit construed the claim element "means to sequentially display data block inquiries" to be a means-plus-function element governed by § 112, ¶ 6. *Id.* The Federal Circuit identified the recited function as "sequentially displaying data block inquiries" and held that the claim did not recite structure for performing that function. *Id.* The claim element therefore covered the structure disclosed in the specification for performing the function of "displaying" data block inquiries, i.e., a CRT, and its equivalents. *Id.* The "data block" term, however, was *not* limited by disclosed structure in the specification because "'data block' is not the means that causes the sequential display," i.e. the data block does not do the displaying – it is what is being displayed, "and is therefore not subject to construction under § 112, ¶ 6." *Id.*

Thus, 1) under standard claim construction rules, an example, preferred embodiment should not limit a claim element, 2) under means-plus-function claim construction rules, the specific means for performing the claimed function is not limited to the preferred embodiment (it

---

[2]     The § 112, ¶ 6 "equivalents" referred to here are thus a component of the literal infringement analysis, not to be confused with infringement under the Doctrine of Equivalents. In fact, under certain circumstances, a means-plus-function claim element that is found not to be literally met may nevertheless be met under the Doctrine of Equivalents. This might occur when the function of the accused device (or a component thereof) is not the same as the function recited in the claim element or the structure used in the device was after-arising technology (i.e. did not exist prior to the issuance of the asserted patent), but the accused device contains structure that performs a substantially similar function with corresponding structure that is insubstantially different from the structure disclosed in the asserted patent. *Al-Site*, 174 F.3d at 1320-21(citations omitted).

063631.1001

REDACTED--Public Version

includes all corresponding structure disclosed in the specification and equivalents thereof), and 3) not all terms in a means-plus-function claim element are treated as means-plus-function terms. Thus, an accused infringer's attempt to limit all terms in a claim element to the example, preferred embodiment, even one that is construed as a means-plus-function element, as Defendants do here (*see* discussion of "ticket image" and "array" in '624 patent claim 18, and "means for separating" and "housing means" of '337 patent claims 20 and 21, *infra*), should be rejected.

## B. Plaintiff's Proposed Construction of the Asserted Claim Terms

### 1. '624 Patent -- Claim 18

Only claim 18 of the '624 patent is asserted in this lawsuit. Claim 18, as discussed earlier, pertains to a video embodiment for the user interface of the claimed ticket vending machine. Broken down into constituent clauses (with letters added for ease of reference and clarity), claim 18 reads as follows:

[A]   A lottery ticket vending machine comprising, in combination,
[B]   a housing,
[C1]  display means for displaying an array of lottery ticket representations viewable from outside of said housing by a customer, said array representing tickets in said machine available for purchase,
[D]   acceptor means for receiving and accepting a means of monetary exchange, and
[E]   means for dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer,
[C2]  in which said display means comprises video display means for displaying a plurality of arrays of ticket images on a video screen.

The lottery ticket vending machine of claim 18 is defined in a straightforward and self-explanatory manner, using well-known terms in the relevant art and everyday English. Defendants attempt to complicate and confuse the meanings of these terms in an effort to rewrite and improperly limit the scope of claim 18 and, thereby, escape its embrace. Defendants focus their dispute on the "display means" and "video display means" elements [C1] and [C2], and the

11

REDACTED--Public Version

"means for dispensing" element [E]. Defendants have not raised a dispute with regard to

Plaintiff's proposed construction of the remaining claim elements, as set forth below.[3]

### a) Undisputed Terms of Claim 18

#### (1) Element [A] - "A lottery ticket vending machine"

No construction of this term is necessary. There is no dispute that this term means exactly

what it says.

#### (2) Element [B] - "housing"

A "housing" as used in claim 18 would have been understood by one of ordinary skill in

the art to have its ordinary and customary meaning, *i.e.* a cabinet, case or enclosure, as indicated

by the specification of the '624 patent. (*See, e.g.,* '624 patent, col. 2:46-51 ("The lower housing

14 forms a storage *cabinet* ... . The upper housing 12 has a hinged, lockable front cover 20.")

(emphasis added); Fig.1, units 12 and 14; *see also* Ex. K, Webster's Ninth New Collegiate

Dictionary at 585 (1986) ("something that covers or protects as a: a case or enclosure (as for a

mechanical part or an instrument) . . .")).

#### (3) Element [D] – "acceptor means for receiving and accepting a means of monetary exchange"

"Acceptor means" should be construed as a means-plus-function claim element subject to

§ 112, ¶ 6. The function for the "acceptor means" is to receive and accept a means of monetary

exchange. The specification of the '624 patent discloses structure corresponding to that function,

namely a unit with an inlet slot for receiving currency notes or bills. (*See, e.g.,* '624 patent, col.

2:52-55; Fig. 1 at units "22" and "24".) The "acceptor means," therefore, covers a unit with an

inlet slot for receiving currency notes or bills, and equivalents thereof.

---

[3]    Plaintiff's understanding of what elements Defendants are disputing is based on the interrogatory
responses and expert reports served by Defendants in this case. (*See* Exs. F, G (Myers Opening Report),
H (Myers Rebuttal Report), I (Keefe Opening Report), J (Keefe Rebuttal Report).

12

063631.1001

REDACTED--Public Version

### b) Disputed Elements and Terms of Claim 18

(1) Element [C1] - "display means for displaying an array of lottery ticket representations viewable from outside of said housing by a customer, said array representing tickets in said machine available for purchase,"

Element [C2] - "in which said display means comprises video display means for displaying a plurality of arrays of ticket images on a video screen."

Claim 18 recites "display means" for displaying to the customer an array or arrays of representations of the lottery tickets available for purchase in the machine. This "display means" is further defined in element [C2] as a "video display means" for displaying "a plurality of arrays of ticket images" on a "video screen."

The "display means" and "video display means" elements [C1] and [C2] should not be construed as a means-plus-function elements subject to 35 U.S.C. §112, ¶6 because sufficient structure is recited in claim 18 for these display means, namely a video screen as recited in element [C2]. The video screen performs the recited function of "displaying." Section 112, ¶ 6 is intended to apply only to claim elements that recite *only* function and not corresponding structure for performing that recited function. *See Envirco*, 209 F.3d at 1365 ("Th[e] recital of structure conflicts with the statutory requirement that means-plus-function claim elements state a function 'without the recital of structure.'") (citing 35 U.S.C. § 112, ¶ 6).

