IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GTECH CORPORATION,

        Plaintiff,

        v.

SCIENTIFIC GAMES INTERNATIONAL,
INC., SCIENTIFIC GAMES HOLDINGS
CORPORATION, SCIENTIFIC GAMES
FINANCE CORPORATION, and
SCIENTIFIC GAMES CORPORATION,

        Defendants.

C.A. No. 04-138-JJF

**REDACTED VERSION**

## SCIENTIFIC GAMES' OPENING BRIEF IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
 Attorneys for Defendants

Original Filing Date:  November 14, 2005

Redacted Filing Date:  November 15, 2005

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| TABLE OF CITATIONS | | iii |
| NATURE AND STAGE OF THE PROCEEDING | | 1 |
| SUMMARY OF ARGUMENT | | 1 |
| STATEMENT OF FACTS | | 2 |
| | A. The '337 Patent | 4 |
| | B. The '624 Patent | 6 |
| | C. Scientific Games' PlayCentral Kiosk | 9 |
| ARGUMENT | | 15 |
| I. | SUMMARY JUDGMENT STANDARD | 15 |
| II. | SCIENTIFIC GAMES' PLAYCENTRAL KIOSK DOES NOT INFRINGE CLAIMS 20 AND 21 OF THE '337 PATENT. | 15 |
| | A. Infringement Of Means-Plus-Function Limitations | 15 |
| | B. The PlayCentral Does Not Have The Claimed "Means For Separating." | 17 |
| | 1. Interlott -- GTECH's Predecessor -- Admitted That The Separating Mechanism Of The PlayCentral Does Not Infringe The '337 Patent. | 17 |
| | 2. The Structure In The PlayCentral For Separating Tickets Is Not Identical Or Equivalent To The Structure Disclosed In The '337 Patent. | 19 |
| | C. The PlayCentral Kiosk Does Not Have The Claimed "Dispensing Means." | 28 |
| | D. The PlayCentral Kiosk Does Not Have The Claimed "Housing Means." | 30 |
| III. | SCIENTIFIC GAMES' PLAYCENTRAL KIOSK DOES NOT INFRINGE CLAIM 18 OF THE '624 PATENT. | 33 |
| | A. The PlayCentral Kiosk Does Not Display "A Plurality Of Arrays Of Ticket Images." | 33 |

## TABLE OF CONTENTS (cont'd)

B.    The PlayCentral Kiosk Does Not Have The Claimed "Means For Dispensing."    36

IV.    GTECH SHOULD BE PRECLUDED FROM RECOVERING DAMAGES FOR THE PERIOD BEFORE MARCH 4, 2004.    37

CONCLUSION    38

TABLE OF CITATIONS

Page(s)

Cases

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
  296 F.3d 1106 (Fed. Cir. 2002) .................................................. 20

*Cephalon, Inc. v. Barr Labs., Inc.*,
  389 F. Supp. 2d 602 (D. Del. 2005) ............................................ 33

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
  145 F.3d 1303 (Fed. Cir. 1998) .......................................... 16, 20, 24, 27

*Dunlap v. Schofield*,
  152 U.S. 244 (1894) ............................................................... 38

*Faroudja Labs., Inc. v. Dwin Elec., Inc.*,
  76 F. Supp. 2d 999 (N.D. Cal. 1999) .......................................... 20

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002) ............................................................... 35

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,
  389 F.3d 1370 (Fed. Cir. 2004) .............................................. 16, 17

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
  370 F.3d 1131 (Fed. Cir. 2004) ................................................ 36

*Ishida Co. v. Taylor*,
  221 F.3d 1310 (Fed. Cir. 2000) ................................................ 16

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005) ................................................ 25

*Kemco Sales, Inc. v. Control Papers Co.*,
  208 F.3d 1352 (Fed. Cir. 2000) ................................................ 16

*Lans v. Digital Equip. Corp.*,
  252 F.3d 1320 (Fed. Cir. 2001) ................................................ 37

*Liposome Co. v. Vestar, Inc.*,
  1994 WL 738952 (D. Del. 1994) .............................................. 18

*Maxwell v. J. Baker, Inc.*,
  86 F.3d 1098 (Fed. Cir. 1996) ................................................. 37

iv.

TABLE OF CITATIONS (cont'd)

*Nomos Corp. v. BrainLAB USA, Inc.*,
  357 F.3d 1364 (Fed. Cir. 2004) ............................................ 27

*Nomos Corp. v. BrainLAB, Inc.*,
  195 F. Supp. 2d 606 (D. Del. 2002),
  *aff'd*, 357 F.3d 1364 (Fed. Cir. 2004) ............................. 16

*Nomos Corp. v. BrainLAB, Inc.*,
  239 F. Supp. 2d 430 (D. Del. 2003),
  *aff'd*, 357 F.3d 1364 (Fed. Cir. 2004) ......................... 15, 26

*Sage Prods., Inc. v. Devon Indus., Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997) ........................................ 30

*Unidynamics Corp. v. Automatic Prods. Int'l Ltd.*,
  157 F.3d 1311 (Fed. Cir. 1998) ...................................... 29

<u>Statutes</u>

35 U.S.C. § 112, ¶ 6 ..................................................... *passim*

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff GTECH Corporation ("GTECH") filed this patent infringement action against Scientific Games International, Inc., Scientific Games Holdings Corporation, Scientific Games Finance Corporation, and Scientific Games Corporation (collectively, "Scientific Games") on March 4, 2004 (D.I. 1). GTECH amended its Complaint on March 10, 2004 (D.I. 4). GTECH never served the Complaint, and never advised Scientific Games that it had been filed. Scientific Games answered the Complaint on May 18, 2004 (D.I. 6).

