## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

GTECH CORPORATION,

               Plaintiff,

            v.

SCIENTIFIC GAMES INTERNATIONAL, INC.,
SCIENTIFIC GAMES HOLDINGS
CORPORATION, SCIENTIFIC GAMES
FINANCE CORPORATION, and SCIENTIFIC
GAMES CORPORATION,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

REDACTED

Civil Action No. 04-138-JJF

~~Confidential — Filed Under Seal~~

---

## APPENDIX TO GTECH'S ANSWERING BRIEF IN OPPOSITION TO SCIENTIFIC GAMES' MOTION FOR SUMMARY JUDGMENT

### Volume II of II

Dated: December 2, 2005

Josy W. Ingersoll (#1088)
Karen Keller (#4489)
YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19889
Telephone: (302) 571-6600

OF COUNSEL:
Thomas J. Meloro
Larissa A. Soccoli
Andrew L. Reibman
KENYON & KENYON
One Broadway
New York, New York 10004
Telephone: (212) 425-7200

Douglas E. Ringel
KENYON & KENYON
1500 K Street NW
Washington, DC 20005
Telephone: (202) 220-4200

*Attorneys for Plaintiff GTECH Corporation*

# EXHIBIT AA

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT BB

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT CC

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT DD



GTECH 039791

# EXHIBIT EE



PLAINTIFF'S
EXHIBIT
GTech v. Scientific Games
04-128-JJF

GTECH 039790

JAN 25 2004

# EXHIBIT FF

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT GG

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT HH

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT II

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT JJ

2005 U.S. App. LEXIS 23964, *

LEXSEE 2005 U.S. APP. LEXIS 23964

**DOREL JUVENILE GROUP, INC., Plaintiff-Appellant, v. GRACO CHILDREN'S PRODUCTS, INC., Defendant-Appellee.**

05-1026

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**2005 U.S. App. LEXIS 23964**

**November 7, 2005, Decided**

**PRIOR HISTORY:** [*1] Appealed from: United States District Court for the Southern District of Indiana. Chief Judge Larry J. McKinney. Dorel Juvenile Group, Inc. v. Graco Children's Prods., 2004 U.S. Dist. LEXIS 20501 (S.D. Ind., Sept. 9, 2004)

**LexisNexis(R) Headnotes**

**COUNSEL:** Todd G. Vare, Barnes & Thornburg, of Indianapolis, Indiana, argued for plaintiff-appellant. With him on the brief were Andrew B. Dzeguze and Daniel P. Albers, of Chicago, Illinois.

Jeffrey H. Dean, Marshall, Gerstein & Borun, LLP, of Chicago, Illinois, argued for defendant-appellee. With him on the brief were Kevin D. Hogg and Matthew C. Nielsen.

**JUDGES:** Before NEWMAN, CLEVENGER, and GAJARSA, Circuit Judges. Opinion for the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Circuit Judge NEWMAN.

**OPINIONBY:** CLEVENGER

**OPINION:** CLEVENGER, Circuit Judge.

Dorel Juvenile Group, Inc. ("Dorel") sued Graco Children's Products, Inc., ("Graco") for patent infringement, seeking a jury trial. Dorel is the exclusive licensee of U.S. Patent No. 6,550,862 ("the '862 patent") and continuing U.S. Patent No. 6,612,649 ("the '649 patent"), both directed to a child's car seat assembly having a retractable cup holder. Graco conceded that its accused car seat embodies all of the elements of the asserted claims, except for certain aspects concerning the seat and base assembly, [*2] i.e., a base removably attached to a seat.

On cross-motions for summary judgment, the United States District Court for the Southern District of Indiana ruled for Graco and against Dorel, holding that under the district court's interpretation of the pertinent claim terms, Graco's car seat does not infringe the '862 and '649 patents. See Dorel Juvenile Group, Inc. v. Graco Children's Prods., Inc., 2004 U.S. Dist LEXIS 20501, No. 03-1273 (S.D. Ind. Sept. 9, 2004) ("Summary Judgment"). Dorel timely appealed the final judgment of the district court. Because there exists a question of fact as to whether Graco's car seat infringes the patents, we vacate the district court's summary judgment and remand the case for further proceedings.

I

Claim 1 of the '862 patent covers a juvenile seat assembly comprising, inter alia, "a seat, and . . . a base, the seat being removably secured to the base." '862 patent, col. 6, ll. 2-14. Claim 1 of the '649 patent likewise covers a juvenile seat assembly comprising, inter alia, "a seat, [and] a base removably attached and arranged to support the seat." '649 patent, col. 6, ll. 2-6.

Graco's accused seat consists of two plastic parts. The top portion provides [*3] a relatively flat surface for a child to sit on, and the bottom portion is a structure upon which the top portion fits. The two parts are firmly held together by screws. In one iteration of the accused product, the screws are of the ordinary variety, removable with ease by use of a

common screwdriver. In another iteration of the accused product, Graco uses so-called "one-way" screws. A one-way screw can be "screwed down" with an ordinary screwdriver, but a different type of screwdriver is required to loosen and remove the tightened screw. Ordinary screwdrivers and one-way screwdrivers can be purchased in hardware stores, among other places.

II

Upon granting Graco's motion for summary judgment of noninfringement, Summary Judgment at 1, the district court first interpreted the terms "removably attached" and "removably secured," id. at 5-6. Neither party argued that a specialized meaning of the terms existed in the art of juvenile car seat design. The district court thus attributed to the terms their ordinary meaning and concluded that they require that the seat and base in the claimed invention "will be detached or unsecured on some occasion during the lifetime of the product. [*4] " Id. at 5. In other words, the district court determined that the claimed product is designed to come apart. The district court concluded, however, that the claim language does not require that the seat and base come apart during normal usage. Ease of separation is not a limitation on claim scope, as the district court opined, because the claim language does not recite "easily" removable or removable "relatively easily." Id. at 6. Indeed, the district court expressly and emphatically rejected any notion that the claims require "easeof separation" of the seat from the base. "Removably attached" and "removably secured" mean only that the seat and base "are designed at some time or another to come apart." Id. at 5.

The district court further opined that the claim terms "removably attached" and "removably secured" "carry with them an implication that the detach mentor unsecuring process not do violence to the seat." Id. The seat must therefore be usable as a seat upon separation from the base. In sum, the district court held that the claims cover a structure that includes a seat and base "affixed together in a manner that contemplates that the seat may be removed from [*5] the base such that the seat remains functional." Id. at 6.

Turning next to the claim term "base" and to the surrounding claim language, the district court determined that the base is "the structure that props up the seat." Id. Finally, the district court interpreted the claim term "seat" as "the structure intended to be sat in or on," id., a structure the district court thought necessarily to be separate from the base.

The district court applied this construction to the accused Graco products and found no literal infringement because the accused products were found not to have a seat separate from the base, as claimed in the asserted patents, and because the two parts of the accused products were found to be an integrated unit. Id. at 7. In short, the district court held that Graco's two-part structure is integral, meaning that it lacks a seat and base as separate, stand-alone structures.

III

We review issues of claim interpretation independently, Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (enbanc), and test the scope of claim language with primary reference to the specification, of which the claims are a part, Phillips v. AWH Corp., 415 F.3d 1303, 1315-17 (Fed. Cir. 2005) [*6] (en banc).

The district court correctly interpreted "removably attached" and "removably secured." The specifications of the patents in suit are mainly directed to the claimed cupholder feature of the inventions, and there is little reference to the concept of the removability of the seat from the base. See '862 patent, Abstract ("A juvenile vehicle seat is provided including a cup holder. The cup holder is movable between a retracted position adjacent the seat and an extended position spaced from the seat."); '649 patent, Abstract (same). The specifications speak of "means for coupling" the seat bottom to the base, but expressly state that such means are not shown in the drawings. '862 patent, col. 2, ll. 52-53; '649 patent, col. 2, ll. 55-56. Further, the "seat base is configured to releasably couple to the seat bottom." '862 patent, col. 1, ll. 27-29; '649 patent, col. 1, ll. 31-33.

To impart "ease of separation" to the claims would require adding the words "easily" or "relatively easily" to the "removable" limitations, as the district court noted. Nothing in the patent's specification suggests "ease of separation." If anything, the specification teaches the meaning given [*7] to the "removable" limitations by the district court. This is so, because the only reference to what might be claimed in the patented cup holder is shown in Figure 4 as a "COLA." Given the configuration of the cup holder and the seat's base, spilled cola would surely invade the bottom portion, where it could attract bees, hornets and other unwelcome insects. The occasional need to unscrew the top portion from the bottom portion to clean away spilled cola, or other matter that could find its way from the cup holder into the bottom portion, comports with the district court's holding that the seat and base merely be capable of separation.

