# EXHIBITS A-D

# EXHIBIT A

# MORRIS, NICHOLS, ARSHT & TUNNELL

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

RODGER D. SMITH
302 575 7205
302 498 6209 FAX
rsmith@mnat.com

April 25, 2005

BY FEDERAL EXPRESS

Larissa A. Soccoli, Esquire
Kenyon & Kenyon
One Broadway
New York, NY  10004-1050

Re:    GTECH Corp. v. Scientific Games International, Inc., et al.,
        C.A. No. 04-138-JJF

Dear Larrisa:

Enclosed are documents and one CD that have been Bates numbered SGI104801-995, and marked "Confidential -- Outside Counsel's Eyes Only" in accordance with the Protective Order in this litigation.

Sincerely,

Rodger D. Smith

Enclosures

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GTECH CORPORATION,

        Plaintiff,

    v.

SCIENTIFIC GAMES INTERNATIONAL,
INC., SCIENTIFIC GAMES HOLDINGS
CORPORATION, SCIENTIFIC GAMES
FINANCE CORPORATION, and
SCIENTIFIC GAMES CORPORATION,

        Defendants.

C.A. No. 04-138-JJF

## SCIENTIFIC GAMES' SUPPLEMENTAL RESPONSES TO
## PLAINTIFF'S INTERROGATORIES NOS. 2 AND 7

        Defendants Scientific Games International, Inc., Scientific Games Holdings Corporation, Scientific Games Finance Corporation, and Scientific Games Corporation (collectively, "Scientific Games") hereby supplement their responses and object to plaintiff's Interrogatories Nos. 2 and 7 as follows:

### GENERAL OBJECTIONS

        1.    Scientific Games objects to the Interrogatories to the extent they seek information that is protected by the attorney-client privilege, work product immunity, or any other applicable privilege or immunity.

        2.    Scientific Games objects to the Interrogatories and the Instructions to the extent they seek to impose obligations not required under the Federal Rules of Civil Procedure or the Local Rules of the District of Delaware.

        3.    Scientific Games objects to the definition of "Scientific Games" as overly broad.

4.    Scientific Games objects to the definition of "TVM" as overly broad.

5.    Scientific Games objects to the definition of "Scientific Games' TVM" as overly broad to the extent it seeks to include products that have not been accused of infringement.

6.    Scientific Games objects to the Interrogatories to the extent they seek Scientific Games' confidential information.

7.    Scientific Games objects to the Interrogatories to the extent they seek production of confidential information of third parties.

8.    Scientific Games objects to the Interrogatories to the extent they seek information that is not relevant to the claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence.

9.    Scientific Games objects to the Interrogatories to the extent they are overly broad and unduly burdensome.

10.    Scientific Games objects to the Interrogatories to the extent they seek information not in the possession, custody, or control of Scientific Games.

11.    Scientific Games reserves the right to supplement its responses to the Interrogatories as appropriate.

The foregoing General Objections are incorporated into each of the Specific Responses to the Interrogatories.

2

(col. 4, ll. 56-63; col. 5, ll. 14-18).  The feeding and bursting mechanism disclosed in the '337 patent, and incorporated by reference into the '624 patent, also requires a burster block, burster motor, cable spool arrangement, and tensioning spring ('337 patent, col. 3, ll. 55-63; col. 13, ll. 23-32).

For at least the same reasons that the PlayCentral Kiosk does not have the "means for separating" of claim 20 of the '337 patent, the PlayCentral Kiosk does not have the "means for dispensing" of claim 18 of the '624 patent.  The PlayCentral Kiosk also does not have a "precise code wheel and detector arrangement" as described in the '337 patent, and as incorporated by reference into the '624 patent.

Individuals with knowledge of the design and operation of the PlayCentral Kiosk include:  Bill Behm, Tony Bartolone, Janine Whiteman, Vic Collucci and Mark Gilmore. Documents describing the design and operation of the PlayCentral Kiosk include: SGI104995; SGI043580-81; SGI011043-44; SGI007437-621; SGI009906-07; SGI010758-85; SGI016905-17028; SGI018897-19340.   In addition, the PlayCentral Kiosk is covered by U.S. Patent No. 5,950,898, U.S. Patent No. 6,609,644 B1, and U.S. Patent No. 6,669,071 B1.