Defendants contend that this claim element is a means-plus-function element. Defendants cannot deny, however, that a "video screen" is structure and that the video screen performs the function of "displaying" arrays of ticket representations or ticket images. Defendants, instead, nonsensically argue that a video screen (although it is a structure which displays) cannot be the structure for the video display means of claim 18 because the claim would then purportedly read "[a video screen] for displaying a plurality of arrays of ticket

13

REDACTED--Public Version

images on a video screen." (*See* Ex. H, Myers Rebuttal Report at ¶ 13). This artificial substitution of language is improper.[4]

Even under Defendants (improper) construction of the display means as a means-plus-function element, it covers a video screen and equivalents thereof because the specification discloses specific structure corresponding to the function of "displaying," which includes a video screen. (*See, e.g.,* '624 patent, col. 10:12-14 ("… a video display screen 218 is provided for displaying a plurality of arrays of lottery tickets."); col. 11:15-25 ("… it may be desired to use the video screen to display the ticket images …"); col. 3:55-58 ("… arrays displayed on a video screen …;" Figs. 8-10 (*see* "218")).

The "display means," *i.e.,* a video screen, displays a "*plurality*" of "*arrays*" of a type of "*lottery ticket representations*," *e.g.* "*ticket images*," that are viewable from outside of the housing of the machine by a customer and that represent the tickets in the machine that are available for purchase. These terms are in dispute and are discussed further below.

### (a) "lottery ticket representations"

"Lottery ticket representations" would be understood by one of ordinary skill in the art to have its ordinary and customary meaning, *i.e.,* a visual representation of the lottery tickets available for sale from the machine so as to communicate to the customer what tickets were sold inside the machine. (*See* '624 patent, col. 1:23-34 (the machine "is improved in its ability to

---

[4] Defendants in effect assert that the "test" for a means-plus-function element is to replace the "means" with the proposed structure and then judge whether the remaining clause is akward. Such a "test" has never been endorsed by the Federal Circuit, and, in fact, such a "test" is contradicted by Federal Circuit law. For example, in *Allen Engineering Corp. v. Bartell Indus.*, 299 F.3d 1336, 1343, 1348 (Fed. Cir. 2002), the Federal Circuit construed the clause "gearbox means for rotating said blade means, said gearbox means comprising a pair of rotatable shafts … ." Under Defendants' test, the "rotatable shafts" could not be the corresponding structure, because the clause would be "rotatable shafts for rotating said blade means, said rotatable shafts comprising a pair of rotatable shafts," an awkward construction. Under Defendants' analysis, that awkwardness would mean that the clause is a means-plus-function clause; however, the Federal Circuit found that the clause was not a means-plus-function clause. *Id.* at 1348.

14

REDACTED--Public Version

communicate to the customer the tickets available"); 36-38 ("a representation of the tickets is displayed ... so that customers can see what they are buying"); 64-66; col. 2:1-5; col. 11:30-35).

The lottery ticket representations must represent the tickets for sale in the machine. The language of claim element [C1] points out: "said array [of lottery ticket representations] representing tickets in said machine available for purchase." Defendants agree with this. (*See* Ex. G, Myers Opening Report at ¶ 16) (indicating that lottery ticket representations pertain to the "tickets to be dispensed by the vending machine.")

### (b) "ticket images"

"Ticket images" are graphical representations of the tickets for sale in the machine. (*See, e.g.,* '624 patent, col. 1:64-66 ("In another embodiment of the vending machine, *graphic* representations of the lottery tickets are displayed on a video screen, rather than through windows.") (emphasis added); col. 10:45-51 ("A video memory 230 is provided to store *graphical* representations of the lottery tickets . . . *These ticket images* are digitized by conventional graphic digitizing means, and the digital signals are stored in the video memory 230 periodically as the games and the lottery tickets are changed.") (emphasis added); col. 11:19-22 ("Also, the video screen, which preferably is a color receiver, will deliver the images of the tickets in vivid, bright colors which will be easy to see in a darkened room, such as in a tavern or café.").

A "ticket image" is a "ticket representation," although the opposite is not necessarily true. The '624 patent specification indicates that examples of "lottery ticket representations" include both physical tickets as well as "ticket images". It states:

> For example, either the ticket itself or a video image of a ticket should be considered to be a "representation" of the ticket. Means other than the specific ones described above can be used to create representations of tickets without departing from the invention.

15

REDACTED--Public Version

(*See* '624 patent, col. 11:30-35). Unlike "lottery ticket representations," "ticket images" (which pertain to lottery ticket representations shown on a video screen) do not include the *physical* embodiments such as a live ticket, a sample ticket, or a portion of the physical ticket actually dispensed by the machine itself, which obviously could not be put on a video screen. Ticket images also do not include any non-graphical representations of a ticket (e.g., the name of a game written in simple text in a button on the screen).

The terms "lottery ticket representations" and "ticket images" are not means-plus-function terms and are not limited by the structure disclosed in the specification (and equivalents thereof), *regardless* of whether the "display means" elements are considered means-plus-function elements. If the "display means" elements are *not* means-plus-function governed by § 112, ¶ 6, as discussed above, then these elements ("lottery ticket representations" and "ticket images") are construed according to standard claim construction rules (as is the "display means" itself) and are not limited to example embodiments in the specification. But this is the case *even if* the "display means" is considered means-plus-function governed by § 112, ¶ 6. *IMS Technology*, 206 F.3d at 1432. Section 112, ¶ 6 applies *only* to interpreting the *means* that performs a recited function when a claim recites insufficient structure for performing the function. *Id.* Thus, the recited function of the "display means" elements is to display. The arrays and tickets images are what is *being displayed*; they are not the *means for* displaying. Thus, their interpretation is not subject to § 112, ¶ 6. *Id.*

The "lottery ticket representations" and "ticket images" in the "display means" elements are analogous to the "data block inquiries" in the "means to sequentially display data block inquiries in *IMS Technology*. "Means to sequentially display data block inquiries" was construed as a means-plus-function element governed by § 112, ¶ 6. *Id.* The recited function was

REDACTED--Public Version

"sequentially displaying data block inquiries," and the means for performing that function covered the structure disclosed in the specification for performing the function of "displaying" the data block inquiries, i.e., a CRT, and its equivalents. *Id.* Notably, the "data block inquiries" were *not* limited by disclosed structure in the specification because "'data block' is not the means that causes the sequential display," i.e. the data block does not do the displaying – it is what is being displayed, "and is therefore not subject to construction under § 112, ¶ 6." *Id.* Similarly, here, the "arrays" (discussed below), "ticket representations" and "ticket images" of claim 18 are not the means for performing the recited "displaying" function; they are what is being displayed. Accordingly, as with the *IMS* "data block inquiries," they are construed in accordance with standard non-§112, ¶6 claim construction rules and are afforded their ordinary and customary meaning.