GTECH has accused Scientific Games' PlayCentral Kiosk of infringing claims 20 and 21 of U.S. Patent No. 4,982,337 ("the '337 patent"), and claim 18 of U.S. Patent No. 5,222,624 ("the '624 patent").

The Court has scheduled a *Markman* hearing for November 18, 2005, and a Final Pretrial Conference for January 12, 2006 (D.I. 105). No trial date has been set.

## SUMMARY OF ARGUMENT

1.     The accused PlayCentral machine does not have the "means for separating" of claim 20 of the '337 patent. There is no genuine issue of material fact that the structure for separating lottery tickets in the PlayCentral machine is not identical or equivalent to the structure disclosed in the '337 patent for separating tickets -- as Interlott's 30(b)(6) witness in the earlier *Pollard* litigation admitted.

2.     The accused PlayCentral machine does not have the "housing means" of claim 20 of the '337 patent. There is no genuine issue of material fact that the structure of the customer-activated PlayCentral is not identical or equivalent to the structure of the clerk-activated terminal disclosed in the '337 patent.

3.    The accused PlayCentral machine does not have the "dispensing means" of claim 20 of the '337 patent. There is no genuine issue of material fact that there is no structure in the PlayCentral that is identical or equivalent to the exit or "kick out" rollers disclosed in the '337 patent.

4.    The accused PlayCentral machine does not have the "video display means" of claim 18 of the '624 patent. There is no genuine issue of material fact that the PlayCentral machine does not display a "plurality of arrays of ticket images," as those terms are used in the '624 patent.

5.    The accused PlayCentral machine does not have the "means for dispensing" of claim 18 of the '624 patent. There is no genuine issue of material fact that the structure for dispensing tickets in the PlayCentral machine is not identical or equivalent to the structure disclosed in the '624 patent.

6.    There is no genuine issue of material fact that GTECH (and its predecessors) did not mark any products with the numbers of the '337 patent or the '624 patent, and there is no genuine issue of material fact that GTECH never provided Scientific Games with actual notice of infringement of the patents. GTECH should be precluded from recovering damages for the period before this case was filed on March 4, 2004.

## STATEMENT OF FACTS

The '337 patent describes a clerk-activated terminal with a front surface that has a control panel facing the sales clerk and a back surface that has a dispensing outlet facing the customer. The separating mechanism described in the '337 patent uses a movably mounted, dull-edge burster wheel that traverses the perforation between tickets that are held in tension by

two sets of pinch rollers. After the leading ticket has been separated, it is dispensed to the customer by a set of "kick-out" rollers.

The accused PlayCentral machine is fundamentally different from the machine described and claimed in the '337 patent. The PlayCentral machine is a customer-activated terminal, not a clerk-activated terminal. The PlayCentral machine does not have a control panel and dispensing outlet on opposite sides of the machine. The PlayCentral machine also does not use a movable burster wheel; it uses a flat, pointed, stationary blade for separating tickets. The PlayCentral machine does not have two sets of rollers that hold the strip of tickets on either side of the perforation to be separated. And the PlayCentral machine does not have a drive means for bringing the blade into contact with the strip of tickets. In the PlayCentral, the tickets are folded at the perforation, which is then brought into contact with the stationary blade.

The '624 patent describes a customer-activated vending machine that displays arrays of actual lottery tickets on the front surface of the machine, which move as tickets are dispensed to the customer. The dispensing mechanism described in the '624 patent is the same "feeding and bursting" mechanism described in the '337 patent, which is incorporated by reference into the '624 patent.

The PlayCentral machine is fundamentally different from the vending machine described in the '624 patent. The PlayCentral machine does not show strips of tickets that move as they are dispensed. The PlayCentral machine presents customers with an icon-based menu for selecting the tickets to be purchased, and never shows more than one actual ticket at a time on the video screen. The PlayCentral also does not use the "feeding and bursting" mechanism of the '337 patent.

A.     The '337 Patent

The '337 patent issued to Robert Burr, Laird Campbell, Donald Keagle and Alfred Fulton on January 1, 1991, from an application filed on December 3, 1987 (Ex. A). The patent describes a lottery ticket vending machine that sits on a countertop (*id.*, col. 7, ll. 3-5). The tickets are perforated and stored in the machine in fan-fold form (*id.*, col. 9, ll. 20-24).

The machine is operated by a sales agent. It has a front surface with a control panel that includes a keypad and push-buttons for use by the sales agent (Ex. A, col. 2, ll. 49-54; col. 7, ll. 5-9, 14-21, 41-44). The back of the machine faces the customer, and includes an opening through which the tickets are dispensed to the customer (*id.*, col. 2, ll. 49-54; col. 7, ll. 10-11). The front and back surfaces of the vending machine are depicted in Figures 3 and 4:



FIG. 3

FIG. 4

The patent explains that it is important to have a machine with a front surface facing the sales agent and a back surface facing the customer -- to speed up the dispensing of tickets (Ex. A, col. 2, ll. 49-54). The dispensing of tickets is faster because the sales agent does not need physically to receive the ticket and hand it to the customer. *See id.*, col. 7, ll. 16-25 ("This structure eliminates the need for the sales agent to physically receive the lottery tickets from unit **14** and to personally hand the lottery tickets to the customer, as is done in conventional lottery ticket dispensers."); *see also id.,* col. 8, ll. 5-9 ("[T]he sales agent may concentrate on

receiving money and giving change, a task which is both easier to perform and more likely to be accurate when the agent is not handling tickets.").