As the district court was no doubt aware, "easeof separation" is a common trait of many iterations of modern infant car seats. Simple observation on the public streets of parents removing children from cars reveals two-part infant car

seats, whereby the base portion remains in the car while the seat portion is removed with the child still strapped in. This seat portion can then be easily secured into an infant stroller and later removed from the stroller to be reattached to the base portion that had remained in the car. While this may be the preferable [*8] two-part car seat for use with infants, the patents in suit do not require that the seat be "easily removable" from the base. There simply is no reference whatsoever in the specifications to "ease of release" or "ease of separation," no indication that the patent is directed to a product comprising a base that, during everyday usage, remains in the automobile while the user removes the seat and the child.

In short, the "removable" limitations, as understood through the plain meaning of the claim language and as tested by information in the specification, per Phillips, are just as the district court held. The seat and base can be separated "in a manner that contemplates that the seat may be removed from the base such that the seat remains functional." Summary Judgment at 6.

The district court also correctly construed the terms "seat" and "base" to require two separate structures- "the structure intended to be sat in or on" and "the structure that props up the seat," respectively. Id. The drawings in the patents certainly confirm the district court's understanding that the seat and the base are two separate structures held together by some means. See '862 patent, Figs. [*9] 1-4; '649 patent, Figs. 1-4. We thus discern no error in the district court's interpretation of the key claim terms.

IV

We, however, take issue with the district court's conclusion, on cross-motions for summary judgment, that the accused Graco juvenile car seat cannot infringe as a matter of law because it lacks a seat separate from a base and, at most, includes a base that is integral to the seat. See Nazomi Communications, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1367 (Fed. Cir. 2005) ("A summary judgment motion is proper if there are no genuine issues of material fact, while viewing the facts in a light most favorable to the non-moving party."). The district court has invaded the province of the finder of fact, here a jury requested by Dorel, in deciding the infringement question. See Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998) (stating that the "determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact").

The accused products comprise a top structure and a bottom structure, each easily removable from the other by an ordinary or one-way screwdriver, such that they are "removably [*10] attached" or "removably secured". However, whether the top and bottom structures of the Graco products are in fact the claimed "seat" and "base" of the asserted patents, such that the top structure is capable of functioning as a "seat" upon being removed from the bottom structure, is a question of fact that cannot be determined on summary judgment. We therefore vacate the summary judgment of noninfringement and remand the case to the district court to determine, as a matter of fact, whether the accused products meet the seat and base limitations of the asserted claims, and to decide any remaining issues.

VACATE AND REMAND

DISSENTBY: NEWMAN

DISSENT: NEWMAN, Circuit Judge, dissenting.

I respectfully dissent. The district court correctly construed the term "removably attached/secured" to mean "removably," not its opposite, as the panel majority holds. The Graco carseat is a permanent assembly whose molded parts are permanently screwed together with six "one-way" screws. Upon unscrewing and disassembly, the Graco seat becomes a collection of loose parts, the cup holder incapable of its function of supporting a cup. The Graco carseat is clearly not a base and seat assembly as in the [*11] Dorel patents, whereby the seat can be reversibly slipped from its mooring to carry its infant passenger. Removal of the top part of the Graco carseat (for example, to carry the infant into grandma's house), would require removing the upholstery, upending the carseat (requiring removal of the entire assembly from its crash-proof installation), and removing the six unremovable screws with the special tool needed for removing unremovable screws -- and then repeating the operation in reverse upon returning to the car with the top part and its infant cargo. The panel majority's redefinition of the patented invention to cover such a carseat is devoid of support.

The Dorel patents include drawings of the patented carseat, showing the separate base carrying the cup holders:

The specifications show that the seat and base are distinct structures that are designed to be manually released and reattached, as the district court found. The seat 12, which includes a "seat bottom" and a "seat back," is described as "releasably coupled" to the base 16, which includes a "front," a "rear," a "pair of side walls," and a "cupholder receptor

38." The term "releasably" is also used to describe the manually [*12] adjustable cupholder 18, as "releasably held" and "releasably locked" by tabs 22.

In striking contrast, the Graco carseat is a unitary structure without a removable seat portion:

The panel majority has misperceived the Dorel structure, perhaps because the seat of the Turbo Booster is molded in two segments, whose engineering drawings are shown in the record as follows:

"Seat Top" "Seat Bottom"

These molded parts are not "removably attached"; they are permanently assembled, using six permanent screws set in recessed indentations. Graco's "one-way" screws can be unscrewed only with a special tool called the "Un-Do-It" tool. Although the majority states that the tool "can be purchased in hardware stores," that is not the general experience, and Dorel's expert testified that he could locate such a tool only after searching the internet for the term "one-way screw."

The panel majority errs in construing the Dorel claims to a removably attached seat and base, to encompass a unitary structure that does not have a separate and separable seat and base. The Dorel prosecution history itself negates such a construction. The original claims, broadly referring to any "juvenile vehicle [*13] seat" with a retractable cup holder, were rejected as anticipated by O'Brien U.S. Patent No. 3,637,184, which describes a unitary seat with a retractable cup holder. In response, the claims were amended to "further comprise" a "seat" that is "removably secured" or "removably attached" to a "base." The district court correctly construed the claims as requiring a removable seat and separate base. See Phillips v. AWH Corp., 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*enbanc*) ("the prosecution history can [make] the claim scope narrower than it would otherwise be"). Indeed, Dorel in its motion for summary judgment observed that the O'Brien patent "discloses a single, indistinct piece, in which no seat could be identified separately from a base, much less a seat removably attached or removably secured to a base." Neither Dorel nor the panel majority can recapture what Dorel surrendered during prosecution: a single indistinct piece without an identifiable, removable seat portion.

The district court, referring to the prior art, correctly rejected "the one piece, stand alone base/seat" that is adopted by the panel majority as coveredby the Dorel claims. The district court [*14] construed "base" to mean a structure that not only "props up the seat" and "upon which the seat sits," but also is "separate from the seat." The district court correctly construed "seat" to mean not only a structure "intended to be sat in or on, "but also used "in conjunction with but not as part of the base." The district court further construed "removably attached/secured" to require that the base and seat be "designed at some time or another to come apart." On these definitions and the undisputed structure of Graco's carseat, the district court correctly recognized that no reasonable jury could find that the Graco seat device has a seat that is removably attached to a separate base. As the district court observed, the bottom piece of the Graco assembly "is an integral part of the seat," not removably attached or secured to the seat.

The panel majority ignores this central issue and remands for findings on a non-issue: whether "the top structure is capable of functioning as a 'seat' upon being removed from the bottom structure." Maj. op. at 7. That aspect is irrelevant. The question is not whether the top structure is "capable" of being sat upon; the question is whether there is [*15] a seat removably attached to a separate and distinct base.                                        —

The panel majority also holds as a matter of law that the "removably attached" and "removably secured" limitations are met, based on its construction requiring only that the seat and base "be capable of separation." Maj. op. at 5. That is not the description of the invention. Of course even "one-way" screws can be laboriously removed and the structure disassembled; indeed, it is difficult to imagine any assembly not "capable" of being disassembled. The district court correctly required that the seat and base be "affixed in a manner that contemplates" removal; that is, the parts must be "designed at some time or another to come apart." Summary Judgment at 6-7. The record contains no suggestion that Graco's carseat is designed to come apart. The user manual for Graco's product negates disassembly, admonishing the user not to modify the seat or use the seat without all of its parts, warning that failure to properly use the seat "increases the risk of serious injury or death." Even on the panel majority's speculation that the Graco structure might be disassembled for cleaning, the "removably attached/secured" requirement of [*16] the Dorel claims is not met. The specification describes the base as being "releasably coupled" to the seat; this is not compatible with the need to purchase and use a special tool to unscrew one-way screws covered by upholstery.

The panel majority complains that the patent does not discuss the advantage of separating the Dorel seat from its base, stating that "there is no indication that the patent is directed to a product comprising a base that, during everyday

2005 U.S. App. LEXIS 23964, *

usage, remains in the automobile while the user removes the seat and the child." Maj. op. at 5-6. However, such separable carseats were in the prior art at the time the Dorel applications were filed; the patents are directed primarily to the cup holders, not the seat and base structure. See '862 patent, col. 1, ll. 9-10 (describing the invention as a retractable cup holder in a "conventional juvenile vehicle seat" that is "generally known" and in "widespread use"); see also Figures 1 and 2 of Dorel's patents, supra. The record contains other patents by the inventor of the Dorel patents, such as U.S. Patent No. 6,554,358, which is directed to a seat removably attached to a base, and which cites eleven references [*17] to seat and base combinations that are manually separable. In addition, Graco points to Department of Transportation regulations, with which all carseats must conform, that describe carseat components that "can only be removed by use of a tool" as "permanently attached." 49 C.F.R. § § 571.213 S5.9 , 571.225 S15.1.2.1(f). The panel majority's interpretation of "removably attached" and "removably secured" as requiring only that the structure be "capable" of disassembly, however laborious the mechanics, is contrary to the prior art, contrary to usage in the field, and contrary to federal regulation.