## INTERROGATORY NO. 7:

For each claim of the Patents-in-Suit which Defendants contend is invalid, state with particularity the basis for such contention, including but not limited to, identifying with particularity each event or disclosure in a reference or publication forming in whole or in part the basis for such contention, each person with knowledge of the event or reference, and all documents relating to the contention, event or reference.

## RESPONSE TO INTERROGATORY NO. 7:

Scientific Games objects to Interrogatory No. 7 as seeking information that is protected by the attorney-client privilege, work product immunity or any other applicable privilege or immunity.  Scientific Games also objects to Interrogatory No. 7 as overly broad and

10

as seeking information not relevant to the claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence. Scientific Games also objects to Interrogatory No. 7 because GTECH has failed to disclose its proposed constructions of the asserted claims. Scientific Games will supplement its response to Interrogatory No. 7, as appropriate, after GTECH has disclosed its proposed constructions of the asserted claims, and after Scientific Games has had an opportunity to take additional discovery.

Subject to these and the General Objections, Scientific Games responds as follows with respect to the claims asserted by GTECH -- claims 20, 21 and 28 of the '337 patent and claim 18 of the '624 patent:

### A.    Claims 20 and 21 of the '337 patent

If claims 20 and 21 of the '337 patent are construed to cover Scientific Games' PlayCentral Kiosk, those claims are invalid under 35 U.S.C. § 102 in light of the Player-Activated Terminals ("PAT") that Scientific Games offered for sale and sold in the United States more than one year before the application for the '337 patent was filed.

Scientific Games' PATs were lottery ticket vending machines that included a housing with an outlet opening accessible to the ticket purchaser, a touch-screen for ordering multiple tickets in a single batch, and dispensing means for dispensing the instant lottery tickets through the outlet opening (*see* SGI002060-163; SGI104830-31; SGI104811-12; SGI105153; SGI106615). The PATs also had control and separating means that separated and dispensed each ticket individually, regardless of the number of tickets ordered in a batch (*see* SGI002121 ("Our dispenser is designed to cut each continuous form computer-produced ticket individually. Each ticket then drops into a hopper for removal by the customer.")).

11

As discussed above, in response to Interrogatory No. 2, the PlayCentral Kiosk does not have the "housing means" of claims 20 and 21. If the "housing means" limitation, however, is construed to cover the PlayCentral Kiosk, it would also cover the housing means in Scientific Games' prior art PATs.

The PlayCentral Kiosk also does not contain the claimed "means operable for ordering a plurality of tickets in a single batch." If "means ... for ordering," however, is construed to cover the PlayCentral Kiosk, it would also cover Scientific Games' prior art PATs.

The PlayCentral Kiosk does not have the claimed "means for separating." If the "means for separating," however, is construed to cover the separating and dispensing mechanism in the PlayCentral Kiosk, it also covers the separating and dispensing mechanism in the Scientific Games' prior art PATs. Indeed, the separating means used in the prior art PATs is more like the mechanism disclosed in the '337 patent than the PlayCentral Kiosk. The prior art PAT used a moving separation blade, blade drive means, and holding means for holding the ticket as it was being separated (see SGI002121; see also U.S. Patent No. 4,157,670 (to Herring)). Thus, if claims 20 and 21 of the '337 patent are construed to cover the PlayCentral Kiosk, they will also cover Scientific Games' prior art PATs and are invalid under 35 U.S.C. § 102.

In addition, if claims 20 and 21 of the '337 patent are construed so as to cover the PlayCentral Kiosk, they are also invalid under 35 U.S.C. § 102 and § 103 over U.S. Patent No. 4,716,799 (to Hartmann) alone, and in combination with Scientific Games' prior art PAT. Hartmann disclosed an automatic lottery ticket dispensing machine that included a housing, a control panel for ordering multiple tickets, a means for separating tickets from the strip, and a means for dispensing tickets through an outlet opening (see Hartmann '799 patent, Fig. 1, col. 2,

12

ll. 56-60, col. 3, ll. 41-63, col. 4, ll. 49-52). Hartmann also taught that the machine could be mounted as a user activated terminal, providing an outlet opening directly accessible to the purchaser (*see id.*, col. 2, ln. 68 - col. 3, ln. 2). To the extent Hartmann disclosed cutting, and not bursting, the necessary modification would have been obvious in light of Scientific Games' prior art PATs, which burst tickets (*see* SGI002121; *see also* U.S. Patent No. 4,157,670 (to Herring)).