Defendants, ignoring these legal tenets, attempt to limit "ticket images" and "lottery ticket representations" to the example preferred embodiments in the specification. Defendants ostensibly agree to Plaintiff's proposed construction that "ticket images" are "graphical representations" of tickets for sale in the machine. (*See* Ex. G, Myers Opening Report at ¶16). However, Defendants equate the terms "ticket representation" and "ticket image" with an entire ticket or complete picture of the entire ticket for sale. These terms, however, are not limited as Defendants contend. Defendants' proposal improperly restricts the "ticket representations" of element [C1] and the "ticket images" of element [C2] to the specific exemplary preferred embodiments shown in the specification, namely the live ticket (shown behind windows in the windows embodiment) or a complete picture of the ticket actually dispensed by the machine (described in the video embodiment), thereby unduly and impermissibly importing limitations from the specification into the claim. As the Federal Circuit has recently stated:

REDACTED--Public Version

> We do not import limitations into claims from examples or embodiments appearing only in a patent's written description, *even when a specification describes very specific embodiments of the invention or even describes only a single embodiment,* unless the specification makes it clear that "the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive."

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 2005 U.S. App. LEXIS 21426 at *26-27

(Fed. Cir. Oct. 3, 2005) (Ex. L hereto)(quoting *Phillips*, 415 F.3d at 1323).

Here, there is no express statement that the claims and example preferred embodiments are to be "coextensive." In fact, to the contrary, the specification itself teaches that more than just the preferred embodiments are covered by the claims, stating that the preferred embodiments are only examples, and that other means are within the intended meaning of the claims:

> The above description of the invention is intended to be illustrative and not limiting. Various changes or modifications in the embodiments described may occur to those skilled in the art and these can be made without departing from the spirit and scope of the invention. *For example*, either the ticket itself or a video image of a ticket should be considered to be a "representation" of the ticket. *Means other than the specific ones described above can be used* to create representations of tickets without departing from the invention.

('624 patent, col. 11:26-35) (emphasis added). The '624 patent specification also confirms that it is not necessary that all of the details of the ticket be shown. (*Id.* at col. 3:17-20 ("each of the four windows shows most of the front faces of three lottery tickets.") and Fig. 2).

Further, Defendants erroneously equate "lottery ticket representations" with "ticket images." (*See* Ex. G, Myers Opening Report at ¶ 16). This ignores the general rule that two different terms used in the same claim mean different things. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) (one would expect claims to refer to an element with one term, not two synonymous terms). The language of the specification also

18

REDACTED--Public Version

makes it clear ticket images are but one example of ticket representation: "*For example, either the ticket itself* [i.e., the physical ticket actually dispensed by the machine] *or* a video image of a ticket [i.e., a "graphical representation" of the ticket for sale] should be considered to be a 'representation' of the ticket." (*See* '624 patent, col. 11: 31-33)(emphasis added).

### (c)  "array"

The term "array" would be understood by one of ordinary skill in the art to have its ordinary and customary meaning, i.e., a grouping, arrangement, or ordering of two or more things, which would include rows or columns. The specification of the '624 patent shows examples of arrays which are both groupings or orderings of two or more tickets. (*See, e.g.,* '624 patent, col. 11:1-4 ("Although only 2 tickets are shown in each of the arrays A, B, C, D, E and F, it should be understood that each array can be made to contain more tickets, if it is desired to do so."), Figs. 8 and 10 ("218" and "[A]"-"[F]"). The specification does not provide any alternate definition for "array" other than these examples, which are consistent with the ordinary meaning of the term. (*See* Ex. K, Webster's Ninth New Collegiate Dictionary at 104 (1986) ("a regular and imposing grouping or arrangement: ORDER")).

As explained above with regard to "lottery ticket representations" and "ticket images," the term "arrays" is not a means-plus-function term regardless of whether the "display means" is interpreted as a means-plus-function element. The "arrays" of ticket images in claim 18 are *being* displayed; they are not the "means" for performing the recited function of the display means, i.e. "displaying." *See IMS*, discussed *supra*.

As with "ticket images" above, Defendants improperly deviate from the ordinary meaning of the term "array" and propose an improper limiting definition that restricts the term to the exemplary, preferred "windows" embodiment in the specification which shows a strip of lottery tickets behind a window which moves as the tickets are dispensed. Defendants argue that

19

REDACTED--Public Version

"array" means a strip of tickets from the same game which moves. (*See* Ex. G, Myers' Opening Report at §18). This construction bears no resemblance to the ordinary and customary meaning of the word as understood by one of ordinary skill in the art – or anyone for that matter. It improperly imports three features as limitations to claim 18 -- 1) movement, 2) strips of tickets, and 3) tickets from the same game – which are all taken from the *example* preferred embodiments -- and then reproduces them as claim limitations. This manipulation should be rejected.

There is no support for reading into claim 18 the requirement that the tickets shown in the array must move. In fact, to the contrary, the specification and claims confirm that movement of the tickets is not a requirement of claim 18. First, the '624 patent's abstract refers to "moveable arrays." If "arrays" were defined as moving, referring to "moveable arrays" would be redundant. Second, in discussing the example preferred video embodiment, the specification makes clear that both moving and non-moving arrays were included within the scope of the invention: ". . . each of the arrays of ticket images . . . *can be* made to move . . ." ('624 patent, col. 10: 65-6) (emphasis added). If arrays were defined as including movement, the specification would not call out that the arrays "can be" moved. The "can be" language indicates that movement is optional. Third, other claims of the '624 patent confirm that claim 18 does not require movement of the arrays.

> Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.

20

REDACTED--Public Version

*Phillips*, 415 F.3d at 1315-16 (internal citations omitted); s*ee also Free Motion Fitness v. Cybex Int'l, Inc.*, 2005 U.S. App. LEXIS 19886 at *19 (Fed. Cir. Sept. 16, 2005) (Ex. M) ("The doctrine of claim differentiation 'create[s] a presumption that each claim in a patent has a different scope.")(quoting *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)). Claim 19, which is a dependent claim of asserted claim 18, adds a particular limitation to those already in claim 18: "separately scrolling each of said arrays to produce motion." Thus, it is presumed that independent claim 18 is broader in scope than claim 19 and that the "array" of claim 18 is not limited to a moving array. Further, other '624 patent claims, e.g., claim 13, 21, 23, 24, also expressly recite motion: "moving means for moving an array" or "means for moving said array." Since these claims recite "arrays" and the additional limitation that the arrays are "moving," this would indicate that the word "arrays" by itself does not require that the arrays be "moving." Otherwise, language claiming a moving array in other claims would be surplusage.

Similarly, since "arrays" are not a means-plus-function element, they are not limited to the preferred embodiment of a strip of tickets from the same game shown in the specification or its equivalents; there is thus no support for reading in the limitation that the "arrays" of claim 18 must be tickets from the same game. Nowhere in the '624 specification does it say that movement of arrays or tickets from the same game is *required*. [5] Instead, certain claims of the

---

[5]    Defendants rely on deposition testimony of inventor Robert Burr regarding the definition of the term "array" and contend that his testimony somehow supports the conclusion that "array" is limited to moving tickets from the same game. Mr. Burr's deposition is "extrinsic" evidence which may not be used to contradict otherwise unambiguous terms of the claim. Further, Mr. Burr's testimony in this case does not support Defendants' position. In fact, Mr. Burr confirmed GTECH's definition of array; he simply said an array is "Multiple tickets. More than one ticket." (*See* Ex. G, Myers Opening Report ¶18 (citing Burr Dep. at 92:19-20)). Notably, there is no deposition testimony from Mr. Burr indicating that the tickets in an array must move or must be from the same game.