The '337 patent describes only one mechanism for separating tickets -- using a movably mounted dull edge "burster wheel" that exerts pressure on the perforation to be separated: "[B]urster wheel **68** is advantageously in the form of a circular burster blade which, in an advantageous aspect, has a dull, rounded edge which does not cut stream of tickets **50**, but rather exerts pressure against the top of stream of tickets **50** . . ." (Ex. A, col. 10, ll. 58-62).  The strip of tickets is held tightly by two sets of pinch rollers -- one on each side of the perforation to be separated (*id.*, col. 3, ll. 57-59; col. 10, ln. 64 - col. 11, ln. 2).  The burster wheel is moved into contact with, and across, the strip of tickets by a bursting blade drive means that includes a burster block, a motor, a cable spool arrangement, and a tensioning spring (*id.*, col. 3, ll. 60-63; col. 13, ll. 24-26).  The separation mechanism is depicted in Figure 7:



F I G. 7

The '337 patent explains the operation as follows (*id.*, col. 13, ll. 23-31):

> Burster wheel **68** is shown mounted on a burster block **98** driven by a burster motor **100** through a cable spool arrangement **102** including tensioning spring **104**.  When burster block **98** is moved from the illustrated rest position towards interception with dispensing path **57** through the action of cable spool device **102**,

burster wheel **68** will come into contact with stream of tickets **50** at the side thereof initially and then across stream of tickets **50** to burst the same apart.

After the leading ticket has been separated, "[e]xit rollers **64, 66** operate as 'kick-out' rollers to discharge the separated leading ticket **52** from dispensing path **57** into dispensing outlet **34**" (Ex. A, col. 10, ll. 45-48), as depicted in Figure 5:



FIG. 5

TICKET FAN FOLDS IN STACK 51

B.    The '624 Patent

The '624 patent issued to Robert Burr on June 29, 1993, from a February 17, 1989 application (Ex. B). The '624 patent is an improvement patent over the '337 patent. *See id.*, col. 1, ll. 9-13, 24-26 ("Although the machine of the above-described pending application is highly advantageous, it is an object of the present invention to improve upon it . . . ."). The '624 patent expressly incorporates the dispensing mechanism of the '337 patent (*id.*, col. 4, ll. 48-55), which is depicted in Figure 4 of the '624 patent:

The feeding and bursting mechanism **112** is essentially identical to that disclosed in the ['337 patent] . . . , except that it has been rotated through 90° to dispense tickets downwardly. . . . [T]he disclosure of that mechanism, and all other disclosure in the ['337 patent] hereby is incorporated herein by reference.

The improvement described in the '624 patent is a customer-operated lottery ticket vending machine that has windows on the front to display actual lottery tickets that move

as they are dispensed. *See* Ex. B, col. 1, ll. 45-49 ("The machine preferably has one or a plurality of windows with mechanism for moving an array of lottery tickets past each of the windows so that different types of lottery tickets can be seen, but not touched, by the customers."). The vending machine with windows is depicted in Figure 1 of the patent:



The movement of the tickets is the key to the '624 patent. The Abstract introduces the invention by stating that "[l]ottery tickets are displayed in the window and *move past the window as they are being dispensed*, thus allowing the buyer to see the messages and terms on the tickets themselves" (Ex. B, Abstract; emphasis added). *See also id.*, col. 2, ll. 5-7 ("The motion of the tickets during dispensing further bolsters that confidence and is attractive."); col. 1, ll. 37-42 ("[A]s the tickets are being dispensed, the visible representation [of the tickets] moves by an amount corresponding to the number of tickets dispensed.").

The '624 patent also discloses an alternative embodiment that uses a video display, rather than windows. The purpose is the same. The video display simulates actual

lottery tickets moving as they are dispensed: "In another embodiment of the vending machine, graphic representations of the lottery tickets are displayed on a video screen, rather than through windows. The lottery ticket images are moved in the same manner as tickets are moved past windows" (Ex. B, col. 1, ll. 64-68). *See also id.*, col. 10, ll. 65-68 ("The array moves in the same manner as the tickets move past the windows in FIGS. 1 and 2."). The video display -- which shows two ticket images in each of six windows -- is depicted in Figure 8:



During prosecution, Mr. Burr distinguished his invention over the prior art by emphasizing the importance of tickets moving past windows as they are dispensed (Ex. C at GTECH 000179):

> [S]ince the string of peanut bags [in the cited prior art reference] is not motor-driven, one gets no fascination from the movement of a stream of items past the window similar to that which one gets when viewing tickets such as lottery tickets moving past a window under the force of an automatic electric-powered driving mechanism.

Mr. Burr also submitted a declaration stating that the "major improvement" of his invention was the movement of tickets past windows: "The windows, with the tickets moving past them while being dispensed, proved to be a major improvement" (Ex. D at GTECH 000029). Mr. Burr also

told the patent examiner that the movement of the tickets was "at the heart of the commercial success" of his invention (*id.* at GTECH 000066).

C.    Scientific Games' PlayCentral Kiosk

Scientific Games' PlayCentral Kiosk is a customer-activated lottery ticket vending machine that is capable of dispensing instant lottery tickets (Ex. E at SGI104836). The PlayCentral machine has a touch screen display on the front for customers to use to order tickets, and an opening -- also on the front -- for customers to retrieve the tickets purchased (*id.* at SGI104834):



Figure 1 – PlayCentral™ in Georgia Lottery Colors

One of the screens displayed on the PlayCentral for use in purchasing instant lottery tickets is the "Game Selection Screen" (Ex. E at SGI104837-38). The Game Selection Screen displays icons (or logos) that correspond to the instant lottery tickets available for purchase in the machine (*id.* at SGI104838):



Figure 3 – Game Selection Screen

The icons on the Game Selection Screen do not move.

After a customer touches an icon on the Game Selection Screen, the machine then displays a "Ticket Purchase Screen," which shows the customer a graphical representation of a single actual lottery ticket (as well as other information) (Ex. E at SGI104838-39):



Figure 4 – The Ticket Purchase Screen

11.