The majority's approach to claim construction strains this court's attempts to restore consistency of analysis to patent claims by placing the claims in the context of the specification. See Phillips, 415 F.3d at 1321 ("The risk of systematic over breadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down"). The panel majority construes the Dorel claims as encompassing a different [*18] invention from that described and prosecuted. From this incorrect claim construction, leading the court to an incorrect decision, I must, respectfully, dissent.

# EXHIBIT KK

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT LL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT MM

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT NN

| SERIAL NUMBER (Series of 1987) | 07 312111 | PATENT DATE | | PATENT NUMBER |
|---|---|---|---|---|

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 07/312,111 | 02/17/89 | 221 | 123 | 311 | Bollinger |

APPLICANTS

ROBERT L. BURR, SAN DIEGO, CA.

**CONTINUING DATA**********************
  VERIFIED
  DHB          none
  1/11/91

**FOREIGN/PCT APPLICATIONS***********
  VERIFIED
  DHB          none
  1/11/91

FOREIGN FILING LICENSE GRANTED 03/08/89        ***** SMALL ENTITY ****

| Foreign priority claimed ☐yes ☒no | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| 35 USC 119 conditions met ☐yes ☒no | | CA | 6 | 49 | 5 | $ 378.00 | 33902030 |
| Verified and Acknowledged DHB 1/11/91 Examiner's initials | | | | | | | |

ADDRESS
GREGOR N. NEFF
C/O CURTIS, MORRIS & SAFFORD
530 FIFTH AVENUE
NEW YORK, NY 10036

TITLE
TICKET DISPENSING MACHINE AND METHOD

U.S. DEPT. of COMM.-Pat. & TM Office—PTO-436L (rev. 10-78)

| PARTS OF APPLICATION FILED SEPARATELY | | | |
|---|---|---|---|
| NOTICE OF ALLOWANCE MAILED | PREPARED FOR ISSUE | | CLAIMS ALLOWED |
| | Assistant Examiner | Docket Clerk | Total Claims | Print Claim |
| ISSUE FEE | | | DRAWING |
| Amount Due | Date Paid | | Sheets Drwg. | Figs. Drwg. | Print Fig. |
| | | Primary Examiner | |
| | ISSUE CLASSIFICATION | | ISSUE BATCH NUMBER |
| Label Area | Class | Subclass | |

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368.
Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436
(Rev. 9/88)

07 312111

PATENT APPLICATION SERIAL NO.

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

080  02/22/89  312111                          1 201     378.00 CK

PTO-1556
(5/87)

EXPRESS MAIL

Mailing label number B 43807468

Date of Deposit ...February 17, ...9....

I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231.

    Catherine Perman
(Typed or printed name of person mailing paper or fee)

*Catherine Perman*
(Signature of person mailing paper or fee)

CURTIS, MORRIS & SAFFORD P.C.

530 FIFTH AVENUE

NEW YORK, NEW YORK 10036

(212) 840-3333

*Ⅱ 312111*

Date: _____ February 17, 1989 _____

Re: _____ 3390-2030 _____

TO THE COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

Sir:

With reference to the filing in the United States Patent and Trademark Office of an application for patent in the name(s) of:  Robert L. Burr

entitled:  TICKET DISPENSING MACHINE AND METHOD

          ☒ This is an application of a small entity under 37CFR 1.9(f) and the amounts shown in parentheses below have been employed in calculating the fee.  ☒ Small Entity Verified

          Statement(s) is (are) enclosed.

The following are enclosed:

     ☒ Specification

     ☒ _____ 49 _____ Claims(s) (including _____ 5 _____ independent claims)

          ☐ This application contains a multiple dependent claim.

     ☒ Oath or Declaration and Power of Attorney

     ☒ _____ 6 _____ Sheet(s) of Drawings  (informal)

     ☒ Our check for $ _____ 378.00 _____ , calculated as follows:

Basic Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $340.00(170.00)          170.00

Total Number of Claims in excess of 20 at $12.00 (6.00) each . . . . . . . . . . . . . . .          174.00

Number of Independent Claims in excess of 3 at $34.00 (17.00) each . . . . . . . . . . .           34.00

Multiple Dependent Claim Fee at $110.00 ($55.00) . . . . . . . . . . . . . . . . . . . . . . . .

Total Filing Fee . . . . . . . . . . . . . . . . . . . . .                                          378.00

Assignment Recording Fee  $7.00 (+ $2 for each additional patent in the assignment) . .

     ☐ Order Form for Recording Assignment

     ☐ Certified copy of each of the following application(s) to substantiate the claim(s) for priority made in the Declaration:

Application No.                              filed                   in

     Please charge any additional fees required for the filing of this applica-  n or credit any overpayment to Deposit Account No. 03-3925. A duplicate copy of this letter is enclosed.

Respectfully submitted,

CURTIS, MORRIS & SAFFORD, P.C.
*Attorneys for Applicant(s)*
Gregor N. Neff

By: _____ *Gregor N. Neff* _____
     Reg. No. 20,596

**EXPRESS MAIL**

Mailing label number B 43807468

Date of Deposit February 17, 1989

I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231.

Catherine Perman

(Typed or printed name of person mailing paper or fee)

(Signature of person mailing paper or fee)

CURTIS, MORRIS & SAFFORD, P.C.

530 FIFTH AVENUE

NEW YORK, NEW YORK 10036

TEL. (212) 840-3333

312111

Date: February 17, 1989

Re: 3390-2030

TO THE COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231:

Sir:

With reference to the filing in the United States Patent and Trademark Office of an application for patent in the name(s) of: Robert L. Burr

entitled: TICKET DISPENSING MACHINE AND METHOD

[X] This is an application of a small entity under 37CFR 1.9(f) and the amounts shown in parentheses below have been employed in calculating the fee.  [X] Small Entity Verified

Statement(s) is (are) enclosed.

The following are enclosed:

[X] Specification

[X] 49 Claims(s) (including 5 independent claims)

[ ] This application contains a multiple dependent claim.

[X] Oath or Declaration and Power of Attorney

[X] 6 Sheet(s) of Drawings (informal)

[X] Our check for $ 378.00, calculated as follows:

| | | |
|---|---|---|
| Basic Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$340.00(170.00) | | 170.00 |
| Total Number of Claims in excess of 20 at $12.00 (6.00) each . . . . . . . . . . . . . . | | 174.00 |
| Number of Independent Claims in excess of 3 at $34.00 (17.00) each . . . . . . . . . . . | | 34.00 |
| Multiple Dependent Claim Fee at $110.00 (55.00) . . . . . . . . . . . . . . . . . . . . . . . | | |
| Total Filing Fee . . . . . . . . . . . . . . . . . . . . . | | 378.00 |

Assignment Recording Fee $7.00 (+ $2 for each additional patent in the assignment) . .

[ ] Order Form for Recording Assignment

[ ] Certified copy of each of the following application(s) to substantiate the claim(s) for priority made in the Declaration:

Application No. _____ filed _____ in _____

Please charge any additional fees required for the filing of this application or credit any overpayment to Deposit Account No. 03-3925. A duplicate copy of this letter is enclosed.

Respectfully submitted,

CURTIS, MORRIS & SAFFORD, P.C.
Attorneys for Applicant(s)
Gregor N. Neff

By: _____
Reg. No. 20,596

07 312111



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

INVENTOR:     Robert L. Burr

                    *5 01*

FOR:          TICKET DISPENSING MACHINE AND METHOD

49 Claims

6 Sheets of Drawings

EXPRESS MAIL

Mailing label number B 43807468

Date of Deposit February 17, 1989

I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231.

Catherine Perman
(Typed or printed name of person mailing paper or fee)

_Catherine Perman_
(Signature of person mailing paper or fee)

Gregor N. Neff
Attorney for Applicant
Reg. No. 20,596
CURTIS, MORRIS & SAFFORD, P.C.
530 Fifth Avnenue
New York, New York 10036
(212) 840-3333

0 312111    378.10-201

PATENT
3390-2030

MAIL ROOM
FEB 17 1989
PAT. & TRADEMARK OFF.

This invention relates to ticket dispensing apparatus and methods, and particularly to lottery ticket dispensing and vending machines and methods.

Described in my joint U.S. patent application Ser. No. 128,070 filed December 3, 1987 with Laird A. Campbell, Donald H. Keagle and Alfred L. Fulton, is a lottery ticket dispensing mechanism which is very advantageous. It is described as preferably being operated by a ticket agent, rather than by the customer himself. It advantageously stores lottery tickets in fan-fold form, bursts them apart accurately and reliably, and dispenses the tickets one-by-one.

That ticket dispenser is connected to a central computer through a modem and is adapted to deliver accounting, sales inventory and related information to the central computer, and print the information on a printed ticket delivered by the machine to the agent.