If claims 20 and 21 are construed to cover Scientific Games' PlayCentral Kiosk, they are also invalid as obvious under 35 U.S.C. § 103 over the following references, alone or in combination: Scientific Games' prior art PATs; U.S. Patent No. 4,716,799 (to Hartmann); U.S. Patent No. 3,978,958 (to Zandstra); U.S. Patent No. 4,623,081 (to Hain et al.); U.S. Patent No. 4,157,670 (to Herring); U.S. Patent No. 4,094,451 (to Wescoat); U.S. Patent No. 3,894,669 (to Wescoat); U.S. Patent No. 4,401,249 (to Kadlecik et al.); and U.S. Patent No. 4,261,497 (to Roetter).

Claims 20 and 21 of the '337 patent may also be invalid under 35 U.S.C. § 102(b) as a result of public use or offers to sell its ITRs more than a year before the December 3, 1987 application for the '337 patent. GTECH's documents, including an attachment to Mr. Burr's September 25, 1992 Declaration in the Patent Office, refer to "various field tests since 1986." *See also* INLO-030513, INLO-035497, INLO-041626, INLO-200612 ("patents invalid showed publicly").

C.     **Claim 28 of the '337 patent**

If claim 28 of the '337 patent is construed to cover Scientific Games' PlayCentral Kiosk, that claim is invalid under 35 U.S.C. § 102 in light of Scientific Games' prior art PAT, for the reasons set forth with respect to claims 20 and 21.

13

If claim 28 of the '337 patent is construed to cover Scientific Games' PlayCentral Kiosk, it is also invalid under 35 U.S.C. § 102 and § 103 over U.S. Patent No. 3,978,958 (to Zandstra) and U.S. Patent No. 4,716,799 (to Hartmann) alone and in combination, and in combination with Scientific Games' prior art PAT.

Zandstra disclosed an automatic ticket dispenser "especially adapted to vend articles such as lottery tickets" (Zandstra '958 patent, col. 2, ll. 5-7). Zandstra disclosed drive means for moving a strip of tickets connected by perforations to a separation location (*id.*, col. 2, ll. 33-36). Zandstra also disclosed a means for separating tickets (*id.*, col. 4, ll. 11-15). Zandstra also disclosed an optical detector for detecting the distance that the strip of tickets has actually moved and producing an output signal to control the drive means and to control the ticket separation means (*id.*, col. 2, ll. 40-50).

Hartmann disclosed an automatic lottery ticket dispensing machine that uses rollers driven by a stepper motor to advance a strip of tickets to a separation location (Hartmann '799 patent, col. 2, ll. 56-58). Hartmann also disclosed a ticket separation means (*id.*, col. 4, ll. 4-9), and a position detecting means (*id.*, col. 7, ll. 15-17).

As discussed above in response to Interrogatory No. 2, the PlayCentral Kiosk does not have the claimed "means for severing" of claim 28. The means for separating tickets disclosed in Zandstra and Hartmann, however, are more like the mechanism disclosed in the '337 patent than the mechanism used in the PlayCentral Kiosk. Both Hartmann and Zandstra use moving blades, blade drive means, and holding means to separate the tickets. Thus, if the "means for separating" limitation of claim 28 is construed to cover the separating and dispensing mechanism in the PlayCentral Kiosk, it would also cover the separation mechanisms described in Zandstra and Hartmann. Finally, to the extent Zandstra and Hartmann disclosed cutting, and not

14

bursting, the necessary modification would have been obvious in light of Scientific Games' prior art PATs, which burst tickets (*see* SGI002121; *see also* U.S. Patent No. 4,157,670 (to Herring)).