21

REDACTED--Public Version

'624 patent limit arrays to those containing tickets from the same game (such as in a strip of tickets), and some don't. For example, claims 13, 21, and 23 recite an "array of tickets" with the "tickets being formed in a continuous strip" while claim 18 has no such limitation. If "array" were defined to mean a strip of tickets from the same game, language specifying the additional "tickets being formed in a continuous strip" would be surplusage.

### (d) "plurality"

"Plurality" means more than one or containing more than one. (*See* Ex. K, Webster's Ninth New Collegiate Dictionary at 906 (1986) ("Plurality: 1a: the state of being plural"; "Plural: 2: relating to or consisting of or containing more than one . . ."); *see also York Prods. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996); *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1123 (Fed. Cir. 2004); *Landis on Mechanics of Claim Drafting, Fifth Ed.*, at 3-27 (PLI 2004). Defendants agree that the ordinary meaning of "plurality" means more than one. (*See* Ex. H, Myers Rebuttal Report at ¶ 23). However, Defendants' attempt to further limit "plurality" to refer to "the number of games depicted on the screen and available for purchase from the machine" (*see* Ex. G, Myers Opening Report at ¶ 20; Ex. H, Myers Rebuttal Report at ¶ 23). This contradicts the plain meaning of the term and is an attempt to improperly import a limitation from the specification into the claims.

### (2) Element [E] -- "means for dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer"

The "means for dispensing" element is a means-plus-function element subject to 35 U.S.C. 112 ¶ 6. The function for the "means for dispensing" is to dispense tickets in a number corresponding to the amount of money input into said machine by said customer. The specification of the '624 patent discloses corresponding structure for that function: an opening in the housing for tickets to exit, outfeed rollers and a gravity chute to issue the tickets through the

22

REDACTED--Public Version

opening, a receptacle to receive the tickets that fall through the outlet opening, and a keypad for

entering the number of tickets to be dispensed, up to the amount of credit a player has in the

machine. (*See* '624 patent, col. 2:63-68 ("ticket dispensing outlet"); Fig. 1 at 44, 46, 48, 50 and

64; col. 4:64 – 5:13 and Fig. 5 at 136, 138, 139, 140 (showing ticket fed through opening and

dropping by gravity into receptacle); col. 3:55-59; col. 10:15-18; Figs. 8-10 (showing outlets 220

and 222; col. 3: 25-59)).

   "A court may not construe a means-plus-function limitation 'by adopting a function

different from that explicitly recited in the claim.'" *JVW Enterprises, Inc. v. Interact

Accessories, Inc.*, 2005 U.S. App. LEXIS 21426 at * 16 (Fed. Cir. Oct. 3, 2005) (Ex. L hereto).

"Second, a court errs 'by importing the functions of a working device into the[] specific claims,

rather than reading the claims for their meaning independent of any working embodiment.'" *Id.*

(quoting *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1303 (Fed. Cir. 1999)).

> When construing the functional statement in a means-plus-function
> limitation, we must take great care not to impermissibly limit the
> function by adopting a function different from that explicitly
> recited in the claim.

*Generation II Orthotics, Inc. v. Med. Tech., Inc.*, 263 F.3d 1356, 1364-65 (Fed. Cir. 2001).

   Defendants impermissibly attempt to import an additional function, and structure

corresponding to that additional function, into this claim element. They contend that "means for

dispensing" has two functions: *separating* and dispensing, and that the corresponding structure

for the alleged "separating" function is the "burster" assembly of the ***example***, preferred

embodiment of the '337 patent. (*See* Ex. J, Keefe Rebuttal Report at ¶ 33). Notably, nowhere in

claim 20 is the function of "separating" the lottery tickets recited. The *only* function recited is

dispensing tickets in a number corresponding to the amount of money input into the machine by

23

REDACTED--Public Version

the customer. Defendants' attempt to read the separating function into the claim element is legally improper and should be rejected.

In order to qualify as corresponding structure, "the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function." *JVW Enterprises*, 2005 U.S. App. LEXIS 21426 at * 14, fn 1. *See also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003); *Med. Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003).[6]

Not only does the '624 patent specification *not* clearly associate or link the separating structure with the function of dispensing tickets in a number corresponding to the amount of money input into the machine by the customer, it confirms the opposite: that separating the tickets from a strip of tickets to which it is connected, for example, the bursting of the tickets, is *not* part of the dispensing process. (*See* '624 patent, col. 1:15-18 (referring to bursting and dispensing as two different things: "[The lottery ticket vending machine] advantageously stores lottery tickets in fan-fold form, *bursts* them apart accurately and reliably, and *dispenses* the tickets one-by-one.") (emphasis added); col. 10:28-30 (". . . *separates* the proper number of tickets, *and dispenses* them through the outlet opening 220.") (emphasis added). The "separating" of the tickets occurs before "dispensing," and "dispensing" is clearly a separate process. (*Id.* at col. 4:64 – 5:13 ("The severed [i.e. already separated] ticket 128 *is dispensed* past metal guides . . . "))(emphasis added). The '624 patent references the '337 patent (at that time a co-pending application) as disclosing a "feeding and bursting mechanism." (*Id.* at col. 5:14-22). As Defendants acknowledge, (*see* Ex. F at 10), the bursting mechanism of the '337

---

[6]    In *Omega*, when the specification clearly linked two structures to a function, but nothing in the specification or prosecution history linked the third structure to that function, the court rejected an attempt to include that third structure as additional corresponding structure. *Id.* at 1328.

24

REDACTED--Public Version

patent corresponds to the "means for separating" of that patent. Claim 20 of the '337 patent confirms this by claiming *both* a "means for separating" – referring to the bursting of the tickets – *and* a "dispensing means" – which refers to the issuing of the tickets from the machine, indicating that they are *not* the same functions.

Further, claim differentiation establishes that in claim 18 of the '624 patent, separating is an entirely different function from dispensing and has its own corresponding structure. Claim 18, as originally filed (original claim 38), depended from an independent claim (original claim 23) which had a separate dependent claim (original claim 25) directed to separating the tickets.[7] (*See* Ex. C, '624 file wrapper, app. 312,111, at 2/17/89 Application at 30-33). Other claims of the '624 patent also recite a "separator means for . . . separating said tickets" as a means that is distinct from the "dispensing means", *see, e.g.,* claims 13, 21 and 23, further confirming this conclusion.