REDACTED

12.

REDACTED

13.

REDACTED

14.

REDACTED

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the Court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A genuine issue for trial exists only if the record taken as a whole could lead a rational person to conclude that the position of the person with the burden of proof on the disputed issue is correct."  *See Nomos Corp. v. BrainLAB, Inc.*, 239 F. Supp. 2d 430, 434 (D. Del. 2003), *aff'd*, 357 F.3d 1364 (Fed. Cir. 2004). "[I]f the non-moving party fails to make a sufficient showing on an essential element of his or her case to which he or she has the burden of proof, the moving party is entitled to judgment as a matter of law."  *Id.*

### II.    SCIENTIFIC GAMES' PLAYCENTRAL KIOSK DOES NOT INFRINGE CLAIMS 20 AND 21 OF THE '337 PATENT.

There is no genuine issue of material fact that Scientific Games' PlayCentral machine does not have the claimed "means for separating," "housing means" or "dispensing means" of claim 20 of the '337 patent.  Summary judgment of non-infringement should be granted in favor of Scientific Games with respect to claims 20 and 21 of the '337 patent.[1]

#### A.    Infringement Of Means-Plus-Function Limitations

Means-plus-function limitations cover the "the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶ 6.  They do

---

[1]    Claim 21 depends from claim 20.  If there is no infringement of claim 20, there is no infringement of claim 21.

not cover every possible means for performing the claimed function. *See, e.g., Nomos Corp. v. BrainLAB, Inc.*, 195 F. Supp. 2d 606, 611 (D. Del. 2002) ("[A] means clause does not encompass every means for performing the specified function."), *aff'd*, 357 F.3d 1364 (Fed. Cir. 2004).

Literal infringement of a means-plus-function limitation requires that: (1) the accused device perform a function identical to the function recited in the patent claim; and (2) the relevant structure in the accused device is identical or equivalent to the corresponding structure disclosed in the patent specification. *See Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004); *see also Ishida Co. v. Taylor*, 221 F.3d 1310, 1317 (Fed. Cir. 2000) ("If [an accused device] performs the identical function, an accused device literally infringes . . . only if it is insubstantially different from the corresponding structure in the patent specification.").

The test for equivalence under § 112, ¶ 6 is "whether the differences between the structure in the accused device and [the structure] disclosed in the specification are insubstantial." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998). An accused device is not equivalent under § 112, ¶ (6) unless it performs the identical function "in substantially the same way, with substantially the same result." *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000).

If an accused device is not structurally equivalent under § 112, ¶ 6 -- because the differences between the structures are not insubstantial -- a patentee cannot rely on the doctrine of equivalents to establish infringement. *See Chiuminatta*, 145 F.3d at 1311 ("An element of a device cannot be 'not equivalent' and equivalent to the same structure."); *Kemco*, 208 F.3d at 1364 ("Because the 'way' and 'result' prongs are the same under both [§ 112, ¶ 6] and the

doctrine of equivalents tests, a structure failing the [§ 112, ¶ 6 test] under either or both prongs must fail the doctrine of equivalents test for the same reason(s).").

"Although the issue of whether an accused device includes a structural equivalent under § 112, ¶ 6 is a question of fact, . . . the district court may find the absence of an equivalent where no reasonable jury could have found that the accused device has an equivalent to the disclosed structure." *Frank's Casing Crew*, 389 F.3d at 1378 (citation omitted).

**B.     The PlayCentral Does Not Have The Claimed "Means For Separating."**

There is no genuine issue of material fact that the structure for separating tickets in the PlayCentral is not identical or equivalent to the structure disclosed in the '337 patent for separating tickets.

**1.     Interlott -- GTECH's Predecessor -- Admitted That The Separating Mechanism Of The PlayCentral Does Not Infringe The '337 Patent.**

Interlott's Vice President of Technology, David Wagoner, testified in the *Pollard* litigation that the separating mechanism of the PlayCentral does not infringe the '337 patent.

REDACTED

---

2

REDACTED

.

REDACTED

*See Liposome Co. v. Vestar, Inc.*, 1994 WL 738952, at *14 (D. Del. 1994) ("[T]he statements . . . are relevant as evidence of how [the patentee] had in fact read the words of the claim at a time when it was not looking at them as a necessary step in building a claim for relief . . . .").[3]

---

[3]      REDACTED

REDACTED

2.    The Structure In The PlayCentral For Separating
      Tickets Is Not Identical Or Equivalent To The
      Structure Disclosed In The '337 Patent.

Claim 20 requires a "means for separating each of said tickets from said strip." The parties agree that this is a means-plus-function element, and that the claimed function is separating each ticket from a strip of tickets. *See* D.I. 112 at 32; D.I. 115 at 21. The parties agree that the corresponding structure includes three elements that work in combination -- "a separator member, which functions in combination with a 'holding means' and a 'drive means'" (D.I. 112 at 32). In its Opening Claim Construction Brief, GTECH agreed that "[t]he 'separator member' structure disclosed in the '337 patent specification . . . is the dull edged burster wheel and equivalents thereof" (D.I. 112 at 32). GTECH also agreed that the structure for the "holding means" is the "rollers [60, 62, 64, 66] disclosed in the preferred embodiment" (*id.* at 33).

The patent also states that the "means for separating" includes a "bursting blade drive means for bringing the bursting blade into bursting contact with the stream of tickets at the bursting position to burst the leading ticket from the next following ticket" (Ex. A, col. 3, ll. 60-63). The structure disclosed in the specification for bringing the bursting blade into contact with the strip of tickets is a burster block, burster motor, cable spool arrangement, and tensioning spring (*id.*, col. 13, ll. 23-31).