Although the machine of the above-described pending application is highly advantageous, it is an object of the present invention to improve upon it, and also to provide a customer-operated ticket vending machine and method which is improved in its ability to communicate to the customer the tickets available and to enhance customer confidence in the machine. Furthermore, it is desired to

-1-

GN71.01

PATENT
3390-2030

provide such a machine which is very easy for untrained
people to operate, highly reliable in operation, and
persuasive in its presentation of lottery tickets to the
public.

In accordance with the present invention, the
foregoing objects are met by the provision of a ticket
dispensing apparatus and method in which a representation of
the tickets are displayed by the machine at all times so
that customers can see what they are buying.  Then, as the
tickets are being dispensed, the visible representation
moves by an amount corresponding to the number of tickets
dispensed.

In a preferred embodiment of the invention, the
ticket dispensing machine and method is used as a vending
machine in selling lottery tickets.  The machine preferably
has one or a plurality of windows with mechanism for moving
an array of lottery tickets past each of the windows so that
different types of lottery tickets can be seen, but not
touched, by the customers.  In a machine having a plurality
of windows, the tickets displayed can either be separate
sources of tickets of the same lottery game, or they can be
tickets of different games so that the customer can select
the game of his or her choice to play.

Preferably, the vending machines are connected by
modems or similar communication links to a central computer
which performs accounting and other similar functions.  In

-2-

GN71.01

PATENT
3390-2030

one optional arrangement, several of the machines are used
as slaves and are connected to one machine which is used as
a master, and communications are had between the central
computer and slaves and the master unit only through the
master unit so that only one telephone line is required for
the communication.

In another embodiment of the vending machine,
graphic representations of the lottery tickets are displayed
on a video screen, rather than through windows. The lottery
ticket images are moved in the same manner as tickets are
moved past windows.

The customer, by being able to see a
representation of the lottery tickets prior to selecting
them, better understands the terms of the game and has
greater confidence that the machine will vend lottery
tickets to him in a flawless manner. The motion of the
tickets during dispensing further bolsters that confidence
and is attractive. When multiple windows or video
representations are used and multiple games are provided in
a single machine, many more customers can be satisfied by
one vending machine than if only one type of ticket were
being sold.

The foregoing and other objects and advantages of
the invention will be set forth in or apparent from the
following description and drawings.

-3-

GN71.01

PATENT
3390-2030

In the Drawings:

Figure 1 is a perspective view of a ticket vending machine constructed in accordance with the present invention;

Figure 2 is a front elevational view of a portion of the machine shown in Figure 1;

Figure 3 is an enlarged front elevation view of the keypad of the unit shown in Figures 1 and 2;

Figure 4 is a perspective, partially broken-away view of another machine, similar to that shown in Figures 1 and 2;

Figure 5 is a cross-sectional view taken along lines 5-5 of Figure 4;

Figure 6 is a partially broken-away elevation view of a portion of the structure shown in Figure 5;

Figure 7 is a schematic block diagram of a communication and computer system incorporating the present invention.

Figure 8 is a front elevation view of another embodiment of the invention;

Figure 9 is a side elevation schematic view of the ticket dispensing and bursting mechanism of the device shown in Figure 8; and

Figure 10 is a schematic circuit diagram for the embodiment shown in Figures 8 and 9.

-4-

GN71.01

PATENT
3390-2030

## GENERAL DESCRIPTION

Figure 1 is a perspective view of a lottery ticket vending machine 10 constructed in accordance with the present invention.

The vending machine 10 includes upper and lower housings 12 and 14 and support feet 16 for supporting the unit on the floor. The lower housing 14 forms a storage cabinet which has a hinged lockable front cover 18. The upper housing 12 has a hinged, lockable front cover 20.

The machine 10 includes a bill receiver or "acceptor" unit 22 which has an inlet slot 24 for receiving currency notes or bills. If desired, the unit 22 can be adapted to accept credit cards or other monetary exchange media.

The machine 10 has a control panel 26 with a keypad 28 and a LED display window 30. Printed operating instructions are located at 32 above the display window 30.

A larger LED display window 34 is located at the top of the front of the housing to deliver stationary or moving advertising messages.

Four windows 36, 38, 40 and 42 are provided in the front panel 20. Immediately below each of the four windows is a ticket dispensing outlet 44, 46, 48 or 50, respectively. Each of the dispensing outlets has a pair of curved fingers 64 for holding the ticket until it is grasped by the customer.

-5-

GN71.01

PATENT
3390-2030

Clearly visible through each of the four windows
is an array 52, 54, 56, or 58, respectively, of lottery
tickets.  The tickets are visible at all times, both when
they are stationary, and when they are moving during the
ticket dispensing operation of the machine.

As it is shown in Figure 5, each of the windows
includes a bezel 62 with a rectangular opening 72 in the
rear and a cover plate 124 of tempered glass or Lexan or
similar transparent break-resistant material.

Separate locks 66, 68 and 70 are provided,
respectively, for the front panel 20, the bill receiver unit
22, and the front door 18 of the base portion 14 of the unit
10.

The method of issuing the tickets and the
selection process by the customer now will be explained.

Figure 2 is an enlarged view of the windows and
dispensing outlets of the machine 10.  In Figure 2, each of
the four windows shows most of the front faces of three
lottery tickets.  The number of lottery tickets displayed in
each window depends upon the length (the vertical dimension
in Figure 2) of the particular tickets involved.  Each of
the windows displays tickets in a different game conducted
by the lottery authority in the jurisdiction in which the
machines are used.

Referring now to Figure 3, the keypad 28 includes
a row 82 of window selection pushbuttons 84, 86, 88 and 90.

-6-

GN71.01

PATENT
3390-2030

As it is shown in Figures 1 and 2, beneath each window is a
letter and arrow 74, 76, 78 or 80 corresponding to the
letter on one of the pushbuttons 84, 86, 88 or 90.  Thus, if
the customer wishes to play game A, he or she inserts money
in the bill acceptor, and the amount of credit the customer
has appears on the display 30.    The customer then presses
number keys on the keypad 28 to input the number of tickets
desired.  The customer then presses pushbutton 84 (Figure 3)
to select the game illustrated in the window 36 (see Figure
2), and the machine moves the tickets downwardly past the
window 36 (Figure 2) and dispenses them through the outlet
44 one-by-one.  As the tickets are dispensed one-at-a-time,
the amount of credit displayed on the display 30 decreases,
one monetary unit at a time.  The unit by which the credit
decreases depends on the price of the ticket selected.

        If the customer mistakenly presses one of the game
select pushbuttons 82 first, the machine will dispense only
one ticket.  This advises the customer that he or she should
select the number of tickets desired before selecting the
game.

        If the customer has not used up all of his or her
credits, and then wishes to play game D, the customer
presses pushbutton 90 (Figure 3) and the lottery tickets 58
move downwardly and are dispensed through the outlet 50
one-by-one until the credits are used up.

        In the embodiment of Figures 8 through 10, the

GN71.01

PATENT
3390-2030

customer selects tickets from one of the arrays displayed on
a video screen 218, and tickets are issued through one of
two outlets 220 and 222.  Otherwise, the selection process
is the same as for the embodiment using windows.

If the tickets are of the "instant winner"
variety, the customer then can scratch off an opaque coating
over one area of each of the tickets to see whether he or
she is an instant winner.

It should be understood that the vending machine
also can be used to dispense tickets other than lottery
tickets and other than instant winners.  Again, the ticket
display gives the customer selection, confidence and
entertainment.

### TICKET FEEDING

Figure 4 is a perspective, partially broken away
view of a two-window lottery ticket vending unit which is
substantially the same as the one shown in Figure 1, except
that it has two windows instead of four, and does not have a
base portion 14.  The elements of the control panel 26 are
not shown, for the sake of simplification of the drawing.
The front cover 20 of the unit has been unlocked and opened
outwardly on its hinges.  Two lottery ticket feed and
dispensing mechanisms 96 and 98 for the two windows of the
machine are shown pulled out of the machine housing and
supported in the extended position by tracks 108.  This
gives access to the mechanisms for servicing and facilities
replenishing ticket stocks.

-8-

GN71.01

PATENT
3390-2030

Each of the feed units 96 and 98 includes a tray for holding a substantial stack 100 of lottery tickets in fan-fold form. The lottery tickets are printed on a continuous sheet or strip of card stock in which the individual tickets are delineated from one another by perforated lines 103 – lines of weakness along which the tickets can be separated easily.

Referring now to Figure 5 as well as Figure 4, the strip of tickets extends upwardly as shown at 102 or 101 off of the stack, and passes over a roller 104 with enlarged end stops 105, and past the opening 72 (Figure 5) in the bezel forming the rear of the window structure. The roller 104 is rotatably mounted on arms 106 which extend downwardly as shown in Figure 4.

Each of the end stops 105 can be moved longitudinally along the roller 104 by loosening a set-screw 107 and tightening it again in the new position. This permits adjustment of the distance between the end stops to guide ticket strips 118 of varying widths.