Finally, if claim 28 of the '337 patent is construed to cover Scientific Games' PlayCentral Kiosk, it is also invalid as obvious under 35 U.S.C. § 103 over the following references, alone or in combination:    Scientific Games' prior art PATs; U.S. Patent No. 4,716,799 (to Hartmann); U.S. Patent No. 3,978,958 (to Zandstra); U.S. Patent No. 4,623,081 (to Hain et al.); U.S. Patent No. 4,157,670 (to Herring); U.S. Patent No. 4,094,451 (to Wescoat); U.S. Patent No. 3,894,669 (to Wescoat); U.S. Patent No. 4,401,249 (to Kadlecik et al.); and U.S. Patent No. 4,261,497 (to Roetter).

Claim 28 of the '337 patent may also be invalid under 35 U.S.C. § 102(b) as a result of a public use or offer to sell, for the same reasons set forth with respect to claims 20 and 21.

### C.    Claim 18 of the '624 patent

If claim 18 of the '624 patent is construed to cover Scientific Games' PlayCentral Kiosk, it is invalid under 35 U.S.C. § 102 and § 103 over Scientific Games' prior art PATs, which Scientific Games offered for sale and sold in the United States more than one year before the application for the '624 patent was filed. Scientific Games' prior art PATs were lottery ticket vending machines that included a housing, a video display screen viewable by a customer, a bill acceptor, and a dispensing mechanism for dispensing lottery tickets in a number corresponding to the amount of money input into the machine by a customer (*see* SGI002060-163; SGI104830-31; SGI104811-12; SGI105153; SGI106615).

As discussed above, in response to Interrogatory No. 2, the PlayCentral Kiosk does not display "a plurality of arrays of ticket images on a video screen." If, however, the

15

"video display means" limitation of claim 18 is construed to cover the PlayCentral Kiosk, it also covers Scientific Games' prior art PATs.    The PlayCentral Kiosk also does not contain the "means for dispensing" of claim 18.  The separation mechanism in the prior art PATs was more like the mechanism claimed in the '624 patent than the PlayCentral Kiosk.  The prior art PATs used a moving separation blade, blade drive means, and holding means for holding the ticket as it was being separated (*see* SGI002121; *see also* U.S. Patent No. 4,157,670).  Thus, if the "means for dispensing" limitation of claim 18 is construed to cover the separating and dispensing mechanism in the PlayCentral Kiosk, it also covers the separation mechanism used in Scientific Games' prior art PATs.

       If claim 18 of the '624 patent is construed to cover Scientific Games' PlayCentral Kiosk, it is also invalid under 35 U.S.C. § 103 as obvious in light of Scientific Games' prior art PATs in combination with the '337 patent.  The prior art PATs included a housing, a video display screen, a bill acceptor, and a mechanism for dispensing lottery tickets in a number corresponding to the amount of money input into the machine by a customer.  The '337 patent taught a mechanism for separating and dispensing lottery tickets.   In view of the stated advantages of the mechanism disclosed in the '337 patent, it would have been obvious to a person having ordinary skill in the art to combine Scientific Games' prior art PATs with the '337 patent.

       Claim 18 of the '624 patent may also be invalid under 35 U.S.C. § 102 and/or 35 U.S.C. § 103 in light of other prior art lottery ticket vending machines with video screens offered for sale and sold by Electro-Sport, Syntech, AmTote/General Instruments, IGT and Video Lottery Consultants.    *See, e.g.,* SGI105003-08; SGI105132; SGI105271; SGI105280-83; SGI105367; SGI105411; SGI105482; SGI105491; SGI105535-38; SGI105546; SGI105563;

SGI105568-69;  SGI105595-96;  SGI105618;  SGI105643;  SGI105919-20;  SGI105924;

SGI105988-91;  SGI106023;  SGI106064-68;  SGI106117-18;  SGI106651-52;  SGI106797;

SGI106836-37;  SGI106866;  SGI106874;  SGI106904-07;  SGI106913-14;  SGI106930;

SGI106938; SGI106954-55; SGI106235; SGI106236; SGI106298; SGI106603; SGI106607.

Finally, if the "means for dispensing" of claim 18 of the '624 patent is not the structure disclosed in the '337 patent, then claim 18 is invalid under 35 U.S.C. § 112 because the '624 patent does not disclose any other structure corresponding to the means for dispensing.