Since separating is not a function of this means-plus-function element, corresponding structure for separating is irrelevant and is not a limitation on this element. Further, structure for separating, e.g. the '337 preferred burster embodiment, is not structure that corresponds to the *only* recited function of this element, the dispensing function.

### 2. '337 Patent – Claim 20

The '337 patent contains 35 claims directed to various embodiments of a ticket dispensing machine for dispensing lottery tickets, but which all have in common a novel feature of the '337 patent -- they utilize a separator mechanism to "burst" apart, rather than cut, tickets in a fan-folded strip for dispensing. Four claims of the '337 patent have been asserted against

---

[7]  Claim 18 was allowed in the first office action if rewritten in independent form, which it was. (*See* Ex. C, '624 file wrapper, app. 312,111 2/11/91 Office Action at 5; 6/5/91 Amendment at 12; 10/11/91 Office Action).

25

REDACTED--Public Version

Defendants in this lawsuit, namely independent claims 20, 22 and 24 and dependent claim 21,

which depends from claim 20.

Asserted Claim 20 of the '337 Patent, divided into constituent clauses (with letters added

for ease of reference and clarity), recites:

[A]  A ticket dispensing machine for dispensing tickets directly to the purchaser
     thereof, said dispenser comprising the combination of
[B]  housing means for storing a strip of tickets to be dispensed,
[C]  said housing means having an outlet opening accessible to the purchaser of tickets
     from said machine,
[D]  means operable for ordering a plurality of tickets in a single batch,
[E]  means for separating each of said tickets from said strip,
[F]  dispensing means for dispensing tickets through said outlet opening, and
[G]  control means for causing each ticket in said batch to be separated and
     dispensed separately from the other tickets in said batch regardless of the number
     of tickets in said batch.

### a) Undisputed Terms of Claim 20

Defendants have not raised any dispute as to the following claim elements and terms

thereof in its interrogatory responses or expert reports or testimony.  Plaintiff therefore

understands its proposed constructions for these elements and terms to be undisputed.

#### (1) Element [A] -- "A ticket dispensing machine for dispensing tickets directly to the purchaser thereof, said dispenser comprising the combination of"

A ticket dispensing machine is "a machine for dispensing tickets".[8]  This is the plain,

ordinary meaning of this term.

#### (2) Element [D] – "means operable for ordering a plurality of tickets in a single batch,"

---

[8]  The District Court for the Northern District of Ohio, in construing certain claims of the '337 patent in
*Interlott Techs., Inc. v. Pollard Banknote Ltd.*, C.A. No. 1:02CV2157 (the *"Pollard* Court") agreed that
this element should be construed to mean "a machine for dispensing tickets." The *Pollard* Court also
noted that the element "apparatus for dispensing tickets" in claim 22, discussed below, and "dispenser for
dispensing tickets" in claim 28, discussed below, mean the same thing. *See* Ex. N, *Interlott Techs., Inc. v.
Pollard Banknote Ltd.*, C.A. No. 1:02CV2157 (N.D. Ohio Markman ruling Aug. 4, 2003), GTECH
33743-33800("*Pollard* Markman ruling").

REDACTED--Public Version

This is a means-plus-function claim element subject to 35 U.S.C. § 112 ¶6. The function is to allow ordering of a plurality of tickets, i.e., two or more, in a single batch. The specification of the '337 patent discloses structure corresponding to that function, namely a control panel 32, keypad 37, push buttons 38, and control circuit 40. (*See, e.g.,* Ex. B, '337 patent, col. 7: 41-7, 48-50, 56-59; Figs. 3 and 10).[9] This claim elements should be construed to encompass those structures as well as equivalents thereof.

### (3) Element [F] – "dispensing means for dispensing tickets through said outlet opening, and"

This element should be construed as a means-plus-function element because a specific function is claimed without corresponding structure recited in the claim. The recited function of this claim element is dispensing tickets through the outlet opening in the housing. The corresponding structure disclosed in the '337 patent to perform that specific function is ticket exit or "kick-out" rollers that cause a ticket to travel from the point of separation through the dispensing outlet opening. (*See* '337 patent, Col. 10: 45-48). Defendants agree. (*See* Ex. J, Keefe Rebuttal Report at ¶ 29).

### (4) Element [G] -- "control means for causing each ticket in said batch to be separated and dispensed separately from the other tickets in said batch regardless of the number of tickets in said batch."

This element should also be construed as a means-plus-function element. The specific function claimed is causing each ticket in a batch to be separated and dispensed separately regardless of the number of tickets in the batch. The corresponding structure disclosed in the '337 patent for performing this function is a control circuit (*See* '337 patent, Fig. 10, item 40; col. 7:41-47). The specification explains that this control circuit may be a microprocessor-based

---

[9]      The *Pollard* Court agreed with this recited function and corresponding structure. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33772-73).

REDACTED--Public Version

circuit of a minicomputer which controls the operation of the ticket dispensing machine. (*Id.* at col. 7: 44-47). Defendants have not disputed this construction.

### b) Disputed Terms of Claim 20

#### (1) Element [B] – "housing means for storing a strip of tickets to be dispensed,"

This element is not a means-plus-function element subject to interpretation under 35 U.S.C. §112, ¶6, because the claim recites sufficient structure, i.e., a "housing", to perform the recited function. That is, the function of "storing a strip of tickets to be dispensed" is performed by the "housing" structure that is specifically recited in the claim language. The plain, ordinary meaning of housing is "cabinet, case, or enclosure." (*See* Ex. K, Webster's Ninth New Collegiate Dictionary at 585 (1986) ("something that covers or protects as a: a case or enclosure (as for a mechanical part or an instrument) . . .")). The specification indicates it is using the term "housing" consistent with its ordinary meaning. (Ex. B, '337 patent, col. 3:29-32 (". . .[A]pparatus for dispensing lottery tickets comprises a box-like module . . ."); col. 7: 3-9 (". . .[U]nit 14 is constructed as a box-like module . . . Unit 14 includes a housing . . .")[10]

The perfunctory use of the word "means" in this claim element does not magically transform it into an element that recites only function and not structure as required for ¶ 112, § 6 to apply. *See Envirco*, 209 F.3d at 1364. During the threshold inquiry of whether a claim element is a means-plus-function element, the determination involves whether the claim itself

---

[10]  These specification cites also describe the preferred *example* embodiment of the "housing" described in the specification. (*Id.* at col. 7: 5-6 ("Unit 14 includes a housing with a front surface 28 . . .")). If housing was *defined* as the "front surface 28," the "opposed back surface 30," etc., the specification would not say "a housing with a front surface . . ." This language choice confirms that housing is used as a general class of structures that store, like a box-like module. That "housing" can be configured in a number of ways, one of which is the example preferred agent-operated structure described in the specification.