In its Answering Claim Construction Brief, GTECH has changed its position. GTECH now says that "a burster wheel is just an example, preferred form of a 'separation member'" (D.I. 117 at 34), and that the patent specification "provides an example of a holding

means structure . . . : rollers 60, 62, 64 and 66" (*id.* at 35). A "separator member" and "holding means," however, are not structure; they are just additional functional language.[4]  *See Chiuminatta*, 145 F.3d at 1308 (agreeing that "the district court erroneously identified as the disclosed structure broad functional language in the specification rather than physical structure"); *Faroudja Labs., Inc. v. Dwin Elec., Inc.*, 76 F. Supp. 2d 999, 1012 (N.D. Cal. 1999) ("The general description of the comparing means as a 'field comparator 23' . . . does not sufficiently describe any particular structure. Allowing the structure to be any 'field comparator' would not provide readers of the patent with adequate notice of the invention's scope.").

As discussed in Scientific Games' claim construction briefs (D.I 115 at 15-21; D.I. 116 at 10-14), the structure corresponding to the "means for separating" is the combination of: (a) a burster wheel 68 with a dull, rounded edge that is moveably mounted; (b) two sets of rollers 60, 62, 64, 66 -- one set on each side of the perforation to be separated -- which hold the strip of tickets in tension as the burster wheel is brought into contact with the tickets; and (c) a bursting blade drive means that includes a burster block 98, a burster motor 100, cable spool arrangement 102, and tensioning spring 104. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002) ("[C]orresponding structure must include all structure that actually performs the recited function.").

The structure in the PlayCentral for separating tickets is totally different from the structure disclosed in the '337 patent. The PlayCentral machine does not use a movably mounted, dull-edge burster wheel. The PlayCentral uses a flat, pointed, stationary blade. The PlayCentral does not use two sets of rollers to hold the tickets on either side of the perforation to

---

[4]     In fact, the words "separator member" do not appear anywhere in the specification of the '337 patent.

be separated as the bursting blade is brought into contact with the tickets. And the PlayCentral does not have a "bursting blade drive means for bringing the bursting blade into bursting contact with the stream of tickets at the bursting position." In the PlayCentral, the tickets are folded at the perforation, which is then brought into contact with the stationary blade.

GTECH argues that the structure for separating tickets in the PlayCentral "involves a mere 'reversal of parts' from those described in the preferred embodiment of the '337 patent" (D.I. 117 at 33). GTECH is wrong. The PlayCentral involves *different* parts that separate lottery tickets in a *different* way from what is disclosed in the '337 patent. The PlayCentral separates lottery tickets by folding them at the perforation, and then pulling the strip of tickets into a flat, pointed, stationary blade. That is substantially different from holding a strip of tickets in tension with two sets of pinch rollers and causing a movably mounted, dull-edged burster wheel to traverse the tickets, as described in the '337 patent.

REDACTED

REDACTED

The substantial difference between the two mechanisms is also demonstrated by the fact that the blade in the PlayCentral and the burster wheel of the '337 patent are not interchangeable.

REDACTED

REDACTED

23.

REDACTED

24.

REDACTED

In *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303 (Fed. Cir. 1998), the patent related to a machine for cutting concrete and claimed a "means . . . for supporting the surface of the concrete." *Id.* at 1305-06. The court determined that the structure disclosed in the specification was a "skid plate," which the court described as "a generally flat hard plate that straddles the leading edge of the cutting blade." *Id.* at 1308-09. The accused device used wheels to perform the function of supporting the surface of the concrete. *Id.* at 1309. The court held that rotatably mounted wheels were not equivalent under § 112, ¶ 6 to a flat, stationary skid plate.

The accused infringer argued that the wheels of its device were not equivalent to the skid plate because the wheels were "rotatably mounted" and were not "hard, flat, and fixedly attached to the saw." *Id.* The patentee argued that the "wheels of the accused device are equivalent because 'in use, the [accused] wheels compress to form flattened planes on each side of the saw blade, coinciding with the structure of a skid plate.'" *Id.* The court rejected that

argument, holding that the rotatably mounted wheels of the accused device were not equivalent to the fixed skid plate disclosed in the patent:

> [T]he differences between the wheels and the skid plate are not insubstantial. The former support the surface of the concrete by rolling over the concrete while the latter skids. The former are soft, compressible, and round; the latter is hard and predominantly flat (albeit with rounded edges to prevent gouging of the concrete). Additionally, the wheels rotate as opposed to skid as the saw moves across the concrete and thus have a different impact on the concrete. Since the wheels and the skid plate are substantially different from each other, they cannot be equivalent, and no reasonable jury could so find.

*Id.* at 1309. The court held that the wheels operated in a substantially different way as compared to the skid plate:

> The [wheels] support the surface of the concrete by rolling over the concrete while [the skid plate] skids. The [wheels] are soft, compressible, and round; the [skid plate] is hard and predominantly flat . . . . Additionally, the wheels rotate as opposed to skid as the saw moves across the concrete and thus have a different impact on the concrete. The wheels flatten slightly, applying more localized pressure against the concrete than that produced by a hard flat skid plate.

*Id.* at 1311.

In *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1331 (Fed. Cir. 2005), the patent disclosed a video game controller and claimed a "means for lockably receiving a video game controller in fixed position on said mounting member," which the court construed as a means-plus-function element under § 112, ¶ 6. The court held that the corresponding structure was L-shaped plates. *See id.* at 1332. The court held that the "donut-shaped plates" of the accused device ("the V4") (which prevented "rotational" movement) were not equivalent to the L-shaped plates described in the patent (which prevented "linear, up and down" movement):

> [N]o reasonable fact-finder ... could conclude that the means-plus-function limitation reads on the V4 because of substantial differences between the controller holders 21-24 and the V4's plates and molded projections. While controller holders 21-24 are L-shaped, the plates are donut-shaped so as to surround the V4's metal shaft, and the projections are straight. Moreover, the structures clearly perform the claimed function in substantially different ways. For example, controller holders 21-24 lock a controller into a fixed position by preventing linear, up and down movement of the steering wheel column. In contrast, the projections lock a controller into a fixed position by preventing rotational movement of the steering wheel unit on the shaft.