Referring now to Figure 5, the bezel 162 is mounted in the hinged front panel 20 whose frame 122 is shown in the upper left-hand corner of Figure 5. The transparent window 124 is clamped between the front panel parts 122 and 126 and the outer flange of the bezel 62. Thus, the window structure moves away from the ticket strip 118 and feeder/burster mechanism to give optimum access to the internal parts of the mechanism.

-9-

GN71.01

PATENT
3390-2030

The strip 118 of lottery tickets moves downwardly past the opening 72 in the bezel and through a pair of edge guides 134 (also see Figure 6), and through a feeding and bursting mechanism indicated generally at 112 in Figure 5. The feeding and bursting mechanism 112 is essentially identical to that disclosed in the above-identified copending patent application, except that it has been rotated through 90° to dispense tickets downwardly. It will not be described in detail herein; rather, the disclosure of that mechanism, and all other disclosure in the pending application, hereby is incorporated herein by reference.

Each feeding and bursting mechanism 112 includes four drive rollers 154, 158, 162 and 166 mounted, respectively, on shafts 156, 160, 164 and 168 (also see Figure 4). A rotary bursting wheel 152 (Figure 5) is provided and is mounted to rotate and move across the strip 118 of lottery tickets at or near the location of a perforation so as to press to the left on the ticket stock and separate a ticket 128 from the end of the strip.

The severed ticket 128 is dispensed past metal guides 136 and 138 which form a relatively narrow outlet opening 139 through which outfeed rollers 158 feed the severed ticket 128 and issue it through the opening 139 into a receptacle formed by the member 140 with the upturned arms or fingers 64. A severed ticket 130 is shown resting in the receptacle ready to be grasped. As it can be seen in Figures 1 and 2, there is an ample space between the fingers

-10-

GN71.01

PATENT
3390-2030

64 so that the customer easily inserts his own fingers to
grasp the tickets.

The outlet opening 139 is narrow and is recessed
in the housing so it is not easy to reach from outside.  In
addition, the spacing of outlet 139 from the burster blade
152 is such that a ticket will not emerge through the
opening 139 until it has been severed from the ticket strip
118.  By this means, it is made very difficult for someone
to reach into the machine, grasp the uncut ticket strip 118,
and pull out a strip of tickets.

As it is disclosed more fully in the
above-identified copending patent application, the bursting
and feeding mechanism includes a precise code wheel and
detector arrangement for making certain that the
perforations accurately line up with the bursting wheel 152.
However, the use of the bursting wheel to tear the tickets
from one another has the added benefit of automatically
adjusting any misalignment, thus providing highly reliable
feeding and issuing of whole, undamaged tickets.

As it can be seen at the upper portion of Figure
5, a lamp 148 with a housing 146 is mounted adjacent a slot
in the top of each bezel so that light rays 150 shine
downwardly to illuminate the tickets at each window to make
them more visible, readable and attractive.

GN71.01

-11-

PATENT
3390-2030

Figure 6 shows the adjustable edge-guiding members
134.  The members 134 are cams which are pivotably mounted
on a support plate 135 adjacent opposite edges of the ticket
strip 118.  Each of the cams 134 is circular with its pivot
point located considerably outwardly from its center so that
rotation of the element 134 will bring its edge closer to or
farther away from the opposite guide 134.  Each cam element
134 has a recessed edge 137 which forms a groove in which
the edge of the ticket strip is guided.

Two different positions, shown in dashed outline
at 186 and 188 are shown for the cam elements 134, in
addition to the position shown in solid outline.  With the
cams in position 186, the left edge of the ticket strip
would be located at 180.  With the cam elements rotated to
their solid line position, the left edge of the strip would
be located at 184.  The right edge would be similarly
located relative to the right-hand cam 134.  The adjustment
of these elements can be made by a service representative to
accommodate ticket strips of varying widths.

The position of each cam 134 is adjustable by
loosening a threaded fastener 178 with a knurled knob,
rotating the cam 134 to its new position, and tightening the
knob 178 again to hold it in its new position.

Also disclosed in Figure 5 is an optional printer
116, like the one shown in Figure 9 of the co-pending
application, which can be used to imprint information on the

-12-

GN71.01

PATENT
3390-2030

rear surface of each lottery ticket as it passes by.  The
information which can be imprinted is information such as
the location of the vending machine, the identification of
the ticket itself, etc., as more fully disclosed in the
co-pending application.

Also shown in Figure 5 is an optional bar-code
reader 132 which is positioned to read a bar-code printed on
the back of each lottery ticket.  This reader can read the
identification of the ticket's lot number; the
identification of each individual ticket; the ticket batch
number; the ticket manufacturer; the ticket manufacturing
date; and the game represented by the ticket; whether the
ticket is a winner; and how much winnings the ticket is
worth.  This information then can be used for accounting and
security purposes.

CONTROL SYSTEM

Figure 7 shows a ticket vending system including a
number of vending units 10 and a central computer 204.

Each unit 10 has a microprocessor whose CPU 190 is
shown in Figure 7.  The bill receiver or acceptor 22 —
indicates the denomination of the bill and its authenticity.
The CPU computes the amount of credit due to the customer
and displays it on the LED display 30 so the customer knows
how much credit he or she has at any given moment.  The bill
receiver is adapted to accept bills in denominations of
$1.00, $5.00, $10.00 and $20.00 in U.S. currency, or other
multiple denominations of the currency of other countries.

-13-

GN71.01

PATENT
3390-2030

The keypad 28 then is operated by the customer to select one of the four games available, and to select the number of lottery tickets desired. This information is operated upon by the CPU 190 and is used to cause the proper number of tickets 130 to be issued from the selected window 36, 38, 40, or 42. Then the amount of credit shown on the display 30 is reduced by one unit as each ticket is issued so that the customer can see that he is being charged the proper amount for each ticket. The customer then can select other windows and other numbers of tickets until his credit is used up.

Communication between the vending units 10 and the central computer 204 preferably is through telephone lines 202 by means of a modem 203, or an optional dial-up modem 192 in each of the units 10.

If desired, in order to save hardware costs and telephone charges, a group of four or more vending units can be operated in a master-slave relationship with one unit 10 being the master and three units 194, 196 and 198 being connected by cable as slaves to the master unit. In this manner, there is communication with the central computer only through the master unit. This reduces the number of telephone lines needed to one, and reduces hardware costs in the slave units. The master-slave groupings are convenient to use when multiple vending machines are located close to one another, as in a single building.

-14-

GN71.01

PATENT
3390-2030

Figure 7 shows, in the lower portion, another
vending unit 10 with three slaves 210, 212 and 214.  Still
another vending unit 10 without any slaves is shown to the
right and above the central computer 204 in Figure 7.

A keyboard 206 and a printer 208 are connected to
the central computer at the same location as the computer so
that ticket agents can input and output the information
necessary to control the vending units and check on their
operation and security.

A printer 208 is located inside of each vending
machine 10.  Such a printer prints a record of all
transactions and data to be discussed below, and can be used
by the agent servicing the machine for accounting and other
purposes to be disclosed below, or which have been disclosed
in the co-pending application.

The adjustment for different lengths of tickets is
set electronically through a service keypad 191 located
internally in the housing 12.  Alternatively, the length
adjustment can be set electronically from the central
computer.

The wording of the advertising sign can be changed
at will, preferably from the central computer 204.  It is
typically a LED display.  It can be stationary or moving, as
is well-known in the art.

The "clear" button (Figure 3) on the keypad allows
the customer to correct an erroneous keypad entry.  The

-15-

GN71.01

PATENT
3390-2030

programming of the microprocessor in the vending machine advises a customer by way of the display 30 when the mechanism dispensing a particular one of the game tickets is inoperative, and then will advise the customer to chose another game.  The bill receiver will not accept any currency if all games are inoperative.

The specific circuitry and program routines used in the unit 10 are more fully described in the co-pending patent application and will not be elaborated upon here.

## SPECIFIC EXAMPLE

In a particular machine like that shown in Figure 1 which has been built and successfully operated, the following specific features have been incorporated.  The currency acceptor used is a Mars Electronics Model L20-U1M currency acceptor capable of accepting $1.00, $5.00, $10.00 and $20.00 bills in U.S. currency.  It has a 1,000 bill capacity stacker to stack the bills.

The character display 30 is a 20 character light emitting diode display.  It displays prompt messages at regular intervals to assist the customer in making his purchase.

An audible alarm is provided in case the cabinet door is open or the power input to the unit is too low.

The internal printer 208, is a 16-column thermal printer.

-16-

GN71.01

PATENT
3390-2030

The imprinter 116 consists of a stamp roller and
an ink roller in a self-contained replaceable assembly
capable of making 100,000 impressions.