Individuals with knowledge of Scientific Games' prior art PATs include:  Bill Behm and Mark Hoffman.

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
Attorneys for Defendants Scientific Games
International, Inc., Scientific Games Holdings
Corporation, Scientific Games Finance
Corporation and Scientific Games Corporation

April 29, 2005
443944

17

<u>CERTIFICATE OF SERVICE</u>

I, Rodger D. Smith II, hereby certify that copies of the foregoing were caused to

be served on April 29, 2005, on the following in the manner indicated:

**BY HAND**

Josy W. Ingersoll
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899

**BY FEDERAL EXPRESS**

Thomas J. Meloro, Esquire
Kenyon & Kenyon
One Broadway
New York, NY  10004

Rodger D. Smith II

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| GTECH CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 04-138-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| SCIENTIFIC GAMES INTERNATIONAL, INC., | ) | |
| SCIENTIFIC GAMES HOLDINGS | ) | |
| CORPORATION, SCIENTIFIC GAMES | ) | |
| FINANCE CORPORATION, and SCIENTIFIC | ) | |
| GAMES CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF GTECH CORPORATION'S NOTICE OF DEPOSITION OF DEFENDANTS SCIENTIFIC GAMES INTERNATIONAL, INC., SCIENTIFIC GAMES HOLDINGS CORPORATION, SCIENTIFIC GAMES FINANCE CORPORATION AND SCIENTIFIC GAMES CORPORATION PURSUANT TO FED. R. CIV. P. 30(b)(6)

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiff, GTECH Corporation ("GTECH"), through its attorneys, will take the deposition upon oral examination of Defendants, Scientific Games International, Inc., Scientific Games Holdings Corporation, Scientific Games Finance Corporation, and Scientific Games Corporation (collectively "Scientific Games") commencing at 9:00 a.m. on April 8, 2005, and continuing from day to day thereafter until completed, at the law offices of KENYON & KENYON, One Broadway, New York, New York, 10004, or at any other time and place as may be mutually agreed to by counsel for the parties. Scientific Games shall designate one or more of its officers, directors, managing agents, or other persons who consent to testify on its behalf, and shall set forth for each person the matters on which they are to testify. The topics for examination listed are in the attached Schedule A.

The deposition will be taken before a notary public or other officer duly authorized to administer oaths and take testimony, and will be recorded by stenographic means, and/or audiotape(s) and/or videotape.

You are invited to attend.

Dated: March 29, 2005                 By _____

Josy W. Ingersoll (#1088)
Karen E. Keller (#4489)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: 302-571-6600
Facsimile: 302-571-1253

OF COUNSEL:

Thomas J. Meloro
Larissa A. Soccoli
Andrew L. Reibman
KENYON & KENYON
One Broadway
New York, New York 10004
Telephone: (212) 425-7200
Facsimile: (212) 425-5288

2

## SCHEDULE A

The instructions and definitions set forth in *Plaintiff GTECH Corporation's First Set of Requests for the Production of Documents and Things* are incorporated by reference herein and shall apply to this Notice of Deposition.

1. Conception, research, design, engineering, development, testing, manufacture, and/or operation of TVMs made, used, sold, or offered for sale by Scientific Games.

2. Conception, research, design, engineering, development, testing, manufacture, and/or operation of Scientific Games' PlayCentral Kiosk.

3. Conception, design, development, operation, manufacture, and/or testing of the ticket dispensing apparatus or "burster" used in Scientific Games' PlayCentral Kiosk.

4. Conception, design, development, testing, and operation of the customer interface for the Scientific Games' PlayCentral Kiosk, including the design, development, testing, and operation of any touch screen user interface screens.

5. Conception, design, source code, development, testing, and operation of any programs, code, software, or firmware which are part of or run on Scientific Games' PlayCentral Kiosk.

6. Conception, design, coding, documentation, development, testing, and operation of any programs, code, software, or firmware which are part of or run on Scientific Games' PlayCentral Kiosk and which are used to control or operate the ticket dispensing apparatus or "burster."

7. Conception, design, coding, documentation, development, testing, and operation of any programs, code, software which are part of or run on Scientific Games' PlayCentral Kiosk and which are used to control or operate the touch screen user interface.