063631.1001

REDACTED--Public Version

recites *sufficient* structure to perform the claimed function. *See, e.g., Rodime PLC v. Seagate Tech., Inc.*, 174 F.2d 1294, 1304 (Fed. Cir. 1999) (emphasis added).

A term such as "housing" is, in and of itself, a structural term. Its ordinary meaning connotes structure – a cabinet, case or enclosure. *See, e.g., Envirco*, 209 F.3d at 1365 (holding that the term "baffle" in "second baffle means" itself is a structural term, which rebuts the presumption § 112, ¶6 applies). A claim term recites sufficient structure if "the 'term, as the name for structure, has a reasonably well understood meaning in the art.'" *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002) (citations omitted). "Housing" in "housing means" here is analogous to the "digital detector" construed by the Federal Circuit in *Personalized Media Communications v. ITC*, 161 F.3d 696 (Fed. Cir. 1998). The Federal Circuit held that the term "detector" in "digital detector" was a sufficient recitation of structure in and of itself because it had a well-known meaning to those of skill in the art. *Id.* at 704-5. Further, the fact that the term "detector" does not necessarily connote a precise physical structure, as opposed to a variety of structures known as "detectors," did not undermine the conclusion that the term "detector" is a sufficiently definite structural term to preclude the application of § 112, ¶ 6. *Id.* Similarly, "housing" has a definite understood meaning which connotes a class of structures. It need not connote a specific housing, such as the example housing described in the preferred embodiment, to have sufficient structure to avoid the application of § 112, ¶ 6.[11]

---

[11] Defendants' experts have relied on a statement made in the prosecution history of the '624 patent (not of the '337 patent which this claim 20 and element are from) that the structure disclosed in the '337 patent is not suitable for use as an unattended vending machine. First, the statement referred to was a general description of the example, preferred embodiment of the '624 patent. Second, insofar as Defendants contend that any such statement somehow limits the "housing means" of claim 20 of the '337 patent, that position should be rejected. The '624 patent, which was issued after the '337 patent and was *not* cited during the prosecution thereof, is "extrinsic evidence" that may not be used to alter or vary the (continued...)

DB02:5073130.1

063631.1001

REDACTED--Public Version

Defendants attempt to import an additional function into this element that isn't recited there – dispensing. The function recited is ***storing*** a strip of tickets to be dispensed. The prepositional phrase "to be dispensed" modifies the term "tickets," thereby identifying which tickets are ***stored*** in the housing. Nowhere does the function of this element recite dispensing as a function of the housing itself. In fact, as Defendants acknowledge, a different element of claim 20, the "dispensing means," recites the function of dispensing. *See* undisputed claim element [F], *supra*. It is therefore improper to include the function of dispensing into this claim element. *See JVW Enterprises*, 2005 U.S. App. LEXIS 21426 at * 16 ("A court may not construe a means-plus-function limitation 'by adopting a function different from that explicitly recited in the claim.'")(quoting *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)); *Generation II Orthotics*, 263 F.3d at 1364-65; *Rodime*, 174 F.3d at 1303.

It is also improper to import any dispensing structure into this claim element because dispensing structure is not corresponding structure that is specifically linked to the function of storing in the specification. *See JVW Enterprises*, 2005 U.S. App. LEXIS 21426 at *18 (citations omitted). Defendants contend that the *only* corresponding structure for the recited function of storing is the agent-operated structure of the example preferred embodiment, including the outlet opening, control panel, keypad and dispensing outlet. (*See* Ex. I, Keefe Opening Report at ¶ 12). Even if this element were considered means-plus-function governed by § 112, ¶ 6 as Defendants contend, the agent-operated structure of the example preferred

---

construction of terms that are otherwise unambiguous after consideration of the intrinsic evidence, namely the '337 patent and prosecution history. Notably, the '337 prosecution history is devoid of any statement limiting the claims of the '337 patent to an agent-operated ticket vending machine. In fact, the *Pollard* Court considered such an argument in connection with the preamble term of claim 20, and rejected it, as an improper limitation of the '337 patent claims. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33760-64).

REDACTED--Public Version

embodiment is not specifically linked structure corresponding to the storing function. The outlet opening and control panel have nothing to do with the function of *storing* a strip of tickets, nor do the keypad and dispensing outlets. The specification does not indicate that these components are necessary to *store* a strip of tickets to be dispensed.

Defendants contend that since the claim does not recite all the specific agent-operated structure (including the outlet opening, control panel, keypad and dispensing outlet and their specific orientation to each other) from the example, preferred embodiment in it, "housing means" must be considered a means-plus-function claim element limited to this agent-operated corresponding structure. This is an improper claim construction analysis. Not every detail of the structure disclosed in the specification need be included in the claim to remove it from the ambit of § 112, ¶ 6. *Rodime*, 174 F.2d at 1304. Further, sufficient structure to perform the storing function *is* recited in the claim, as discussed above.

### (2) Element [C] – "said housing means having an outlet opening accessible to the purchaser of tickets from said machine,"

"Outlet opening" would be understood by one of ordinary skill in the art to have its ordinary and customary meaning. "Outlet" is a "place or opening through which something is let out" and an "opening" is "something that is open" (Ex. K, Webster's Ninth New Collegiate Dictionary at 838, 826 (1986)). The '337 patent specification shows a "dispensing outlet" which is something that is open and is a place or opening through which the tickets are dispensed. (*See, e.g.*, '337 patent, Fig. 4 at dispensing outlet "34"). Defendants do not dispute these ordinary and accustomed meanings of these terms. Defendants, however, improperly attempt to limit the outlet opening to an orientation on the opposite side of the machine from the control panel and keypad as disclosed in the example preferred embodiment. This attempt should be rejected.

31

REDACTED--Public Version

The term "outlet opening" is not a means-plus-function term, regardless of whether "housing means" of element [B] is interpreted that way. The "outlet opening" does not use the term "means for," and does not recite function, only structure. Further, like the "ticket images" and "arrays" of claim 18 of the '624 patent, even assuming "housing means" were considered to be a means-plus-function element governed by § 112, ¶ 6, "outlet opening" is not the "means" for performing the recited function of storing the strip of tickets to be dispensed and therefore is not limited to the corresponding structure identified in the specification for storing. *See IMS Technology*, 206 F.3d at 1432.

### (3) Element [E] – "means for separating each of said tickets from said strip,"

This is also a means-plus-function claim element. The claimed function is to separate the leading ticket from the remaining tickets in a strip. The specification of the '337 patent discloses structure corresponding to that function, namely a separator member, which functions in combination with a "holding means" and a "drive means."[12]

In the embodiment described and illustrated in the '337 patent, tickets are not separated by cutting with a sharp blade; rather, they are "burst" by application of pressure by a round wheel separator member along the line of weakness or perforation between adjacent tickets. (*See, e.g.,* '337 patent, col. 10:57-63). The "separator member" structure disclosed in the '337 patent specification that corresponds to the cited function of this claim element is the dull edged burster wheel and equivalents thereof. (*See* '337 patent, burster wheel 68). During the bursting process, the ticket is held by pinch rollers while the separator member is brought into contact with the ticket strip by the drive means, a burster motor, causing pressure to be applied by the separator member to the perforation. The separator member bursts the tickets apart at the

---

[12]     The *Pollard* Court agreed. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33745, 33776-77).