*Id.* at 1334-35.

In *Nomos Corp. v. BrainLAB, Inc.*, 239 F. Supp. 2d 430, 436 (D. Del. 2003), *aff'd*, 357 F.3d 1364 (Fed. Cir. 2004), one of the means-plus-function limitations at issue was "generating at least one ultrasound image of the lesion in the patient's body." The Court identified the corresponding structure as "a fixed ultrasound probe and a bracket or fixation device that maintains the ultrasound probe perpendicular to the treatment table and constrains it to rotate or move along the axis of the table . . . ." *Id.*

The defendant argued that it did not infringe, because the accused system did not use a fixed ultrasound probe mounted to a treatment table. *Id.* at 433. Instead, the accused system used a handheld ultrasound probe that could be moved by a surgeon to scan a patient's body at different angles. *Id.* The Court granted summary judgment of non-infringement -- holding that the movable handheld ultrasound probe was not equivalent to the fixed mounted ultrasound probe disclosed in the patent:

> [N]o reasonable jury could conclude that the accused structure is the same or an equivalent under Section 112, Paragraph 6 of the claimed structure. ... According to the Court's claim construction, the claimed structure performs the function of generating an ultrasound image using a fixed ultrasound probe and a bracket or fixation device that maintains the ultrasound probe perpendicular to the treatment table and constrains it to rotate or move along the axis of the table in order to generate an ultrasound

> image. . . . BrainLAB's ExacTrac system . . . does not operate in
> substantially the same way. The ultrasound probe used in the
> ExacTrac system is a handheld device . . . . [T]he handheld device
> can be moved or rotated anywhere and can be positioned at any
> angle relative to the patient . . . .

*Id.* at 436.

The Federal Circuit affirmed, holding that the movable handheld ultrasound probe was not equivalent to the fixed mounted ultrasound probe disclosed in the patent:

> [T]he ExacTrac does not generate the ultrasound image in
> substantially the same way as the '026 invention. . . . The
> ultrasound probe described in the '026 patent must be fixed
> perpendicularly to the treatment table such that it may be moved
> only along the axis of the table. . . . In contrast, the ExacTrac
> device is handheld. The physician may move the probe freely over
> the patient's body . . . . The probe need not remain in any
> particular orientation with respect to the treatment table or any
> other point of reference. . . .

*Nomos Corp. v. BrainLAB USA, Inc.*, 357 F.3d 1364, 1369 (Fed. Cir. 2004). The court also held that there was no infringement under the doctrine of equivalents because the accused device was not identical or equivalent under § 112, ¶ 6. *Id.* ("[T]he finding of no literal infringement . . . is dispositive as to infringement under the doctrine of equivalents as well.").

There is no genuine issue of material fact that the separating mechanism of the PlayCentral (which moves a strip of tickets into a flat, pointed, stationary blade) is substantially different from the separating mechanism disclosed in the '337 patent (which uses pinch rollers to hold a strip of tickets in tension and moves a burster wheel across the tickets), and does not literally infringe claim 20 of the '337 patent.

Because the structure of the PlayCentral's separating mechanism is not equivalent under § 112, ¶ 6 to the structure disclosed in the '337 patent, the PlayCentral cannot infringe under the doctrine of equivalents. *See Chiuminatta*, 145 F.3d at 1311 ("An element of a device cannot be 'not equivalent' and equivalent to the same structure."). Moreover, GTECH cannot

argue that the use of a fixed blade was after-developed technology. The inventors testified that they considered -- and rejected -- the idea of using a fixed blade. *See id.* ("There is no policy-based reason why a patentee should get two bites at the apple. If he or she could have included in the patent what is now alleged to be equivalent, and did not, leading to a conclusion that an accused device lacks an equivalent to the disclosed structure, why should the issue of equivalence have to be litigated a second time?").

REDACTED

C.    The PlayCentral Kiosk Does Not Have The Claimed "Dispensing Means."

Claim 20 requires a "dispensing means for dispensing tickets through said outlet opening." The parties agree that this is a means-plus-function element, and that the claimed

function is dispensing tickets through an outlet opening. *See* D.I. 112 at 27; D.I. 115 at 26. The parties also agree that the corresponding structure is a pair of exit rollers 64, 66: "Exit rollers **64, 66** operate as 'kick-out' rollers to discharge the separated leading ticket **52** from dispensing path **57** into dispensing outlet **34**" (Ex. A, col. 10, ll. 45-51).

There is no structure in the PlayCentral machine that is equivalent to the kick-out rollers of the '337 patent. After the leading ticket is separated from the strip of tickets in the PlayCentral, it drops -- by gravity -- into a receptacle.

## REDACTED

In *Unidynamics Corp. v. Automatic Prods. Int'l Ltd.*, 157 F.3d 1311, 1322 (Fed. Cir. 1998), the court held that gravity was not equivalent structure under § 112, ¶ 6. The claim limitation at issue was a "spring means tending to keep the door closed." *Id.* at 1314. The court held that the corresponding structure was a "spring in a strip hinge." *Id.* at 1322. The court held that the accused vending machine did not infringe -- because gravity (not any structure in the accused device) performed the claimed function:

> The district court correctly determined that, as a matter of law, neither the padded bracket nor the magnet performs that function. . . . *Gravity performs the action of closing the door in both LCM4 versions. Therefore, neither version of the LCM4 machine literally infringes any claim of the '750 patent.*

*Id.* at 1322 (emphasis added).