DATA PROCESSING

The following data is to be stored in the memory
of each vending unit.  Listed below are the means by which
the data is entered ("Entry Source"), and whether the data
is encrypted pursuant to a secret code which is used for
security purposes:

| ENTRY | | SOURCE | ENCRYPTED |
|---|---|---|---|
| A. | Modem Communications Password | Host | Yes |
| B. | Number of Ticket Loaded/Added | Keypad | No |
| C. | Number of Tickets To Be Dispensed | Keypad | No |
| D. | Number of Tickets Remaining | Calculation | No |
| E. | Agent Number (Up to Six Digits) | Host | Yes |
| F. | Machine Number (Up to Eight Digits) | Host | Yes |
| G. | Number of Times Unit is Opened | Auto | No |
| H. | Agent Commission: to 1/10th of 1% | Host | Yes |
| I. | Single Customer Message (80 Character Buffer) | Host | Yes |
| J. | Ticket Purchase Price ($1 Increments) | Host | Yes |
| K. | Primary and Secondary Host Phone # | Host | Yes |
| L. | Date and Time | Host | Yes |
| M. | Keypad Sign-on Password | Host | Yes |
| N. | Ticket Length (1.25" – 2.50") | Keypad | No |

The "keypad" referred to above is the service
keypad 191 (Figure 7) which is not accessible by the public.
Alternatively and preferably, the keypad 28 can be used as

GN71.01                        -17-

PATENT
3390-2030

the service key pad by use of software and a keypad sign-on
password by the service representative.  The display 30 also
serves as a diagnostic message display during servicing.

Time Increments for Filling Data

The above data is kept for each of the following
time increments:

A.   Latest Complete Week (Sun - Sat)
B.   Current Week
C.   Current Day
D.   Most Recent Complete Day (Midnight to Midnight)
E.   Second Most Recent Complete Day

Reports

The following reports are generated by the system
and its software:

A.   Current Sales Report:  for current day.

B.   Daily Sales Report:

   1.   For most recent complete day

   2.   For second most recent complete day

C.   Weekly Sales Report

   1.   For latest complete week

   2.   For current week to date

D.   Invoice:  for latest complete week only.

Reports - Detailed

The following reports are made available to agents
via the thermal printer 208 in the vending machine, and to
the State or other operating authority via modem.  All data
remains stored until the file is needed for the next time
increment.

-18-

GN71.01

PATENT
3390-2030

A.  Current Sales Report Contents:

    1.  "Current Sales" title
    2.  Current date and time
    3.  Agent Number
    4.  Machine Number
    5.  Sales since last report
    6.  Playout since last report
    7.  Net cash since last report
    8.  Total Sales for current day
    9.  Total payout for current day
    10. Net cash for current day
    11. Service entries.  (Two digits Max)

B.  Daily sales report contents:

    1.  "Daily Sales Report" title
    2.  "For 00/00/00".  Add time for current day
        only.
    3.  Agent number
    4.  Machine number
    5.  Sales
    6.  Pay out total
    7.  Net cash amount (sales - payout = net cash)
    8.  Service entries (two digits max)

C.  Weekly sales report content:

    1.  Same format and content as daily report
    2.  "For W/E 00/00/00: (W/E = Week Ending.
        Use Sat Date)

D.  Invoice Content:

    1.  "For W/E 00/00/00" (Sat Date)
    2.  Agent Number
    3.  Machine Number
    4.  Sales
    5.  Payout Total
    6.  Commission earned
    7.  Net Due to State (or from State)

## REPORT FORMAT

Following is the preferred format for each of the
foregoing reports:

DAILY SALES RPT
  FOR 00/00/00

GN71.01

PATENT
3390-2030

```
AGENT #   000000
MACH #  00000000
SALES    $0000.00
PAID      $000.00
NET      $0000.00
SE             00
-----------------

-----------------
WEEKLY SALES REPT
FOR W/E 00/00/00

AGENT #   000000
MACH #  00000000
SALES
PAID
NET
SE
-----------------

-----------------
WEEKLY INVOICE
FOR W/E 00/00/00

AGENT #   000000
MACH #  00000000
SALES    $0000.00
PAY       $000.00
COMM      $000.00
NET DUE $0000.00
-----------------

-----------------
CURRENT SALES
00/00/00 0000:00

AGENT #   000000
MACH #  00000000
FOR CURRENT DAY
SALES    $0000.00
PAID      $000.00
NET      $0000.00
SE             00

FOR THIS REPORT
SALES    $0000.00
PAID      $000.00
NET      $0000.00
SE             00
-----------------
```

-20-

GN71.01

PATENT
3390-2030

## Communications with Host Computer

Communication from the host computer 204 to the unit 10 is accomplished with a 2400 baud modem over a telephone network.  The host computer calls the unit 10, and sends a ten-character ASCII password.  The vending unit is then ready to transmit its encrypted data to the host using CRC XMODEM protocol.  After the vending unit sends its data, it goes into the receive mode.  The host will then send encrypted data to the vending unit using CRC XMODEM protocol.

## Dial-Up Modem

The internal modem 192 for dial-up communications operates at a 2400 baud rate.

The modem 192 will answer calls within a time period programmed by the host computer.  The service operator may also override the modem answer time period to set the modem to answer NOW.

## Master/Slave Serial Data Communications

A master/slave serial data communications bus 200 (Figure 7) is used to communicate between the master and slave units.  This is a bidirectional bus and supports one master and three slave units.  The master is connected to the telephone system and will allow a host computer to collect data from four terminals through one telephone line 202.

-21-

GN71.01

PaᴛENT
3390-2030

### Video Display Embodiment

Figures 8 through 10 show an alternative embodiment of the invention in which a video display is used, instead of separate windows, to display arrays of the different tickets.

Figure 8 is a front elevation view of a vending machine constructed in accordance with this embodiment of the invention.  The unit 216 does not have a base cabinet like the cabinet 14 shown in Figure 1, but instead, like the embodiment shown in Figure 4, rests upon a table or stand (not shown).

Each of the components and elements of the machine 10 shown in Figure 1 which is the same as in Figure 1 bears the same reference numeral.

Instead of the four windows in the unit 10, a video display screen 218 is provided for displaying a plurality of arrays of lottery tickets.  Each array is designated by one of the letters A, B, C, D, E and F in Figure 8.  Instead of one dispensing outlet for each array, as in the Figure 1 embodiment, there are only two dispensing outlets 220 and 222.

Figure 9 is a side elevation schematic view showing one of two burster mechanisms 112 receiving ticket strips 225, 227 or 229 from storage bins 224, 226 or 228, respectively.  The unit 112 contains means for selecting one from among the three ticket storage bins to feed and

-22-

GN71.01

- PATENT
3390-2030

disburse tickets from.  When the customer selects one of the
three lottery ticket arrays A, B or C, the unit 112 behind
outlet 220, which receives tickets from those three
supplies, selects the appropriate strip to feed through the
burster unit, separates the proper number of tickets, and
dispenses them through the outlet opening 220.

Similarly, a separate mechanism like that shown in
Figure 9 is located behind the outlet opening 222 to service
the arrays D, E and F.  When one of those arrays has been
selected, the burster 112 selects a ticket strip from one of
the three bins that feed into it and issues tickets from
that strip.

Figure 10 is a schematic block diagram of the
control circuit for the system shown in Figures 8 and 9.  It
is essentially the same as that shown in Figure 7, except
that the CPU 190 delivers control signals to the units 112
which control which of the three sources it feeds tickets
from.  The CPU also selects which of the two units 112 is
enabled, depending on the array selected by the customer.

A video memory 230 is provided to store digitized
graphic representations of the lottery tickets in each of
the six displays on the screen.  These ticket images are
digitized by conventional graphic digitizing means, and the
digital signals are stored in the video memory 230
periodically as the games and the lottery tickets are
changed.  The digital signals needed for proper operation

PATENT
3390-2030

can be stored and distributed to many different remote machines from the central computer 204. Alternatively, the unit 216 can be provided with a small disk drive or tape player, and the service representative can carry the digital images on a disk or tape and use the disk drive or tape to read them into the machine 216 when he comes to load into the machine a new batch of lottery tickets for a new game.

The video memory 230 is of a conventional type which contains any digital to analog conversion circuitry to deliver signals suitable for display on the video monitor 218.

In accordance with another aspect of the invention, each of the arrays of ticket images A, B, C, D, E and F can be made to move downwardly as a ticket is issued. The array moves in the same manner as the tickets move past the windows in Figures 1 and 2. This can be done by ordinary scrolling techniques. Although only 2 tickets are shown in each of the arrays A, B, C, D, E and F, it should be understood that each array can be made to contain more tickets, if it is desired to do so.

When the supply of any one particular lottery ticket is exhausted, the representation of that ticket on the video screen disappears and is replaced by a legend saying "Sold Out".