8. Conception, design, coding, documentation, development, testing, and operation of any procedures, programs, code, or software which are used to load or download graphical information, graphics files, and/or graphical display information on or to Scientific Games' PlayCentral Kiosk.

9. The format, creation, layout, and/or design of graphical information, graphics files, and/or graphical display information for use on the Scientific Games' PlayCentral Kiosk, and any procedures and processes used to create such information or files.

10. Trials, pilots, and/or tests of PlayCentral Kiosk by any state lottery, foreign lottery, or other Scientific Games customer, including field test results, maintenance, or defect correction issues.

11. Trial, pilot, test deployment, and/or field testing of the PlayCentral Kiosk by, with, or for the Pennsylvania Lottery Corporation, including field test results, maintenance, or defect correction issues.

12. Trial, pilot, test deployment, and/or field testing of the PlayCentral Kiosk by, with, or for the Georgia Lottery Corporation, including field test results, maintenance, or defect correction issues.

13. Trial, pilot, test deployment, and/or field testing of the PlayCentral Kiosk by, with, or for the Colorado Lottery, including field test results, maintenance, or defect correction issues.

14. Trial, pilot, test deployment, and/or field testing of the PlayCentral Kiosk by, with, or for the Tennessee Education Lottery, including field test results, maintenance, or defect correction issues.

15. Bids, Proposals, Responses to Request for Proposals, and/or other offers by Scientific Games to any state or foreign lottery which included, featured, or offered TVMs.

16. Communications between Scientific Games and any state lottery, foreign lottery, or other Scientific Games' customer concerning TVMs.

17. Communications between Scientific Games and any state lottery, foreign lottery, or other Scientific Games' customer concerning PlayCentral Kiosk.

18. Bids, Proposals, Responses to Request for Proposals, and/or other offers by Scientific Games to any state or foreign lottery which included, featured, or offered Scientific Games' PlayCentral Kiosk.

19. Negotiations, contracts and/or agreements between Scientific Games and any state lottery, foreign lottery, or other Scientific Games customer for the purchase, sale, lease, delivery, use, or deployment of TVMs.

20. Negotiations, contracts and/or agreements between Scientific Games and any state lottery, foreign lottery, or other Scientific Games customer for the purchase, sale, lease, delivery, use, or deployment of Scientific Games' PlayCentral Kiosk.

5

21.    Negotiations, contracts and/or agreements between Scientific Games and any state lottery, foreign lottery, or other Scientific Games customer, where the contracts or other agreements permit or include as an option the sale, lease, purchase, use, or deployment of Scientific Games' PlayCentral Kiosk.

22.    Negotiations, contracts and/or agreements between Scientific Games and the Colorado Lottery that concern TVMs.

23.    Negotiations, contracts and/or agreements between Scientific Games and the Colorado Lottery that concern Scientific Games' PlayCentral Kiosk.

24.    Negotiations, contracts and/or agreements between Scientific Games and the Georgia Lottery Corporation that concern TVMs.

25.    Negotiations, contracts and/or agreements between Scientific Games and the Georgia Lottery Corporation that concern Scientific Games' PlayCentral Kiosk.

26.    Negotiations, contracts and/or agreements between Scientific Games and Pennsylvania Lottery Corporation that concern TVMs.

27.    Negotiations, contracts and/or agreements between Scientific Games and Pennsylvania Lottery Corporation that concern Scientific Games' PlayCentral Kiosk.

28.    Negotiations, contracts and/or agreements between Scientific Games and Tennessee Education Lottery Corporation that concern TVMs.

29.    Negotiations, contracts and/or agreements between Scientific Games and Tennessee Education Lottery Corporation that concern Scientific Games' PlayCentral Kiosk.

6

36.  Competitors and/or competition in the market place for TVMs sold or offered for sale by Scientific Games, including but not limited to: (a) the identity of each actual and forecasted competitor in the market place; (b) and the market share of each competitor, (c) the market share of Scientific Games in relation to each of its competitors; (d) documents concerning competition between Scientific Games and GTECH or any third party in the market place for TVMs; and (e) any studies, analyses or evaluations made by or on behalf of Scientific Games regarding its market share of the TVM market.