063631.1001

REDACTED--Public Version

perforation, rather than cutting them. The '337 patent states expressly that the novel separation

mechanism described and claimed in the patent does not include cutting:

> Simply to provide a knife edge or cutting blade to slice through the stream of
> tickets is disadvantageous, since such a knife edge may *cut* through the tickets at
> any point, such as in the middle of a ticket. . . . the present invention provides a
> novel separation mechanism which *bursts* the leading ticket from the next
> following ticket along the line of weakness therebetween, *instead of cutting* the
> two tickets apart.

(*See* '337 patent, col. 9:62-10:4) (emphasis added); *see also* '337 patent, col. 10:61-62 (". . . does

not cut stream of tickets")).

The "holding means" holds the stream of tickets against substantial deflection from the

path at the bursting position. (*See* '337 patent, col. 3:57-59). As explained further with regard to

claims 22 and 24 below, this does not require that the holding occur at the bursting position;

rather, the strip of tickets must simply be held so long as that holding functions to prevent

substantial deflection of the strip from the path at the bursting position. The specification shows

a roller or rollers holding the ticket strip against substantial deflection from the path at the

bursting position. (*Id.* at col. 10:64 – 11:2; rollers 60, 62, 64, 66). This claim element should be

construed to encompass both the rollers disclosed in the preferred embodiment as corresponding

structure and equivalents thereof.

The "drive means" brings the separator member into bursting contact with the stream of

tickets at the bursting location. (*See* '337 patent, col. 3:59-63). The structure corresponding to

this function is a motor. (*See* '337 patent, col. 13:24-26 ("Burster wheel 68 is shown mounted on

a burster block 98 *driven by a burster motor 100* through a cable spool arrangement 102

including tensioning spring 104")(emphasis added). Additional structure beyond the motor is

not directly linked to the driving function of the "drive means." Unlike in claims 22 and 24 (*see*

discussion below), the function of the drive means of claim 20 (to bring the separator member

REDACTED--Public Version

into bursting contact with the strip) involves the creation of motion; it does not require movement in a particular direction as in claims 22 and 24 (where the function is "creating motion of said separator member and said strip *relative to one another in a direction transverse to the strip . . .*") (emphasis added). Thus, the only structure necessary for performance of this function is the motor because it is the motor that drives. The additional structure of the burster block, cable spool arrangement, tensioning spring, etc., are structure which works in conjunction with the driving to provide direction to the motion of the separator member of the preferred embodiment, but direction is not a requirement of the function of this claim element.

### 3.  '337 Patent - Claim 21

Claim 21 of the '337 patent reads as follows:

21.    A machine as in claim 20 in which said tickets are instant-winner lottery tickets.

This claim depends from claim 20 and adds the additional limitation that the tickets described in claim 20 are instant lottery tickets. This claim element has its plain meaning. There is no dispute between the parties about the meaning of the terms claim.

### 4.  '337 Patent - Claim 22

Plaintiff's assertion of claims 22 and 24 of the '337 patent is currently the subject of a pending motion for reconsideration [D.I. 91]. Thus, Plaintiff has included discussion of those claims herein so that the Court can consider the construction of those claims on the same schedule as that of the other claims in suit should it decide the motion for reconsideration favorably to GTECH in the interim. Asserted Claim 22 of the '337 Patent, divided into constituent clauses (with letters added for ease of reference and clarity), recites:

[A]    Apparatus for dispensing tickets from a strip of tickets dilineated [sic] from one another by lines along which the material of said strip is weakened, said apparatus comprising, in combination

REDACTED--Public Version

[B]   means for moving said strip towards a dispensing position,

[C]   a separation member,

[D]   means for holding said strip adjacent one line along which said strip is to be separated, and causing said strip to bend along said one line at said dispensing position to facilitate tearing of said strip by engagement with said separator member along said one line while said strip is bend [sic], and including

[E]   drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line.

### a) Construction of Elements and Terms of Claim 22[13]

#### (1) Element [A] – "Apparatus for dispensing tickets from a strip of tickets dilineated [sic] from one another by lines along which the material of said strip is weakened, said apparatus comprising, in combination"

"Apparatus for dispensing tickets" has the same meaning as "a ticket dispensing machine" in claim 20, which is a machine for dispensing tickets. The tickets must be delineated from each other by lines of weakness.

#### (2) Element [B] – "means for moving said strip towards a dispensing position,"

This is means-plus-function claim element. The function is to move the strip of tickets towards a dispensing position. A dispensing position is the location where the ticket is dispensed.[14] The corresponding structure that performs this function in the '337 patent is a set of rollers with a motor. (*See* '337 patent, col. 10:32-38, 45-48, 49-51). The motor rotates a roller in a set of rollers, with the ticket strip between the rollers, such that movement of the motor causes movement of the rollers and ticket strip. (*Id.*) This claim element should be construed to cover this disclosed structure and equivalents thereof.

---

[13]   Defendants have not provided any positions with regard to claims 22 and 24 in its interrogatory responses or expert reports.

[14]   As discussed in connection with element [F] "means for dispensing" of claim 20, the location where the ticket is dispensed is the site where the tickets are issued to the customer from the machine. The *Pollard* Court agreed. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33745).

REDACTED--Public Version

### (3) Element [C] – "a separation member,"

The "separation member" is "a distinct part used to disconnect or sever the tickets."[15]

The "separation member" is not a cutting blade used to cut the tickets apart. (*See, e.g.,* '337

patent, col. 9:62-68, col.10:61-2 (". . . does not cut stream of tickets"); col. 10:1-4).

> ### (4) Element [D] – "means for holding said strip adjacent one line along which said strip is to be separated, and causing said strip to bend along said one line at said dispensing position to facilitate tearing of said strip by engagement with said separator member along said one line while said strip is bend [*sic*]",

This is a means-plus-function claim element which recites two functions, a "holding"

function and a "bending" function. The "holding" function of this element is slightly different

from the function of the "holding means" element of claim 20. Here, the "holding" function is to

hold the strip *adjacent the "one line"*, i.e. the line of weakness or perforation between two

adjacent tickets, along which the strip is to be separated. Thus, while this element requires

holding, like in claim 20, it requires that the holding occur in a specific location, adjacent the line

of weakness, whereas in claim 20, the holding can occur anywhere so long as there is no

substantial deflection of the ticket from the path at the bursting position. In the '337 patent,

corresponding structure for this "holding" function is rollers 60, 62, 64, and 66. (*See* '337

patent, col. 10:64-col. 11:2, 12-27). The "bending" function recited involves causing the strip to

bend along the line of weakness at a dispensing position to facilitate the tearing of the strip by

engagement with the separator member along the one line while the strip is bent. In the '337

patent, this "bending" function is caused by the relative movement of the separator member

(which is shown as burster wheel 68), and the ticket strip, which is held by the rollers or

---

[15] This is consistent with the *Pollard* Court's construction of this element. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33745, 33764-67; *see* GTECH 33764 ('separation member' of claim 22 and "separator member" of claim 24 have the same meaning); *see also* GTECH 33745, 33747).