There is no genuine issue of material fact that there is no structure in the PlayCentral machine that is identical or equivalent to the exit or "kick out" rollers disclosed in the '337 patent for the "dispensing means."

  
D.    The PlayCentral Kiosk Does Not Have The Claimed
"Housing Means."

Claim 20 requires a "housing means for storing a strip of tickets to be dispensed, said housing means having an outlet opening accessible to the purchaser of the tickets from said machine."

The use of the word "means" creates a presumption that the "housing means" should be construed under 35 U.S.C. § 112, ¶ 6. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997). In the earlier *Pollard* litigation, GTECH (Interlott) acknowledged that the "housing means" of claim 20 of the '337 patent was a means-plus-function limitation (Ex. Q at GTECH 033461).

The only structure disclosed in the '337 patent for "storing a strip of tickets to be dispensed" is "a box-like module having opposed front and back surfaces, . . . control panel means mounted at the front surface of the module . . . [and] a dispensing outlet manually accessible at the back surface for receiving a dispensed lottery ticket . . ." (Ex. A, col. 3, ll. 29-37). *See also id.*, Abstract ("The tickets are dispensed at one end of the unit which faces the customer. A control panel for the vendor is located at the opposite end"); col. 7, ll. 5-16 ("Unit **14** includes a housing with a front surface **28** which . . . is intended to face the sales agent or vendor standing behind a counter **26**. An opposed back surface **30** of unit **14** is intended to face the customers . . . ."). Figures 3 and 4 of the patent depict a housing that has a front surface with a control panel, and a back surface with a dispensing outlet.

As discussed in Scientific Games' claim construction briefs (D.I. 115 at 22-25; D.I. 116 at 14-18), the "housing means" element of claim 20 should be construed under § 112, ¶ 6. The claimed function is "storing a strip of tickets to be dispensed." The corresponding structure is a box-like unit 14 with a control panel 32 mounted on the front surface 28 for use by

31.

the vendor for initiating the dispensing of a lottery ticket and a back surface 30 that faces the customer with a dispensing outlet 34 from which the customer receives the dispensed ticket.

There is no genuine issue of material fact that the structure of the PlayCentral is not identical or equivalent to the structure disclosed in the patent.

REDACTED

The differences between a clerk-activated terminal (as described in the '337 patent) and a customer-activated terminal (like the PlayCentral) are not insubstantial -- as Mr. Burr argued in prosecuting the '624 patent. During prosecution, Mr. Burr distinguished a number of prior art references (including the '337 patent) because they were clerk-activated terminals, which he said are "significantly" different from customer-activated terminals (Ex. C at GTECH 000175-76; emphasis added):

> Each of the above three references shows an instant winner lottery ticket dispenser which is intended to be attended by an agent. Each is designed to dispense tickets from the rear of the unit while the customer faces the unit from the opposite end. . . .
>
> The devices shown in the three last-named references are not suitable for use as unattended ticket vending devices. *They significantly differ from the present invention* . . . .

REDACTED

There is no genuine issue of material fact that -- if the "housing means" of claim 20 is construed under § 112, ¶ 6 to require a front surface facing a sales agent and a back surface facing a customer -- the PlayCentral does not have the claimed "housing means."

III.    SCIENTIFIC GAMES' PLAYCENTRAL KIOSK DOES NOT
        INFRINGE CLAIM 18 OF THE '624 PATENT.

There is no genuine issue of material fact that the PlayCentral machine does not display a "plurality of arrays of ticket images." There is also no genuine issue of material fact that the structure in the PlayCentral for dispensing tickets is not identical or equivalent to the structure disclosed in the '624 patent for dispensing tickets. Summary judgment of non-infringement of claim 18 of the '624 patent should be granted in favor of Scientific Games.

A.    The PlayCentral Kiosk Does Not Display "A Plurality Of
      Arrays Of Ticket Images."

Claim 18 of the '624 patent requires a "video display means for displaying a plurality of arrays of ticket images on a video screen." Scientific Games' PlayCentral machine does not display a "plurality of arrays of ticket images."

As discussed in Scientific Games' claim construction briefs, the phrase "plurality arrays of ticket images" refers to strips of actual lottery tickets (D.I. 115 at 28-34; D.I. 116 at 21-31). The only "ticket images" described or depicted in the '624 patent are graphical representations (or video images) of actual lottery tickets. The only "arrays" described or depicted in the '624 patent are movable strips of actual lottery tickets. *See Cephalon, Inc. v. Barr Labs., Inc.*, 389 F. Supp. 2d 602, 606 (D. Del. 2005) ("[T]he consistent use of a claim term by the inventor in the specification may serve to limit the scope of a claim."). The phrase "plurality of arrays of ticket images" should be construed to mean more than one array, where each array is a movable strip of graphical representations (or video images) of actual lottery tickets.

GTECH argues that the icons on the PlayCentral's Game Selection Screen constitute a "plurality of arrays of ticket images." Nowhere does the '624 patent say anything

about icons being "ticket images."                REDACTED

That is a significant omission.  By February 1989, when Mr. Burr filed his patent application, many companies (including Apple and Xerox) had already commercialized products with user interfaces that used icons (including the Xerox Star, the Apple Lisa and the Apple Macintosh).  *See* Ex. R at 302 ("Another trend [in user interfaces] is that of incorporating in the interface *icons*, images representing system commands, objects, states, or results."), 649-51;                REDACTED

If Mr. Burr had intended to include icons within the definition of "ticket images," he could have -- and should have -- said so in the patent.

The icons displayed on the PlayCentral's Game Selection Screen are not "ticket images" as that term is used in the patent.  They are not graphical representations (or video images) of actual tickets.