The device shown in Figures 8, 9 and 10 has the advantage that it is relatively compact and may require

-24-

GN71.01

PATENT
3390-2030

fewer burster and feeder mechanisms.  It would be possible, for example, by extension of the principles discussed above, to use only one burster and feeder mechanism to service four or five or more different supplies of lottery tickets.

Another advantage of the device shown in Figures 8 through 10 is the arrays A, B, C, D, E and F appear on a video screen.  This may make viewers more comfortable in that they will be viewing the tickets in a familiar format. Also, the video screen, which preferably is a color receiver, will deliver the images of the tickets in vivid, bright colors which will be easy to see in a darkened room, such as in a tavern or cafe.  For these reasons, it may be desired to use the video screen to display the ticket images, even though a separate burster and feeder mechanism is used for each type of ticket.

The above description of the invention is intended to be illustrative and not limiting.  Various changes or modifications in the embodiments described may occur to those skilled in the art and these can be made without departing from the spirit or scope of the invention.  For example, either the ticket itself or a video image of a ticket should be considered to be a "representation" of the ticket.  Means other than the specific ones described above can be used to create representations of tickets without departing from the invention.

-25-

PATENT
3390-2030

CLAIMS:

1.    A ticket dispensing machine, comprising, in combination, a housing, at least one window in said housing through which tickets inside said housing can be seen but not touched by a person outside said housing, a dispensing outlet in said housing, moving means for moving an array of tickets past said window, and means for dispensing through said outlet a pre-determined number of tickets to an operator of said machine.

2.    A machine as in Claim 1 in which said housing has a plurality of said windows, and said moving means is adapted to move an array of tickets past each of said windows.

3.    A machine as in Claim 1 in which said tickets are attached together in a continuous strip when they move past said window, and separating means for separating said tickets from one another before they are dispensed.

3.    A machine as in Claim 1 in which said tickets are lottery tickets.

5.    A machine as in Claim 1 including means for receiving a medium of monetary exchange, detecting the number of monetary units represented by said medium and dispensing the number of tickets corresponding to said number of monetary units.

GN71.01                        -26-

PATENT
3390-2030

6.   A machine as in Claim 5 in which said tickets are instant-winner lottery tickets.

7.   A machine as in Claim 2 in which the array of tickets at each of at least two of said windows is different, each array representing a different lottery game.

8.   A machine as in Claim 2 including means for selecting one array of tickets behind one of said windows and operating said moving means so as to move only the tickets in the selected array.

9.   A machine as in Claim 5, in which said medium of monetary exchange is selected from the group consisting of a currency detector and a credit card reader.

10.  A machine as in Claim 1 in which said dispensing means includes means for barring a person from grasping any ticket before it is dispensed through said outlet.

11.  A machine as in Claim 1 including bar-code reading means mounted adjacent the path of travel by said tickets for reading a bar code from said tickets and transmitting to central computer means the information so read.

12.  A machine as in Claim 11 in which the barcodes on said tickets represent one or more of the group consisting of; individual ticket identification; ticket batch identification; ticket lot numbers; ticket manufacturer; ticket manufacture date; the game represented

-27-

GN71.01

PATENT
3390-2030

by the ticket; whether the ticket is a winner; how much winnings the ticket is worth.

13.  A machine as in Claim 3 in which said separating means comprises bursting means for bursting said tickets apart along lines of weakness delineating said tickets from one another.

14.  A machine as in Claim 13 in which said bursting means comprises means for holding the tickets on both sides of one of said lines of weakness against longitudinal movement, and pressing means for pressing transversely against said tickets at said line to burst them apart at said line.

15.  A machine as in Claim 14 in which said pressing means comprises a dull-edged wheel, and means for rolling said wheel along said line to separate said tickets.

16.  A ticket vending method, said method comprising the steps of:

(a)  utilizing powered drive means for moving an array of tickets past a viewing window in a housing in a manner such that the tickets can be seen from outside said housing, and

(b)  issuing from said housing the number of tickets from said array which are ordered by an operator.

17.  A method as in Claim 16 in which said array comprises a fan-fold group of tickets delineated from one another by perforation lines, and including the step of

-28-

GN71.01

PATENT
3390-2030

separating ones of said tickets from the others in said
array prior to issuing them.

18. A method as in Claim 16 including the step of
providing a plurality of windows in said housing, each with
an array of tickets and powered drive means to move the
array past it, and selecting among said arrays and issuing
tickets from one of them.

19. A method as in Claim 18 including the steps
of providing a monetary medium of exchange acceptor means
and a character display, displaying the amount of credit due
the customer in response to the input of a monetary exchange
medium into said acceptor means and acceptance thereof, and
reducing the amount of credit displayed by an amount
corresponding to the number of tickets issued to indicate
how much credit remains after the ordered number of tickets
has been issued.

20. A method as in Claim 16 including on said
tickets bar-coded information selected from the group
consisting of individual ticket identification; ticket batch
identification; ticket lot numbers; ticket manufacturer;
ticket manufacture date; the game represented by the ticket;
whether the ticket is a winner; how much winnings the ticket
is worth, providing a bar-code reader to read said
information from said tickets as they are being dispensed,
and communicating said information to an information
gathering station.

-29-

GN71.01

PΛrENT
3390-2030

21. A method as in Claim 16 including the steps of providing a plurality of ticket vending machines in a particular locale, selecting one of said machines to be a master and the others to be slaves, and communicating data regarding the operation of said master and slave units through said master unit.

22. A method as in Claim 16 in which said tickets are lottery tickets, the tickets displayed through each of said windows representing a different lottery game to provide the customer with a variety of different games to select from.

23. A lottery ticket vending machine comprising, in combination, a housing, display means for displaying an array of lottery ticket representations viewable from outside of said housing by a customer, said array representing tickets in said machine available for purchase, acceptor means for receiving and accepting a means of monetary exchange, and means for dispensing said tickets in a number corresponding to the amount of money input into said machine by said customer.

24. A machine as in Claim 23 in which said display means is adapted for displaying a plurality of arrays of said tickets and including means for selecting from among said arrays one array from which tickets are dispensed.

GN71.01                              -30-

P......NT
3390-2030

25    A machine as in Claim 23 in which said
display means comprises at least one transparent enclosure
through which said array can be seen but not touched by said
customer, and means for moving said array in said enclosure
during the dispensing of said tickets.

26.    A machine as in Claim 25 in which said
transparent enclosure is a window, said tickets being formed
in a continuous strip with individual tickets delineated
from their neighbors by perforations, storage means in said
housing for storing a supply of said tickets, feed means for
feeding said strip past said window, separator means for
receiving said strip after passing by said window and
separating said tickets from one another, said dispensing
means being adapted to dispense one or more tickets
separated from said strip.

27.    A machine as in Claim 26 in which said
housing has a restricted outlet opening, said outlet opening
being positioned so that a ticket does not emerge therefrom
until after it has been separated from said strip, whereby
the strip of tickets is made difficult to reach and pull out
of the machine.

28.    A machine as in Claim 27 including a ticket
receptacle adjacent said outlet opening, said receptacle
having bifurcated means for holding a dispensed ticket, with
a space for the insertion of fingers to easily grasp the
tickets.

-31-

GN71.01

PATENT
3390-2030

29. A machine as in Claim 26 including sliding support means for mounting said storage, feed, separator and dispensing means in said housing, said housing having a removable panel and said support means being slidable out of said housing for ease of reloading and service.

30. A machine as in Claim 29 in which said removable panel is a hinged front panel, said window being located in said front panel.

31. A machine as in Claim 26 said housing having a front panel, said window comprising a bezel in said front panel, a transparent covering for the front of said bezel, and the back of said bezel being open, and guide means for guiding said strip along said back of said bezel.

32. A machine as in Claim 25 including a lamp for illuminating said array.

33. A machine as in Claim 26, including adjustable edge guide means for guiding the edges of said strip, said adjustable edge guide means comprising a pair of cams rotatable to change the spacing between them.

34. A machine as in Claim 23 including means for displaying the amount of credit due the customer in response to the input of a monetary exchange medium into said acceptor means and acceptance thereof, and means for reducing the amount of credit displayed by an amount corresponding to the number of tickets issued to indicate

GN71.01

--32--

P..ENT
9390-2030

how much credit remains after the ordered number of tickets has been issued.

35.  A machine as in Claim 23 and a plurality of additional ones of said machines, said additional machines being adapted to be slaves and the first-named machine being a master, and communications means including a modem for communicating data and instructions between a central computer and said vending machines through said modem and said master machine.

36.  A machine as in Claim 24 in which said machine has a message display for displaying an advertising message related to the lottery in which said tickets sold.

37.  A machine as in Claim 26 in which said strip is fed downwardly past said window, and said housing has a dispensing outlet below said window.

38.  A machine as in Claim 23 in which said display means comprises video display means for displaying a plurality of arrays of ticket images on a video screen.

39.  A machine as in Claim 38 including means for separately scrolling each of said arrays to produce motion as tickets represented by a selected array are being dispensed.