37.  Competitors and/or competition in the market place for the PlayCentral Kiosk sold or offered for sale by Scientific Games, including but not limited to: (a) the identity of each actual and forecasted competitor in the market place; (b) and the market share of each competitor, (c) the market share of Scientific Games in relation to each of its competitors; (d) documents concerning competition between Scientific Games and GTECH or any third party in the market place for PlayCentral Kiosk; and (e) any studies, analyses or evaluations made by or on behalf of Scientific Games regarding its market share in the market for PlayCentral Kiosk.

38.  Any products which Scientific Games believes or alleges are acceptable, non-infringing substitutes or alternatives to the inventions claimed in the patents-in-suit, including: (a) all reasons why such products would be acceptable to the customers who use Scientific Games' TVMs and/or PlayCentral Kiosks; (b) all reasons why such products would be available to Scientific Games; (c) all reasons why such products would not be infringing the patents-in-suit; (d) all attempts by

8

Scientific Games to implement such a system; and (e) any successes and failures in implementing such a system.

39. Scientific Games' pricing, costs, expenses, revenues, and profits attributable to the sale, lease, deployment, delivery, or operation of TVMs, and the basis and method for determining such pricing, costs, expenses, revenues, and profits

40. Scientific Games' pricing, costs, expenses, revenues, and profits attributable to the sale, lease, deployment, delivery, or operation, or maintenance of Scientific Games' PlayCentral Kiosk, the basis and method for determining such pricing, costs, expenses, revenues, and profits.

41. Any comparisons between any of Scientific Games' TVMs and GTECH's or Interlott's TVMs.

42. The values of Scientific Games' TVMs and/or PlayCentral Kiosk to Scientific Games, investors in Scientific Games, or any other third party, including: (any opinions and/or analyses ascribing overall value or worth to Scientific Games' TVMs and/or PlayCentral Kiosks; (b) the methods used in such valuations, studies and analyses; (c) the benefits provided to Scientific Games because of the operation and use of such TVMS and/or PlayCentral Kiosk; (d) the increase in customer value attributable from the operation and use of such TVMs and/or PlayCentral Kiosks; (e) any impact on Scientific Games' business as a result of the operation and use of such TVMs and/or PlayCentral Kiosks; and (f) any impact on any competitor's business, including GTECH, as a result of the operation and use of such TVMS and PlayCentral Kiosks.

30. Delivery to, deployment by, or use of PlayCentral Kiosk by any state lottery, foreign lottery, or other Scientific Games customer, including dates and numbers of machines actually deployed and/or delivered, and dates and numbers of machines planned, committed, and/or contracted for delivery.

31. Scientific Games' revenue, costs, expenses, and profits or losses (gross and net), including forecasted and actual revenue, costs, expenses, and profits and losses generated by Scientific Games' PlayCentral Kiosk; and how such revenue, costs, expenses, and profits or losses are accounted for and reported, including but not limited to Scientific Games' sales, accounting, and financial systems.

32. Scientific Games' revenue, costs, expenses, and profits or losses (gross and net), including forecasted and actual revenue, costs, expenses, and profits and losses generated by Scientific Games' TVMs; and how such revenue, costs, expenses, and profits or losses are accounted for and reported, including but not limited to Scientific Games' sales, accounting, and financial systems.

33. Marketing, promotion, advertising, and offering for sale of TVMs by Scientific Games.

34. Marketing, promotion, advertising, and offering for sale of Scientific Games' PlayCentral Kiosk.

35. The market(s) for instant ticket vending or dispensing machines, the market(s) for products covered by the Patents-in-Suit, and the market(s) for Scientific Games' PlayCentral Kiosk, and any market research, studies, or analyses, competitive analysis, sales forecasts, strategic or business plans concerning those markets.

7

43.    The reasons for launching each version of Scientific Games' PlayCentral Kiosk, including any business plans, revenue forecasts, projections, reports, proposals, studies, market research, or business models performed by or on behalf of Scientific Games or any third party.