REDACTED--Public Version

equivalents thereof. (*See* '337 patent at col. 10:64 – col. 11:11; col. 11:28-41). This element should therefore be construed to encompass the rollers used for holding and equivalents thereof, and a separator member and ticket strip, and equivalents thereof, which move relative to each other for bending the ticket strip.

> (5) **Element [E] – "and including drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line."**

The "drive means" of this element is a means-plus-function claim element. The function of the drive means here (as opposed to that of claim 20) is to create motion of the separator member and the strip relative to each other in a direction that is transverse to the strip while the separator member is in contact with and deflects the strip to bend it along the line of weakness and to burst the ticket apart along the line of weakness. "Transverse" means any direction perpendicular to the direction of the travel of the strip. Bursting the ticket apart along the "one line," the line of weakness, means to separate the tickets by application of pressure along the line of weakness. [16] The structure corresponding to this function is the buster motor which creates the motion, as well as a burster block (driven by the burster motor) and a cable spool arrangement including a tensioning spring which provides directional control necessary to achieve the transverse motion. Unlike in the "drive means" element of claim 20, directional control, as well as the ability to create motion, correspond to this function. [17]

### b)  '337 Patent - Claim 24

---

[16]     The *Pollard* Court agreed with the constructions of these terms. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33745-46, 33777-83).

[17]     *See* Ex. N, *Pollard* Markman ruling at GTECH 33784.

REDACTED--Public Version

Asserted Claim 24 of the '337 Patent, divided into constituent clauses (with letters added for ease of reference and clarity), recites:

> [A] Apparatus for dispensing tickets from a strip of tickets dilineated [sic] from one another by lines along which the material of said strip is weakened, said apparatus comprising, in combination,
> [B] means for moving said strip towards a dispensing position,
> [C] means for holding said strip adjacent one line along which said strip is to be separated, and bending said strip along said line to facilitate tearing of said strip along said one line,
> [D] including separation means having a separator member and drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line,
> [E] and including means for causing said separator member to break through said strip in one locale and then traverse the strip along said line.

### c)  Construction of Elements and Terms of Claim 24

#### (1)  Elements [A] –[C]

Element [A] should be construed the same as element [A] of claim 22.  Element [B] should be construed the same as element [B] of claim 22.  Element [C] should be construed the same as element [D] of claim 22.

> **(2)  Element [D] – "including separation means having a separator member and drive means for creating motion of said separator member and said strip relative to one another in a direction transverse to the strip, with said member in contact with and deflecting said strip to bend said strip along said one line and burst said tickets apart along said one line,"**

This element "separation means" here is not a means-plus-function element because it recites sufficient structure in the claim itself for what constitutes the separation means, namely a separator member and drive means.  The separator member of this element is the same as the

38

REDACTED--Public Version

"separation member" of claim 22. The drive means of this element is the same as the "drive means" of claim 22.[18]

### (3) Element [E] – "and including means for causing said separator member to break through said strip in one locale and then traverse the strip along said line."

This is also a means-plus-function claim element. The function of this claim element is to cause the separator member to break through the strip in one locale and then traverse the strip along the line of weakness. Here, "in one locale" means at a point or position. "[T]raverse the strip along said line" means to travel across, over, or through the strip along the line of weakness.[19] In the '337 patent, the corresponding structure, the "means for" causing the separator member to break through the perforations sequentially instead of all at once are the burster motor and the separator member shape.[20]

---

[18]    The *Pollard* Court treated this element as a means-plus-function element with the function and corresponding structure of the "means for separating" of claim 20. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33747, 33773). However, given the clear structure recited in the claim, GTECH submits that conclusion was incorrect. In fact, a "holding means" is already included in this claim in element [C]; thus, if this claim were interpreted as a means-plus-function claim, two "holding means" would be required by this claim, which supports the conclusion that this element should not be treated as a means-plus-function element.

[19]    The *Pollard* Court agreed with the constructions of these terms. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33748, 33787-89).

[20]    The *Pollard* Court held that the additional structure of a burster block and cable spool arrangement including a tensioning spring are necessary to perform this function. (*See* Ex. N, *Pollard* Markman ruling at GTECH 33787-90). This additional structure, though, is not necessary for the function of this claim element. The motor is what drives. (*See* '337 patent, col. 13:24-26 ("Burster wheel 68 is shown mounted on a burster block 98 driven by a burster motor 100 through a cable spool arrangement 102 including tensioning spring 104")(emphasis added)). The burster block and cable merely transmit the power provided by the motor; they are not the cause of the motion of the strip relative to the separator.

REDACTED--Public Version

## IV.    CONCLUSION

For all of the above reasons, the asserted claims of the '624 patent and '337 patent should

be construed as GTECH has proposed.

YOUNG, CONAWAY, STARGATT
& TAYLOR, LLP


Dated: October 14, 2005

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Karen E. Keller (#4489)
Andrew A. Lundgren (#4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

OF COUNSEL:

Thomas J. Meloro
Larissa A. Soccoli
KENYON & KENYON
One Broadway
New York, New York 10004
Telephone: (212) 425-7200
Facsimile: (212) 425-5288


Douglas E. Ringel
KENYON & KENYON
1500 K Street NW
Washington, DC 20005
Telephone: (202) 220-4200
Facsimile: (202) 220-4201

*Attorneys for Plaintiff GTECH Corporation*

40

REDACTED--Public Version

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on October 14, 2005, I caused to be

electronically filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

> Jack B. Blumenfeld Esquire
> Morris Nichols Arsht & Tunnell
> 1201 North Market Street
> Wilmington, DE 19801

I further certify that on October 14, 2005, I caused a copy of the foregoing document to

be served by hand delivery on the above-listed counsel of record.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Karen E. Keller (#4489)
Andrew A. Lundgren (#4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600
alundgren@ycst.com

*Attorneys for GTECH Corporation*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on November 7, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld Esquire
> Morris Nichols Arsht & Tunnell
> 1201 North Market Street
> Wilmington, DE 19801

I further certify that on November 7, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Karen E. Keller*

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Karen E. Keller (#4489)
Andrew A. Lundgren (#4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600
kkeller@ycst.com

*Attorneys for GTECH Corporation*