                            REDACTED


Even if the icons on the Game Selection Screen were considered to be "ticket images" (which they are not), the PlayCentral does not display "arrays" of such images, as that term is used in the patent.  The '624 patent consistently uses the term "arrays" to refer to movable strips of actual lottery tickets.  The PlayCentral's Game Selection Screen displays a single icon for each game.  It does not display a strip of lottery tickets.  It also does not display a strip of tickets that moves as the tickets are dispensed -- let alone a plurality of such strips (or arrays).

REDACTED

There is no genuine issue of material fact that -- if the phrase "plurality of arrays of ticket images" is construed to mean more than one array, where each array is a movable strip of graphical representations (or video images) of actual lottery tickets -- the PlayCentral machine does not infringe claim 18 of the '624 patent.[6]

---

[6] GTECH cannot rely on the doctrine of equivalents regarding the "plurality of arrays of ticket images" because of prosecution history estoppel. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002) ("Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope."). Claim 18 (application claim 35) was originally dependent from application claim 23 and was subsequently rewritten in independent form and application claim 23 was cancelled after having been rejected over the prior art (Ex. C at GTECH 000166-83). As a result, GTECH is presumptively estopped from asserting that the "plurality of arrays of ticket images" limitation -- which was present in the original dependent claim, but not in the cancelled independent claim -- is satisfied under the doctrine of equivalents. *See Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1134 (Fed. Cir. 2004) (en banc) ("[T]he rewriting of dependent claims into independent form coupled with the cancellation of the original independent claims creates a presumption of prosecution history estoppel.").

B.    The PlayCentral Kiosk Does Not Have The Claimed
      "Means For Dispensing."

Claim 18 requires a "means for dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer." The parties agree that this is a means-plus-function element, and that the function is dispensing tickets in a number corresponding to the amount of money input into the machine by the customer (D.I. 112 at 22; D.I. 115 at 38-39).

The parties disagree as to whether the corresponding structure includes the feeding and bursting mechanism 112 (as described in the '337 patent and incorporated into the '624 patent). GTECH argues that the corresponding structure is "an opening in the housing for tickets to exit, outfeed rollers and a gravity chute to issue the tickets through the opening, a receptacle to receive the tickets that fall through the outlet opening, and a keypad for entering the number of tickets to be dispensed . . ." (D.I. 112 at 22-23; emphasis added). As with the "dispensing means" of claim 20 of the '337 patent, however, because the dispensing mechanism of the PlayCentral does not have outfeed rollers (or any equivalent structure), it is not substantially equivalent to the dispensing mechanism described in the '624 patent, even under GTECH's proposed claim construction.

Scientific Games also argues (*see* D.I. 115 at 34-39; D.I. 116 at 33-36) that the corresponding structure includes the feeding and bursting mechanism 112 (described in the '337 patent and incorporated into the '624 patent). *See* Ex. B, col. 10, ll. 24-30 ("[T]he unit **112** . . . separates the proper number of tickets, and dispenses them through the outlet opening **220**."). The "means for dispensing" of claim 18 should be construed to include the feeding and bursting mechanism described in the '337 patent. There is no genuine issue of material fact that the PlayCentral machine does not have the claimed "means for dispensing" for the reasons discussed

above as to why the PlayCentral machine does not have the "means for separating" of claim 20 of the '337 patent.

## IV.  GTECH SHOULD BE PRECLUDED FROM RECOVERING DAMAGES FOR THE PERIOD BEFORE MARCH 4, 2004.

Under 35 U.S.C. § 287(a), a patentee who fails to mark its patented products may recover damages only for infringement that occurs after the accused infringer receives actual notice of infringement of the patents.  There is no genuine issue of material fact that GTECH (and its predecessors) did not mark any products with the numbers of the '337 patent or the '624 patent, and there is no genuine issue of material fact that GTECH never provided Scientific Games with actual notice of infringement of the patents.  Indeed, GTECH never even served the Complaint or Amended Complaint in this case.  *See Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1327-28 (Fed. Cir. 2001) (Actual notice "must be an affirmative act on the part of the patentee which informs the defendant of the infringement.").

As the patentee, GTECH has the burden of pleading and proving compliance with the requirements of § 287(a).  *See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 770 (Fed. Cir. 1984), and *Dunlap v. Schofield*, 152 U.S. 244, 248 (1894) ("The duty of alleging, and the burden of proving, either [actual notice or constructive notice] is upon the [patentee].")).

REDACTED

REDACTED

Because GTECH cannot prove that it marked its products or provided Scientific Games with actual notice of infringement of the patents, summary judgment should be granted precluding GTECH from recovering damages for the period before March 4, 2004, the date this case was filed.

<u>CONCLUSION</u>

For the foregoing reasons, Scientific Games respectfully requests that the Court grant summary judgment (1) of non-infringement of claims 20 and 21 of the '337 patent; (2) of non-infringement of claim 18 of the '624 patent; and (3) that GTECH is not entitled to recover damages for the period before March 4, 2004.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rsmith@mnat.com
  Attorneys for Defendants

Original Filing Date:  November 14, 2005

Redacted Filing Date:  November 15, 2005
493016

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on November 15, 2005, I caused to be electronically filed Scientific Games' Opening Brief In Support Of Its Motion For Summary Judgment (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Josy W. Ingersoll
> Young, Conaway, Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE 19899

and that I caused copies to be served upon the following in the manner indicated:

> BY HAND
>
> Josy W. Ingersoll
> Young, Conaway, Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE 19899
>
> BY FEDERAL EXPRESS
>
> Thomas J. Meloro, Esquire
> Kenyon & Kenyon
> One Broadway
> New York, NY 10004

> _/s/ Rodger D. Smith II_
> Rodger D. Smith II (#3778)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
> rsmith@mnat.com