40.  A machine as in Claim 39 including video memory means for storing and delivering to said video display means signals to form said arrays under the control of electrical control circuitry.

GN71.01                                    -33-

PATENT
3390-2030

41.  A ticket dispensing machine, said machine comprising, in combination, a housing, at least one window in said housing through which tickets inside said housing can be seen but not touched by a person outside said housing, a dispensing outlet in said housing, moving means for moving an array of tickets past said window, means for dispensing through said outlet a pre-determined number of tickets to an operator of said machine, said tickets being formed in a continuous strip with individual tickets delineated from their neighbors by perforations, storage means in said housing for storing a supply of said tickets, separator means for receiving said strip after passing by said window and separating said tickets from one another, said dispensing means being adapted to dispense one or more tickets separated from said strip.

42   A machine as in Claim 41 in which said housing has a restricted outlet opening, said outlet opening being positioned so that a ticket does not emerge therefrom until after it has been separated from said strip, whereby the strip of tickets is not easy to each and pull out of the machine, including a ticket receptacle adjacent said outlet opening, said receptacle having bifurcated means for holding a dispensed ticket, with a space for the insertion of fingers to easily grasp the tickets.

43.  A machine as in Claim 41 including sliding support means for mounting said storage, feed, separator and

-34-

GN71.01

PATENT
3390-2030

dispensing means in said housing, said housing having a
removable panel and said support means being slidable out of
said housing for ease of reloading and service.

44.  A machine as in Claim 43 in which said
removable panel is a hinged front panel, said window being
located in said front panel.

45.  A machine as in Claim 41 said housing having
a front panel, said window comprising a bezel in said front
panel, a transparent covering for the front of said bezel,
and the back of said bezel being open, and guide means for
guiding said strip along said back of said bezel.

46.  A method of dispensing tickets from a machine
said method comprising the steps of:

(a)  displaying a plurality of arrays of
ticket representations, each of said arrays representing
tickets available for dispensing from said machine,

(b)  selecting tickets from one of said
arrays,

(c)  dispensing a selected number of said
tickets, and

(d)  causing the selected array to move to
indicate the dispensing of tickets therefrom.

47.  A method as in Claim 46 in which said ticket
representations comprise video images of said tickets
displayed on a video screen.

GN71.01                          -35-

PATENT
3390-2030

48.  A method as in Claim 46 in which said dispensing step comprises selectively feeding tickets from one of a plurality of ticket storage units through a dispensing means, said one unit containing tickets corresponding to the selected array.

49.  A method as in Claim 46 in which said displaying step comprises moving an array of tickets past a window in the housing of said machine so that said array is visible but untouchable from outside said machine.

-36-

GN71.01

S. no
9/2005

# ABSTRACT OF THE DISCLOSURE

Preferably, instant-winner lottery tickets are
sold by the machine.  The machine includes a bill acceptor
to receive the money of the purchaser.  It has from one to
four windows in a front panel.  Lottery tickets are
displayed in the window and move past the window as they are
being dispensed, thus allowing the buyer to see the messages
and terms on the tickets themselves.  When more than one
window is provided in the machine, the buyer can select
among a plurality of different instant-winner lottery games.
The machine is connected electrically to a central computer
for accounting and control functions.  In another
embodiment, representations of the tickets are displayed in
a movable array on a video screen.

DECLARATION ᴀ ɪ PATENT APPLICATION AND POWEɪ. ᴀ ATTORNEY
(Under 37 CFR ᵣ 1.63; includes reference to PCT Internatio˰ɪ applications)

CURTIS, MORRIS & SAFFORD, P.C. File No. .3390-2030. . . . . . . . .

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am an original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention ENTITLED:

TICKET DISPENSING MACHINE AND METHOD
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
the specification of which

☒ is attached hereto.      ( ☐ PCT International)

☐ was filed on . . . . . . . . . as  ( ☐ United States ) Application, No. . . . . . . . . . . . . . . . . . . . .

with amendment(s) through . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .(if applicable, give details).

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, §1.56 (a).

I hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate or of any PCT international application(s) designating at least one country other than the United States of America listed below and have also identified below any foreign application for patent or inventor's certificate or any PCT international applications designating at least one country other than the United States of America filed by me on the same subject matter having a filing date before that of the application(s) of which priority is claimed:

| Prior Foreign/PCT Application(s) [list additional applications on separate page]: | | | Priority Claimed: | |
|---|---|---|---|---|
| Country (or PCT) | Application Number: | Filed (Day/Month/Year): | Yes | No |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |

I hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) or PCT international application(s) designating the United States of America that is/are listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in that/those prior application(s) in the manner provided by the first paragraph of Title 35, United States Code §112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application(s) and the national or PCT international filing date of this application:

Prior U.S. (or U.S.-designating PCT) Application(s) [list additional applications on separate page]:

| U.S. Serial No.: | Filed (Day/Month/Year): | PCT Application No. | Status (patented, pending, abandoned): |
|---|---|---|---|
| | | | 30/ |

I hereby appoint . .Gregor. N.. Neff. . . . . . . . . . . . . . . . . . . . . . . . . . , Registration No. .20,596. ,

and . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
and CURTIS, MORRIS & SAFFORD, P.C., Registration No. 12761, or their duly appointed associate, my attorneys, with full power of substitution and revocation, to prosecute this application, to make alterations and amendments therein, to file continuation and divisional applications thereof, to receive the Patent, and to transact all business in the Patent and Trademark Office and in the Courts in connection therewith, and specify that all communications about the application are to be directed to the following correspondence address: ƛʗʃ

Gregor N. Neff . . . . . . . . . . . . . . . . . . . . . ., Esq.     Direct all telephone calls to: (212) 840-3333
ʚʂ; c/o CURTIS, MORRIS & SAFFORD, P.C.                              to the attention
ʋʋ; 530 Fifth Avenue
ʋʋNew York, New York 10036                           of . .Gregor. N.. Neff. . . . . . . . . . . . . . . . . .

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

INVENTOR(S):

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Date: ꞏꞏ Feb 15, 1989

Full name of sole or first inventor: Robert L. Burr

Residence: 7515 CHARMANT DR SUITE 1407 SAN DIEGO, CA 92122

Citizenship: U.S.A.

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Date: . . . . . . . . . . . . . . . . . .

Full name of 2nd joint inventor (if any):

Residence:

Citizenship:

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Date: . . . . . . . . . . . . . . . . . .

Full name of 3rd joint inventor:

Residence:

Citizenship:

[Similarly list additional inventors on separate page]

Post Office Address(es) of inventor(s):

[if different from residence]

Note: In order to qualify for reduced fees available to Small Entities, each inventor and any other individual or entity having rights to the invention must also sign an appropriate separate "Verified Statement (Declaration) Claiming [or Supporting a Claim by Another for] Small Entity Status" form [e.g. for Independent Inventor, Small Business Concern, Nonprofit Organization, individual Non-Inventor].

312111

| Applicant or Patentee | : Robert L. Burr | Curtis, Morris & Safford, P.C. |
|---|---|---|
| Serial or Patent No. | : | File No. 3390-2030 |
| Filed or Issued | : | |
| For | : TICKET DISPENSING MACHINE AND METHOD | |

## VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY STATUS
(37 CFR 1.9(f) and 1.27 (b)) — INDEPENDENT INVENTOR

As a below-named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees under Section 41(a) and (b) of Title 35, United States Code, to the Patent and Trademark Office with regard to the invention, entitled
TICKET DISPENSING MACHINE AND METHOD
described in

☒ the specification filed herewith.
☐ application serial no._____, filed_____.
☐ patent no._____, issued_____.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who could not be classified as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to asssign, grant, convey, or license any rights in the invention is listed below:

☒ no such person, concern, or organization
☐ persons, concerns or organizations listed below*
*NOTE: Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

FULL NAME_____
ADDRESS_____
  ☐ INDIVIDUAL      ☐ SMALL BUSINESS CONCERN      ☐ NONPROFIT ORGANIZATION

FULL NAME_____
ADDRESS_____
  ☐ INDIVIDUAL      ☐ SMALL BUSINESS CONCERN      ☐ NONPROFIT ORGANIZATION

FULL NAME_____
ADDRESS_____
  ☐ INDIVIDUAL      ☐ SMALL BUSINESS CONCERN      ☐ NONPROFIT ORGANIZATION

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any mainenance fee due after the date on which status as a small entity is no logner appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

Robert L. Burr
NAME OF INVENTOR                NAME OF INVENTOR                NAME OF INVENTOR

_____                _____                _____
Signature of Inventor          Signature of Inventor          Signature of Inventor

Feb 15, 1989
_____                _____                _____
Date                          Date                          Date



FIG 1



FIG. 2



FIG. 4



312 /11

3390-2030

FIG. 6

FIG. 3

FIG. 5



FIG. 7