44.    The licenses or agreements entered into by Scientific Games, including (a) the terms of such licenses or agreements; (b) the purposes for entering into such licenses or agreements; (c) Scientific Games' licensing policies, whether formal or informal, relating to such licenses or agreements; and (d) all documents relating to licenses pursuant to which Scientific Games pays or received royalties.

45.    The licenses or agreements entered into by Scientific Games concerning TVMs, including (a) the terms of such licenses or agreements; (b) the purposes for entering into such licenses or agreements; (c) Scientific Games' licensing policies, whether formal or informal, relating to such licenses or agreements; and (d) all documents relating to licenses pursuant to which Scientific Games pays or received royalties.

46.    The licenses or agreements entered into by Scientific Games concerning PlayCentral Kiosk including (a) the terms of such licenses or agreements; (b) the purposes for entering into such licenses or agreements; (c) Scientific Games' licensing policies, whether formal or informal, relating to such licenses or agreements; and (d) all documents relating to licenses pursuant to which Scientific Games pays or received royalties.

47.    Agreements to indemnify, hold harmless or defend against infringement of the patents-in-suit, and the terms of such agreements.

10

48.    Scientific Games' first knowledge or awareness of: (i) the application that resulted in the '337 patent; (ii) the '337 patent; (iii) the application that resulted in the '624 patent; and/or (iv) the '624 patent, and the circumstances concerning such awareness, including the identification of the name and address of the individual(s) who first became aware, the date such individual(s) first became aware, any actions taken following such awareness and the identification (including by production number) of all documents referring or relating to any of the foregoing.

49.    All communications made to or by Scientific Games that refer or relate to Scientific Games' awareness of: (i) the application that resulted in the '337 patent; (ii) the '337 patent; (iii) the application that resulted in the '624 patent; and/or (iv) the '624 patent.

50.    All opinions and draft opinions of counsel, both written and oral, communicated to Scientific Games relating to the infringement or non-infringement, validity or invalidity, or enforceability or unenforceability of any claim of the patents-in-suit, including the identification of all authors and recipients thereof, the identification of all individuals who provided information in connection with the preparation of such opinions, and any reliance or lack of reliance thereof by Scientific Games on such opinions.

51.    All communications made to or by Scientific Games concerning any opinions or draft opinions of counsel, both written and oral, communicated to Scientific Games that refer or relate to the infringement or non-infringement, validity or invalidity, or enforceability or unenforceability of any claim of the patents-in-suit,

including but not limited to communications made prior to the dates such opinions and draft opinions were made in connection with the preparation of such opinions and draft opinions, communications made with such opinions and draft opinions, and communications made subsequent to the dates such opinions and draft opinions were provided to Scientific Games.

52. All work and other activities engaged in by Scientific games in response to Scientific Games' awareness of: (i) the application that resulted in the '337 patent; (ii) the '337 patent; (iii) the application that resulted in the '624 patent; and/or (iv) the '624 patent, including but not limited to any attempt by Scientific Games to determine whether any of Scientific Games' products or services infringed any claim of the patents-in-suit.

53. Any attempt by Scientific Games to design around either of the Patents-in-Suit.

54. Any comparisons of Scientific Games' PlayCentral Kiosk with TVMs made, sold, or offered for sale by GTECH and/or Interlott.

55. Communication to or from Scientific Games personnel regarding this lawsuit and/or the Patents-in-Suit, including any communications from or to customers by Scientific Games personnel involved in sales, marketing, public relations, or government relations.

56. Communications between Scientific Games and On-Point Technologies concerning TVMs.

57. Communications between Scientific Games and Interlott concerning TVMs.

58. The conception, design, development, manufacture, operation, sale, offer for sale, and use of the "Player Activated Terminal" identified in Scientific

12

Games' Response to GTECH's Interrogatory No. 7, which Scientific Games alleges was "offered for sale and sold more than one year before the application for the '624 patent was filed," and any other substantially similar terminal.

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> Wilmington, DE  19801

I further certify that on March 29, 2005,  I caused a copy of the foregoing document to be served by hand-delivery on the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> Wilmington, DE  19801

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
kkeller@ycst.com

*Attorneys for GTECH Corporation*

WP3:1098484.1                                                                 63055.1001

# EXHIBIT D

**REDACTED**